Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

IN THE CIRCUIT COURT OF FRANKLIN COUNTY
STATE OF MISSOURI

| | | |
|---|---|---|
| KIM DAMES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 19AB-CC00264 |
| v. | ) | |
| | ) | Division VI |
| MERCY HOSPITALS | ) | |
| EAST COMMUNITIES, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant Mercy Hospitals East Communities ("Mercy") moves pursuant to Rule 74.04 for summary judgment as to all of the claims asserted by Plaintiff Kim Dames ("Dames") in her petition. In support of its motion, Mercy states:

1. Mercy is entitled to summary judgment as to Dames' claims because:

    a. The four written contracts at issue in this case (the "Contracts") and Missouri insurance law govern the parties' rights and obligations as to the medical treatment that Dames received from Mercy;

    b. Mercy acted in accordance with the Contracts and Missouri insurance law; and

    c. Mercy was correctly reimbursed for Dames' treatment under the Contracts and Missouri insurance law.

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

2.    The four written Contracts that apply to Dames' treatment are:

a.    <u>Dames' automobile insurance policy with Acuity, A Mutual Insurance Company ("Acuity")</u>. Mercy SJ Ex. 2. This policy (the "Acuity Policy") contains medical payments coverage that is the primary coverage for Dames' treatment.

b.    <u>Dames' individual health insurance policy with Anthem Blue Cross and Blue Shield ("Anthem")</u>. Mercy SJ Ex. 3. This policy (the "Anthem Policy") is the secondary coverage for Dames' treatment because of the Anthem Policy's variable deductible/coordination of benefits provision and Dames' Acuity medical payments coverage.

c.    <u>Dames' written agreement with Mercy to obtain treatment (the "Consent and Agreement")</u>. Mercy SJ Ex. 1. Under Section 3 of the Consent and Agreement, Dames assigned to Mercy all of her "rights under all insurance and benefit plan documents," including her rights under her Acuity medical payments insurance coverage.

d.    <u>Mercy's provider agreement with Anthem (the "Anthem Provider Agreement")</u>. Mercy SJ Ex. 4. Under Section 2.8 of the Anthem Provider Agreement, Mercy was entitled to bill and collect from Acuity the amount due under the Acuity Policy for Dames' treatment ($5,000) without regard to any negotiated rates between Mercy and Anthem because Acuity is the primary payor for Dames' treatment.

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

3. The applicable Missouri insurance law consists of:

    a. 20 CSR 500-2.100(2)(C). Under this Missouri insurance regulation, Dames' Acuity medical payments coverage is primary coverage.

    b. 20 CSR 400-2.060(7). Under this Missouri insurance regulation, Dames' Anthem Policy lawfully contains the variable deductible/coordination of benefits provision that rendered the Anthem Policy secondary coverage for Dames' treatment because of her Acuity medical payments coverage.

    c. RSMo § 376.427. This Missouri insurance statute enforces Dames' assignment to Mercy of her benefits under her Acuity medical payments coverage.

4. Dames was involved in an auto accident.

5. She chose to obtain medical treatment at Mercy Hospital Washington, a hospital operated by Mercy.

6. Dames was covered for her treatment under: (1) the medical payments coverage of her Acuity automobile insurance policy; and (2) her Anthem health insurance policy.

7. Under the plain terms of the two insurance policies and Missouri insurance regulations (20 CSR 500-2.100(2)(C) and 20 CSR 400-2.060(7)), the Acuity Policy is the primary coverage and Acuity is the primary payor for Dames' treatment, and the Anthem Policy is the secondary coverage and Anthem is the secondary payor for her treatment.

- 3 -

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

8.      Thus, Acuity was required to pay first for Dames' treatment, and it did so. *See, e.g., Planet Ins. Co. v. Ertz*, 920 S.W.2d 591, 593 (Mo. App. W.D. 1996) ("Primary insurance first pays toward the loss.").

9.      As part of her written agreement with Mercy to obtain treatment (the Consent and Agreement), Dames assigned to Mercy all of her "rights under all insurance and benefit plan documents" and authorized "direct payment to" Mercy "of all insurance and plan benefit payments for services provided." Mercy SJ Ex. 1, § 3.

10.     Dames' assignment of benefits included her rights under the medical payments coverage of her Acuity Policy, as expressly allowed under RSMo § 376.427.

11.     Her assignment of benefits passed all of her title and interest in the Acuity medical payments coverage to Mercy and divested her of all right of control over the coverage. *Marvin v. State Farm Mut. Auto. Ins. Co.*, 894 S.W.2d 712, 713 (Mo. App. W.D. 1995) (enforcing assignment of patient's medical payments coverage); *Saint Luke's Hosp. of Kansas City v. Benefit Mgmt. Consultants, Inc.*, No. WD 83388, 2021 WL 1375846, at *7 (Mo. App. W.D. Apr. 13, 2021). "When [Dames] assigned to [Mercy] her rights to [Acuity's] insurance payments, [Mercy] gained all of [Dames'] rights as beneficiary of the [Acuity] insurance policy's proceeds. [Dames] no longer had title or an interest to the insurance proceeds; [Mercy] became the insured for the purposes of receiving the medical benefits." *Marvin*, 894 S.W.2d at 713.

12.     As Dames authorized in her assignment of *all* insurance benefits to Mercy, and as expressly allowed under Section 376.427.2, Mercy submitted a claim to Acuity for Dames' medical treatment.

- 4 -

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

13.     As required under the Acuity Policy (the primary coverage for Dames' treatment) and Section 376.427.2, Acuity promptly paid $5,000 (the coverage limit) to Mercy without question.

14.     Because Acuity is the primary payor for Dames' treatment, Mercy was expressly allowed under Section 2.8 of its provider agreement with Anthem (the Anthem Provider Agreement) to bill Acuity and accept Acuity's $5,000 payment for Dames' treatment.

15.     The Anthem Provider Agreement includes a negotiated rate (called the "Company Rate") as between Mercy and Anthem for treatment provided by Mercy to individuals covered by Anthem.[1] But the Anthem Provider Agreement expressly states that Mercy could pursue and collect more than the Anthem negotiated rate from any other insurance carrier that provided primary coverage to Dames (i.e., Acuity):

- Section 2.8.1 provides: "If Plan [Anthem] is other than the primary payor, Provider [Mercy] is not precluded from accepting amounts in excess of the Company Rate from the primary payor [Acuity]."

- Section 2.8.3 provides: "Except as provided in this section [2.8], this Agreement does not prohibit Provider [Mercy] from pursuing any available legal remedy, including, but not limited to, collecting from any insurance carrier [Acuity] providing coverage to a Covered Individual [Dames]."

---

[1] The "Company Rate" between Mercy and Anthem for Dames' treatment was $576.

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

- Section 9.9 provides: " Coordination of Benefits. Except as otherwise required under state and federal law, Provider [Mercy] shall cooperate with Plan [Anthem] regarding coordination of benefits…."

Mercy SJ Ex. 4.

16.    Because Acuity is the primary payor, Mercy was entitled under the Anthem Provider Agreement to bill Acuity and collect from Acuity the amount owed unde the Acuity Policy ($5,000) without regard to any negotiated rate between Mercy and Anthem.[2]

17.    Acuity's $5,000 payment was the entire reimbursement that Mercy received and was entitled to receive for Dames' treatment under the applicable Contracts. As a result of Acuity's payment, nothing was owed for Dames' treatment by Anthem (the secondary payor) or Dames, and Dames has paid nothing to Mercy out of her own pocket for her treatment. In sum, her insurance fully covered the cost of her treatment at Mercy.

18.    Nevertheless, Dames has sued Mercy for billing and collecting from Acuity for her treatment. She claims that Mercy violated the Missouri Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. § 407.010 *et seq.* (Count I), was unjustly enriched (Count II), and is liable to her for money had and received (Count III) because Mercy billed and

---

[2] Acuity has no provider agreement with Mercy and did not, and could not, invoke the Anthem negotiated rate because Acuity is not a party to the Anthem Provider Agreement and the Anthem negotiated rate only applies to Anthem.

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

collected $5,000 from Acuity for her treatment (thereby exhausting her medical payments coverage) instead of billing and collecting only $576 from Anthem and Dames.[3]

19.    Each of Dames' claims is based on her baseless allegations that Mercy was required under the Anthem Provider Agreement to accept a negotiated rate of $576 as payment in full for her treatment and could not collect more than $576 for her treatment from Acuity or anyone else:

- Petition ¶ 4: "[D]efendant is contractually required to submit said bills to health insurance, accept payment from health insurance in satisfaction of the bill, not seek payments from any additional sources, and hold the patient harmless from any amounts owed other than co-pays or deductibles."

- Petition ¶ 9: "Defendant is required to honor a contractual discount with their patients' health insurance and accept discounted payment from health insurance in full satisfaction of the patients' debts."

- Petition ¶ 10: "Defendant is precluded by its contracts with private health insurance from seeking payment for covered services from other sources, including from the patient directly, [or seeking] medical benefits from the patients' automobile insurer…."

---

[3] In Count IV of her petition, Dames asserts a purported claim for "declaratory judgment and injunctive relief." In her opposition to Mercy's motion to dismiss, Dames stipulated that Count IV is not a separate and independent claim, but asserts "alternative remedies under her substantive claims" in Counts I-III. Pl.'s Opp. to Mot. to Dismiss, p. 2, n.1 (filed Aug. 7, 2020).

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

20.     These allegations, which underlie each of Dames' claims, are simply untrue in light of the unambiguous provisions of the actual Anthem Provider Agreement. Under the express terms of the Anthem Provider Agreement, Mercy was authorized to bill and collect $5,000 from Acuity for Dames' treatment.

21.     Accordingly, each of Dames' claims fails as a matter of law, and Mercy is entitled to summary judgment.

22.     This case is essentially identical to *Hoops v. Med. Reimbursements of Am., Inc.*, No. 4:16-CV-01543-AGF, 2018 WL 1138464, at *11-14 (E.D. Mo. Mar. 2, 2018). In that case, the court granted summary judgment to Mercy on nearly identical claims brought by another Mercy patient who signed the same Consent and Agreement at issue here. The court held that under the same Anthem Provider Agreement at issue here, Mercy was allowed to bill and collect $5,000 from the patient's automobile medical payments insurer (State Farm) for the patient's treatment, even though the negotiated rate under the Anthem Provider Agreement was only $1,045, because State Farm was the primary payor and the patient's health insurer (an Anthem affiliate) was the secondary payor. *Id.*

23.     As in *Hoops*, the Court should enter summary judgment in favor of Mercy as to each of Dames' claims.

24.     In accordance with Rule 74.04(c)(1), attached to this motion is a statement of uncontroverted material facts.

25.     In accordance with Rule 74.04(c)(1), Mercy submits its legal memorandum explaining why summary judgment should be granted.

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

ACCORDINGLY, Mercy requests that the Court enter summary judgment in favor of Mercy and against Dames as each count in Dames' petition, assess all costs against Dames, and grant all other relief to which Mercy is entitled.

Respectfully submitted,

THOMPSON COBURN LLP

By /s/ Jeffrey R. Fink
 Jeffrey R. Fink, #44963
 Thompson Coburn LLP
 One US Bank Plaza
 St. Louis, Missouri 63101-1611
 Telephone: 314.552.6000
 Facsimile: 314.552.7000
 jfink@thompsoncoburn.com

 Attorneys for Defendant
 Mercy Hospitals East Communities

**Certificate of Service**

The undersigned hereby certifies that on June 15, 2021, a true and correct copy of the foregoing was served on all counsel of record via the Missouri Court's electronic filing system.

/s/ Jeffrey R. Fink

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

IN THE CIRCUIT COURT OF FRANKLIN COUNTY
STATE OF MISSOURI

| | | |
|---|---|---|
| KIM DAMES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 19AB-CC00264 |
| v. | ) | |
| | ) | Division VI |
| MERCY HOSPITALS | ) | |
| EAST COMMUNITIES, | ) | |
| | ) | |
| Defendant. | ) | |

**STATEMENT OF UNCONTROVERTED MATERIAL FACTS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant Mercy Hospitals East Communities ("Mercy") submits the following statement of uncontroverted material facts in support of its motion for summary judgment.

**Exhibits**

The following exhibits are attached to this statement of uncontroverted material facts and cited in this statement as "Mercy SJ Ex. __."

Exhibit 1 -- Plaintiff's Response to Defendant's First Request for Admissions with Plaintiff's Consent and Agreement with Mercy

Exhibit 2 -- Plaintiff's Acuity Policy (Produced by Plaintiff)

Exhibit 3 -- Business Records Affidavit of Dianna Moeller (Anthem Blue Cross and Blue Shield) with Plaintiff's Anthem Policy

Exhibit 4 -- Affidavit of James Mazzola (Mercy) with Provider Agreement Between Mercy and Anthem

Exhibit 5 -- Affidavit of Kristina Jolley (Medical Reimbursements of America, Inc.)

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Exhibit 6   --    January 28, 2016 Email from Kathryn Theriot (Acuity) to Plaintiff with Mercy's Claim to Acuity for Plaintiff's Treatment (Produced by Plaintiff)

Exhibit 7   --    Missouri Secretary of State Registrations of Fictitious Name "Anthem Blue Cross and Blue Shield."

Exhibit 8   --    Plaintiff's Response to Defendant's First Set of Interrogatories

Exhibit 9   --    Plaintiff's Deposition

**Statement of Uncontroverted Material Facts**

**A.    The parties.**

1.    Plaintiff Kim Dames ("Dames") has been a resident of Warren County, Missouri, for the past 20 years. Mercy SJ Ex. 9, Plaintiff's Dep. 14:22-15:16. (In her petition (¶ 21), Dames erroneously alleges that she is a resident of Franklin County. *Id.*)

2.    Mercy is a Missouri nonprofit corporation that provides health care services at various facilities, including Mercy Hospital Washington in Washington, Missouri. Pet. ¶¶ 1, 22.

**B.    Dames' treatment at Mercy.**

3.    On October 25, 2015, Dames was involved in an auto accident. Pet. ¶ 23.

4.    Dames chose to obtain medical treatment at Mercy Hospital Washington. Pet. ¶ 24.

5.    When she obtained treatment, Dames signed a contract with Mercy entitled "Consent and Agreement - Physician Services and Hospital Services" (the "Consent and Agreement"). Mercy SJ Ex. 1, Plaintiff's Response to Defendant's First Request for

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Admissions, ¶ 1 and Consent and Agreement (attached to Defendant's First Request for Admissions).

6.    Section 3 of the Consent and Agreement provides:

**Assignment of Insurance Benefits:** I assign to Mercy, my physician or other non-Mercy healthcare professional involved in my (or the patient's) care my (or the patient's) rights under all insurance and benefit plan documents, and authorize direct payment to each healthcare provider of all insurance and plan benefits payments for services provided to me (or the patient) by these providers. By paying my providers directly, my insurance company or employer is fulfilling its obligations to me (or the patient) under the health insurance policy, or the employer is fulfilling its obligations as required by law. I also agree that I (or the patient) am financially responsible for charges not paid according to this assignment.

Mercy SJ Ex. 1.

7.    Mercy's charges for Dames' treatment were $12,382.50. Pet. ¶ 25.

8.    Dames has paid nothing directly to Mercy out of her own pocket for her treatment at Mercy. Mercy SJ Ex. 9, Plaintiff's Dep. 65:1-10.

**C.    Dames' insurance coverage with Acuity.**

9.    Dames had insurance coverage for her treatment at Mercy under the medical payments coverage portion of an automobile insurance policy (the "Acuity Policy") issued by Acuity, A Mutual Insurance Company ("Acuity"). Pet. ¶ 34; Mercy SJ Ex. 8, Plaintiff's Response to Defendant's First Set of Interrogatories, Nos. 3-4; Mercy SJ Ex. 2, Plaintiff's Acuity Policy.

10.    The Acuity Policy contains an "Auto Medical Payments Coverage" endorsement to the "Business Auto Coverage Form" in the Acuity Policy. Mercy SJ Ex. 2, Acuity Policy at pages bates-labeled Dames, Kim 000060-61.

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

11.     Section 1 of the Auto Medical Payments Coverage endorsement in the Acuity Policy provides:

> **COVERAGE**.
>
> We will pay reasonable expenses incurred for necessary medical and funeral services to or for an *insured* who sustains *bodily injury* caused by an *accident*.

Mercy SJ Ex. 2, Acuity Policy at page bates-labeled Dames, Kim 000060 (emphasis in original).

12.     Dames owned the vehicle that was involved in the auto accident. Mercy SJ Ex. 9, Plaintiff's Dep. 24:19-23.

13.     Section IV.B.5.a. of the Business Auto Coverage Form in the Acuity Policy provides in pertinent part:

> **Other Insurance**
>
> For any covered *auto* you own, this Coverage Form provides primary insurance.

Mercy SJ Ex. 2, Acuity Policy at page bates-labeled Dames, Kim 000039 (emphasis in original).

14.     The Acuity Policy contains no provision: (a) stating that the medical payments coverage in the Acuity Policy is excess over Dames' commercial health insurance coverage; or (b) coordinating the Acuity Policy's benefits with any benefits under Dames' commercial health insurance coverage. Mercy SJ Ex. 2, Acuity Policy.

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

**D.    Mercy's billing and collection from Acuity for Dames' treatment.**

15.    Medical Reimbursements of America, Inc. ("MRA"), is a company that assists Mercy in collecting payment for treatment that Mercy provides to patients such as Dames who are involved in a motor vehicle accident. Mercy SJ Ex. 5, Affidavit of Kristina Jolley, ¶ 1.

16.    In November 2015, MRA learned about the existence of the Acuity Policy. Mercy SJ Ex. 5, Jolley Aff. ¶ 2.

17.    In November 2015 and again in January 2016, MRA submitted a claim to Acuity on behalf of Mercy seeking payment for Dames' treatment under any available medical payments coverage in the Acuity Policy. Mercy SJ Ex. 5, Jolley Aff. ¶ 3 and Exs. A-B to Jolley Aff.; Mercy SJ Ex. 8, Plaintiff's Response to Defendant's First Set of Interrogatories, No. 3.

18.    Mercy's claim to Acuity disclosed that Dames had commercial health insurance. Mercy SJ Ex. 5, Jolley Aff. ¶ 4 and Exs. A-B to Jolley Aff. (see Box 50, Line B); Mercy SJ Ex. 6, January 28, 2016 Email from Kathryn Theriot (Acuity) to Plaintiff with Mercy's Claim to Acuity for Plaintiff's Treatment.

19.    Acuity did not ask MRA or Mercy any questions about Mercy's claim or Dames' commercial health insurance. Mercy SJ Ex. 5, Jolley Aff. ¶ 5.

20.    Acuity did not object to Mercy's claim for Dames' treatment. Mercy SJ Ex. 5, Jolley Aff. ¶ 6.

21.    In January 2016, Acuity determined that it owed $5,000 to Mercy and paid $5,000 to Mercy for Mercy's treatment of Dames. Pet. ¶ 38; Mercy SJ Ex. 8, Plaintiff's

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Response to Defendant's First Set of Interrogatories, No. 3; Mercy SJ Ex. 5, Jolley Aff. ¶ 7.

### E.    Dames' insurance coverage with Anthem.

22.    Dames also had coverage for her treatment at Mercy under an individual health insurance policy (the "Anthem Policy") issued by Healthy Alliance Life Insurance Company (HALIC), which does business in Missouri under the trade name "Anthem Blue Cross and Blue Shield" ("Anthem"). Pet. ¶ 26; Mercy SJ Ex. 3, Business Records Affidavit of Dianna Moeller with Plaintiff's Anthem Policy; Mercy SJ Ex. 9, Plaintiff's Dep. 35:15-36:1; Mercy SJ Ex. 7, Missouri Secretary of State Registrations of Fictitious Name "Anthem Blue Cross and Blue Shield."

23.    The Anthem Policy states: "Benefits under the Plan, including the Deductible, may vary depending on other medical expense insurance you may have." Mercy SJ Ex. 3, Anthem Policy, fourth page.

24.    The Anthem Policy has a deductible of $3,000. Mercy SJ Ex. 3, Anthem Policy, p. M-8.

25.    The Anthem Policy contains the following provision:

**Variable Deductible (Coordination of Benefits)**

When a Member has other valid coverage, the applicable Deductible amount will be determined as follows. Other valid coverage means any group or individual hospital, surgical or medical insurance policy or medical practice or other prepayment plan or any other plan or program, whether insured or uninsured, or by reason of state or federal law, including automobile medical payment coverage.

The amount paid under other valid coverage for services received by a Member will be compared to the individual Deductible applicable to this

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Contract. If the amount paid by the other valid coverage is less than the individual Deductible under this Contract, We will calculate the Member's benefit as if there were no other valid coverage. If the amount paid by the other valid coverage is greater than the Deductible under this Contract, the amount paid by other valid coverage will replace and satisfy the individual Deductible under this Contract. We will then process the remaining amount of covered expenses, as specified by the other valid coverage, under the provisions of this Contract….

Mercy SJ Ex. 3, Anthem Policy, p. M-78.

### F.    Mercy's provider agreement with Anthem.

26.    At the time of Dames' treatment at Mercy, there was a provider agreement (the "Anthem Provider Agreement") between: (a) Mercy and Affiliates, LLC (a subsidiary of Mercy Health), on behalf of Mercy Hospitals East Communities and others; and (b) RightCHOICE Managed Care, Inc., an affiliate of HALIC that also does business in Missouri under the trade name "Anthem Blue Cross and Blue Shield." Mercy SJ Ex. 4, Mazzola Aff. ¶ 5 and Anthem Provider Agreement; Mercy SJ Ex. 7, Missouri Secretary of State Registrations of Fictitious Name "Anthem Blue Cross and Blue Shield."

27.    The Anthem Provider Agreement is the agreement between Mercy and Anthem concerning Dames' treatment at Mercy. Mercy SJ Ex. 4, Mazzola Aff. ¶ 6.

28.    Section 2.8 of the Anthem Provider Agreement is entitled "Payment in Full and Hold Harmless." Mercy SJ Ex. 4.

29.    Section 2.8.1 of the Anthem Provider Agreement states:

Except as expressly set forth herein, Provider agrees to accept as payment in full, in all circumstances, the applicable Company Rate whether such payment is in the form of a Cost Share, or a payment by Plan, or payment by another source. ***If Plan is other than the primary payor, Provider is not precluded from accepting amounts in excess of the Company Rate from the primary payor….***

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Mercy SJ Ex. 4 (emphasis added).

30.    Section 2.8.3 of the Anthem Provider Agreement states: "Except as provided in this section [2.8][1], this Agreement does not prohibit Provider from pursuing any available legal remedy, including, but not limited to, collecting from any insurance carrier providing coverage to a Covered Individual." Mercy SJ Ex. 4.

31.    Section 9.9 of the Anthem Provider Agreement states: " <u>Coordination of Benefits</u>. Except as otherwise required under state and federal law, Provider shall cooperate with Plan regarding coordination of benefits…." Mercy SJ Ex. 4.

**G.    Mercy did not assert any hospital lien against any claim that Dames may have against any tortfeasor.**

32.    Mercy did not assert any hospital lien against any claim that Dames may have against any tortfeasor. Mercy SJ Ex. 4, Mazzola Aff. ¶ 7; Mercy SJ Ex. 1, Plaintiff's Response to Defendant's First Request for Admissions, ¶ 2.

---

[1] Section 2.8.3 refers to Section 2.7, but this reference is a typographical error and should be to Section 2.8.

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Respectfully submitted,

THOMPSON COBURN LLP

By /s/ Jeffrey R. Fink

    Jeffrey R. Fink, #44963
    Thompson Coburn LLP
    One US Bank Plaza
    St. Louis, Missouri 63101-1611
    Telephone: 314.552.6000
    Facsimile: 314.552.7000
    jfink@thompsoncoburn.com

    Attorneys for Defendant
    Mercy Hospitals East Communities

## Certificate of Service

The undersigned hereby certifies that on June 15, 2021, a true and correct copy of the foregoing was served on all counsel of record via the Missouri Court's electronic filing system and was sent by electronic mail in PDF and Word formats to Bradford B. Lear at lear@learwerts.com, Todd C. Werts at werts@learwerts.com, Mark Brinkman at mark@attorneysrbf.com, and Charles R. Wooten at charleswooten@rwzlaw.com.

                    /s/ Jeffrey R. Fink

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

IN THE CIRCUIT COURT OF FRANKLIN COUNTY
STATE OF MISSOURI

KIM DAMES,                              )
                                       )
        Plaintiff,                     )
                                       )        Case No. 19AB-CC00264
v.                                     )
                                       )        Division VI
MERCY HOSPITALS                        )
EAST COMMUNITIES, d/b/a                )
Mercy Hospital Washington,             )
                                       )
        Defendant.                     )

PLAINTIFF'S RESPONSE TO
DEFENDANT'S FIRST REQUEST FOR ADMISSIONS TO PLAINTIFF

COMES NOW Plaintiff Kim Dames, by and through her undersigned attorneys of

record, and submits the following responses to Defendant's First Request for Admissions to

Plaintiff:

1.      Attached to this First Request for Admissions as Exhibit 1 is a true and
accurate copy of a Consent and Agreement document that you signed on October 25, 2015,
in connection with receiving medical treatment at Mercy Hospital Washington.

**RESPONSE:** Admitted.

2.      Mercy did not assert any lien upon any claims that you may have against
anyone arising from the auto accident in which you were injured on October 25, 2015.

**RESPONSE:** Plaintiff is without sufficient information to respond to this request for

admission. Plaintiff does admit that Mercy did not collect on any lien arising from the October

2015 auto accident, but Plaintiff is without sufficient information to admit or deny a

statement regarding Mercy's intentions in asserting any liens, its statements to Plaintiff's

insurers, or the like.

Mercy SJ Exhibit 1

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

3.      Mercy did not demand payment directly from you for your medical treatment at Mercy Hospital Washington on October 25, 2015.

**RESPONSE:** Denied. After the contractual adjustment, Plaintiff owed $576 to Mercy. Mercy then demanded payment directly from Plaintiff in that Mercy demanded from Plaintiff's auto insurance company – and Plaintiff's auto insurance company did pay to Mercy – Plaintiff's Medical Payments Coverage in the amount of $5,000. This money was Plaintiff's property to which Mercy was not entitled. Mercy then kept the entire $5,000.

4.      You have not directly made any payment to Mercy for your medical treatment at Mercy Hospital Washington on October 25, 2015.

**RESPONSE:** Denied. As stated in response to Request for Admission #3, Plaintiff did make direct payment to Mercy in that Mercy demanded and received Plaintiff's Medical Payments Coverage from Plaintiff's auto insurance company. This resulted in Mercy receiving Plaintiff's property to which it was not entitled.

Mercy SJ Exhibit 1

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Respectfully submitted,

LEAR WERTS LLP

/s/ Todd C. Werts
Bradford B. Lear, Mo. Bar No. 53204
Todd C. Werts, Mo. Bar No. 53288
Anthony J. Meyer, Mo. Bar No. 71238
103 Ripley Street
Columbia, MO 65201
Telephone:  573-875-1991
Facsimile:  573-279-0024
Email:  lear@learwerts.com
Email:  werts@learwerts.com
Email:  meyer@learwerts.com

ROBINSON BRINKMANN & FULFORD LLC
Mark E. Brinkmann, Mo. Bar No. 49950
24 S. Church St.
Union, MO  63084
T: 636-583-7908
F: 636-583-7908
E: mark@attorneysrbf.com

ROBERTS, WOOTEN & ZIMMER, LLC
Charles R. Wooten, Mo. Bar No. 51250
10438 Business 21
Hillsboro, MO  63050
T: 636-797-2693
F: 636-789-4205
E: charleswooten@rwzlaw.com

COUNSEL FOR PLAINTIFF

CERTIFICATE OF SERVICE

The above was filed with the Court's Case.net system on this 26th day of February, 2021.

That system will serve copies on all those registered for service therein.

/s/ Todd C. Werts

3

Mercy SJ Exhibit 1

Case: 4:22-cv-01360-SEP   Doc. #: 1-6   Filed: 12/20/22   Page: 22 of 271 PageID #: 177

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Respectfully submitted,

THOMPSON COBURN LLP

By /s/ Jeffrey R. Fink
   Jeffrey R. Fink, #44963
   Thompson Coburn LLP
   One US Bank Plaza
   St. Louis, Missouri 63101-1611
   Telephone: 314.552.6000
   Facsimile: 314.552.7000
   jfink@thompsoncoburn.com

   Attorneys for Defendant
   Mercy Hospitals East Communities

## Certificate of Service

The undersigned hereby certifies that on January 27, 2021, a true and correct copy of the foregoing was sent by electronic mail in PDF and Word formats to Bradford B. Lear at lear@learwerts.com, Todd C. Werts at werts@learwerts.com, Mark Brinkman at mark@attorneysrbf.com, and Charles R. Wooten at charleswooten@rwzlaw.com.
.

               /s/ Jeffrey R. Fink

10029097.1

Mercy SJ Exhibit 1

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM



Page 1

## Consent and Agreement
## Physician Services and Hospital Services

Patient Name:_____

Date of Birth:_____

1. **Annual Consent for Services:** I consent to the services that may be performed by a Mercy Health ("Mercy") physician or non-physician provider ("provider") or facility. I understand I can withdraw this consent at any time. This consent and agreement applies to any provider services I may obtain from Mercy hospital or from a hospital-based clinic location.

2. **Financial Agreement:** I guarantee and agree to pay for all goods and services provided to me or the patients named above at the rates listed in Mercy's Charge Description Master as of the date of treatment, unless I am entitled to pay a different amount under my (or the patient's) health insurance plan or my (or the patient's) status as a Medicare or Medicaid beneficiary. Should an account be referred to an attorney or collection agency for collection, I will pat attorney's fees and collection expenses. Mercy will provide a medical screening exam to anyone in need of emergency medical treatment, regardless of ability to pay.

3. **Assignment of Insurance Benefits:** I assign to Mercy, my Physician or other non –Mercy healthcare professionals involved in my (or the patient's) care my (or the patient's) rights under all insurance and benefit plan documents, and authorize direct payment to each healthcare provider of all insurance and plan benefits payments for services provided to me (or the patient) by these providers. By paying my provider directly, my insurance company or employer is fulfilling its obligations to me (or the patient) under the health insurance policy or the employer is fulfilling its obligations as required by law. I also agree that I (or the patient) am financially responsible for charges not paid according to the assignment.

4. **Medicare Assignment:** I certify that the information given by me in applying for payment from any third party payor, including payment under Title XVIII of the Social Security Act, is correct. I request that payment of authorized benefits be made in my (or the patient's) behalf, and I authorize the Social Security Administration Office of the Department of Health and Human Services to release information regarding my (or the patient's) eligibility for coverage under Medicare Part A and Part B, including but not limited to the effective date of such coverage. I also authorize Mercy to release to the Social Security Administration or its intermediaries or carriers any information needed for this or a related Medicare claim.

5. **Legal Relationship between Hospital and Provider:** I understand the when I am hospitalized, I am under the care and supervision of my attending provider, and it is the responsibility of the hospital and nursing staff to carry out his/her instructions. It is the responsibility of my provider of surgeon to obtain my informed consent, when required, for specific medical or surgical treatment, special diagnostic or therapeutic procedures, or hospital services provided to me under instruction of the provider.

6. **Clinic and Hospital Rules:** I understand that my visitors and I must obey all Mercy clinic and hospital rules. I understand that if I or my visitors do not follow the rules, Mercy and pursue corrective action.

7. **Notice of Privacy Practice:** I acknowledge that I have received a copy of the Notice and Privacy Practices (NOPP), which describes when Mercy may use or disclose information for treatment, payment and health care operations. The NOPP is considered part of this Consent and Agreement by this reference. I understand that the NOPP is only provided the first time I receive services from the hospital and is otherwise available upon request and on Mercy's website.

Mercy SJ Exhibit 1

Mercy Consent &/Agreement  Revised  1/2014



Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Page 2

## Consent and Agreement
## Physician Services and Hospital Services

Patient Name: KIMBERLY A DAMES

Date of Birth: ████████████

8. **Personal Valuables:** I understand that as a patient, I am encouraged to leave valuable personal items at home. While Mercy may maintain a safe for small personal items of unusual value, Mercy is not responsible for the loss or damage to these items.

9. **Demographic Information:** I have reviewed the demographic information listed for me and confirm that it is correct. I am aware that I need to inform Mercy of any changes as soon as possible.

10. **Independent Contractor/Providers:** I understand that separate bills may be sent for professional services from non-Mercy providers such as radiologists, pathologists, and anesthesiologists, in addition to the Mercy bill.

11. **Phone Calls:** I authorize Mercy and its collection agencies to contact me, or a representative I appoint, about my account, including using any contact information or cell phone numbers that I have provided or will provide, or that is available to Mercy from third parties. I authorize contact with me by telephone or voice messages and authorize the use of automated dialing technology and pre-recorded messages, even if I am charged for the call under my phone plan. I agree such contact will not be "unsolicited" for purposes of local, state, or federal law. I agree that Mercy and its collection agencies may monitor and/ or record any communication.

12. **Notice to Mercy Co-workers:** As a co-worker employed by an entity owned or controlled by Mercy, I agree to payment of outstanding balance(s) due for medical services rendered to me, or any dependents for whom I am financially responsible, after all applicable insurance payments are received for such services. In the event I do not make reasonable attempts to resolve the outstanding balances, I understand Mercy may initiate payroll deduction, in accordance with Mercy's Co-worker Payroll Deduction Policy.

A copy of this form shall have the same force and effect as the original. The undersigned is the patient or is duly authorized to act on behalf of the patient to sign for the patient and accept the terms written above. A signed copy of this form is available upon request.

Date: 10/25/15    Time: 6:58 Pm    Signature: _Kim Dames_

If signed by other than patient, indicate relationship: _____

Date: 10/25/15    Time: 858 pm    Witness: _____

Mercy SJ Exhibit 1

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

## AFFIDAVIT

### True Copy of Policy

STATE OF WISCONSIN    )
                                        )
SHEBOYGAN COUNTY    )

**Amy L. Hughes**, <u>Manager - Commercial Underwriting</u> of *ACUITY*, A Mutual Insurance Company, being familiar with the forms used by the company in its regular course of business and being its custodian of underwriting records and files, certifies that she has checked the records for policy number <u>K90724</u> issued to <u>Jack Dames Heating & Cooling Inc</u> and covering <u>Commercial Auto</u> during the policy term from <u>04/16/2015</u> to <u>04/16/2016</u>.

THAT said policy according to the records was subject to the Coverages and Limits, Insuring Agreements, Conditions, Exclusions, and applicable Endorsements as attached.

_____
Amy L. Hughes

Subscribed and sworn to before me
this 21at day of September , 2016
_____

Notary Public, State of Wisconsin
My Commission: 08-13-2019



UC-179(12-06)

Mercy SJ Exhibit 2

Dames, Kim 000026

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM


**A Mutual Insurance Company**

**COMMERCIAL AUTO
COVERAGE PART**

## Business Auto  Renewal Declarations

**Item One**
First Named Insured and Address:

JACK DAMES HEATING & COOLING INC
C/O JACK & KIM DAMES
PO BOX 23
WARRENTON MO 63383

Agency Name and Number:

K FLYNN INSURANCE AGENCY
6765-AB

Policy Number:  K90724

| Policy Period: | Effective Date: | 04-16-15 |
|---|---|---|
| | Expiration Date: | 04-16-16 |

In return for the payment of the premium and subject to all the terms of the policy, we agree to provide the insurance coverage as stated in the same.

12:01 A.M. standard time at your mailing address shown in the declarations

**Item Two**
### SCHEDULE OF COVERAGES AND COVERED AUTOS

Each of these coverages apply only to those *autos* shown as covered *autos* by the entry of one or more of the symbols from the Covered Autos section of the Business Auto Coverage Form next to the name of the coverage.

| Coverages | Covered Auto Symbols | Limit of Insurance | | Premium |
|---|---|---|---|---|
| Liability | 7,19 | $ 1,000,000 each *accident* | | $ 2,540.00 |
| Auto Medical Payments | 7 | 5,000 each person | | 120.00 |
| Uninsured Motorists Bodily Injury | 6 | 500,000 each person | 500,000 each *accident* | 69.00 |
| Underinsured Motorists | 7 | 500,000 each person | 500,000 each *accident* | 202.00 |
| Comprehensive | 7 | Actual cash value, cost of repair or stated amount (if any), whichever is less, minus the deductible shown in Item Three for each covered *auto*. | | 455.00 |
| Collision | 7 | Actual cash value, cost of repair or stated amount (if any), whichever is less, minus the deductible shown in Item Three for each covered *auto*. | | 841.00 |

Estimated Schedule Premium . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$    4,227.00

**PREMIUM SUMMARY**

Estimated Schedule Premium . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$    4,227.00

Estimated Endorsement Premium . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Estimated Advance Premium . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$    4,227.00

### COVERAGE FORMS AND ENDORSEMENTS APPLICABLE TO BUSINESS AUTO COVERAGE

Mercy SJ Exhibit 2

CA-7000(2-12)                                    Policyholder - Original                                    SO 01 04/09/15

Dames, Kim 000027

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Page 2

Policy Number: K90724
Effective Date: 04-16-15

| Form Number | Form Title | Premium |
|---|---|---|
| IL-0017F (11-98) | Common Policy Conditions | $ |
| IL-0021F (03-14) | Nuclear Energy Liability Exclusion - Broad Form | |
| IL-7012 (03-14) | Asbestos Exclusion | |
| CA-9903F (03-06) | Auto Medical Payments Coverage | |
| CA-0001F (12-11) | Business Auto Coverage Form | |
| CA-0165F (10-06) | Missouri Changes | |
| CA-0166R (03-06) | Missouri Changes - Pollution Exclusion | |
| CA-0219F (02-13) | Missouri Changes - Cancellation and Nonrenewal | |
| CA-2104F (10-12) | Missouri Uninsured Motorists Coverage | |
| CA-2156F (04-01) | Missouri Split Uninsured Motorists Coverage Limits | |
| CA-3104F (09-10) | Missouri Underinsured Motorists Coverage | |
| CA-3105F (03-94) | Missouri Split Underinsured Motorists Coverage Limits | |
| CA-2384F (01-06) | Exclusion of Terrorism | |
| CA-7246 (12-12) | ACUITY Advantages - Business Auto | |
| CA-2001R (03-06) | Lessor - Additional Insured and Loss Payee | |
| CA-7027 (12-93) | Loss Payable Clause | |
| CA-7045 (09-02) | Drive Other Car Coverage - Broadened Coverage for Named Individuals | |

**Estimated Endorsement Premium** .................................................$

## Item Three
## SCHEDULE OF COVERAGES

| Unit No. | Model Year | Vehicle Description | Vehicle ID Number | PGS Comp | PGS Coll | Terr | Class Code |
|---|---|---|---|---|---|---|---|
| 001 | 01 | GMC SAVANA G3500 | 1GTHG39RX11114617 | 008 | 008 | 129 | 01483 |
| 002 | 90 | FORD E350 | 1FDKE37G0LHB00860 | 004 | 004 | 129 | 21483 |
| 003 | 05 | FORD E350 SUPER DUTY | 1FDSE35L05HA19392 | 008 | 008 | 129 | 01483 |
| 004 | 13 | NISSAN/DATSUN ALTIMA | 1N4AL3AP6DC184265 | 030 | 031 | 535 | A10701 |
| 005 | | DRIVE OTHER CAR COVERAGE (1 Individuals) | | | | 129 | 800001 |
| 006 | 05 | FORD ECONOLINE E250 | 1FTNS24LX5HA79119 | 007 | 007 | 129 | 01483 |

| Unit No. | Liability Limit | Liability BI Premium | Liability PD Premium | PD Deductible | Medical Payments Limit | Medical Payments Premium |
|---|---|---|---|---|---|---|
| 001 | 1,000,000 | 447.00 | Included | | 5,000 | 25.00 |
| 002 | 1,000,000 | 470.00 | Included | | 5,000 | 25.00 |
| 003 | 1,000,000 | 447.00 | Included | | 5,000 | 25.00 |
| 004 | 1,000,000 | 665.00 | Included | | 5,000 | 18.00 |
| 005 | 1,000,000 | 64.00 | Included | | 5,000 | 2.00 |
| 006 | 1,000,000 | 447.00 | Included | | 5,000 | 25.00 |

Mercy SJ Exhibit 2

CA-7000(2-12)

SO 01 04/09/15

Dames, Kim 000028

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Page 3

Policy Number: K90724
Effective Date: 04-16-15

| Unit No. | Uninsured Motorists Limit [3] | Premium | UMPD Deductible | Underinsured Motorists Limit [3] | Premium |
|---|---|---|---|---|---|
| 001 | 500/500/0 | 12.00 | | 500/500 | 34.00 |
| 002 | 500/500/0 | 12.00 | | 500/500 | 34.00 |
| 003 | 500/500/0 | 12.00 | | 500/500 | 34.00 |
| 004 | 500/500/0 | 19.00 | | 500/500 | 61.00 |
| 005 | 500/500/0 | 2.00 | | 500/500 | 5.00 |
| 006 | 500/500/0 | 12.00 | | 500/500 | 34.00 |

| Unit No. | Comprehensive Stated Amount | Deductible Amount | Premium Amount | Specified Causes of Loss Stated Amount | Deductible Amount | Premium Amount | Full Glass |
|---|---|---|---|---|---|---|---|
| 001 | | | | | | | |
| 002 | | | | | | | |
| 003 | | 2,500 | 110.00 | | | | |
| 004 | | 1,000 | 243.00 | | | | |
| 005 | | 1,000 | 18.00 | | | | |
| 006 | | 2,500 | 84.00 | | | | |

| Unit No. | Stated Amount | Collision Deductible Amount | Premium Amount | Towing Limit | Premium | APC Discount | Safety Discount |
|---|---|---|---|---|---|---|---|
| 001 | | | | | | | |
| 002 | | | | | | | |
| 003 | | 2,500 | 183.00 | | | | |
| 004 | | 1,000 | 480.00 | | | | |
| 005 | | 1,000 | 49.00 | | | | |
| 006 | | 2,500 | 129.00 | | | | |

| Unit No. | Fleet No. | Premium Per Unit Number |
|---|---|---|
| 001 | | 518.00 |
| 002 | | 541.00 |
| 003 | | 811.00 |
| 004 | | 1,486.00 |
| 005 | | 140.00 |
| 006 | | 731.00 |

**Estimated Schedule Premium** . . . . . . . . . . . . . . . $      **4,227.00**

[3] First number is thousands of bodily injury coverage each person; second number is thousands of bodily injury coverage each *accident;* third number (if any) is thousands of property damage coverage each *accident.*

Mercy SJ Exhibit 2

CA-7000(2-12)

SO 01 04/09/15

Dames, Kim 000029

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Page 4

Policy Number:    K90724
Effective Date:    04-16-15

**ADDITIONAL NAMED INSUREDS**

WHO IS AN INSURED includes the following Additional Named Insureds:

NONE

**FIRST NAMED INSURED IS:**

CORPORATION

Mercy SJ Exhibit 2

CA-7000(2-12)

SO 01 04/09/15

Dames, Kim 000030

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

**BUSINESS AUTO COVERAGE FORM**

**Index of Policy Provisions**

| | Page |
|---|---|
| **SECTION I - COVERED AUTOS** | 1 |
| Description of Covered Auto Designation Symbols | 1 |
| Owned Autos You Acquire After the Policy Begins | 1 |
| Certain Trailers, Mobile Equipment and Temporary Substitute Autos | 2 |
| **SECTION II - LIABILITY COVERAGE** | 2 |
| Coverage | 2 |
| Exclusions | 3 |
| Limit of Insurance | 5 |

| | Page |
|---|---|
| **SECTION III - PHYSICAL DAMAGE COVERAGE** | 5 |
| Coverage | 5 |
| Exclusions | 6 |
| Limit of Insurance | 6 |
| **SECTION IV - BUSINESS AUTO CONDITIONS** | 7 |
| Loss Conditions | 7 |
| General Conditions | 8 |
| **SECTION V - DEFINITIONS** | 9 |

Mercy SJ Exhibit 2

CA-0001F(12-11)

Dames, Kim 000031

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

## BUSINESS AUTO COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declara-tions. The words "we," "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in italics have special meaning. Refer to Section V - Definitions.

## SECTION I - COVERED AUTOS

Item Two of the Declarations shows the *autos* that are covered *autos* for each of your coverages. The following numerical symbols describe the *autos* that may be covered *autos*. The symbols entered next to a coverage on the Declarations designate the only *autos* that are covered *autos*.

A. **DESCRIPTION OF COVERED AUTO DESIG-NATION SYMBOLS**

SYMBOL   DESCRIPTION

**1 =**   ANY *AUTO*.

**2 =**   OWNED *AUTOS* ONLY. Only those *autos* you own (and for Liability Coverage any *trailers* you do not own while attached to power units you own). This includes those *autos* you acquire ownership of after the policy begins.

**3 =**   OWNED PRIVATE PASSENGER *AUTOS* ONLY. Only the private passenger *autos* you own. This includes those private passenger *autos* you acquire ownership of after the policy begins.

**4 =**   OWNED *AUTOS* OTHER THAN PRIVATE PASSENGER *AUTOS* ONLY. Only those *autos* you own that are not of the private passenger type (and for Liability Coverage any *trailers* you do not own while attached to power units you own). This includes those *autos* not of the private passenger type you acquire ownership of after the policy begins.

**5 =**   OWNED *AUTOS* SUBJECT TO NO-FAULT. Only those *autos* you own that are required to have no-fault benefits in the state where they are licensed or principally garaged. This includes those *autos* you acquire ownership of after the policy begins provided they are required to have no-fault benefits in the state where they are licensed or principally garaged.

**6 =**   OWNED *AUTOS* SUBJECT TO A COMPULSORY UNINSURED MOTORISTS LAW. Only those *autos* you own that because of the law in the state where they are licensed or principally garaged, are required to have and can-not reject Uninsured Motorists Coverage. This includes those *autos* you acquire ownership of after the policy begins provided they are subject to the same state uninsured motorists requirement.

**7 =**   SPECIFICALLY DESCRIBED *AUTOS*. Only those *autos* described in Item Three of the Declarations for which a premium charge is shown (and for Liability Coverage any *trailers* you do not own while attached to any power unit described in Item Three).

**8 =**   HIRED *AUTOS* ONLY. Only those *autos* you lease, hire, rent or borrow. This does not include any *auto* you lease, hire, rent or borrow from any of your *employees* or partners or members of their households.

**9 =**   NONOWNED *AUTOS* ONLY. Only those *autos* you do not own, lease, hire, rent or borrow that are used in connection with your business. This includes *autos* owned by your *employees,* partners (if you are a partnership), members (if you are a limited liability company) or members of their households but only while used in your business or your personal affairs.

**19 =**   MOBILE EQUIPMENT SUBJECT TO COMPULSORY OR FINANCIAL RESPONSIBILITY OR OTHER MOTOR VEHICLE INSURANCE LAW ONLY. Only those *autos* that are land vehicles and that would qualify under the definition of *mobile equipment* under this policy if they were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where they are licensed or principally garaged.

B. **OWNED AUTOS YOU ACQUIRE AFTER THE POLICY BEGINS**

1. If symbols 1, 2, 3, 4, 5, 6 or 19 are entered next to a coverage in Item Two of the Declarations, then you have coverage for *autos* that you acquire of the type described for the remainder of the policy period.

2. But, if symbol 7 is entered next to a cov-

Mercy SJ Exhibit 2

Dames, Kim 000032

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

erage in Item Two of the Declarations, an *auto* you acquire will be a covered *auto* for that coverage only if:

**a.** We already cover all *autos* that you own for that coverage or it replaces an *auto* you previously owned that had that coverage; and

**b.** You tell us within 30 days after you acquire it that you want us to cover it for that coverage.

**C. CERTAIN TRAILERS, MOBILE EQUIPMENT AND TEMPORARY SUBSTITUTE AUTOS**

If Liability Coverage is provided by this Coverage Form, the following types of vehicles are also covered *autos* for Liability Coverage:

**1.** *Trailers* with a load capacity of 2,000 pounds or less designed primarily for travel on public roads.

**2.** *Mobile equipment* while being carried or towed by a covered *auto.*

**3.** Any *auto* you do not own while used with the permission of its owner as a temporary substitute for a covered *auto* you own that is out of service because of its:

**a.** Breakdown;

**b.** Repair;

**c.** Servicing;

**d.** *Loss;* or

**e.** Destruction.

## SECTION II - LIABILITY COVERAGE

**A. COVERAGE**

We will pay all sums an *insured* legally must pay as damages because of *bodily injury* or *property damage* to which this insurance applies, caused by an *accident* and resulting from the ownership, maintenance or use of a covered *auto.*

We will also pay all sums an *insured* legally must pay as a *covered pollution cost or expense* to which this insurance applies, caused by an *accident* and resulting from the ownership, maintenance or use of covered *autos.* However, we will only pay for the *covered pollution cost or expense* if there is either *bodily injury* or *property damage* to which this insurance applies that is caused by the same *accident.*

We have the right and duty to defend any *insured* against a *suit* asking for such damages or a *covered pollution cost or expense.* However, we have no duty to defend any *insured* against a *suit* seeking damages for *bodily injury* or *property damage* or a *covered pollution cost or expense* to which this insurance does not apply. We may investigate and settle any claim or *suit* as we consider appropriate. Our duty to defend or settle ends when the Liability Coverage Limit of Insurance has been exhausted by payment of judgments or settlements.

**1. Who Is an Insured**

The following are *insureds:*

**a.** You for any covered *auto.*

**b.** Anyone else while using with your permission a covered *auto* you own, hire or borrow except:

(1) The owner or anyone else from whom you hire or borrow a covered *auto.* This exception does not apply if the covered *auto* is a *trailer* connected to a covered *auto* you own.

(2) Your *employee* if the covered *auto* is owned by that *employee* or a member of his or her household.

(3) Someone using a covered *auto* while he or she is working in a business of selling, servicing, repairing, parking or storing *autos* unless that business is yours.

(4) Anyone other than your *employees,* partners (if you are a partnership), members (if you are a limited liability company) or a lessee or borrower or any of their *employees,* while moving property to or from a covered *auto.*

(5) A partner (if you are a partnership) or a member (if you are a limited liability company) for a covered *auto* owned by him or her or a member of his or her household.

**c.** Anyone liable for the conduct of an *insured* described above but only to the extent of that liability.

**2. Coverage Extensions**

**a. Supplementary Payments**

We will pay for the *insured:*

(1) All expenses we incur.

(2) Up to $2,000 for cost of bail bonds (including bonds for related traffic law violations) required because of an *accident* we cover. We do not have to furnish these bonds.

(3) The cost of bonds to release attachments in any *suit* against the *insured* we defend, but only for bond amounts within our Limit of Insurance.

(4) All reasonable expenses incurred by the *insured* at our request, in-

Mercy SJ Exhibit 2

Dames, Kim 000033

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

cluding actual loss of earnings up to $250 a day because of time off from work.

(5) All costs taxed against the *insured* in any *suit* against the *insured* we defend.

(6) All interest on the full amount of any judgment that accrues after entry of the judgment in any *suit* against the *insured* we defend; but our duty to pay interest ends when we have paid, offered to pay or deposited in court the part of the judgment that is within our Limit of Insurance.

These payments will not reduce the Limit of Insurance.

**b. Out of State Coverage Extensions**

While a covered *auto* is away from the state where it is licensed we will:

(1) Increase the Limit of Insurance for Liability Coverage to meet the limit or limits specified by a compulsory or financial responsibility law in the jurisdiction where the covered *auto* is being used. This extension does not apply to the limit or limits specified by any law governing motor carriers of passengers or property.

(2) Provide the minimum amounts and types of other coverages, such as no-fault, required of out of state vehicles by the jurisdiction where the covered *auto* is being used.

We will not pay anyone more than once for the same elements of *loss* because of these extensions.

**B. EXCLUSIONS**

This insurance does not apply to any of the following:

**1. Expected or Intended Injury**

*Bodily injury* or *property damage* expected or intended from the standpoint of the *insured.*

**2. Contractual**

Liability assumed under any contract or agreement. But this exclusion does not apply to liability for damages:

**a.** Assumed in a contract or agreement that is an *insured contract* provided the *bodily injury* or *property damage* occurs subsequent to the execution of the contract or agreement; or

**b.** That the *insured* would have in the absence of the contract or agreement.

**3. Workers' Compensation**

Any obligation for which the *insured* or the *insured's* insurer may be held liable under any workers' compensation law, disability benefits law or unemployment compensation law or any similar law.

**4. Employee Indemnification and Employer's Liability**

*Bodily injury* to:

**a.** An *employee* of the *insured* arising out of and in the course of:

(1) Employment by the *insured;* or

(2) Performing duties related to the conduct of the *insured's* business; or

**b.** The spouse, child, parent, brother or sister of that *employee* as a consequence of paragraph a above.

This exclusion applies:

**a.** Whether the *insured* may be liable as an employer or in any other capacity; and

**b.** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

But this exclusion does not apply to *bodily injury* to domestic *employees* not entitled to workers' compensation benefits or to liability assumed by the *insured* under an *insured contract.* For the purposes of the Coverage Form, a domestic *employee* is a person engaged in household or domestic work performed principally in connection with a residence premises.

**5. Fellow Employee**

*Bodily injury* to any fellow *employee* of the *insured* arising out of and in the course of the fellow *employee's* employment or while performing duties related to the conduct of your business.

**6. Care, Custody or Control**

*Property damage* to or *covered pollution cost or expense* involving property owned or transported by the *insured* or in the *insured's* care, custody or control. But this exclusion does not apply to liability assumed under a sidetrack agreement.

**7. Handling of Property**

*Bodily injury* or *property damage* resulting from the handling of property:

**a.** Before it is moved from the place where it is accepted by the *insured* for movement into or onto the covered *auto;* or

**b.** After it is moved from the covered *auto* to the place where it is finally delivered by the *insured.*

**8. Movement of Property by Mechanical Device**

*Bodily injury* or *property damage* resulting from the movement of property by a me-

Mercy SJ Exhibit 2

Dames, Kim 000034

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

chanical device (other than a hand truck) unless the device is attached to the covered *auto.*

**9. Operations**

*Bodily injury* or *property damage* arising out of the operation of:

a. Any equipment listed in paragraphs 6b and 6c of the definition of *mobile equipment*; or

b. Machinery or equipment that is on, attached to, or part of, a land vehicle that would qualify under the definition of *mobile equipment* if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

**10. Completed Operations**

*Bodily injury* or *property damage* arising out of your work after that work has been completed or abandoned.

In this exclusion, your work means:

a. Work or operations performed by you or on your behalf; and

b. Materials, parts or equipment furnished in connection with such work or operations.

Your work includes warranties or representations made at any time with respect to the fitness, quality, durability or performance of any of the items included in paragraphs a or b above.

Your work will be deemed completed at the earliest of the following times:

a. When all of the work called for in your contract has been completed.

b. When all of the work to be done at the site has been completed if your contract calls for work at more than one site.

c. When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**11. Pollution**

*Bodily injury* or *property damage* arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of *pollutants:*

a. That are, or that are contained in any property that is:

(1) Being transported or towed by, han-

dled, or handled for movement into, onto or from, the covered *auto;*

(2) Otherwise in the course of transit by or on behalf of the *insured;* or

(3) Being stored, disposed of, treated or processed in or upon the covered *auto.*

b. Before the *pollutants* or any property in which the *pollutants* are contained are moved from the place where they are accepted by the *insured* for movement into or onto the covered *auto;* or

c. After the *pollutants* or any property in which the *pollutants* are contained are moved from the covered *auto* to the place where they are finally delivered, disposed of or abandoned by the *insured.*

Paragraph a above does not apply to fuels, lubricants, fluids, exhaust gases or other similar *pollutants* that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the covered *auto* or its parts, if:

(1) The *pollutants* escape, seep, migrate, or are discharged, dispersed or released directly from an *auto* part designed by its manufacturer to hold, store, receive or dispose of such *pollutants;* and

(2) The *bodily injury, property damage* or *covered pollution cost or expense* does not arise out of the operation of any equipment listed in paragraphs 6b and 6c of the definition of *mobile equipment.*

Paragraphs b and c above of this exclusion do not apply to *accidents* that occur away from premises owned by or rented to an *insured* with respect to *pollutants* not in or upon a covered *auto* if:

(1) The *pollutants* or any property in which the *pollutants* are contained are upset, overturned or damaged as a result of the maintenance or use of a covered *auto;* and

(2) The discharge, dispersal, seepage, migration, release or escape of the *pollutants* is caused directly by such upset, overturn or damage.

**12. War**

*Bodily injury* or *property damage* arising directly or indirectly out of:

a. War, including undeclared or civil war;

b. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other au-

Mercy SJ Exhibit 2

Dames, Kim 000035

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

thority using military personnel or other agents; or

c. Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

### 13. Racing

Covered *autos* while used in any professional or organized racing or demolition contest or stunting activity, or while practicing for such contest or activity. This insurance also does not apply while that covered *auto* is being prepared for such a contest or activity.

## C. LIMIT OF INSURANCE

Regardless of the number of covered *autos, insureds,* premiums paid, claims made or vehicles involved in the *accident,* the most we will pay for the total of all damages and *covered pollution cost or expense* combined, resulting from any one *accident* is the Limit of Insurance for Liability Coverage shown in the Declarations.

All *bodily injury, property damage* and *covered pollution cost or expense* resulting from continuous or repeated exposure to substantially the same conditions will be considered as resulting from one *accident.*

No one will be entitled to receive duplicate payments for the same elements of *loss* under this Coverage Form and any Medical Payments Coverage endorsement, Uninsured Motorists Coverage endorsement or Underinsured Motorists Coverage endorsement attached to this Coverage Part.

## SECTION III - PHYSICAL DAMAGE COVERAGE

### A. COVERAGE

1. We will pay for *loss* to a covered *auto* or its equipment under:

   a. **Comprehensive Coverage**

   From any cause except:

   (1) The covered *auto's* collision with another object; or

   (2) The covered *auto's* overturn.

   b. **Specified Causes of Loss Coverage**

   Caused by:

   (1) Fire, lightning or explosion;

   (2) Theft;

   (3) Windstorm, hail or earthquake;

   (4) Flood;

   (5) Mischief or vandalism; or

   (6) The sinking, burning, collision or derailment of any conveyance transporting the covered *auto.*

   c. **Collision Coverage**

   Caused by:

   (1) The covered *auto's* collision with another object; or

   (2) The covered *auto's* overturn.

2. **Towing**

   We will pay up to the limit shown in the Declarations for towing and labor costs incurred each time a covered *auto* of the private passenger type is disabled. However, the labor must be performed at the place of disablement.

3. **Glass Breakage - Hitting a Bird or Animal - Falling Objects or Missiles**

   If you carry Comprehensive Coverage for the damaged covered *auto,* we will pay for the following under Comprehensive Coverage:

   a. Glass breakage;

   b. *Loss* caused by hitting a bird or animal; and

   c. *Loss* caused by falling objects or missiles.

   However, you have the option of having glass breakage caused by a covered *auto's* collision or overturn considered a *loss* under Collision Coverage.

4. **Coverage Extensions**

   a. **Transportation Expenses**

   We will also pay up to $20 per day to a maximum of $600 for temporary transportation expense incurred by you because of the total theft of a covered *auto* of the private passenger type. We will pay only for those covered *autos* for which you carry either Comprehensive or Specified Causes of Loss Coverage. We will pay for temporary transportation expenses incurred during the period beginning 48 hours after the theft and ending, regardless of the policy's expiration, when the covered *auto* is returned to use or we pay for its *loss.*

   b. **Loss of Use Expenses**

   For Hired Auto Physical Damage, we will pay expenses for which an *insured* becomes legally responsible to pay for loss of use of a vehicle rented or hired without a driver, under a written rental contract or agreement. We will pay for loss of use expenses if caused by:

   (1) Other than collision only if the Declarations indicate that Comprehen-

Mercy SJ Exhibit 2

Dames, Kim 000036

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

sive Coverage is provided for any covered *auto;*

(2) Specified Causes of Loss only if the Declarations indicate that Specified Causes of Loss Coverage is provided for any covered *auto;* or

(3) Collision only if the Declarations indicate that Collision Coverage is provided for any covered *auto.*

However, the most we will pay for any expenses for loss of use is $20 per day, to a maximum of $600.

## B. EXCLUSIONS

1. We will not pay for *loss* caused by or resulting from any of the following. Such *loss* is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the *loss.*

   a. **Nuclear Hazard**

      (1) The explosion of any weapon employing atomic fission or fusion; or

      (2) Nuclear reaction or radiation, or radioactive contamination, however caused.

   b. **War or Military Action**

      (1) War, including undeclared or civil war;

      (2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

      (3) Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

2. We will not pay for *loss* to any covered *auto* while used in any professional or organized racing or demolition contest or stunting activity, or while practicing for such contest or activity. We will also not pay for *loss* to any covered *auto* while that covered *auto* is being prepared for such a contest or activity.

3. We will not pay for *loss* caused by or resulting from any of the following unless caused by other *loss* that is covered by this insurance:

   a. Wear and tear, freezing, mechanical or electrical breakdown.

   b. Blowouts, punctures or other road damage to tires.

4. We will not pay for *loss* to any of the following:

   a. Tapes, records, discs or other similar audio, visual or data electronic devices designed for use with audio, visual or data electronic equipment.

   b. Any device designed or used to detect speed measuring equipment such as radar or laser detectors and any jamming apparatus intended to elude or disrupt speed measurement equipment.

   c. Any electronic equipment, without regard to whether this equipment is permanently installed, that receives or transmits audio, visual or data signals and that is not designed solely for the reproduction of sound.

   d. Any accessories used with the electronic equipment described in paragraph c above.

   Exclusions 4c and 4d do not apply to:

   a. Equipment designed solely for the reproduction of sound and accessories used with such equipment, provided such equipment is permanently installed in the covered *auto* at the time of the *loss* or such equipment is removable from a housing unit which is permanently installed in the covered *auto* at the time of the *loss,* and such equipment is designed to be solely operated by use of the power from the *auto's* electrical system, in or upon the covered *auto;* or

   b. Any other electronic equipment that is:

      (1) Necessary for the normal operation of the covered *auto* or the monitoring of the covered *auto's* operating system; or

      (2) An integral part of the same unit housing any sound reproducing equipment described in a above and permanently installed in the opening of the dash or console of the covered *auto* normally used by the manufacturer for installation of a radio.

5. We will not pay for *loss* to a covered *auto* due to *diminution of value.*

## C. LIMIT OF INSURANCE

1. The most we will pay for *loss* in any one *accident* is the lesser of:

   a. The actual cash value of the damaged or stolen property as of the time of the *loss;* or

   b. The cost of repairing or replacing the damaged or stolen property with other property of like kind and quality.

2. An adjustment for depreciation and physical condition will be made in determining actual cash value in the event of a total *loss.*

3. If a repair or replacement results in better than like kind or quality, we will not pay for

Mercy SJ Exhibit 2

Dames, Kim 000037

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

the amount of the betterment.

## D. DEDUCTIBLE

For each covered *auto,* our obligation to pay for, repair, return or replace damaged or stolen property will be reduced by the applicable deductible shown in the Declarations. Any Comprehensive Coverage deductible shown in the Declarations does not apply to *loss* caused by fire or lightning.

## SECTION IV - BUSINESS AUTO CONDITIONS

The following conditions apply in addition to the Common Policy Conditions:

### A. LOSS CONDITIONS

**1. Appraisal for Physical Damage Loss**

If you and we disagree on the amount of *loss,* either may demand an appraisal of the *loss.* In this event, each party will select a competent appraiser. The two appraisers will select a competent and impartial umpire. The appraisers will state separately the actual cash value and amount of *loss.* If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If we submit to an appraisal, we will still retain our right to deny the claim.

**2. Duties in the Event of Accident, Claim, Suit or Loss**

We have no duty to provide coverage under this policy unless there has been full compliance with the following duties:

**a.** In the event of *accident,* claim, *suit* or *loss,* you must give us or our authorized representative prompt notice of the *accident* or *loss.* Include:

(1) How, when and where the *accident* or *loss* occurred;

(2) The *insured's* name and address; and

(3) To the extent possible, the names and addresses of any injured persons and witnesses.

**b.** Additionally, you and any other involved *insured* must:

(1) Assume no obligation, make no payment or incur no expense without our consent, except at the *insured's* own cost.

(2) Immediately send us copies of any request, demand, order, notice, summons or legal paper received concerning the claim or *suit.*

(3) Cooperate with us in the investigation or settlement of the claim or defense against the *suit.*

(4) Authorize us to obtain medical records or other pertinent information.

(5) Submit to examination, at our expense, by physicians of our choice, as often as we reasonably require.

**c.** If there is *loss* to a covered *auto* or its equipment you must also do the following:

(1) Promptly notify the police if the covered *auto* or any of its equipment is stolen.

(2) Take all reasonable steps to protect the covered *auto* from further damage. Also keep a record of your expenses for consideration in the settlement of the claim.

(3) Permit us to inspect the covered *auto* and records proving the *loss* before its repair or disposition.

(4) Agree to examinations under oath at our request and give us a signed statement of your answers.

**3. Legal Action Against Us**

No one may bring a legal action against us under this Coverage Form until:

**a.** There has been full compliance with all the terms of this Coverage Form; and

**b.** Under Liability Coverage, we agree in writing that the *insured* has an obligation to pay or until the amount of that obligation has finally been determined by judgment after trial. No one has the right under this policy to bring us into an action to determine the *insured's* liability.

**4. Loss Payment - Physical Damage Coverages**

At our option we may:

**a.** Pay for, repair or replace damaged or stolen property;

**b.** Return the stolen property at our expense. We will pay for any damage that results to the *auto* from the theft; or

**c.** Take all or any part of the damaged or stolen property at an agreed or appraised value.

If we pay for the *loss,* our payment will

Mercy SJ Exhibit 2

Dames, Kim 000038

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

include the applicable sales tax for the damaged or stolen property.

**5. Transfer of Rights of Recovery Against Others to Us**

If any person or organization to or for whom we make payment under this Coverage Form has rights to recover damages from another, those rights are transferred to us. That person or organization must do everything necessary to secure our rights and must do nothing after *accident* or *loss* to impair them.

## B. GENERAL CONDITIONS

**1. Bankruptcy**

Bankruptcy or insolvency of the *insured* or the *insured's* estate will not relieve us of any obligations under this Coverage Form.

**2. Concealment, Misrepresentation or Fraud**

This Coverage Form is void in any case of fraud by you at any time as it relates to this Coverage Form. It is also void if you or any other *insured*, at any time, intentionally conceal or misrepresent a material fact concerning:

a. This Coverage Form;

b. The covered *auto;*

c. Your interest in the covered *auto;* or

d. A claim under this Coverage Form.

**3. Liberalization**

If we revise this Coverage Form to provide more coverage without additional premium charge, your policy will automatically provide the additional coverage as of the day the revision is effective in your state.

**4. No Benefit to Bailee - Physical Damage Coverages**

We will not recognize any assignment or grant any coverage for the benefit of any person or organization holding, storing or transporting property for a fee regardless of any other provision of this Coverage Form.

**5. Other Insurance**

a. For any covered *auto* you own, this Coverage Form provides primary insurance. For any covered *auto* you do not own, the insurance provided by this Coverage Form is excess over any other collectible insurance. However, while a covered *auto* which is a *trailer* is connected to another vehicle, the Liability Coverage this Coverage Form provides for the *trailer* is:

(1) Excess while it is connected to a motor vehicle you do not own.

(2) Primary while it is connected to a covered *auto* you own.

b. For Hired Auto Physical Damage Coverage, any covered *auto* you lease, hire, rent or borrow is deemed to be a covered *auto* you own. However, any *auto* that is leased, hired, rented or borrowed with a driver is not a covered *auto.*

c. Regardless of the provisions of paragraph a above, this Coverage Form's Liability Coverage is primary for any liability assumed under an *insured contract.*

d. When this Coverage Form and any other Coverage Form or policy covers on the same basis, either excess or primary, we will pay only our share. Our share is the proportion that the Limit of Insurance of our Coverage Form bears to the total of the limits of all the Coverage Forms and policies covering on the same basis.

**6. Premium Audit**

a. The estimated premium for this Coverage Form is based on the exposures you told us you would have when this policy began. We will compute the final premium due when we determine your actual exposures. The estimated total premium will be credited against the final premium due and the First Named Insured will be billed for the balance, if any. The due date for the final premium or retrospective premium is the date shown as the due date on the bill. If the estimated total premium exceeds the final premium due, the First Named Insured will get a refund.

b. If this policy is issued for more than one year, the premium for this Coverage Form will be computed annually based on our rates or premiums in effect at the beginning of each year of the policy.

**7. Policy Period, Coverage Territory**

a. Under this Coverage Form, we cover *accidents* and *losses* occurring:

(1) During the policy period shown in the Declarations; and

(2) Within the coverage territory.

b. The coverage territory is:

(1) The United States of America;

(2) The territories and possessions of the United States of America;

(3) Puerto Rico;

(4) Canada; and

(5) Anywhere in the world if:

(a) A covered *auto* of the private passenger type is leased,

Mercy SJ Exhibit 2

Dames, Kim 000039

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

hired, rented or borrowed without a driver for a period of 30 days or less; and

    (b) The *insured's* responsibility to pay damages is determined in a *suit* on the merits, in the United States of America, the territories and possessions of the United States of America, Puerto Rico, or Canada or in a settlement we agree to.

**c.** We also cover *loss* to, or *accidents* involving, a covered *auto* while being transported between any of these places.

**8. Two or More Coverage Forms or Policies Issued by Us**

If this Coverage Form and any other Coverage Form or policy issued to you by us or any company affiliated with us apply to the same *accident,* the aggregate maximum Limit of Insurance under all the Coverage Forms or policies shall not exceed the highest applicable Limit of Insurance under any one Coverage Form or policy. This condition does not apply to any Coverage Form or policy issued by us or an affiliated company specifically to apply as excess insurance over this Coverage Form.

## SECTION V - DEFINITIONS

**A.** *"Accident"* includes continuous or repeated exposure to the same conditions resulting in *bodily injury* or *property damage.*

**B.** *"Auto"* means:

**1.** A land motor vehicle, *trailer* or semitrailer designed for travel on public roads; or

**2.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, *auto* does not include *mobile equipment.*

**C.** *"Bodily injury"* means bodily injury, sickness or disease sustained by a person including death resulting from any of these.

**D.** *"Covered pollution cost or expense"* means any cost or expense arising out of:

**1.** Any request, demand, order or statutory or regulatory requirement that any *insured* or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of *pollutants*; or

**2.** Any claim or *suit* by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to or assessing the effects of *pollutants.*

*Covered pollution cost or expense* does not include any cost or expense arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of *pollutants:*

**a.** That are, or that are contained in any property that is:

    (1) Being transported or towed by, handled, or handled for movement into, onto or from the covered *auto;*

    (2) Otherwise in the course of transit by or on behalf of the *insured;*

    (3) Being stored, disposed of, treated or processed in or upon the covered *auto;*

**b.** Before the *pollutants* or any property in which the *pollutants* are contained are moved from the place where they are accepted by the *insured* for movement into or onto the covered *auto;* or

**c.** After the *pollutants* or any property in which the *pollutants* are contained are moved from the covered *auto* to the place where they finally are delivered, disposed of or abandoned by the *insured.*

Paragraph a above does not apply to fuels, lubricants, fluids, exhaust gases or other similar *pollutants* that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the covered *auto* or its parts, if:

    (1) The *pollutants* escape, seep, migrate, or are discharged, dispersed or released directly from an *auto* part designed by its manufacturer to hold, store, receive or dispose of such *pollutants;* and

    (2) The *bodily injury, property damage* or *covered pollution cost or expense* does not arise out of the operation of any equipment listed in paragraphs 6b or 6c of the definition of *mobile equipment.*

Paragraphs b and c above do not apply to *accidents* that occur away from premises owned by or rented to an *insured* with respect to *pollutants* not in or upon a covered *auto* if:

    (1) The *pollutants* or any property in which the *pollutants* are contained

Mercy SJ Exhibit 2

Dames, Kim 000040

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

are upset, overturned or damaged as a result of the maintenance or use of a covered *auto;* and

   (2) The discharge, dispersal, seepage, migration, release or escape of the *pollutants* is caused directly by such upset, overturn or damage.

E.  *"Diminution in value"* means the actual or perceived loss in market value or resale value which results from a direct or accidental *loss.*

F.  *"Employee"* includes a *leased worker. Employee* does not include a *temporary worker.*

G.  *"Insured"* means any person or organization qualifying as an *insured* in the Who Is an Insured provision of the applicable coverage. Except with respect to the Limit of Insurance, the coverage afforded applies separately to each *insured* who is seeking coverage or against whom a claim or *suit* is brought.

H.  *"Insured contract"* means:

  1.  A lease of premises;

  2.  A sidetrack agreement;

  3.  Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

  4.  An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

  5.  That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another to pay for *bodily injury* or *property damage* to a third party or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

  6.  That part of any contract or agreement entered into, as part of your business, pertaining to the rental or lease, by you or any of your *employees,* of any *auto.* However, such contract or agreement shall not be considered an *insured contract* to the extent that it obligates you or any of your *employees* to pay for *property damage* to any *auto* rented or leased by you or any of your *employees.*

An *insured contract* does not include that part of any contract or agreement:

  1.  That indemnifies a railroad for *bodily injury* or *property damage* arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing; or

  2.  That pertains to the loan, lease or rental of

an *auto* to you or any of your *employees,* if the *auto* is loaned, leased or rented with a driver; or

  3.  That holds a person or organization engaged in the business of transporting property by *auto* for hire harmless for your use of a covered *auto* over a route or territory that person or organization is authorized to serve by public authority.

I.  *"Leased worker"* means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. *Leased worker* does not include a *temporary worker.*

J.  *"Loss"* means direct and accidental loss or damage.

K.  *"Mobile equipment"* means any of the following types of land vehicles, including any attached machinery or equipment:

  1.  Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

  2.  Vehicles maintained for use solely on or next to premises you own or rent;

  3.  Vehicles that travel on crawler-treads;

  4.  Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

    a.  Power cranes, shovels, loaders, diggers or drills; or

    b.  Road construction or resurfacing equipment such as graders, scrapers or rollers.

  5.  Vehicles not described in paragraph 1, 2, 3 or 4 above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

    a.  Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

    b.  Cherry pickers and similar devices used to raise or lower workers.

  6.  Vehicles not described in paragraph 1, 2, 3 or 4 above maintained primarily for purposes other than the transportation of persons or cargo. However, self-propelled vehicles with the following types of permanently attached equipment are not *mobile equipment* but will be considered *autos:*

    a.  Equipment designed primarily for:

      (1)  Snow removal;

      (2)  Road maintenance, but not construction or resurfacing; or

Mercy SJ Exhibit 2

Dames, Kim 000041

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

(3) Street cleaning.

b. Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

c. Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting or well servicing equipment.

However, *mobile equipment* does not include land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered *autos*.

L. *"Pollutants"* means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

M. *"Property damage"* means damage to or loss of use of tangible property.

N. *"Suit"* means a civil proceeding in which:

1. Damages because of *bodily injury* or *property damage;* or

2. A *covered pollution cost or expense,*

to which this insurance applies are alleged.

Suit includes:

1. An arbitration proceeding in which such damages or *covered pollution costs or expenses* are claimed and to which the *insured* must submit or does submit with our consent; or

2. Any other alternative dispute resolution proceeding in which such damages or *covered pollution costs or expenses* are claimed and to which the *insured* submits with our consent.

O. *"Temporary worker"* means a person who is furnished to you to substitute for a permanent *employee* on leave or to meet seasonal or short-term workload conditions.

P. *"Trailer"* includes semitrailer.

Mercy SJ Exhibit 2

Dames, Kim 000042

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

**MISSOURI CHANGES - CANCELLATION AND NONRENEWAL**

CA-0219F(2-13)

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
GARAGE COVERAGE FORM
MOTOR CARRIER COVERAGE FORM
TRUCKERS COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

**A.** If you are an individual, partnership or limited liability company and a covered *auto* you own is of the *private passenger type,* and this policy covers fewer than five *autos* and does not insure the motor vehicle hazard of garages, motor vehicle sales agencies, repair shops, service stations or public parking places, the Cancellation Common Policy Condition does not apply to that *auto*. The following Condition applies instead:

**ENDING THIS POLICY**

**1. Cancellation**

  **a.** You may cancel the policy by returning it to us or by giving us advance notice of the date cancellation is to take effect.

  **b.** If this policy has been in effect for 60 days or less and is not a renewal or continuation policy, we may cancel for any reason. If we cancel, we will mail you at least 10 days notice.

  **c.** When this policy has been in effect for more than 60 days or is a renewal or continuation policy, we may cancel only for one or more of the following reasons:

  (1) Nonpayment of premium. If we cancel for this reason, we will mail you at least 10 days notice.

  (2) If you are an individual, partnership or limited liability company and your driver's license has been suspended or revoked during the policy period. If we cancel for this reason, we will mail you at least 60 days notice. However, we may not cancel if you are more than one person, but only one person's license has been suspended or revoked. Instead we may exclude coverage for that person while operating a covered *auto* during a period of suspension or revocation.

  (3) If you are an individual, we replace this policy with another one providing similar coverages and the same limits for the covered *auto*. The replacement policy will take effect

when this policy is cancelled, and will end a year after this policy begins or on this policy's expiration date, whichever is earlier.

**d.** If this policy is cancelled, you may be entitled to a premium refund. If so, we will send you the refund. However, making or offering to make the refund is not a condition of cancellation. The following provisions govern calculation of return premium:

  (1) We will compute return premium pro rata and round to the next higher whole dollar when this policy is:

  (a) Cancelled by us or at our request;

  (b) Cancelled because you no longer have a financial or insurable interest in the property or business operation that is the subject of this insurance;

  (c) Cancelled but rewritten with us or in our company group; or

  (d) Cancelled after the first year, if it is a prepaid policy written for a term of more than one year.

  (2) When this policy is cancelled at the request of the First Named Insured (except when paragraph (1)(b), (1)(c) or (1)(d) applies), we will return 90% of the pro rata unearned premium, rounded to the next higher whole dollar. However, when such cancellation takes place during the first year of a multiyear prepaid policy, we will return the full annual premium for the subsequent years.

  (3) When this policy is cancelled at your request and is an auto dealer's policy written on a reporting form basis, we will calculate the return or additional premium as follows:

  (a) Final annual premium will be determined on the basis of the average value reported during the period on which the policy was in effect.

  (b) Pro rata earned premium will be determined based on the final annual premium for the number of days the policy was in force as determined by paragraph (3)(a) rounded to the next whole dollar.

Mercy SJ Exhibit 2

(continued next page)

Dames, Kim 000043

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

(c) Pro rata unearned premium will be determined by subtracting paragraph (3)(b) from paragraph (3)(a).

(d) The short rate surcharge will be determined by multiplying the unearned premium by 10% and rounding to the next higher whole dollar.

(e) Calculate the short rate earned premium by adding paragraphs (3)(b) and (3)(d).

(f) If the short rate earned premium is less than the sum of all payments (including any deposit premium), the difference is the return premium.

(g) If the short rate earned premium is greater than the sum of all payments (including any deposit premium), the difference is the additional premium due.

e. The effective date of cancellation stated in the notice shall become the end of the policy period.

f. Our notice of cancellation will state the actual reason for cancellation unless the cancellation is due to nonpayment of premium.

**2. Nonrenewal**

a. If we decide not to renew or continue this policy, we will mail you notice at least 60 days before the end of the policy period. If the policy period is other than one year, we will have the right not to renew or continue it only at the anniversary of its original effective date. If we offer to renew or continue and you do not accept, this policy will terminate at the end of the current policy period. Failure to pay the required renewal or continuation premium when due shall mean that you have not accepted our offer.

b. If we fail to mail proper notice of nonrenewal and you obtain other insurance, the coverages provided by this policy will end on the effective date of any similar coverages provided by the other insurance.

c. Our notice of nonrenewal will state the actual reason for nonrenewal unless the nonrenewal is due to nonpayment of premium.

**3. Mailing Of Notices**

Any notice of cancellation or nonrenewal will be mailed by United States post office certificate of mailing to your last known mailing address. Proof of mailing of any notice will be sufficient proof of notice.

B. For *autos* not described in paragraph A above:

1. Paragraph 2 of the Cancellation Common Policy Condition is replaced by the following:

We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation, stating the actual reason for cancellation, at least:

a. Ten days before the effective date of cancellation if we cancel for nonpayment of premium;

b. Thirty days before the effective date of cancellation if cancellation is for one or more of the following reasons:

(1) Fraud or material misrepresentation affecting this policy or a claim filed under this policy or a violation of any of the terms or conditions of this policy;

(2) Changes in conditions after the effective date of this policy which have materially increased the risk assumed;

(3) We become insolvent; or,

(4) We involuntarily lose reinsurance for this policy.

c. Sixty days before the effective date of cancellation if we cancel for any other reason.

2. Paragraph 5 of the Cancellation Common Policy Condition is replaced by the following:

5. If this policy is cancelled, we will send the First Named Insured any premium refund due. The cancellation will be effective even if we have not made or offered a refund. The following provisions govern calculation of return premium:

a. We will compute return premium pro rata and round to the next higher whole dollar when this policy is:

(1) Cancelled by us or at our request;

(2) Cancelled because you no longer have a financial or insurable interest in the property or business operation that is the subject of this insurance;

(3) Cancelled but rewritten with us or in our company group; or

(4) Cancelled after the first year, if it is a prepaid policy written for a term of more than one year.

Mercy SJ Exhibit 2

(continued next page)

Dames, Kim 000044

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

**b.** When this policy is cancelled at the request of the First Named Insured (except when paragraph a(2), a(3) or a(4) applies), we will return 90% of the pro rata unearned premium, rounded to the next higher whole dollar. However, when such cancellation takes place during the first year of a multiyear prepaid policy, we will return the full annual premium for the subsequent years.

**c.** When this policy is cancelled at the request of the First Named Insured and is an auto dealer's policy written on a reporting form basis, we will calculate the return or additional premium as follows:

(1) Final annual premium will be determined on the basis of the average value reported during the period in which the policy was in effect.

(2) Pro rata earned premium will be determined based on the final annual premium for the number of days the policy was in force as determined by paragraph c(1) rounded to the next higher whole dollar.

(3) Pro rata unearned premium will be determined by subtracting paragraph c(2) from paragraph c(1).

(4) The short rate surcharge will be determined by multiplying the unearned premium by 10% and rounding to the next higher whole dollar.

(5) Calculate the short rate earned premium by adding paragraphs c(1) and c(4).

(6) If the short rate earned premium is less than the sum of all payments (including any deposit premium), the difference is the return premium.

(7) If the short rate earned premium is greater than the sum of all payments (including any deposit premium), the difference is the additional premium due.

**3.** The following is added and supersedes any provision to the contrary:

**Nonrenewal**

**1.** We may elect not to renew this policy by mailing or delivering to the first Named Insured, at the last mailing address known to us, written notice of nonrenewal, stating the actual reason for nonrenewal, at least 60 days prior to the effective date of the nonrenewal.

**2.** If notice is mailed, proof of mailing will be sufficient proof of notice.

---

**MISSOURI SPLIT UNDERINSURED MOTORISTS COVERAGE LIMITS**                    CA-3105F(3-94)

For a covered *auto* licensed or principally garaged in, or *garage operations* conducted in, Missouri, this endorsement modifies insurance provided under the following:

MISSOURI UNDERINSURED MOTORISTS COVERAGE

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

Paragraph 1 of Limit of Insurance is replaced by the following:

**a.** Regardless of the number of covered *autos, insureds,* premiums paid, claims made or vehicles involved in the *accident,* the most we will pay for *bodily injury* to any one person resulting from any one *accident,* including all damages claimed by any person or organization for care, loss of services or death resulting from the *bodily injury,* is the limit of *Bodily Injury* for each person shown in the Declarations applicable to each covered *auto.*

**b.** Subject to the limit for each person, regardless of the number of covered *autos, insureds,* premiums paid, claims made or vehicles involved in the *accident,* the most we will pay for *bodily injury* resulting from any one *accident,* including all damages claimed by any person or organization for care, loss of services or death resulting from the *bodily injury,* is the limit of *Bodily Injury* for each *accident* shown in the Declarations applicable to each covered *auto.*

Mercy SJ Exhibit 2

Dames, Kim 000045

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

**MISSOURI UNDERINSURED MOTORISTS COVERAGE**                    CA-3104F(9-10)

For a covered *auto* licensed or principally garaged in, or *garage operations* conducted in, Missouri, this endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
GARAGE COVERAGE FORM
MOTOR CARRIER COVERAGE FORM
TRUCKERS COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the coverage form apply unless modified by the endorsement.

### A. COVERAGE

1. We will pay all sums the *insured* is legally entitled to recover as compensatory damages from the owner or driver of an *underinsured motor vehicle*. The damages must result from *bodily injury* sustained by the *insured* caused by an *accident*. The owner's or driver's liability for these damages must result from the ownership, maintenance or use of the *underinsured motor vehicle*.

2. We will pay under this coverage only if paragraph a or b below applies:

   a. The limit of any applicable liability bonds or policies have been exhausted by payment of judgments or settlements; or

   b. A tentative settlement has been made between an *insured* and the insurer of the *underinsured motor vehicle* and we:

      (1) Have been given prompt written notice of such tentative settlement; and

      (2) Advance payment to the *insured* in an amount equal to the tentative settlement within 30 days after receipt of notification.

3. Any judgment for damages arising out of a *suit* brought without our written consent is not binding on us.

### B. WHO IS AN INSURED

If the Named Insured is designated in the Declarations as:

1. An individual, then the following are *insureds:*

   a. The Named Insured and any *family members*. However, this does not include any *family member*, other than the Named Insured's spouse, who owns an *auto*.

   b. Anyone else *occupying* a covered *auto* or a temporary substitute for a covered *auto*. The covered *auto* must be out of service because of its breakdown, repair, servicing, *loss* or destruction.

   c. Anyone for damages he or she is entitled to recover because of *bodily injury* sustained by another *insured*.

2. A partnership, limited liability company, corporation or any other form of organization, then the following are *insureds:*

   a. Anyone *occupying* a covered *auto* or a temporary substitute for a covered *auto*. The covered *auto* must be out of service because of its breakdown, repair, servicing, *loss* or destruction.

   b. Anyone for damages he or she is entitled to recover because of *bodily injury* sustained by another *insured*.

### C. EXCLUSIONS

This insurance does not apply to any of the following:

1. The direct or indirect benefit of any insurer or self-insurer under any workers' compensation, disability benefits or similar law.

2. *Bodily injury* sustained by any person while *occupying* or struck by any vehicle owned by the Named Insured or if the Named Insured is an individual, any *family member,* that is not a covered *auto*. However, this exclusion does not apply to an individual Named Insured.

3. Anyone using a vehicle without a reasonable belief that the person is entitled to do so.

4. Punitive or exemplary damages.

5. *Bodily injury* arising directly or indirectly out of:

   a. War, including undeclared or civil war;

   b. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

   c. Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

### D. LIMIT OF INSURANCE

1. Regardless of the number of covered *autos, insureds,* premiums paid, claims made or vehicles involved in the *accident,* the most we will pay for all damages resulting from any one *accident* is the limit of Underinsured Motorists Coverage shown in the Declarations.

Mercy SJ Exhibit 2

(continued next page)

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

2. We will not pay for any element of *loss* if a person is entitled to receive duplicate payment under any of the following or similar law:

   a. Workers' compensation law; or

   b. Disability benefits law.

3. No one will be entitled to receive duplicate payments for the same elements of *loss* under this coverage and this policy's Liability Coverage.

4. We will not make a duplicate payment under this coverage for any element of *loss* for which payment has been made by or for anyone who is legally responsible.

**E. CHANGES IN CONDITIONS**

The Conditions are changed for Missouri Underinsured Motorists Coverage as follows:

1. Other Insurance in the Business Auto and Garage Coverage Forms and Other Insurance - Primary and Excess Insurance Provisions in the Truckers and Motor Carrier Coverage Forms are replaced by the following:

   If there is other applicable insurance available under one or more policies or provisions of coverage:

   a. The maximum recovery under all coverage forms or policies combined may equal but not exceed the highest applicable limit for any one vehicle under any coverage form or policy providing coverage on either a primary or excess basis.

   b. Subject to all other provisions of this policy, including but not limited to:

      (1) Exclusion C2 of this endorsement;

      (2) Paragraph D, Limit of Insurance of this endorsement;

      (3) Paragraph E1a of the Other Insurance condition of this endorsement; and

      (4) The Two or More Coverage Forms or Policies Issued by Us condition of this policy;

      any insurance we provide with respect to a vehicle the Named Insured does not own shall be excess over any other collectible underinsured motorists insurance providing coverage on a primary basis.

   c. If the coverage under this coverage form is provided:

      (1) On a primary basis, we will pay only our share of the loss that must be paid under insurance providing coverage on a primary basis. Our share is the proportion that our limit of liability bears to the total of all applicable limits of liability for coverage on a primary basis.

      (2) On an excess basis, we will pay only our share of the loss that must be paid under insurance providing coverage on an excess basis. Our share is the proportion that our limit of liability bears to the total of all applicable limits of liability for coverage on an excess basis.

2. Duties in the Event of Accident, Claim, Suit or Loss is changed by adding the following:

   a. Promptly notify the police if a hit-and-run driver is involved;

   b. Promptly send us copies of the legal papers if a *suit* is brought; and

   c. A person seeking Underinsured Motorists Coverage must also promptly notify us in writing of a tentative settlement between the *insured* and the insurer of the *underinsured motor vehicle* and allow us to advance payment to that *insured* in an amount equal to the tentative settlement within 30 days after receipt of notification to preserve our rights against the insurer, owner or operator of such *underinsured motor vehicle.*

3. Transfer of Rights of Recovery Against Others to Us is changed by adding the following:

   If we make any payment and the *insured* recovers from another party, the *insured* shall hold the proceeds in trust for us and pay us back the amount we have paid.

   Our rights do not apply under this provision with respect to damages caused by an *accident* with an *underinsured motor vehicle* if we:

   a. Have been given prompt written notice of a tentative settlement between an *insured* and the insurer of an *underinsured motor vehicle;* and

   b. Fail to advance payment to the *insured* in an amount equal to the tentative settlement within 30 days after receipt of notification.

   If we advance payment to the *insured* in an amount equal to the tentative settlement within 30 days after receipt of notification:

   a. That payment will be separate from any amount the *insured* is entitled to recover under the provisions of Underinsured Motorists Coverage; and

   b. We also have a right to recover the

Mercy SJ Exhibit 2

(continued next page)

Dames, Kim 000047

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

advanced payment.

**4.** The following condition is added:

**Arbitration**

    **a.** If we and an *insured* disagree whether the *insured* is legally entitled to recover damages from the owner or driver of an *underinsured motor vehicle* or do not agree as to the amount of damages that are recoverable by that *insured,* both parties may agree to an arbitration and to be bound by the results of that arbitration. However, disputes concerning coverage under this endorsement may not be arbitrated. If both parties so agree, then each party will select an arbitrator. The two arbitrators will select a third. If they cannot agree within 30 days, either may request that selection be made by a judge of a court having jurisdiction. Each party will pay the expenses it incurs and bear the expenses of the third arbitrator equally.

    **b.** Unless both parties agree otherwise, arbitration will take place in the county in which the *insured* lives. Local rules of law as to arbitration procedure and evidence will apply. A decision agreed to

by two of the arbitrators will be binding.

**F. ADDITIONAL DEFINITIONS**

As used in this endorsement:

**1.** *"Family member"* means a person related to an individual Named Insured by blood, marriage or adoption who is a resident of such Named Insured's household, including a ward or foster child.

**2.** *"Occupying"* means in, upon, getting in, on, out or off.

**3.** *"Underinsured motor vehicle"* means a land motor vehicle or *trailer* for which a *bodily injury* liability bond or policy applies at the time of an *accident* but the amount paid for *bodily injury* under that bond or policy to an *insured* is not enough to pay the full amount the *insured* is legally entitled to recover as damages.

However, *underinsured motor vehicle* does not include any vehicle:

    **a.** Owned or operated by a self insurer under any applicable motor vehicle law; or

    **b.** Designed for use mainly off public roads while not on public roads.

---

**MISSOURI CHANGES - POLLUTION EXCLUSION**

CA-0166R(3-06)

For a covered *auto* licensed or principally garaged in, or *garage operations* conducted in Missouri, this endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
GARAGE COVERAGE FORM
MOTOR CARRIER COVERAGE FORM
TRUCKERS COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by this endorsement.

**A.** The following is added to the Pollution Exclusion in Section II - Liability Coverage in the Business Auto, Motor Carrier and Truckers Coverage Forms and to the Pollution Exclusion Applicable To *Garage Operations* - Covered *Autos* in the Garage Coverage Form:

This Pollution Exclusion applies even if such irritant or contaminant has a function in your business, operations, premises, site or location.

**B.** The following is added to the Pollution Exclusion Applicable To *Garage Operations* - Other Than Covered *Autos* in Section II - Liability Coverage in the Garage Coverage Form or to any amendment to or replacement thereof:

This Pollution Exclusion applies even if such

irritant or contaminant has a function in your business, operations, premises, site or location.

**C.** If the Broadened Coverage - Garages or Broadened Coverage - Garages - Split Limits of Insurance endorsement is attached to a Garage Coverage Form, then Exclusion 2a(15) in the Broadened Coverage - Garages or Broadened Coverage - Garages - Split Limits of Insurance endorsement is revised by the addition of the following:

This Pollution Exclusion applies even if such irritant or contaminant has a function in your business, operations, premises, site or location.

**D.** If the Personal Injury Liability Coverage - Garages or Personal Injury Liability Coverage - Garages - Split Limits of Insurance endorsement is attached to a Garage Coverage Form, then exclusion 2a(8) in the Personal Injury Liability Coverage - Garages or Personal Injury Liability Coverage - Garages - Split Limits of Insurance endorsement is revised by the addition of the following:

This Pollution Exclusion applies even if such irritant or contaminant has a function in your business, operations, premises, site or location.

Mercy SJ Exhibit 2

Dames, Kim 000048

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

**MISSOURI UNINSURED MOTORISTS COVERAGE**

CA-2104F(10-12)

For a covered *auto* registered or principally garaged in, or *garage operations* conducted in, Missouri, this endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
GARAGE COVERAGE FORM
MOTOR CARRIER COVERAGE FORM
TRUCKERS COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

### A. COVERAGE

1. We will pay all sums the *insured* is legally entitled to recover as compensatory damages from the owner or driver of an *uninsured motor vehicle.* The damages must result from *bodily injury* sustained by the *insured* caused by an *accident.* The owner's or driver's liability for these damages must result from the ownership, maintenance or use of the *uninsured motor vehicle.*

2. No judgment for damages arising out of a *suit* brought against the owner or operator of an *uninsured motor vehicle* is binding on us unless we have:

   a. Received reasonable notice of the pendency of the *suit* resulting in the judgment; and

   b. Had a reasonable opportunity to protect our interests in the *suit.*

### B. WHO IS AN INSURED

If the Named Insured is designated in the Declarations as:

1. An individual, then the following are *insureds:*

   a. The Named Insured and any *family members.* However, this does not include any *family member,* other than the Named Insured's spouse, who owns an *auto.*

   b. Anyone else *occupying* a covered *auto* or a temporary substitute for a covered *auto.* The covered *auto* must be out of service because of its breakdown, repair, servicing, *loss* or destruction.

   c. Anyone for damages he or she is entitled to recover because of *bodily injury* sustained by another *insured.*

2. A partnership, limited liability company, corporation or any other form of organization, then the following are *insureds:*

   a. Anyone *occupying* a covered *auto* or a temporary substitute for a covered *auto.* The covered *auto* must be out of ser-

vice because of its breakdown, repair, servicing, *loss* or destruction.

   b. Anyone for damages he or she is entitled to recover because of *bodily injury* sustained by another *insured.*

### C. EXCLUSIONS

This insurance does not apply to any of the following:

1. Any claim settled without our consent, if the settlement or judgment prejudices our right to recover payment. However, this exclusion applies only to the extent that the limits of liability for Uninsured Motorists Coverage exceed the minimum limits of liability required by the financial responsibility law of Missouri.

2. The direct or indirect benefit of any insurer or self-insurer under any workers' compensation, disability benefits or similar law.

3. *Bodily injury* sustained by any person while *occupying* or struck by any vehicle owned by the Named Insured or if the Named Insured is an individual, any *family member,* that is not a covered *auto.* However, this exclusion does not apply to an individual Named Insured.

4. Anyone using a vehicle without a reasonable belief that the person is entitled to do so.

5. Punitive or exemplary damages.

6. *Bodily injury* arising directly or indirectly out of:

   a. War, including undeclared or civil war;

   b. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

   c. Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

### D. LIMIT OF INSURANCE

1. Regardless of the number of *insureds,* premiums paid, claims made or vehicles involved in the *accident,* the most we will pay for all damages resulting from any one *accident* is the limit of Uninsured Motorists Coverage shown in the Declarations.

   However, if *bodily injury* to which this coverage applies is sustained by any person other than an individual Named Insured or any *family member,* the Limit of Insurance

Mercy SJ Exhibit 2

(continued next page)

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

shown in the Declarations for this coverage is also the most we will pay regardless of the number of covered *autos.*

2. If there are two or more covered *autos,* that are not trailers, and *bodily injury* is sustained by an individual Named Insured or any *family member,* our Limit of Insurance for any one *accident* is the sum of the limits applicable to each covered *auto* which is not a *trailer.* Subject to this maximum limit of liability for all damages:

   a. The most we will pay for all damages sustained in such *accident* by an *insured* other than an individual Named Insured or any *family member* is that *insured's* pro rata share of the limit shown in the Declarations for this coverage, at the time of the *accident.*

   b. An individual Named Insured or any *family member* who sustains *bodily injury* in such *accident* will also be entitled to a pro rata share of the limit described in Paragraph a above.

   A person's pro rata share is the proportion that that person's damages bears to the total damages sustained by all *insureds.*

3. No one will be entitled to receive duplicate payments for the same elements of *loss* under this Coverage Form and any Liability Coverage Form attached to this Coverage Part.

   We will not make a duplicate payment under this coverage for any element of *loss* for which payment has been made by or for anyone who is legally responsible. However, this does not include any amounts paid or payable under medical payments or any workers' compensation, disability benefits or similar law.

**E. CHANGES IN CONDITIONS**

The Conditions are changed for Missouri Uninsured Motorists Coverage as follows:

1. The reference in Other Insurance in the Business Auto and Garage Coverage Forms and Other Insurance - Primary And Excess Insurance Provisions in the Truckers and Motor Carrier Coverage Forms to "other collectible insurance" applies only to other collectible uninsured motorists insurance.

2. Duties In The Event Of Accident, Claim, Suit Or Loss is changed by adding the following:

   a. Promptly notify the police if a hit-and-run driver is involved; and

   b. Promptly send us copies of the legal papers if a *suit* is brought.

3. Transfer Of Rights Of Recovery Against

Others To Us is changed by adding the following:

If we make any payment and the *insured* recovers from another party, the *insured* shall hold the proceeds in trust for us and pay us back the amount we have paid.

4. The following condition is added:

   **Arbitration**

   a. If we and an *insured* disagree whether the *insured* is legally entitled to recover damages from the owner or driver of an *uninsured motor vehicle* or do not agree as to the amount of damages that are recoverable by that *insured,* both parties may agree to an arbitration and to be bound by the results of that arbitration. However, disputes concerning coverage under this endorsement may not be arbitrated. If both parties so agree, then each party will select an arbitrator. The two arbitrators will select a third. If they cannot agree within 30 days, either may request that selection be made by a judge of a court having jurisdiction. Each party will pay the expenses it incurs and bear the expenses of the third arbitrator equally.

   b. Unless both parties agree otherwise, arbitration will take place in the county in which the *insured* lives. Local rules of law as to arbitration procedure and evidence will apply. A decision agreed to by two of the arbitrators will be binding.

5. Two Or More Coverage Forms Or Policies Issued By Us does not apply.

**F. ADDITIONAL DEFINITIONS**

As used in this endorsement:

1. *"Family member"* means a person related to an individual Named Insured by blood, marriage or adoption, who is a resident of such Named Insured's household, including a ward or foster child.

2. *"Occupying"* means in, upon, getting in, on, out or off.

3. *"Uninsured motor vehicle"* means a land motor vehicle or *trailer:*

   a. For which no liability bond or policy at the time of an *accident* provides at least the amounts required by the applicable law where a covered *auto* is principally garaged;

   b. For which an insuring or bonding company denies coverage or is or becomes insolvent; or

   c. That is a hit-and-run vehicle and neither the driver nor owner can be identified. The vehicle must either:

Mercy SJ Exhibit 2

(continued next page)

Dames, Kim 000050

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

(1) Hit an *insured,* a covered *auto* or a vehicle an *insured* is *occupying,* or

(2) Cause *bodily injury* to an *insured* without hitting an *insured,* a covered *auto* or a vehicle an *insured* is *occupying.* The facts of the *accident* must be proved. We may request supporting evidence beyond the testimony of a person making a claim under this or any similar coverage to support the validity of such claim.

However, *uninsured motor vehicle* does not include any vehicle:

a. Owned or operated by a self-insurer under any applicable motor vehicle law, except a self-insurer who is or becomes insolvent and cannot provide the amounts required by that motor vehicle law; or

b. Designed for use mainly off public roads while not on public roads.

## DRIVE OTHER CAR COVERAGE - BROADENED COVERAGE FOR NAMED INDIVIDUALS

CA-7045(9-02)

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
GARAGE COVERAGE FORM
MOTOR CARRIER COVERAGE FORM
TRUCKERS COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

1. This endorsement changes only those coverages where a premium is shown in the Declarations or in the Schedule.

2. **CHANGES IN LIABILITY COVERAGE**

a. Any *auto* you don't own, hire or borrow is a covered *auto* for Liability Coverage while being used by any individual named in the Schedule or by his or her spouse while a resident of the same household except:

(1) Any *auto* owned by that individual or by any member of his or her household.

(2) Any *auto* used by that individual or his or her spouse while working in a business of selling, servicing, repairing or parking *autos.*

b. The following is added to Who Is an Insured:

Any individual named in the Schedule and his or her spouse, while a resident of the same household, are *insureds* while using any covered *auto* described in paragraph 2a of this endorsement.

3. **CHANGES IN AUTO MEDICAL PAYMENTS, UNINSURED MOTORISTS AND UNDERINSURED MOTORISTS COVERAGE**

The following is added to Who Is an Insured:

Any individual named in the Schedule and his or her *family members* are *insureds* while *occupying* or while a pedestrian when being struck by any *auto* you do not own except:

Any *auto* owned by that individual or by any *family member.*

4. **CHANGES IN PHYSICAL DAMAGE COVERAGE**

Any private passenger type *auto* you don't own, hire or borrow is a covered *auto* while in the care, custody or control of any individual named in the Schedule or his or her spouse while a resident of the same household except:

a. Any *auto* owned by that individual or by any member of his or her household.

b. Any *auto* used by that individual or his or her spouse while working in a business of selling, servicing, repairing or parking *autos.*

5. **ADDITIONAL DEFINITION**

As used in this endorsement:

*"Family member"* means a person related to the individual named in the Schedule by blood, marriage or adoption who is a resident of the individual's household, including a ward or foster child.

### SCHEDULE

#### Names of Individuals

JACK DAMES

Mercy SJ Exhibit 2

Dames, Kim 000051

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

**EXCLUSION OF TERRORISM**

CA-2384F(1-06)

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
GARAGE COVERAGE FORM
MOTOR CARRIER COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

A. The following definitions are added and apply under this endorsement wherever the term terrorism, or the phrase any injury, damage, loss or expense, are shown in italics:

   1. *"Terrorism"* means activities against persons, organizations or property of any nature:

      a. That involve the following or preparation for the following:

         (1) Use or threat of force or violence; or

         (2) Commission or threat of a dangerous act; or

         (3) Commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; and

      b. When one or both of the following applies:

         (1) The effect is to intimidate or coerce a government or the civilian population or any segment thereof, or to disrupt any segment of the economy; or

         (2) It appears that the intent is to intimidate or coerce a government, or to further political, ideological, religious, social or economic objectives or to express (or express opposition to) a philosophy or ideology.

   2. *"Any injury, damage, loss or expense"* means any injury, damage, loss or expense covered under any Coverage Form or Policy to which this endorsement is applicable, and includes but is not limited to *bodily injury, property damage, personal injury, personal and advertising injury, loss,* loss of use, rental reimbursement after *loss* or *covered pollution cost or expense,* as may be defined under this Coverage Form, Policy or any applicable endorsement.

B. Except with respect to Physical Damage Coverage, Trailer Interchange Coverage, Garagekeepers Coverage or Garagekeepers Coverage - Customers' Sound Receiving Equipment, the following exclusion is added:

**EXCLUSION OF TERRORISM**

We will not pay for *any injury, damage, loss or expense* caused directly or indirectly by *terrorism,* including action in hindering or defending against an actual or expected incident of *terrorism. Any injury, damage, loss or expense* is excluded regardless of any other cause or event that contributes concurrently or in any sequence to such injury, damage, loss or expense. **But this exclusion applies only when one or more of the following are attributed to an incident of *terrorism*:**

1. The *terrorism* is carried out by means of the dispersal or application of radioactive material, or through the use of a nuclear weapon or device that involves or produces a nuclear reaction, nuclear radiation or radioactive contamination; or

2. Radioactive material is released, and it appears that one purpose of the *terrorism* was to release such material; or

3. The *terrorism* is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

4. Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the *terrorism* was to release such materials; or

5. The total of insured damage to all types of property exceeds $25,000,000. In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the *terrorism* and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions; or

6. Fifty or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:

   a. Physical injury that involves a substantial risk of death; or

   b. Protracted and obvious physical disfigurement; or

   c. Protracted loss of or impairment of the function of a bodily member or organ.

Multiple incidents of *terrorism* which occur within a 72-hour period and appear to be carried out in concert or to have a related purpose or common leadership will be deemed to be one

Mercy SJ Exhibit 2

(continued next page)

Dames, Kim 000052

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

incident, for the purpose of determining whether the thresholds in Paragraphs B5 and B6 are exceeded.

With respect to this Exclusion, Paragraphs B5 and B6 describe the thresholds used to measure the magnitude of an incident of *terrorism* and the circumstances in which the threshold will apply, for the purpose of determining whether this Exclusion will apply to that incident. When the Exclusion applies to an incident of *terrorism,* there is no coverage under this Coverage Form, Policy or any applicable endorsement.

**C.** With respect to Physical Damage Coverage, Trailer Interchange Coverage, Garagekeepers Coverage or Garagekeepers Coverage - Customers' Sound Receiving Equipment, the following exclusion is added:

**EXCLUSION OF TERRORISM**

We will not pay for any *loss,* loss of use or rental reimbursement after *loss* caused directly or indirectly by *terrorism,* including action in hindering or defending against an actual or expected incident of *terrorism*. **But this exclusion applies only when one or more of the following are attributed to an incident of *terrorism*:**

**1.** The *terrorism* is carried out by means of the dispersal or application of radioactive material, or through the use of a nuclear weapon or device that involves or produces a nuclear reaction, nuclear radiation or radioactive contamination; or

**2.** Radioactive material is released, and it appears that one purpose of the *terrorism* was to release such material; or

**3.** The *terrorism* is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

**4.** Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the *terrorism* was to release such materials; or

**5.** The total of insured damage to all types of property exceeds $25,000,000. In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the *terrorism* and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions.

Multiple incidents of *terrorism* which occur within a 72-hour period and appear to be carried out in concert or to have a related purpose or common leadership will be deemed to be one incident, for the purpose of determining whether the threshold in Paragraph C5 is exceeded.

With respect to this Exclusion, Paragraph C5 describes the threshold used to measure the magnitude of an incident of *terrorism* and the circumstances in which the threshold will apply, for the purpose of determining whether this Exclusion will apply to that incident. When the Exclusion applies to an incident of *terrorism,* there is no coverage under this Coverage Form, Policy or any applicable endorsement.

**D.** In the event of any incident of *terrorism* that is not subject to the Exclusion in Paragraphs B or C, coverage does not apply to *any injury, damage, loss or expense* that is otherwise excluded under this Coverage Form, Policy or any applicable endorsement.

---

**ASBESTOS EXCLUSION**

IL-7012(3-14)

This endorsement modifies insurance provided under the following:

BIS-PAK BUSINESS LIABILITY AND MEDICAL EXPENSE COVERAGE FORM
COMMERCIAL AUTO COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
DIRECTORS' AND OFFICERS' LIABILITY COVERAGE PART
EMPLOYEE BENEFITS LIABILITY COVERAGE PART
ERRORS AND OMISSIONS COVERAGE PART
GARAGE COVERAGE FORM
LIQUOR LIABILITY COVERAGE FORM
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
POLLUTION LIABILITY COVERAGE FORM

PRODUCT WITHDRAWAL COVERAGE PART
PRODUCTS-COMPLETED OPERATIONS LIABILITY COVERAGE FORM
RAILROAD PROTECTIVE LIABILITY COVERAGE FORM

The following exclusion is added:

**Asbestos**

This insurance does not apply to any *bodily injury* or *property damage* arising out of activities related to, but not limited to, manufacture, mining, storage, distribution, installation, sale, use, exposure to, service, testing for, repair, containment or removal of asbestos, asbestos fibers, asbestos dust, or products containing asbestos.

Mercy SJ Exhibit 2

Dames, Kim 000053

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

*ACUITY* ADVANTAGES - BUSINESS AUTO

CA-7246(12-12)

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
MOTOR CARRIER COVERAGE FORM

**1. Newly Acquired Organizations**

The following is added to paragraph A1, Who Is an Insured of Section II - Liability Coverage:

Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

a. Coverage under this provision is afforded only until the 180th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

b. This coverage does not apply to bodily injury or property damage that occurred before you acquired or formed the organization;

c. No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**2. Increased Supplementary Payments**

a. The limit shown in paragraph A2a(2) of Section II - Liability Coverage is increased to $2,500.

b. The limit shown in paragraph A2a(4) of Section II - Liability Coverage is increased to $300.

**3. Coverage Extensions**

The following are added to paragraph A4, Coverage Extensions of Section III - Physical Damage Coverage in the Business Auto Coverage Form and to paragraph A4, Coverage Extensions under Section IV - Physical Damage Coverage in the Motor Carrier Coverage Form:

**a. Fuel in Vehicle Coverage**

We will also pay, with respect to a covered *loss*, the actual loss sustained for the *loss* to the fuel used to operate your vehicle but only with respect to a covered *auto*. You must provide documentation supporting your claim for damages.

**Deductible**

A deductible applies to this coverage. Refer to paragraph 5 Deductible Applicable to Fuel in Vehicle, Miscellaneous Equipment Used With Covered Vehicle and Original Equipment Manufacturer Electronic Equipment Coverages for further information.

**b. Miscellaneous Equipment Used With Covered Vehicle Coverage**

We will also pay, with respect to a covered *loss*, the actual cash value, repair cost or replacement cost, whichever is less, for *loss* to your miscellaneous equipment but only with respect to a covered *auto*. Miscellaneous equipment means hand trucks, dollies, pallets, pads, covers, binders, tarps, tie-downs, chains and other similar equipment used in the handling of property being transported.

**Deductible**

A deductible applies to this coverage. Refer to paragraph 5 Deductible Applicable to Fuel in Vehicle, Miscellaneous Equipment Used With Covered Vehicle and Original Equipment Manufacturer Electronic Equipment Coverages for further information.

**4. Original Equipment Manufacturer Electronic Equipment Coverage**

The following is added to paragraph B4, Exclusions of Section III - Physical Damage Coverage in the Business Auto Coverage Form and to paragraph B2, Exclusions under Section IV - Physical Damage Coverage in the Motor Carrier Coverage Form:

Exclusions 4c and 4d in the Business Auto Coverage Form and exclusions 2e and 2f of the Motor Carrier Coverage Form do not apply to the following:

**c. Original Equipment Manufacturer Electronic Equipment Coverage**

We will also pay, with respect to a covered *loss*, the actual loss sustained to electronic equipment permanently installed in the location provided for such equipment by the original manufacturer of the *auto* but only with respect to a covered *auto*.

**Deductible**

A deductible applies to this coverage. Refer to paragraph 5 Deductible Applicable to Fuel in Vehicle, Miscellaneous Equipment Used With Covered Vehicle and Original Equipment Manufacturer Electronic Equipment Coverages for further information.

**5. Deductible Applicable to Fuel in Vehicle, Miscellaneous Equipment Used With Covered Vehicle and Original Equipment Manufacturer Electronic Equipment Coverages**

a. If *loss* to property covered by these coverages is the result of a *loss* to the covered *auto* under this Coverage Form's Comprehensive or Collision Coverage, then for each covered *auto* our obligation to pay for, repair, return or replace damaged or stolen

Mercy SJ Exhibit 2

(continued next page)

Dames, Kim 000054

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

property will be reduced by the applicable deductible shown in the Declarations. Any Comprehensive Coverage deductible shown in the Declarations does not apply to *loss* to property covered by an extension caused by fire or lightning.

**b.** If *loss* to property covered by these coverages is the result of a *loss* to the covered *auto* under this Coverage Form's Specified Causes of Loss Coverage, then for each covered *auto* our obligation to pay for, repair, return or replace damaged or stolen property will be reduced by a $100 deductible.

**c.** In the event that there is more than one applicable deductible, only the highest deductible will apply. In no event will more than one deductible apply.

**6. Deductible Waiver**

The following is added to paragraph D of Section III - Physical Damage Coverage in the Business Auto Coverage Form and to paragraph D of Section IV - Physical Damage Coverage in the Motor Carrier Coverage Form:

If the insured chooses to have a damaged windshield or other glass repaired, no deductible will apply to the loss.

**7. Knowledge of an Occurrence**

The following is added to paragraph A2, Duties in the Event of Accident, Claim, Suit or Loss of Section IV - Business Auto Conditions in the Business Auto Coverage Form and to paragraph A2, Duties in the Event of an Accident, Claim, Suit or Loss of Section V - Motor Carrier Conditions in the Motor Carrier Coverage Form:

Knowledge of an *accident,* claim or *suit* by your agent, servant or *employee* shall not in itself constitute knowledge of the Named Insured unless an officer of the Named Insured has received such notice from the agent, servant or *employee*.

Mercy SJ Exhibit 2

Dames, Kim 000055

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

**MISSOURI CHANGES**                                CA-0165F(10-06)

For a covered *auto* licensed or principally garaged in, or *garage operations* conducted in, Missouri, this endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
GARAGE COVERAGE FORM
MOTOR CARRIER COVERAGE FORM
TRUCKERS COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

**A.** Coverage Extensions is amended as follows:

The following is added to Supplementary Payments:

(7) Prejudgment interest awarded against the *insured* on the part of the judgment we pay. If we make an offer to pay the applicable Limit of Insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**B.** Paragraph A1b of Who Is An Insured in Section II - Liability Coverage in the Business Auto Coverage Form, Motor Carrier Coverage Form and Truckers Coverage Form is changed by adding the following:

(6) If you are an individual, any member of your household, other than your spouse, who is related to you by blood or adoption, including a ward or foster child, who owns an *auto*.

Paragraph a(2) of Who Is An Insured in Section II - Liability Coverage in the Garage Coverage Form is changed by adding the following:

(f) If you are an individual, any member of your household, other than your spouse, who is related to you by blood or adoption, including a ward or foster child, who owns an *auto*.

**C.** Liability Coverage for a covered *auto* licensed or principally garaged in, or *garage operations* conducted in, Missouri is changed as follows:

**1.** If your business is other than selling, repairing or servicing *autos:*

**a.** The Care, Custody Or Control Exclusion does not apply to *property damage* to or *covered pollution cost or expense* involving an *auto* loaned to you, with or without consideration, by a person engaged in the business of selling, repairing or servicing *autos* as a temporary substitute for an *auto* you own.

**b.** The following is added to the Other Insurance Condition in the Business Auto and Garage Coverage Forms and the Other Insurance - Primary And Excess Insurance Provisions in the Truckers and Motor Carrier Coverage Forms:

Liability Coverage is primary for any temporary substitute for an *auto* you own if the substitute *auto* is operated by an *insured* and is loaned to you, with or without consideration, by a person engaged in the business of selling, repairing or servicing *autos.*

**2.** If your business is selling, repairing or servicing *autos,* the following is added to the Other Insurance Condition in the Business Auto and Garage Coverage Forms and the Other Insurance - Primary And Excess Insurance Provisions in the Truckers and Motor Carrier Coverage Forms:

Liability Coverage is excess for any *auto* you own if operated by a customer to whom you have loaned the *auto,* with or without consideration, as a temporary substitute for an *auto* owned by the customer.

**D.** The Appraisal For Physical Damage Loss, Loss Condition is replaced by the following:

If you and we disagree on the amount of *loss,* both parties may agree to an appraisal of the *loss* and to be bound by the results of that appraisal. If both parties so agree, then each party will select a competent appraiser. The two appraisers will select a competent and impartial umpire. The appraisers will state separately the actual cash value and amount of *loss.* If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**1.** Pay its chosen appraiser; and

**2.** Bear the other expenses of the appraisal and umpire equally.

If we submit to an appraisal, we will still retain our right to deny the claim.

**E.** The following is added to the Concealment, Misrepresentation and Fraud Condition:

With respect to Liability Coverage, this Condition only applies in excess of the minimum limits of liability required by the Missouri Financial Responsibility Laws.

**F.** Missouri Property and Casualty Insurance Guaranty Association Coverage Limitations

**1.** Subject to the provisions of the Missouri Property and Casualty Insurance Guaranty Association Act (to be referred to as the Act), if we are a member of the Missouri Property and Casualty Insurance Guaranty

Mercy SJ Exhibit 2

(continued next page)

Dames, Kim 000056

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Association (to be referred to as the Association), the Association will pay claims covered under the Act if we become insolvent.

2. The Act contains various exclusions, conditions and limitations that govern a claimant's eligibility to collect payment from the Association and affect the amount of any payment. The following limitations apply subject to all other provisions of the Act:

   a. Claims covered by the Association do not include a claim by or against an *insured* of an insolvent insurer, if the *insured* has a net worth of more than $25 million on the later of the end of the *insured's* most recent fiscal year or the December thirty-first of the year next preceding the date the insurer becomes insolvent; provided that an *insured's* net worth on such date shall be deemed to include the aggregate net worth of the *insured* and all of its affiliates as calculated on a consolidated basis.

   b. Payments made by the Association for covered claims will include only that amount of each claim which is less than $300,000.

   However, the Association will not:

   (1) Pay an amount in excess of the applicable Limit of Insurance of the policy from which a claim arises; or

   (2) Return to an *insured* any unearned premium in excess of $25,000.

   These limitations have no effect on the coverage we will provide under this policy.

Mercy SJ Exhibit 2

Dames, Kim 000057

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

## NUCLEAR ENERGY LIABILITY EXCLUSION - BROAD FORM

IL-0021F(3-14)

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTO COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
DIRECTORS' AND OFFICERS' LIABILITY COVERAGE PART
EMPLOYEE BENEFITS LIABILITY COVERAGE PART
ERRORS AND OMISSIONS COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE FORM
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
POLLUTION LIABILITY COVERAGE FORM
PRODUCT WITHDRAWAL COVERAGE PART
PRODUCTS-COMPLETED OPERATIONS LIABILITY COVERAGE FORM
RAILROAD PROTECTIVE LIABILITY COVERAGE FORM

1. The insurance does not apply:

   a. Under any Liability Coverage to *bodily injury* or *property damage*:

      (1) With respect to which an *insured* under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

      (2) Resulting from the *hazardous properties* of *nuclear material* and with respect to which:

         (a) Any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954 or any law amendatory thereof; or

         (b) The insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   b. Under any Medical Payments coverage, to expenses incurred with respect to *bodily injury* resulting from the *hazardous properties* of *nuclear material* and arising out of the operation of a *nuclear facility* by any person or organization.

   c. Under any Liability Coverage, to *bodily injury* or *property damage* resulting from the *hazardous properties* of *nuclear material*, if:

      (1) The *nuclear material*:

         (a) Is at any *nuclear facility* owned by, or operated by or on behalf of, an *insured*; or

         (b) Has been discharged or dispersed therefrom.

      (2) The *nuclear material* is contained in *spent fuel* or *waste* at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an *insured*; or

      (3) The *bodily injury* or *property damage* arises out of the furnishing by an *insured* of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any *nuclear facility*, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to *property damage* to such *nuclear facility* and any property thereat.

2. As used in this endorsement:

   a. *"Hazardous properties"* include radioactive, toxic or explosive properties.

   b. *"Nuclear material"* means *source material, special nuclear material* or *byproduct material*.

   c. *"Source material," "special nuclear material"* and *"byproduct material"* have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

   d. *"Spent fuel"* means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a *nuclear reactor*.

   e. *"Waste"* means any waste material:

      (1) Containing *byproducts material* other than the tailings or *wastes* produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its *source material* content; and

      (2) Resulting from the operation by any person or organization of any *nuclear facility* included under the first two paragraphs of the definition of *nuclear facility*.

   f. *"Nuclear facility"* means:

      (1) Any *nuclear reactor*;

      (2) Any equipment or device designed or used for:

         (a) Separating the isotopes of uranium or plutonium;

         (b) Processing or utilizing *spent fuel*; or

Mercy SJ Exhibit 2

**(continued next page)**

Dames, Kim 000058

(c) Handling, processing or packaging *waste.*

(3) Any equipment or device used for the processing, fabricating or alloying of *special nuclear material* if at any time the total amount of such material in the custody of the *insured* at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235.

(4) Any structure, basin, excavation, prem-ises or place prepared or used for the storage or disposal of *waste;*

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

g. *"Nuclear reactor"* means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

h. *"Property damage"* includes all forms of radioactive contamination of property.

Mercy SJ Exhibit 2

Dames, Kim 000059

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

## AUTO MEDICAL PAYMENTS COVERAGE

CA-9903F(3-06)

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
GARAGE COVERAGE FORM
MOTOR CARRIER COVERAGE FORM
TRUCKERS COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

### 1. COVERAGE

We will pay reasonable expenses incurred for necessary medical and funeral services to or for an *insured* who sustains *bodily injury* caused by an *accident.* We will pay only those expenses incurred within three years from the date of the *accident.*

### 2. WHO IS AN INSURED

a. You while *occupying* or, while a pedestrian, when struck by any *auto.*

b. If you are an individual, any *family member* while *occupying* any *auto* or, while a pedestrian, when struck by any *auto.*

c. Anyone else *occupying* a covered *auto* or a temporary substitute for a covered *auto.* The covered *auto* must be out of service because of its breakdown, repair, servicing, loss or destruction.

### 3. EXCLUSIONS

This insurance does not apply to any of the following:

a. *Bodily injury* sustained by an *insured* while *occupying* a vehicle located for use as a premises.

b. *Bodily injury* sustained by you or any *family member* while *occupying* or struck by any vehicle (other than a covered *auto*) owned by you or furnished or available for your regular use.

c. *Bodily injury* sustained by any *family member* while *occupying* or struck by any vehicle (other than a covered *auto*) owned by or furnished or available for the regular use of any *family member.*

d. *Bodily injury* to your *employee* arising out of and in the course of employment by you. However we will cover *bodily injury* to your domestic *employees* if not entitled to workers' compensation benefits. For the purposes of this endorsement, a domestic *employee* is a person engaged in household or domestic work performed principally in connection with a residence premises.

e. *Bodily injury* to an *insured* while working in a business of selling, servicing, repairing or parking *autos* unless that business is yours.

f. *Bodily injury* arising directly or indirectly out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

g. *Bodily injury* to anyone using a vehicle without a reasonable belief that the person is entitled to do so.

h. *Bodily injury* sustained by an *insured* while *occupying* any covered *auto* while used in any professional racing or demolition contest or stunting activity, or while practicing for such contest or activity. This insurance also does not apply to any *bodily injury* sustained by an *insured* while the *auto* is being prepared for such a contest or activity.

### 4. LIMIT OF INSURANCE

Regardless of the number of covered *autos, insureds,* premiums paid, claims made or vehicles involved in the *accident,* the most we will pay for *bodily injury* for each *insured* injured in any one *accident* is the Limit of Insurance for Auto Medical Payments Coverage shown in the Declarations.

No one will be entitled to receive duplicate payments for the same elements of *loss* under this coverage and any Liability Coverage Form, Uninsured Motorists Coverage endorsement or Underinsured Motorists Coverage endorsement attached to this Coverage Part.

### 5. CHANGES IN CONDITIONS

The Conditions are changed for Auto Medical Payments Coverage as follows:

a. The Transfer of Rights of Recovery Against Others to Us Condition does not apply.

b. The reference in Other Insurance in the Business Auto and Garage Coverage Forms and Other Insurance - Primary and Excess Insurance Provisions in the Truckers and Motor Carrier Coverage Forms to "other collectible insurance" applies only to other collectible auto medical payments insurance.

### 6. ADDITIONAL DEFINITIONS

As used in this endorsement:

Mercy SJ Exhibit 2

(continued next page)

Dames, Kim 000060

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

**a.** *"Family member"* means a person related to you by blood, marriage or adoption who is a resident of your household, including a ward or foster child.

**b.** *"Occupying"* means in, upon, getting in, on, out or off.

## COMMON POLICY CONDITIONS

IL-0017F(11-98)

All Coverage Parts included in this policy are subject to the following conditions.

### A. CANCELLATION

**1.** The First Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

**2.** We may cancel this policy by mailing or delivering to the First Named Insured written notice of cancellation at least:

**a.** Ten days before the effective date of cancellation if we cancel for nonpayment of premium; or

**b.** Thirty days before the effective date of cancellation if we cancel for any other reason.

**3.** We will mail or deliver our notice to the First Named Insured's last mailing address known to us.

**4.** Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

**5.** If this policy is cancelled, we will send the First Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the First Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

**6.** If notice is mailed, proof of mailing will be sufficient proof of notice.

### B. CHANGES

This policy contains all the agreements between you and us concerning the insurance afforded. The First Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

### C. EXAMINATION OF YOUR BOOKS AND RECORDS

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

### D. INSPECTIONS AND SURVEYS

**1.** We have the right to:

**a.** Make inspections and surveys at any time;

**b.** Give you reports on the conditions we find; and

**c.** Recommend changes.

**2.** We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

**a.** Are safe or healthful; or

**b.** Comply with laws, regulations, codes or standards.

**3.** Paragraphs 1 and 2 of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

**4.** Paragraph 2 of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

### E. PREMIUMS

The First Named Insured shown in the Declarations:

**1.** Is responsible for the payment of all premiums; and

**2.** Will be the payee for any return premiums we pay.

### F. TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative, but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

Mercy SJ Exhibit 2

Dames, Kim 000061

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

## MISSOURI SPLIT UNINSURED MOTORISTS COVERAGE LIMITS

CA-2156F(4-01)

For a covered *auto* licensed or principally garaged in, or *garage operations* conducted in, Missouri, this endorsement modifies insurance provided under the following:

MISSOURI UNINSURED MOTORISTS COVERAGE

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

Paragraphs 1 and 2 of Limit Of Insurance are replaced by the following:

**a.** Regardless of the number of *insureds,* premiums paid, claims made or vehicles involved in the *accident,* the most we will pay for *bodily injury* to any one person resulting from any one *accident,* including all damages claimed by any person or organization for care, loss of services or death resulting from the *bodily injury,* is the limit of *Bodily Injury* for each person shown in the Declarations applicable to each covered *auto.*

(1) If there is more than one covered *auto,* and *bodily injury* is sustained by an individual Named Insured or any *family member,* our Limit of Insurance for any one *accident* is the sum of the limits of *Bodily Injury* for each person shown in the Declarations applicable to each covered *auto.* Subject to the maximum limit of *Bodily Injury* for each person:

(a) The most we will pay for *bodily injury* sustained in such *accident* by an *insured* other than an individual Named Insured or any *family member* is that *insured's* pro rata share of the *Bodily Injury* for each person limit shown in the Declarations for this coverage, at the time of the *accident.*

(b) An individual Named Insured or any *family member* who sustains *bodily injury* in such *accident* will also be entitled to a pro rata share of the limit described in Paragraph a(1)(a) above.

(c) A person's pro rata share is the proportion that that person's damages bears to the total damages sustained by all *insureds.*

(2) If the *bodily injury* is sustained by any *insured* other than an individual Named Insured or any *family member,* in an *accident* in which neither such Named Insured nor any *family member* sustained *bodily injury,* the limit of *Bodily Injury* for each person

shown in the Declarations for this coverage, at the time of the *accident,* is also our maximum limit for *bodily injury* resulting from any such *accident* regardless of the number of covered *autos.*

**b.** Subject to the limit for each person, regardless of the number of *insureds,* premiums paid, claims made or vehicles involved in the *accident,* the most we will pay for *bodily injury* resulting from any one *accident,* including all damages claimed by any person or organization for care, loss of services or death resulting from the *bodily injury,* is the limit of *Bodily Injury* for each *accident* shown in the Declarations applicable to each covered *auto.*

(1) If there is more than one covered *auto,* and *bodily injury* is sustained by an individual Named Insured or any *family member,* our Limit of Insurance for any one *accident* is the sum of the limits of *Bodily Injury* for each *accident* shown in the Declarations applicable to each covered *auto.* Subject to the maximum limit of *Bodily Injury* for each *accident:*

(a) The most we will pay for *bodily injury* sustained in such *accident* by an *insured* other than an individual Named Insured or any *family member* is that *insured's* pro rata share of the *Bodily Injury* for each *accident* limit shown in the Declarations for this coverage, at the time of the *accident.*

(b) An individual Named Insured or any *family member* who sustains *bodily injury* in such *accident* will also be entitled to a pro rata share of the limit described in Paragraph b(1)(a) above.

(c) A person's pro rata share is the proportion that that person's damages bears to the total damages sustained by all *insureds.*

(2) If the *bodily injury* is sustained by any *insured* other than an individual Named Insured or any *family member,* in an *accident* in which neither such Named Insured nor any *family member* sustained *bodily injury,* the limit of *Bodily Injury* for each *accident* shown in the Declarations for this coverage, at the time of the *accident,* is also our maximum limit for *bodily injury* resulting from any such *accident* regardless of the number of covered *autos.*

Mercy SJ Exhibit 2

Dames, Kim 000062

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

**LESSOR - ADDITIONAL INSURED AND LOSS PAYEE**                    CA-2001R(3-06)

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
GARAGE COVERAGE FORM
MOTOR CARRIER COVERAGE FORM
TRUCKERS COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

**1. COVERAGE**

a. Any *leased auto* designated or described in the Schedule will be considered a covered *auto* you own and not a covered *auto* you hire or borrow.

b. For a *leased auto* designated or described in the Schedule, Who Is an Insured is changed to include as an *insured* the lessor named in the Schedule. However, the lessor is an *insured* only for *bodily injury* or *property damage* resulting from the acts or omissions by:

(1) You;

(2) Any of your *employees* or agents; or

(3) Any person, except the lessor or any *employee* or agent of the lessor, operating a *leased auto* with the permission of any of the above.

c. The coverages provided under this endorsement apply to any *leased auto* described in the Schedule until the expiration date of the lease, the expiration date of the policy or when the lessor or his or her agent takes possession of the *leased auto,* whichever occurs first.

**2. LOSS PAYABLE CLAUSE**

a. We will pay, as interest may appear, you and the lessor named in this endorsement for *loss* to a *leased auto.*

b. The insurance covers the interest of the lessor unless the *loss* results from fraudulent acts or omissions on your part.

c. If we make any payment to the lessor, we will obtain his rights against any other party.

**3. CANCELLATION**

a. If we cancel the policy for any reason other than nonpayment of premium, we will mail notice to the lessor in accordance with the Cancellation Common Policy Condition.

b. If the policy is cancelled due to nonpayment of premium, we will mail to the lessor, a copy of the policy lapse notice we send the insured.

c. If you cancel the policy, we will mail notice to the lessor.

d. Cancellation ends this agreement.

**4.** The lessor is not liable for payment of your premiums.

**5. ADDITIONAL DEFINITION**

As used in this endorsement:

*"Leased auto"* means an *auto* leased or rented to you, including any substitute, replacement or extra *auto* needed to meet seasonal or other needs, under a lease or rental agreement that requires you to provide direct primary insurance for the lessor.

**SCHEDULE**

**Lessor**
**(Name and Address)**

JACK & KIM DAMES
712 BROOKSIDE DR
MARTHASVILLE MO 63357

**Designation or Description of Leased Autos**

| Model Year | Vehicle Description | ID Number |
|---|---|---|
| 2001 | GMC SAVANA G3500 | 1GTHG39RX11114617 |
| 1990 | FORD E350 | 1FDKE37G0LHB00860 |
| 2005 | FORD E350 SUPER DUTY | 1FDSE35L05HA19392 |
| 2013 | NISSAN/DATSUN ALTIMA | 1N4AL3AP6DC184265 |

Mercy SJ Exhibit 2

Dames, Kim 000063

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

## LOSS PAYABLE CLAUSE

CA-7027(12-93)

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
GARAGE COVERAGE FORM
MOTOR CARRIER COVERAGE FORM
TRUCKERS COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

**1.** We will pay, as interest may appear, you and the loss payee named in the Schedule for *loss* to a covered *auto.*

**2.** The insurance covers the interest of the loss payee unless the *loss* results from conversion, secretion or embezzlement on your part.

### 3. CANCELLATION

**a.** If we cancel the policy for any reason other than nonpayment of premium, we will mail notice to the loss payee in accordance with the Cancellation Common Policy Condition.

**b.** If the policy is cancelled due to nonpayment of premium, we will mail to the loss payee, a copy of the policy lapse notice we send the insured.

**c.** If notice is mailed, proof of mailing will be sufficient proof of notice.

**d.** Cancellation ends this agreement.

**4.** If we make any payment to the loss payee, we will obtain their rights against any other party.

### SCHEDULE

**First Named Insured and Address:**

JACK DAMES HEATING & COOLING INC
C/O JACK & KIM DAMES
PO BOX 23
WARRENTON MO 63383

**Loss Payee (Name and Address)**

JONESBURG STATE BANK
PO BOX E
JONESBURG MO 63351

**Company Name and Address:**

*ACUITY,* A Mutual Insurance Company
2800 South Taylor Drive
PO Box 58
Sheboygan, WI 53082-0058

**Agency Name and Number:**

K FLYNN INSURANCE AGENCY
6765-AB

Policy Number:    K90724

Policy Period:    Effective Date:    04-16-15

                  Expiration Date:    04-16-16

| Unit Number | Model Year | Vehicle Description | ID Number |
|---|---|---|---|
| | | **Description of Applicable Vehicles** | |
| 001 | 2001 | GMC SAVANA G3500 | 1GTHG39RX11114617 |
| 003 | 2005 | FORD E350 SUPER DUTY | 1FDSE35L05HA19392 |

| Unit Number | Comprehensive | Specified Causes of Loss | Collision |
|---|---|---|---|
| | **Physical Damage Deductibles** | | |
| 001 | | | |
| 003 | $  2,500 | | $  2,500 |

Mercy SJ Exhibit 2

Dames, Kim 000064

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

THE STATE OF MISSOURI

COUNTY OF ST. LOUIS

### AFFIDAVIT

Before me, the undersigned authority, personally appeared Dianna Moeller, who, being by me duly sworn, deposed as follows:

My name is Dianna Moeller, I am of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated:

I am the custodian of the records of Healthy Alliance Life Insurance Company, d/b/a Anthem Blue Cross Blue Shield (Anthem). Attached hereto are _106_ pages of records from Anthem. These _106_ pages of records are kept by Anthem in the regular course of business, and it was the regular course of business of Anthem for an employee or representative of Anthem with knowledge of the act, event, condition, opinion, or diagnosis recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time of the act, event, condition, opinion or diagnosis. The records attached hereto are the original or exact duplicates of the original.

_____
Affiant

In witness whereof I have hereunto subscribed my name and affixed my official seal this _____7_____ day of May, 2021.

_____
(Signed)

JON R. ETTERLING
Notary Public - Notary Seal
St Louis County - State of Missouri
Commission Number 14406930
My Commission Expires Oct 29, 2022

_____
(Seal)

Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM



*You've made a good decision in choosing Lumenos® Individual Health Savings Account*

*Individual*

**For more information, visit our web site at anthem.com**
**12/31/2013 00217838 INDM-MB1 SBSB**
**ESIM0086**

In Missouri (excluding 30 counties in the Kansas City area): Anthem Blue Cross and Blue Shield is the trade name for RightCHOICE® Managed Care, Inc. (RIT), Healthy Alliance® Life Insurance Company (HALIC), and HMO Missouri, Inc. RIT and certain affiliates administer non-HMO benefits underwritten by HALIC and HMO benefits underwritten by HMO Missouri, Inc. RIT and certain affiliates only provide administrative services for self-funded plans and do not underwrite benefits. Independent licensees of the Blue Cross and Blue Shield Association. ® ANTHEM is a registered trademark of Anthem Insurance Companies, Inc. The Blue Cross and Blue Shield names and symbols are registered marks of the Blue Cross and Blue Shield Association.

MO IND LUMENOS HSA REV 01/10 REV 03/13

Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

# Table of Contents

**1   Health Contract**                                                                                          **M-1**

Underwritten by Healthy Alliance Life Insurance Company

**2   HIPAA Notice of Privacy Practices**                                                         **M-1**

Underwritten by Healthy Alliance Life Insurance Company

Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM



*Underwritten by Healthy Alliance Life Insurance Company*

# Your Health Contract

Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

# Individual Contract

**(herein called the "Contract")**

## Lumenos® HSA Plus

**Anthem Blue Cross and Blue Shield**
**1831 Chestnut**
**St. Louis, MO 63103**
**314-923-4444**

### RIGHT TO EXAMINE THIS CONTRACT:

You have 30 days to examine this Contract. If you are not satisfied with this Contract, You may return it to Us or the agent who sold it to you within 30 days after You receive it or have access to it electronically, whichever is earlier. Your Premium will be refunded and this Contract will be void from its start.

**Guaranteed Renewable: Renewability of coverage under this Contract is at the sole option of the Member. The Member may renew this Contract by payment of the renewal premium by the end of the grace period of any Premium due date. The Plan may refuse renewal only under certain conditions, as explained in the "Changes in Coverage: Termination and Reinstatement" section.**

**Benefits under the Plan, including the Deductible, may vary depending on other medical expense insurance you may have.**

In Missouri (excluding 30 counties in the Kansas City area): Anthem Blue Cross and Blue Shield is the trade name for RightCHOICE® Managed Care, Inc. (RIT), Healthy Alliance® Life Insurance Company (HALIC), and HMO Missouri, Inc. RIT and certain affiliates administer non-HMO benefits underwritten by HALIC and HMO benefits underwritten by HMO Missouri, Inc. RIT and certain affiliates only provide administrative services for self-funded plans and do not underwrite benefits. Independent licensees of the Blue Cross and Blue Shield Association. ®ANTHEM is a registered trademark of Anthem Insurance Companies, Inc. The Blue Cross and Blue Shield names and symbols are registered marks of the Blue Cross and Blue Shield Association.

MO IND LUMENOS HSA REV 01/10 REV 03/13

Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

# 1  INTRODUCTION

Welcome to Anthem Blue Cross and Blue Shield! This Contract has been prepared by Us to help explain your coverage. Please refer to this Contract whenever you require medical services. It describes how to access medical care, what health services are covered by Us, and what portion of the health care costs you will be required to pay.

This Contract, the application, and any amendments or riders attached shall constitute the entire Contract under which Covered Services and supplies are provided by Us.

This Contract should be read and re-read in its entirety. Since many of the provisions of this Contract are interrelated, you should read the entire Contract to get a full understanding of your coverage.

Many words used in the Contract have special meanings and start with a capital letter and are defined for you. Refer to the definitions in the "Definitions" section for the best understanding of what is being stated.

This Contract also contains "Non-Covered Services/Exclusions", so please be sure to read this Contract carefully.

### PATIENT PROTECTION AND AFFORDABLE CARE ACT OF 2010

Some of the benefits, terms, conditions, limitations, and exclusions contained in your Contract will change as a result of the Patient Protection and Affordable Care Act of 2010.

Steve Martenet
President

**Health Contract**                                    Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

## 2  MEMBER RIGHTS AND RESPONSIBILITIES

**We are committed to:**

- Recognizing and respecting you as a Member.

- Encouraging your open discussions with your health care professionals and Providers.

- Providing information to help you become an informed health care consumer.

- Providing access to health benefits and Our Network Providers.

- Sharing Our Designate or authorize another party to act on your behalf, regardless of whether you are physically or mentally incapable of providing consent.

**You have the right to:**

- Participate with your health care professionals and Providers in making decisions about your health care.

- Receive the benefits for which you have coverage.

- Be treated with respect and dignity.

- Privacy of your personal health information, consistent with state and federal laws, and Our policies.

- Receive information about Our organization and services, Our network of health care professionals and Providers, and your rights and responsibilities.

- Candidly discuss with your Physicians and Providers appropriate or Medically Necessary care for your condition, regardless of cost or benefit coverage.

- Make recommendations regarding the organization's Members' rights and responsibilities policies.

- Voice complaints or appeals about: Our organization, any benefit or coverage decisions We (or Our designated administrators) make, your coverage, or care provided.

- Refuse treatment for any condition, illness or disease without jeopardizing future treatment, and be informed by your Physician(s) of the medical consequences.

- Participate Us of changes to your name, address, phone number, or if you want to add or remove Dependents.

**You have the responsibility to:**

- Choose a participating Primary Care Physician if required by your health benefit plan.

- Treat all health care professionals and staff with courtesy and respect.

- Keep scheduled appointments with your doctor, and call the doctor's office if you have a delay or cancellation.

- Read and understand to the best of your ability all materials concerning your health benefits or ask for help if you need it.

**Health Contract**

Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

- Understand your health problems and participate, along with your health care professionals and Providers in developing mutually agreed upon treatment goals to the degree possible.

- Supply, to the extent possible, information that We and/or your health care professionals and Providers need in order to provide care.

- Follow the plans and instructions for care that you have agreed on with your health care professional and Provider.

- Tell your health care professional and Provider if you do not understand your treatment plan or what is expected of you.

- Follow all health benefit plan guidelines, provisions, policies and procedures.

- Let Our Customer Service Department know if you have any changes to your name, address, or family members covered under your policy.

**Health Contract**                         Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

# Contents

| 1 | **INTRODUCTION** | **M-3** |
|---|---|---|
| 2 | **MEMBER RIGHTS AND RESPONSIBILITIES** | **M-4** |
| 3 | **SCHEDULE OF BENEFITS** | **M-8** |
| 4 | **COVERED SERVICES** | **M-19** |

| | Ambulance Services | M-20 |
|---|---|---|
| | Behavioral Health Services | M-21 |
| | Dental Services | M-22 |
| | Diabetic Equipment, Education and Supplies | M-23 |
| | Diagnostic Services | M-23 |
| | Emergency Care and Urgent Care Services | M-24 |
| | Home Care Services | M-25 |
| | Hospice Services | M-26 |
| | Inpatient Services | M-27 |
| | Maternity Services | M-28 |
| | Medical Supplies, Durable Medical Equipment, and Appliances | M-29 |
| | Outpatient Services | M-33 |
| | Physician Home Visits and Office Services | M-34 |
| | Preventive Care Services | M-34 |
| | Surgical Services | M-35 |
| | Therapy Services | M-37 |
| | Human Organ and Tissue Transplant (Bone Marrow/Stem Cell) Services | M-39 |
| | Prescription Drug Benefits | M-41 |

| 5 | **NON-COVERED SERVICES/EXCLUSIONS** | **M-46** |
|---|---|---|
| | EXPERIMENTAL/INVESTIGATIVE SERVICES EXCLUSION | M-53 |
| 6 | **ELIGIBILITY AND ENROLLMENT** | **M-54** |
| | Eligibility | M-54 |
| | Enrollment | M-55 |
| | Effective Date of Coverage | M-57 |
| 7 | **CHANGES IN COVERAGE: TERMINATION AND REINSTATEMENT** | **M-57** |
| | Termination | M-57 |
| | Removal of Members | M-59 |
| | Reinstatement | M-59 |
| | Certification of Prior Creditable Coverage | M-59 |
| | Material Misrepresentation | M-59 |
| 8 | **HOW TO OBTAIN COVERED SERVICES** | **M-60** |
| | Network Services and Benefits | M-60 |
| | Non-Network Services | M-61 |
| | Relationship of Parties (Plan - Network Providers) | M-61 |
| | Not Liable for Provider Acts or Omissions | M-61 |
| | Identification Card | M-62 |
| 9 | **CLAIMS PAYMENT** | **M-62** |
| | How Benefits Are Paid | M-62 |
| | Payment of Benefits | M-65 |

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Services Performed During Same Session . . . . . . . . . . . . . . . . . . . . . . . . . . . . M-65
Assignment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . M-65
Notice of Claim and Proof of Loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . M-65
Claim Forms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . M-66
Member's Cooperation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . M-67
Overpayment of Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . M-67
Explanation of Benefits (EOB) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . M-67
The BlueCard Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . M-68
**10  HEALTH CARE MANAGEMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **M-68**
Types of Requests: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . M-69
Request Categories: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . M-70
Decision and Notification Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . M-71
Value-Added and Incentive Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . M-73
**11  COMPLAINT, GRIEVANCE AND APPEALS PROCEDURES** . . . . . . . . . . . . . . **M-73**
How To File An Expedited Grievance Review . . . . . . . . . . . . . . . . . . . . . . . . . M-74
How To File a First Level Grievance for Review . . . . . . . . . . . . . . . . . . . . . . . . M-74
How to File a Second Level Grievance for Review . . . . . . . . . . . . . . . . . . . . . . M-75
Review of Your Complaint By the MDI . . . . . . . . . . . . . . . . . . . . . . . . . . . . M-75
Legal Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . M-76
**12  GENERAL PROVISIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **M-76**
Entire Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . M-76
Renewal Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . M-76
Policy Year . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . M-76
Form or Content of Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . M-76
Premium . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . M-76
Grace Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . M-77
Disagreement with Recommended Treatment . . . . . . . . . . . . . . . . . . . . . . . . M-77
Variable Deductible (Coordination of Benefits) . . . . . . . . . . . . . . . . . . . . . . . M-78
Medicare . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . M-78
Physical Examination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . M-78
Worker's Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . M-78
Other Government Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . M-78
Subrogation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . M-79
Important Note . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . M-79
Conformity with Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . M-79
Clerical Error . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . M-79
Policies and Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . M-79
Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . M-79
Additional Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . M-80
Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . M-80
**13  DEFINITIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **M-80**

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

# 3   SCHEDULE OF BENEFITS

The Schedule of Benefits is a summary of the Deductibles, Coinsurance, Copayments, maximums and other limits that apply when you receive Covered Services from a Provider. Please refer to the "Covered Services" section of this Contract for a more complete explanation of the specific services covered by the Plan. All Covered Services are subject to the conditions, exclusions, limitations, terms and provisions of this Contract including any endorsements, amendments, or riders. Under certain circumstances, if We pay the healthcare provider amounts that are your responsibility, such as Deductibles, Copayments or Coinsurance, We may collect such amounts directly from you. You agree that We have the right to collect such amounts from you.

**This Schedule of Benefits lists the Member's responsibility for Covered Services.**

**To receive maximum benefits at the lowest Out-of-Pocket expense, Covered Services must be provided by a Network Provider.** Benefits for Covered Services are based on the Maximum Allowed Amount, which is the maximum amount the Plan will pay for a given service. When you use a Non-Network Provider, you are responsible for any balance due between the Non-Network Provider's charge and the Maximum Allowed Amount, in addition to any Deductibles, Coinsurance, Copayments, and non-covered charges. **Benefits for Covered Services are processed at the Network level when received from either a Blue Access or Blue Access Choice Network Provider.**

**Copayments/Coinsurance/Maximums are calculated based upon the Maximum Allowed Amount, not the Provider's charge.**

| | |
|---|---|
| **BENEFIT PERIOD** | Calendar Year |
| **DEPENDENT AGE LIMIT** | To the end of the month in which the child attains age 26. |
| **PRE-EXISTING PERIOD** | For Members age 19 and older, for any Pre-Existing Conditions in existence 12 months **prior** to your Effective Date, the services, supplies or other care related to the Pre-Existing Condition(s) are not covered for 12 months **after** your Effective Date. |

**DEDUCTIBLE**

| | Network | Non-Network |
|---|---|---|
| Per Family | $3,000 | $3,000 |

**Note:** All Covered Services and Prescription Drugs are subject to the Deductible. Please note that Network Preventive Care Services are not subject to the Deductible. The Deductible and Coinsurance amounts (except for Non-Network Human Organ and Tissue Transplant Coinsurance) incurred in a Benefit Period apply to the Out-of-Pocket Limit. The Family Deductible must be satisfied by either one Member or all Members collectively before any Covered Services are paid by the Plan. Network / Non-Network immunizations for children through age 5 are not subject to the Deductible or Coinsurance.

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

**Note:** The Network and Non-Network Deductibles **are separate and do not apply toward each other**.

**Note:** The Family Deductibles are subject to change each Calendar Year, based on requirements established by the Internal Revenue Service (IRS). You will be notified if your Deductibles change.

### OUT-OF-POCKET LIMIT

| | Network | Non-Network |
|---|---|---|
| Per Family | $3,000 | $6,000 |

**Note: The Out-of-Pocket Limit includes all Deductibles and/or Coinsurance you incur in a Benefit Period, except for Non-Network Human Organ and Tissue Transplant Coinsurance**. Once the Family Out-of-Pocket Limit is satisfied, no additional Coinsurance will be required for the Family for the remainder of the Benefit Period, except for Non-Network Human Organ and Tissue Transplant services.

Network and Non-Network Coinsurance and Out-of-Pocket Limits **are separate and do not accumulate toward each other**.

**Note:** The Family Out-of-Pocket Limits are subject to change each Calendar Year, based on requirements established by the Internal Revenue Service (IRS). You will be notified if your Out-of-Pocket Limits change.

| COVERED SERVICES | COPAYMENTS/COINSURANCE/MAXIMUMS | |
|---|---|---|
| | Network | Non-Network |
| **Ambulance Services** | 0% Coinsurance | 0% Coinsurance |

**Note:** Ambulance services will always be covered at the Network level.

### Behavioral Health Services

### Mental Health & Substance Abuse Services

Coverage for the Inpatient and Outpatient treatment of a Recognized Mental Illness is provided to the same extent and degree as for the treatment of physical illness, except that Inpatient Care for a Recognized Mental Illness is limited to 90 days per Benefit Period.

| | Network | Non-Network |
|---|---|---|
| Inpatient Services for Recognized Mental Illness or Substance Abuse services | 0% Coinsurance | 30% Coinsurance. You are responsible for any amounts charged that exceed Our Maximum Allowed Amount. |

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

| | | |
|---|---|---|
| Outpatient Services for Recognized Mental Illness or Substance Abuse services | 0% Coinsurance | 30% Coinsurance. You are responsible for any amounts charged that exceed Our Maximum Allowed Amount. |
| Medical and Social Setting Detoxification up to six days per Calendar Year | 0% Coinsurance | 30% Coinsurance. You are responsible for any amounts charged that exceed Our Maximum Allowed Amount. |
| Physician Home Visits & Office Services for Recognized Mental Illness or Substance Abuse services | 0% Coinsurance | 30% Coinsurance. You are responsible for any amounts charged that exceed Our Maximum Allowed Amount. |
| Inpatient Services for a Recognized Mental Illness, days per Benefit Period | 90 days, Network and Non-Network combined | |
| Substance Abuse Episodes:<br><br>An Episode is defined as a distinct course of Substance Abuse treatment separated by at least 30 days without treatment. | 10 Episodes per lifetime for Inpatient and Outpatient services, Network and Non-Network combined | |
| Inpatient Substance Abuse Services through a Facility-Based Treatment Program, days per Benefit Period | 21 days, Network and Non-Network combined | |
| Outpatient Substance Abuse Care through a Facility-Based Treatment Program, days per Benefit Period. | 30 days, Network and Non-Network combined | |
| Physician Home Visits & Office Services for Substance Abuse Care, visits per Benefit Period. | 30 visits, Network and Non-Network combined | |

**Health Contract**                                      Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

SCHEDULE OF BENEFITS                                                                M-11

| | | |
|---|---|---|
| **Dental Services (only when related to accidental injury or for certain members requiring general anesthesia)** | Coinsurance based on setting where Covered Services are received. | Coinsurance based on setting where Covered Services are received. |
| **Diabetic Equipment, Education and Supplies** | For information on equipment and supplies, see "Medical Supplies, Durable Medical Equipment, and Appliances". | |
| | For information on diabetic education services, see "Diabetic Equipment, Education and Supplies". | |
| | For information on Prescription Drug coverage, see "Prescription Drugs". | |
| | Screenings for gestational diabetes are covered under "Preventive Care." | |
| **Diagnostic Services** | 0% Coinsurance | 30% Coinsurance. You are responsible for any amounts charged that exceed Our Maximum Allowed Amount. |
| **Emergency Room Services** | 0% Coinsurance | 0% Coinsurance. You are responsible for any amounts charged that exceed Our Maximum Allowed Amount. |
| **Home Care Services** | 0% Coinsurance | 30% Coinsurance. You are responsible for any amounts charged that exceed Our Maximum Allowed Amount. |
| Benefit Period Maximum Visits | 60 visits, Network and Non-Network combined | |

**Note:** Maximum does not include Home Infusion Therapy or post-delivery Home Care services.

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

| | | |
|---|---|---|
| **Hospice Services** | 0% Coinsurance | 30% Coinsurance. You are responsible for any amounts charged that exceed Our Maximum Allowed Amount. |
| **Inpatient and Outpatient Professional Services** | 0% Coinsurance | 30% Coinsurance. You are responsible for any amounts charged that exceed Our Maximum Allowed Amount. |
| **Inpatient Facility Services** | 0% Coinsurance | 30% Coinsurance. You are responsible for any amounts charged that exceed Our Maximum Allowed Amount. |
| Benefit Period Maximum Inpatient days for Physical Medicine and Rehabilitation (includes Day Rehabilitation Therapy services on an Outpatient basis) | 40 Inpatient days, combined Network and Non-Network | |
| Benefit Period Maximum days for Skilled Nursing Facility | 90 days, combined Network and Non-Network | |
| **Maternity Services** | Not Covered | Not Covered |
| **Complications of Pregnancy only** | Coinsurance based on setting where Covered Services are received | Coinsurance based on setting where Covered Services are received |
| **Medical Supplies, Durable Medical Equipment and Appliances** (Includes certain diabetic and asthmatic supplies from a Non-Network Pharmacy.) | 0% Coinsurance | 30% Coinsurance. You are responsible for any amounts charged that exceed Our Maximum Allowed Amount. |

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

| **Outpatient Services** | | |
|---|---|---|
| **Outpatient Surgery (in a Hospital or Alternative Care Facility, such as an Ambulatory Surgical Facility)** | 0% Coinsurance | 30% Coinsurance. You are responsible for any amounts charged that exceed Our Maximum Allowed Amount. |
| **Other Outpatient Services** | 0% Coinsurance | 30% Coinsurance. You are responsible for any amounts charged that exceed Our Maximum Allowed Amount. |

**Note:** Physical Medicine Therapy obtained through Day Rehabilitation Programs is subject to the Other Outpatient Services Coinsurance regardless of setting where Covered Services are received.

| **Physician Home Visits and Office Services** | | |
|---|---|---|
| Primary Care Physician (PCP) | 0% Coinsurance | 30% Coinsurance. You are responsible for any amounts charged that exceed Our Maximum Allowed Amount. |
| Specialty Care Physician (SCP) | 0% Coinsurance | 30% Coinsurance. You are responsible for any amounts charged that exceed Our Maximum Allowed Amount. |
| Allergy injections | 0% Coinsurance | 30% Coinsurance. You are responsible for any amounts charged that exceed Our Maximum Allowed Amount. |

**Health Contract**                          Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

| **Preventive Care Services**<br><br>**Note:**  Preventive Care Services in this section shall meet requirements as determined by federal and state law.  Many preventive care services are covered by this policy with no deductible, copayments or coinsurance from the covered Member.  That means Anthem pays 100% of the Maximum Allowable Amount.  These services fall under four broad categories as shown in the "Covered Services" section of this Contract, under "Preventive Care Services." | No Copayment / Coinsurance up to Our Maximum Allowed Amount; not subject to Deductible. | 30% Coinsurance. You are responsible for any amounts charged that exceed Our Maximum Allowed Amount. |
|---|---|---|
| Immunizations for children prior to 6th birthday | No Coinsurance up to Our Maximum Allowable Amount; not subject to Deductible. | No Coinsurance up to Our Maximum Allowable Amount; not subject to Deductible. |
| **Surgical Services** | 0% Coinsurance | 30% Coinsurance. You are responsible for any amounts charged that exceed Our Maximum Allowed Amount. |
| **Therapy Services*** | 0% Coinsurance | 30% Coinsurance. You are responsible for any amounts charged that exceed Our Maximum Allowed Amount. |

**Note:** If different types of Therapy Services are performed during one Physician Home Visit, Office Service, or Outpatient Service, then each different type of Therapy Service performed will be considered a separate Therapy Visit.  Each Therapy Visit will count against the applicable Maximum Visits listed below.  For example, if both a Physical Therapy Service and an Occupational Therapy Service are performed during one Physician Home Visit, Office Service, or Outpatient Service, they will count as both one Physical Therapy Visit and one Occupational Therapy Visit.

*For Covered Services you receive in the office from a Physical Therapist, you will not have to pay an office visit Copayment or office visit Coinsurance that is higher than what you would pay for a Primary Care Physician.

**Health Contract**                                                     Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Benefit Period Maximum Visits for:

| | |
|---|---|
| Physical Therapy and Manipulation Therapy | 20 visits when rendered as Physician Home Visits and Office Services or Outpatient Services, combined Network and Non-Network. When rendered in the home, Home Care Services limits apply. Manipulation Therapy in the home is not covered. |
| Occupational Therapy | 20 visits when rendered as Physician Home Visits and Office Services or Outpatient Services, combined Network and Non-Network. When rendered in the home, Home Care Services limits apply. |
| Speech Therapy | Unlimited visits when rendered as Physician Home Visits and Office Services or Outpatient Services, combined Network and Non-Network. When rendered in the home, Home Care Services limits apply. |

| **Urgent Care Center Services** | 0% Coinsurance | 0% Coinsurance You are responsible for any amounts charged that exceed Our Maximum Allowed Amount. |
|---|---|---|

**Human Organ and Tissue Transplant (Bone Marrow/Stem Cell) Services**

**The human organ and bone marrow/stem cell transplant and transfusion services benefits or requirements described below do not apply to the following:**

- **Cornea and kidney transplants; and**
- **Any Covered Services, related to a Covered Transplant Procedure, received prior to or after the Transplant Benefit Period. Please note that the harvest and storage of bone marrow/stem cells is included in the Covered Transplant Procedure benefit regardless of date of service.**

**The above services are covered as Inpatient Services, Outpatient Services or Physician Home Visits and Office Services depending on where the service is performed, subject to applicable Member cost shares.**

**Note:** Even if a Hospital is a Network Provider for other services, it may not be a Network Transplant Provider for these services. Please be sure to contact Us to determine which Hospitals are Network Transplant Providers. (When calling Customer Service, ask to be connected with the Transplant Case Manager for further information.)

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

| Transplant Benefit Period | Network Transplant Provider | Non-Network Transplant Provider |
|---|---|---|
| | Starts one day prior to a Covered Transplant Procedure and continues for the applicable case rate/global time period (The number of days will vary depending on the type of transplant received and the Network Transplant Provider agreement. Contact the Transplant Case Manager for specific Network Transplant Provider information.) for services received at or coordinated by a Network Transplant Provider Facility. | Starts one day prior to a Covered Transplant Procedure and continues to the date of discharge. |

| Deductible | Network Transplant Provider | Non-Network Transplant Provider |
|---|---|---|
| | Applicable | Applicable. During the Transplant Benefit Period, Covered Transplant Procedure charges that count toward the Deductible will NOT apply to your Out-of-Pocket Limit. |

| Covered Transplant Procedure during the Transplant Benefit Period | Network Transplant Provider Facility | Non-Network Transplant Provider Facility |
|---|---|---|

**Health Contract**

Mercy SJ Exhibit 3

Case: 4:22-cv-01360-SEP    Doc. #:  1-6    Filed: 12/20/22    Page: 84 of 271 PageID #: 239

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

| | During the Transplant Benefit Period, 0% Coinsurance. | During the Transplant Benefit Period, You will pay 30% of the Maximum Allowed Amount. During the Transplant Benefit Period, Covered Transplant Procedure charges at a Non-Network Transplant Provider Facility will NOT apply to your Out-of-Pocket Limit. |
| | Prior to and after the Transplant Benefit Period, Covered Services will be paid as Inpatient Services, Outpatient Services or Physician Home Visits and Office Services depending on where the service is performed. | If the Provider is also a Network Provider for this Contract (for services other than Covered Transplant Procedures), then you will **not** be responsible for Covered Services that exceed Our Maximum Allowed Amount. |
| | | If the Provider is a Non-Network Provider for this Contract, you **will** be responsible for Covered Services that exceed Our Maximum Allowed Amount. |
| | | Prior to and after the Transplant Benefit Period, Covered Services will be paid as Inpatient Services, Outpatient Services or Physician Home Visits and Office Services depending on where the service is performed. |
| **Covered Transplant Procedure during the Transplant Benefit Period** | **Network Transplant Provider Professional and Ancillary (non-Hospital) Providers** | **Non-Network Transplant Provider Professional and Ancillary (non-Hospital) Providers** |

**Health Contract**

Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

M-18                                                                    SCHEDULE OF BENEFITS

|  |  |  |
| --- | --- | --- |
|  | 0% Coinsurance | You are responsible for 30% of Maximum Allowed Amount.  These charges will NOT apply to your Out-of-Pocket Limit. |
| **Transportation and Lodging** | Covered, as approved by Us, up to a $10,000 benefit limit per transplant | Not Covered for Transplants received at a Non-Network Transplant Provider Facility |
| **Unrelated donor searches for bone marrow/stem cell transplants for a Covered Transplant Procedure** | Covered, as approved by Us, up to a $30,000 benefit limit | Covered, as approved by Us, up to a $30,000 benefit limit.  You will be responsible for 30% of search charges. These charges will NOT apply to your Out-of-Pocket Limit. |
| **Live Donor Health Services (including complications from the donor procedure for up to six weeks from the date of procurement)** | 0% Coinsurance | You are responsible for 30% of Maximum Allowed Amount.  These charges will NOT apply to your Out-of-Pocket Limit. |

**Note:** Live Donor Health Services are only covered if the donor does not have coverage elsewhere.

---

**Prescription Drugs**

**Days Supply: Days Supply may be less than the amount shown due to Prior Authorization, Quantity Limits, and/or age limits and Utilization Guidelines.**

|  |  |
| --- | --- |
| Retail Pharmacy (Network and Non-Network) | 30 days |
| Mail Service | 90 days |
| Retail Specialty Pharmacy (Network only) and Specialty Mail Service (Network only) | 30 days |

**Health Contract**                                                    Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

| | |
|---|---|
| **Network Retail Pharmacy Prescription Drug Coinsurance:** | 0% Coinsurance per Prescription Order |
| **Network Mail Service Program Prescription Drug Coinsurance:** | 0% Coinsurance per Prescription Order |
| **Network Specialty Retail, Including Network Specialty Mail Service Program, Prescription Drug Coinsurance:** | 0% Coinsurance per Prescription Order* |

***Note**: Specialty Prescription Drugs are covered only when purchased from a Network Specialty Pharmacy.

| | |
|---|---|
| **Non-Network Retail Pharmacy Prescription Drug Coinsurance:** | 30% Coinsurance per Prescription Order |

**Note:** Certain Diabetic and asthmatic supplies are covered subject to applicable Prescription Drug Coinsurance when obtained from a Network Pharmacy. These supplies are covered as Medical Supplies, Durable Medical Equipment, and Appliances if obtained from a Non-Network Pharmacy. Diabetic test strips are covered subject to applicable Prescription Drug Copayment/Coinsurance.

**Note:** You will be responsible for only one Coinsurance for a covered Prescription Drug if the required single dosage is unavailable and/or a combination of dosage amounts is needed to fill the Prescription Order.

# 4  COVERED SERVICES

This section describes the Covered Services available under your health care benefits when provided and billed by Providers. **Care must be received from a Primary Care Physician (PCP), Specialty Care Physician (SCP) or another Network Provider to be covered at the Network level, except for Emergency Care, Urgent Care, and ambulance services. Services that are not received from a PCP, SCP or another Network Provider or approved as an Authorized Service will be considered a Non-Network service, except as otherwise specified in this Contract.** The amount payable for Covered Services varies depending on whether you receive your care from a PCP, SCP or another Network Provider or a Non-Network Provider, except for Emergency Care, Urgent Care, and ambulance services.

If you use a Non-Network Provider, you are responsible for the difference between the Non-Network Provider's charge and the Maximum Allowed Amount, in addition to any applicable Coinsurance, Copayment or Deductible. We cannot prohibit Non-Network Providers from billing you for the difference in the Non-Network Provider's charge and the Maximum Allowed Amount.

**All Covered Services and benefits are subject to the conditions, Exclusions, limitations, terms and provisions of this Contract, including any attachments, riders and endorsements.** Covered Services must be Medically Necessary and not Experimental/Investigative. The fact that a Provider may prescribe, order, recommend or approve a service, treatment or supply does not

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

make it Medically Necessary or a Covered Service and **does not** guarantee payment. To receive maximum benefits for Covered Services, you must follow the terms of the Contract, including receipt of care from a PCP, SCP or another Network Provider, and obtain any required Prior Authorization or Precertification. Contact your Network Provider to be sure that Prior Authorization/Precertification has been obtained. We base Our decisions about Prior Authorization, Precertification, Medical Necessity, Experimental/Investigative services and new technology on Our clinical coverage guidelines and medical policy. We may also consider published peer-review medical literature, opinions of experts and the recommendations of nationally recognized public and private organizations which review the medical effectiveness of health care services and technology.

Benefits for Covered Services may be payable subject to an approved treatment plan created under the terms of this Contract. **Benefits for Covered Services are based on the Maximum Allowed Amount for such service. Our payment for Covered Services will be limited by any applicable Coinsurance, Copayment, Deductible, Benefit Period Limit/Maximum in this Contract.**

## Ambulance Services

**See the Schedule of Benefits for any applicable Deductible, Coinsurance, Copayment, and Benefit Limitation information.**

Ambulance Services are transportation by a vehicle (including ground, water, fixed wing and rotary wing air transportation) designed, equipped and used only to transport the sick and injured and staffed by Emergency Medical Technicians (EMTs), paramedics, or other certified medical professionals:

- from your home, scene of accident or medical Emergency to a Hospital;

- between Hospitals;

- between a Hospital and Skilled Nursing Facility; or

- from a Hospital or Skilled Nursing Facility to your home.

Other vehicles that do not meet this definition, including but not limited to ambulettes, are not Covered Services.

Ambulance services are a Covered Service only when Medically Necessary, except:

- when ordered by an employer, school, fire or public safety official and the Member is not in a position to refuse; or

- when a Member is required by Us to move from a Non-Network Provider to a Network Provider.

Ambulance trips must be made to the closest local facility that can give Covered Services appropriate for your condition. If none of these facilities are in your local area, you are covered for trips to the closest facility outside your local area. Ambulance usage is not covered when another type of transportation can be used without endangering the Member's health. Any ambulance usage for the convenience of the Member, family or Physician is not a Covered Service.

Non-Covered Services for Ambulance include, but are not limited to, trips to:

- a Physician's office or clinic;

- a morgue or funeral home.

Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Ambulance services or emergency medical response agencies that are licensed by the state of Missouri to provide the above Covered Services will be paid directly by the Plan.

# Behavioral Health Services

## Mental Health and Substance Abuse Services

**See the Schedule of Benefits for any applicable Deductible, Coinsurance, Copayment, and Benefit Limitation information.**

Covered Services for a Recognized Mental Illness are as follows:

- Inpatient Hospital treatment for a Recognized Mental Illness to the same extent as for any other illness, subject to the day maximum shown in the Schedule of Benefits.

- Inpatient Facility-Based Treatment Programs for the therapeutic care and treatment of a Recognized Mental Illness when prescribed by a Licensed Mental Health Professional and rendered in a psychiatric facility licensed by the Department of Mental Health or accredited by the Joint Commission on Accreditation of Hospitals, to the same extent as any other illness.

- Outpatient treatment, including both professional services and services received through Facility-Based Treatment Programs, for mental health services for a Recognized Mental Illness rendered by a Licensed Mental Health Professional, to the same extent as any other illness.

Care for Recognized Mental Illness may be rendered by Community Mental Health Centers, Hospitals, Facility-Based Treatment Programs or other mental health service delivery entities certified by the Department of Mental Health or accredited by a nationally recognized organization or licensed by the state.

Covered Services for Substance Abuse are as follows:

- Inpatient Care through a Facility-Based Treatment Program

- Medical and Social Setting Detoxification

- Outpatient Care through a Facility-Based Treatment Program

- Physician Home Visits and Office Services

Two days of Partial Hospitalization treatment or Intensive Outpatient Treatment are the equivalent of one day as an Inpatient.

Care for Substance Abuse may be rendered by Hospitals, Facility-Based Treatment Programs, or other mental health service delivery entities certified by the Department of Mental Health or accredited by a nationally recognized organization, or licensed by the state.

Coverage for Substance Abuse will be subject to a separate lifetime Episode maximum, as specified in the Schedule of Benefits, except that such separate Episode maximum will not apply to Medical Detoxification in a life-threatening situation as determined by the treating Physician and subsequently documented within 48 hours of treatment to the reasonable satisfaction of the Plan. Two days of Partial Hospitalization treatment or Intensive Outpatient Treatment are the equivalent of one day as an Inpatient.

**Health Contract**                                   Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

## Dental Services

**See the Schedule of Benefits for any applicable Deductible, Coinsurance, Copayment, and Benefit Limitation information.**

### Related to Accidental Injury

Outpatient Services, Physician Home Visits and Office Services, Emergency Care and Urgent Care services for dental work and oral surgery are covered if they are for the initial repair of an injury to the jaw, sound natural teeth, mouth or face which are required as a result of an accident and are not excessive in scope, duration, or intensity to provide safe, adequate, and appropriate treatment without adversely affecting the patient's condition. Injury as a result of chewing or biting is not considered an accidental injury. "Initial" dental work to repair injuries due to an accident means performed within 12 months from the injury, or as reasonably soon thereafter as possible and includes all examinations and treatment to complete the repair. For a child requiring facial reconstruction due to dental related injury, there may be several years between the accident and the final repair.

Covered Services for accidental dental include, but are not limited to:

- oral examinations.

- x-rays.

- tests and laboratory examinations.

- restorations.

- prosthetic services.

- oral surgery.

- mandibular/maxillary reconstruction.

- anesthesia.

### General Anesthesia

Benefits are provided only for the administration of general anesthesia and for both facility and professional charges occurring in connection with dental services provided for the following Members:

- A Member through the age of four;

- A Member who is severely disabled; and

- A Member who has a medical or behavioral condition that requires hospitalization or general anesthesia when dental services are provided.

General anesthesia is a Drug, gas or other modality that, when administered, causes a complete loss of sensation and a loss of consciousness. Benefits are not provided for routine dental services.

**Health Contract**                          Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

## Diabetic Equipment, Education and Supplies

**See the Schedule of Benefits for any applicable Deductible, Coinsurance, Copayment, and Benefit Limitation information.**

Diabetes self-management training is covered for an individual with insulin dependent diabetes, non-insulin dependent diabetes, or elevated blood glucose levels induced by pregnancy or another medical condition when:

- Medically Necessary;

- Ordered in writing by a Physician or a podiatrist; and

- Provided by a Health Care Professional who is licensed, registered, or certified under state law.

For the purposes of this benefit, a "Health Care Professional" means the Physician or podiatrist ordering the training or a Provider who has obtained certification in diabetes education by the American Diabetes Association.

Covered Services also include all Physician prescribed Medically Necessary equipment and supplies used for the management and treatment of diabetes. See "Medical Supplies, Durable Medical Equipment and Appliances" and "Preventive Care Services".  For information on Prescription Drug coverage, please refer to the "Prescription Drugs" provision in this section.      Screenings for gestational diabetes are covered under "Preventive Care."

## Diagnostic Services

**See the Schedule of Benefits for any applicable Deductible, Coinsurance, Copayment, and Benefit Limitation information.**

Diagnostic services are tests or procedures generally performed when you have specific symptoms, to detect or to monitor a certain disease or condition. Coverage for Diagnostic Services, including when provided as part of Physician Home Visits and Office Services, Inpatient Services, Outpatient Services, Home Care Services, and Hospice Services includes but is not limited to:

- X-ray and other radiology services, including mammograms for any person diagnosed with breast disease.

- Magnetic Resonance Angiography (MRA).

- Magnetic Resonance Imaging (MRI).

- CAT scans.

- Laboratory and pathology services.

- Cardiographic, encephalographic, and radioisotope tests.

- Nuclear cardiology imaging studies.

- Ultrasound services.

- Allergy tests.

- Electrocardiograms (EKG).

**Health Contract**

Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

- Electromyograms (EMG) except that surface EMGs are not Covered Services.

- Echocardiograms.

- Bone density studies.

- Positron emission tomography (PET scanning).

- Diagnostic Tests as an evaluation to determine the need for a Covered Transplant Procedure.

- Echographies.

- Doppler studies.

- Brainstem evoked potentials (BAER).

- Somatosensory evoked potentials (SSEP)

- Visual evoked potentials (VEP)

- Nerve conduction studies.

- Muscle testing.

- Electrocorticograms.

Central supply (IV tubing) and pharmacy (dye) necessary to perform tests are covered as part of the test, whether performed in a Hospital or Physician's office.

## Emergency Care and Urgent Care Services

**See the Schedule of Benefits for any applicable Deductible, Coinsurance, Copayment, and Benefit Limitation information.**

### Emergency Care (including Emergency Room Services)

If you are experiencing an Emergency, call 9-1-1 or go to the nearest Hospital. Emergency Care rendered by a Non-Network Provider will be covered as a Network service; however, the Member **may** be responsible for the difference between the Non-Network Provider's charge and the Maximum Allowed Amount, in addition to any applicable Coinsurance, Copayment or Deductible. In certain circumstances, Emergency Care received from a Non-Network Provider may be approved as an Authorized Service. You must contact Us for authorization prior to the claim being filed. Hospitals generally are open to treat an Emergency 24 hours a day, 7 days a week. **Follow-up care is not considered Emergency Care.**

Benefits are provided for treatment of Emergency medical conditions and Emergency screening and Stabilization services without Prior Authorization for conditions that reasonably appear to a prudent layperson to constitute an Emergency medical condition based upon the patient's presenting symptoms and conditions. Benefits for Emergency Care include facility costs and Physician services, as well as supplies and Prescription Drugs charged by that facility.

For an Inpatient admission following Emergency Care, Precertification is not required. However, you must notify Us or verify that your Physician has notified Us of your admission within 48 hours or as soon as possible within a reasonable period of time. When We are contacted, you will be notified

**Health Contract**

Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

whether the Inpatient setting is appropriate, and if appropriate, the number of days considered Medically Necessary.

Care and treatment provided once you are Stabilized is no longer considered Emergency Care. Continuation of care from a Non-Network Provider beyond that needed to evaluate or Stabilize your condition in an Emergency will be covered as a Non-Network service unless We authorize the continuation of care and it is Medically Necessary.

### Urgent Care Center Services

Often an urgent rather than an Emergency medical problem exists. All Covered Services obtained at Urgent Care Centers are subject to the Urgent Care Copayment/Coinsurance. Urgent Care services can be obtained from a Network or Non-Network Provider. Urgent Care Services received from a Non-Network Provider will be covered as a Network service; however the Member **may** be responsible for the difference between the Non-Network Provider's charge and the Maximum Allowed Amount, in addition to any applicable Coinsurance/Copayment or Deductible. If you experience an accidental injury or a medical problem, the Plan will determine whether your injury or condition is an Urgent Care or Emergency Care situation for coverage purposes, based on your diagnosis and symptoms.

An Urgent Care medical problem is an unexpected episode of illness or an injury requiring treatment that cannot reasonably be postponed for regularly scheduled care. It is not considered an Emergency. Urgent Care medical problems include, but are not limited to, earache, sore throat, and fever (not above 104 degrees). An Urgent Care medical problem is one that is not life threatening and does not require use of an emergency room at a Hospital. If you call your Physician prior to receiving care for an urgent medical problem and your Physician authorizes you to go to an emergency room, your care will be paid at the level specified in the Schedule of Benefits for Emergency Room Services.

See your Schedule of Benefits for benefit limitations.

## Home Care Services

**See the Schedule of Benefits for any applicable Deductible, Coinsurance, Copayment, and Benefit Limitation information.**

Covered Services are those performed by a Home Health Care Agency or other Provider in your residence. Home Health Care includes professional, technical, health aide services, supplies, and medical equipment. The Member must be confined to the home for medical reasons, and be physically unable to obtain needed medical services on an Outpatient basis. Covered Services include but are not limited to:

- Intermittent Skilled Nursing Services (by an R.N. or L.P.N.).

- Medical/Social Services.

- Diagnostic Services.

- Nutritional Guidance.

- Home Health Aide Services. The Member must be receiving skilled nursing or therapy. Services must be furnished by appropriately trained personnel employed by the Home Health Care Provider. Other organizations may provide services only when approved by Us, and their duties must be assigned and supervised by a professional nurse on the staff of the Home Health Care Provider.

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

- Therapy Services (except for Manipulation Therapy which will not be covered when rendered in the home). Home Care Visit limits specified in the Schedule of Benefits for Home Care Services apply when Therapy Services are rendered in the home.

- Medical/Surgical Supplies.

- Durable Medical Equipment.

- Prescription Drugs (only if provided and billed by a Home Health Care Agency).

Non-Covered Services include but are not limited to:

- Food, housing, homemaker services and home delivered meals.

- Home or Outpatient hemodialysis services (these are covered under Therapy Services).

- Physician charges.

- Helpful environmental materials (hand rails, ramps, telephones, air conditioners, and similar services, appliances and devices.)

- Services provided by Registered Nurses and other health workers who are not acting as employees or under approved arrangements with a contracting Home Health Care Provider.

- Services provided by a member of the patient's immediate family.

- Services provided by volunteer ambulance associations for which patient is not obligated to pay, visiting teachers, vocational guidance and other counselors, and services related to outside, occupational and social activities.

- Private Duty Nursing.

**Home infusion therapy** will be paid only if you obtain prior approval from Our Home Infusion Therapy Administrator (if applicable). Benefits for home infusion therapy include a combination of nursing, durable medical equipment and pharmaceutical services which are delivered and administered intravenously in the home. Home IV therapy includes but is not limited to: injections (intra-muscular, subcutaneous, continuous subcutaneous), Total Parenteral Nutrition (TPN), Enteral nutrition therapy, Antibiotic therapy, pain management and chemotherapy.

## Hospice Services

**See the Schedule of Benefits for any applicable Deductible, Coinsurance, Copayment, and Benefit Limitation information.**

Hospice care may be provided in the home or at a Hospice facility where medical, social and psychological services are given to help treat patients with a terminal illness. Hospice Services include routine home care, continuous home care, Inpatient Hospice and Inpatient respite. To be eligible for Hospice benefits, the patient must have a life expectancy of six months or less, as confirmed by the attending Physician. Covered Services will continue if the Member lives longer than six months.

When approved by your Physician, Covered Services include the following:

- Skilled Nursing Services (by an R.N. or L.P.N.).

**Health Contract**

Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

- Diagnostic Services.

- Physical, speech and inhalation therapies if part of a treatment plan.

- Medical supplies, equipment and appliances (benefits will not be covered for equipment when the Member is in a Facility that should provide such equipment).

- Counseling services.

- Inpatient confinement at a Hospice.

- Prescription Drugs given by the Hospice.

- Home health aide.

Non-Covered Services include but are not limited to:

- Services provided by volunteers.

- Housekeeping services.

## Inpatient Services

**See the Schedule of Benefits for any applicable Deductible, Coinsurance, Copayment, and Benefit Limitation information.**

Inpatient Services include:

- Charges from a Hospital, Skilled Nursing Facility (SNF) or other Provider for room, board and general nursing services.

- Ancillary (related) services.

- Professional services from a Physician while an Inpatient.

### Room, Board, and General Nursing Services

- A room with two or more beds.

- A private room. The private room allowance is the Hospital's average semi-private room rate unless it is Medically Necessary that you use a private room for isolation and no isolation facilities are available.

- A room in a special care unit approved by Us. The unit must have facilities, equipment and supportive services for intensive care of critically ill patients.

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

### Ancillary (Related) Services

- Operating, delivery and treatment rooms and equipment.

- Prescribed Drugs.

- Anesthesia, anesthesia supplies and services given by an employee of the Hospital or other Provider.

- Medical and surgical dressings, supplies, casts and splints.

- Diagnostic Services.

- Therapy Services.

### Professional Services

- **Medical care visits** limited to one visit per day by any one Physician.

- **Intensive medical care** for constant attendance and treatment when your condition requires it for a prolonged time.

- **Concurrent care** for a medical condition by a Physician who is not your surgeon while you are in the Hospital for Surgery. Care by two or more Physicians during one Hospital stay when the nature or severity of your condition requires the skills of separate Physicians.

- **Consultation**, which is a personal bedside examination by another Physician when requested by your Physician. Staff consultations required by Hospital rules; consultations requested by the patient; routine radiological or cardiographic consultations; telephone consultations; and EKG transmittal via phone are excluded.

- **Surgery and the administration of general anesthesia**.

- **Newborn exams**. A Physician other than the Physician who performed the obstetrical delivery must do the examination.

## Maternity Services

**See the Schedule of Benefits for any applicable Deductible, Coinsurance, Copayment, and Benefit Limitation information.**

**Maternity services are not covered under this Contract**. However, complications of pregnancy are covered. Complications of pregnancy are conditions experienced during pregnancy that may seriously jeopardize the health of either the mother or her unborn infant. The condition may be related to the pregnancy itself or be non-pregnancy related occurring coincidentally and adversely influencing the course of the pregnancy. Miscarriage is considered a complication of pregnancy.

### Statement of Rights Under the Newborns' and Mothers' Health Protection Act

Under federal law, health insurance issuers generally may not restrict benefits for any hospital length of stay in connection with childbirth for the mother or newborn child to less than 48 hours following a vaginal delivery, or less than 96 hours following a delivery by cesarean section. However, the issuer may

**Health Contract**

Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

pay for a shorter stay if the attending provider (e.g., your physician, nurse, midwife, or physician assistant), after consultation with the mother, discharges the mother or newborn earlier.

Also, under federal law, issuers may not set the level of benefits or out-of-pocket costs so that any later portion of the 48-hour (or 96-hour) stay is treated in a manner less favorable to the mother or newborn than any earlier portion of the stay.

In addition, an issuer may not, under federal law, require that a physician or other health care provider obtain authorization for prescribing a length of stay of up to 48 hours (or 96 hours). However, to use certain providers or facilities, or to reduce your out-of-pocket costs, you may be required to obtain Precertification. For information on Precertification, contact Us by calling the phone number on your ID card.

## Medical Supplies, Durable Medical Equipment, and Appliances

**See the Schedule of Benefits for any applicable Deductible, Coinsurance, Copayment, and Benefit Limitation information.**

The supplies, equipment and appliances described below are Covered Services under this benefit. If the supplies, equipment and appliances include comfort, luxury, or convenience items or features that exceed what is Medically Necessary in your situation or needed to treat your condition, reimbursement will be based on the Maximum Allowed Amount for a standard item that is a Covered Service, serves the same purpose, and is Medically Necessary. Any expense that exceeds the Maximum Allowed Amount for the standard item that is a Covered Service is your responsibility. For example, the reimbursement for a motorized wheelchair will be limited to the reimbursement for a standard wheelchair, when a standard wheelchair adequately accommodates your condition.

Repair, adjustment and replacement of purchased equipment, supplies or appliances as set forth below may be covered, as approved by Us. The repair, adjustment or replacement of the purchased equipment, supply or appliance is covered if:

- the equipment, supply or appliance is a Covered Service;

- the continued use of the item is Medically Necessary;

- there is reasonable justification for the repair, adjustment, or replacement (warranty expiration is not reasonable justification).

In addition, replacement of purchased equipment, supplies or appliance may be covered if:

1. The equipment, supply or appliance is worn out or no longer functions.

2. Repair is not possible or would equal or exceed the cost of replacement. An assessment by a rehabilitation equipment specialist or vendor should be done to estimate the cost of repair.

3. Individual's needs have changed and the current equipment or appliance is no longer usable due to weight gain, rapid growth, or deterioration of function, etc.

4. The equipment, supply or appliance is damaged and cannot be repaired.

Benefits for repairs and replacement do not include the following:

- Repair and replacement due to misuse, malicious breakage or gross neglect.

**Health Contract**

Mercy SJ Exhibit 3

- Replacement of lost or stolen items.

We may establish reasonable quantity limits for certain supplies, equipment or appliances described below. A detailed listing of supplies, equipment or appliances that are not covered by Us, including quantity limits, is available to you upon request. Please call the customer service number on your Identification Card. This list is subject to change.

Covered Services may include, but are not limited to:

- **Medical and surgical supplies** – Certain supplies and equipment for the management of disease that We approve are covered under the Prescription Drug benefit, if any. These supplies are considered as a medical supply benefit if the Member does not have Prescription Drug benefits through Anthem or if the supplies, equipment or appliances are not received from the Mail Service used by Anthem or from a Network Pharmacy: syringes, needles, oxygen, surgical dressings, splints and other similar items which serve only a medical purpose. Covered Services also include Prescription Drugs and biologicals that cannot be self-administered and are provided in a Physician's office. Covered Services do not include items usually stocked in the home for general use like bandages, thermometers, and petroleum jelly.

  Covered Services may include, but are not limited to:

  1. Allergy serum extracts.
  2. Chem strips, Glucometer, Lancets.
  3. Clinitest.
  4. Needles/syringes.
  5. Ostomy bags and supplies, except charges such as those made by a Pharmacy for purposes of a fitting are not Covered Services.s and supplies, except charges such as those made by a Pharmacy for purposes of a fitting are not Covered Services.

  Covered Services include the following:

  PKU formula and low protein modified food products for the treatment of phenylketonuria or any inherited diseases of amino acids and organic acids (covered only for children through age 5.) Low protein modified food products are foods that are specifically formulated to have less than one gram of protein per serving and are intended to be used under the direction of a Physician for the dietary treatment of any inherited metabolic disease. Low protein foods do not include foods that are naturally low in protein.

  Non-Covered Services include but are not limited to:

  1. Adhesive tape, bandages, cotton tipped applicators
  2. Arch supports
  3. Doughnut cushions
  4. Hot packs, ice bags
  5. Vitamins
  6. Medijectors
  7. Elastic stockings or supports;
  8. Gauze and dressings.

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

If you have any questions regarding whether a specific medical or surgical supply is covered or want to obtain a detailed list, call the customer service number on the back of your Identification Card.

- **Durable medical equipment** - The rental (or, at Our option, the purchase) of durable medical equipment prescribed by a Physician or other Provider. Durable medical equipment is equipment which can withstand repeated use; i.e., could normally be rented, and used by successive patients; is primarily and customarily used to serve a medical purpose; generally is not useful to a person in the absence of illness or injury; and is appropriate for use in a patient's home. Examples include but are not limited to wheelchairs, crutches, hospital beds, and oxygen equipment. Rental costs must not be more than the purchase price. The costs for delivering and installing the equipment are Covered Services. Payment for related supplies is a Covered Service only when the equipment is a rental, and medically fitting supplies are included in the rental; or the equipment is owned by the Member; medically fitting supplies may be paid separately. Equipment should be purchased when it costs more to rent it than to buy it. Repair of medical equipment is covered.

Covered Services may include, but are not limited to:

1. Hemodialysis equipment
2. Crutches and replacement of pads and tips
3. Pressure machines
4. Infusion pump for IV fluids and medicine
5. Glucometer
6. Tracheotomy tube
7. Cardiac, neonatal and sleep apnea monitors
8. Augmentive communication devices are covered when We approve based on the Member's condition.

**Non-covered** items may include but are not limited to:

1. Air conditioners
2. Ice bags/coldpack pump
3. Raised toilet seats
4. Rental of equipment if the Member is in a Facility that is expected to provide such equipment
5. Translift chairs
6. Treadmill exerciser
7. Tub chair used in shower.

If you have any questions regarding whether a specific durable medical equipment is covered or want to obtain a detailed list, call the customer service number on the back of your Identification Card.

- **Prosthetics** – Artificial substitutes for body parts and tissues and materials inserted into tissue for functional or therapeutic purposes. Covered Services include purchase, fitting, needed adjustment, repairs, and replacements of prosthetic devices and supplies that:

1. Replace all or part of a missing body part and its adjoining tissues; or
2. Replace all or part of the function of a permanently useless or malfunctioning body part.

**Health Contract**                                                        Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Prosthetic devices should be purchased, not rented, and must be Medically Necessary. Applicable taxes, shipping and handling are also covered.

Covered Services may include, but are not limited to:

1. Aids and supports for defective parts of the body including but not limited to internal heart valves, mitral valve, internal pacemaker, pacemaker power sources, synthetic or homograph vascular replacements, fracture fixation devices internal to the body surface, replacements for injured or diseased bone and joint substances, mandibular reconstruction appliances, bone screws, plates, and vitallium heads for joint reconstruction.

2. Left Ventricular Artificial Devices (LVAD) (only when used as a bridge to a heart transplant).

3. Breast prosthesis whether internal or external, following a mastectomy, and surgical bras, as required by the Women's Health and Cancer Rights Act.

4. Replacements for all or part of absent parts of the body or extremities, such as artificial limbs, artificial eyes, etc.

5. Intraocular lens implantation for the treatment of cataract or aphakia. Contact lenses or glasses are often prescribed following lens implantation and are Covered Services. (If cataract extraction is performed, intraocular lenses are usually inserted during the same operative session). Eyeglasses (for example bifocals) including frames or contact lenses are covered when they replace the function of the human lens for conditions caused by cataract surgery or injury; the first pair of contact lenses or eyeglasses are covered. The donor lens inserted at the time of surgery is not considered a contact lens, and is not considered the first lens following surgery. If the injury is to one eye or if cataracts are removed from only one eye and the Member selects eyeglasses and frames, then reimbursement for both lenses and frames will be covered.

6. Cochlear implant.

7. Colostomy and other ostomy (surgical construction of an artificial opening) supplies directly related to ostomy care.

8. Restoration prosthesis (composite facial prosthesis).

9. Wigs (the first one following cancer treatment, not to exceed one per Benefit Period).

10. Hearing Aids provided to a newborn for initial amplification following a newborn hearing screening (including any necessary rescreening, audiological assessment and follow-up; see "Preventive Care"). A hearing aid is an electronic device worn or implanted for the purpose of amplifying sound and assisting the physiological process of hearing.

Non-covered Prosthetic appliances include but are not limited to:

1. Dentures, replacing teeth or structures directly supporting teeth.

2. Dental appliances.

3. Such non-rigid appliances as elastic stockings, garter belts, arch supports and corsets.

4. Artificial heart implants.

5. Wigs (except as described above following cancer treatment).

6. Penile prosthesis in men suffering impotency resulting from disease or injury.

If you have any questions regarding whether a specific prosthetic is covered or want to obtain a detailed list, call the customer service number on the back of your Identification Card.

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

- **Orthotic devices** – Covered Services are the initial purchase, fitting, and repair of a custom-made rigid or semi-rigid supportive device used to support, align, prevent, or correct deformities or to improve the function of movable parts of the body, or which limits or stops motion of a weak or diseased body part. The cost of casting, molding, fittings, and adjustments are included. Applicable tax, shipping, postage and handling charges are also covered. The casting is covered when an orthotic appliance is billed with it, but not if billed separately.

Covered orthotic devices may include, but are not limited to, the following:

1. Cervical collars.
2. Ankle foot orthosis.
3. Corsets (back and special surgical).
4. Splints (extremity).
5. Trusses and supports.
6. Slings.
7. Wristlets.
8. Built-up shoe.
9. Custom made shoe inserts.

Orthotic appliances may be replaced once per year per Member when Medically Necessary in the Member's situation. However, additional replacements will be allowed for Members under age 18 due to rapid growth, or for any Member when an appliance is damaged and cannot be repaired.

Benefits for repairs and replacement do not include the following:

- Repair and replacement due to misuse, malicious breakage or gross neglect.
- Replacement of lost or stolen items.

Non-Covered Services include, but are not limited to:

1. Orthopedic shoes.
2. Foot support devices, such as arch supports and corrective shoes, unless they are an integral part of a leg brace.
3. Standard elastic stockings, garter belts, and other supplies not specially made and fitted (except as specified under Medical Supplies).
4. Garter belts or similar devices.

If you have any questions regarding whether a specific orthotic is covered or want to obtain a detailed list, call the customer service number on the back of your Identification Card.

## Outpatient Services

**See the Schedule of Benefits for any applicable Deductible, Coinsurance, Copayment, and Benefit Limitation information.**

Outpatient Services include facility, ancillary, facility use, and professional charges when given as an Outpatient at a Hospital, Alternative Care Facility, or other Provider as determined by the Plan. These facilities may include a non-Hospital site providing Diagnostic and Therapy Services, surgery, or

**Health Contract**                                                    Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

rehabilitation, or other Provider facility as determined by Us. Refer to the section titled "Behavioral Health Services" for services covered by the Plan. Professional charges only include services billed by a Physician or other professional.

**For Emergency Accident or Medical Care** refer to the "**Emergency Care and Urgent Care**" section.

## Physician Home Visits and Office Services

**See the Schedule of Benefits for any applicable Deductible, Coinsurance, Copayment, and Benefit Limitation information.**

Covered Services include care provided by a Physician in his or her office or your home. Refer to the sections titled "Preventive Care Services", "Maternity Care", "Home Care Services", for services covered by the Plan. For Emergency Care, refer to the "Emergency Care and Urgent Care" section.

**Office visits** for medical care and consultations to examine, diagnose, and treat an illness or injury performed in the Physician's office. Office visits also include allergy testing, injections and serum.

**Home Visits** for medical care and consultations performed in your home to examine, diagnose, and treat an illness or injury.

**Diagnostic Services** when required to diagnose or monitor a symptom, disease or condition.

**Surgery and Surgical services** (including anesthesia and supplies). The surgical fee includes normal post-operative care.

**Therapy Services** for physical medicine therapies and other Therapy Services when given in the office of a Physician or other professional Provider.

## Preventive Care Services

**See the Schedule of Benefits for any applicable Deductible, Coinsurance, Copayment, and Benefit Limitation information.**

Preventive Care Services in this section shall meet requirements as determined by federal and state law. Many preventive care services are covered by this Contract with no Deductible, Copayments or Coinsurance from the Member, as explained in your Schedule of Benefits. That means Anthem pays 100% of the Maximum Allowed Amount. These services fall under four broad categories as shown below:

1. Services with an "A" or "B" rating from the United States Preventive Services Task Force.

   Examples of these services are screenings for:

   Breast cancer;

   Cervical cancer;

   Colorectal cancer;

   High blood pressure;

   Type 2 Diabetes Mellitus;

   Cholesterol;

   Child and adult obesity.

2. Immunizations for children, adolescents, and adults recommended by the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention;

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

3. Preventive care and screenings for infants, children and adolescents as provided for in the comprehensive guidelines supported by the Health Resources and Services Administration; and

4. Additional preventive care and screening for women provided for in the guidelines supported by the Health Resources and Services Administration, including the following:

   i. Women's contraceptives, sterilization procedures, and counseling. This includes Generic drugs only, unless there is no Generic equivalent, obtained from a Network pharmacy, as well as injectable contraceptives and patches. Contraceptive devices such as diaphragms, intra uterine devices (IUDs), and implants are also covered. When Generic equivalents are available, Prescription Brand name contraceptives will not be covered under the Preventive Care benefit. Instead, Prescription contraceptives not covered under Preventive Care will be considered for benefits under the Prescription Drug benefit as described in the "Prescription Drugs" section.

   ii. Breastfeeding support, supplies, and counseling. To obtain Network benefits, breast pumps and supplies must be received from Our Network Provider. If another Provider is used, benefits will be covered as Non-Network. Breast pumps are limited to one per calendar year, or as required by law.

   iii. Gestational diabetes screening.

You may call Customer Service using the number on your ID card for additional information about these services.

We cover routine patient care costs for reasonable and Medically Necessary Drugs, devices, medical treatments, procedures or other technology included as part of a Phase II, III or IV clinical trial undertaken to treat cancer. The clinical trial must be underwritten by a National Institute of Health Cooperative or an equivalent entity. Covered care includes routine patient care costs incurred for Drugs and devices related to the clinical trial. Covered items do not include: the investigational item or service itself; items and services used only for data collection, not for clinical management of the patient; or items and services customarily provided by research sponsors at no charge.

## Surgical Services

**See the Schedule of Benefits for any applicable Deductible, Coinsurance, Copayment, and Benefit Limitation information.**

Coverage for Surgical Services when provided as part of Physician Home Visits and Office Services, Inpatient Services, or Outpatient Services includes but is not limited to:

- Performance of generally accepted operative and other invasive procedures;

- The correction of fractures and dislocations;

- Anesthesia surgical assistance when Medically Necessary;

- Usual and related pre-operative and post-operative care;

- Cochlear implants;

- Other procedures as approved by Us.

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

The surgical fee includes normal post-operative care. We may combine the reimbursement when more than one surgery is performed during the same operative session. Contact Us for more information.

Covered Surgical Services include, but are not limited to:

- Operative and cutting procedures;

- Endoscopic examinations, such as arthroscopy, bronchoscopy, colonoscopy, laparoscopy;

- Other invasive procedures such as angiogram, arteriogram, amniocentesis, tap or puncture of brain or spine.

## Reconstructive Services

Certain reconstructive services required to correct a deformity caused by disease, trauma, congenital anomalies, or previous therapeutic process are covered. Reconstructive services required due to prior therapeutic process are payable only if the original procedure would have been a Covered Service under this Plan. Covered Services are limited to the following:

- necessary care and treatment of medically diagnosed congenital defects and birth abnormalities of a newborn child;

- breast reconstruction resulting from a mastectomy. See "Mastectomy Notice" below for further coverage details;

- hemangiomas, and port wine stains of the head and neck areas for children ages 18 years of age or younger;

- limb deformities such as club hand, club foot, syndactyly (webbed digits), polydactyly (supernumerary digits), macrodactylia;

- otoplasty when performed to improve hearing by directing sound in the ear canal, when ear or ears are absent or deformed from trauma, surgery, disease, or congenital defect;

- tongue release for diagnosis of tongue-tied;

- congenital disorders that cause skull deformity such as Crouzon's disease;

- cleft lip;

- cleft palate.

## Mastectomy Notice

Regardless of when the mastectomy was performed, a Member who is receiving benefits for a mastectomy or for follow-up care in connection with a prior mastectomy, on or after the date the Women's Health & Cancer Rights Act became effective for this Plan, and who elects breast reconstruction, will also receive coverage for:

- reconstruction of the breast on which the mastectomy has been performed;

- surgery and reconstruction of the other breast to produce a symmetrical appearance; and

- prostheses and treatment of physical complications of all stages of mastectomy, including lymphedemas.

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

## Sterilization

Sterilization is a Covered Service. Sterilizations for women will be covered under the "Preventive Care" benefit. Please see that section for further details.

## Therapy Services

**See the Schedule of Benefits for any applicable Deductible, Coinsurance, Copayment, and Benefit Limitation information.**

When Therapy Services are given as part of Physician Home Visits and Office Services, Inpatient Services, Outpatient Services, or Home Care Services, coverage for these Therapy Services is limited to the following:

### Physical Medicine Therapy Services

The expectation must exist that the therapy will result in a practical improvement in the level of functioning within a reasonable period of time.

- **Physical therapy**, including treatment by physical means, hydrotherapy, heat, or similar modalities, physical agents, bio-mechanical and neuro-physiological principles and devices. Such therapy is given to relieve pain, restore function, and to prevent disability following illness, injury, or loss of a body part. Non-Covered Services include but are not limited to: maintenance therapy to delay or minimize muscular deterioration in patients suffering from a chronic disease or illness; repetitive exercise to improve movement, maintain strength and increase endurance (including assistance with walking for weak or unstable patients); range of motion and passive exercises that are not related to restoration of a specific loss of function, but are for maintaining a range of motion in paralyzed extremities; general exercise programs; diathermy, ultrasound and heat treatments for pulmonary conditions; diapulse; work hardening.

- **Speech therapy** for the correction of a speech impairment.

- **Occupational therapy** for the treatment of a physically disabled person by means of constructive activities designed and adapted to promote the restoration of the person's ability to satisfactorily accomplish the ordinary tasks of daily living and those tasks required by the person's particular occupational role. Occupational therapy does not include diversional, recreational, vocational therapies (e.g. hobbies, arts and crafts). Non-Covered Services include but are not limited to: supplies (looms, ceramic tiles, leather, utensils); therapy to improve or restore functions that could be expected to improve as the patient resumes normal activities again; general exercises to promote overall fitness and flexibility; therapy to improve motivation; suction therapy for newborns (feeding machines); soft tissue mobilization (visceral manipulation or visceral soft tissue manipulation), augmented soft tissue mobilization, myofascial; adaptations to the home such as rampways, door widening, automobile adaptors, kitchen adaptation and other types of similar equipment.

- **Manipulation Therapy** includes the manipulation and adjustment of the movable joint, muscle, and nerve tissue of the body to restore and maintain health and function.

**Health Contract**                                                      Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

## Other Therapy Services

- **Cardiac rehabilitation** to restore an individual's functional status after a cardiac event. It is a program of medical evaluation, education, supervised exercise training, and psychosocial support. Home programs, on-going conditioning and maintenance are not covered.

- **Chemotherapy** for the treatment of a disease by chemical or biological antineoplastic agents, including the cost of such agents.

- **Dialysis treatments** of an acute or chronic kidney ailment that may include the supportive use of an artificial kidney machine.

- **Radiation therapy** for the treatment of disease by X-ray, radium, or radioactive isotopes. Includes treatment (teletherapy, brachytherapy and intraoperative radiation, photon or high energy particle sources); materials and supplies used in therapy; treatment planning.

- **Inhalation therapy** for the treatment of a condition by the administration of medicines, water vapors, gases, or anesthetics by inhalation. Covered Services include but are not limited to, introduction of dry or moist gases into the lungs; nonpressurized inhalation treatment; intermittent positive pressure breathing treatment, air or oxygen, with or without nebulized medication; continuous positive airway pressure ventilation (CPAP); continuous negative pressure ventilation (CNP); chest percussion; therapeutic use of medical gases or Drugs in the form of aerosols, and equipment such as resuscitators, oxygen tents, and incentive spirometers; broncho-pulmonary drainage and breathing exercises.

- **Pulmonary rehabilitation** to restore an individual's functional status after an illness or injury. Covered Services include but are not limited to Outpatient short-term respiratory services for conditions that are expected to show significant improvement through short-term therapy. Also covered is inhalation therapy administered in Physician's office, including but not limited to breathing exercise, exercise not elsewhere classified, and other counseling. Pulmonary rehabilitation in the acute Inpatient rehabilitation setting is not a Covered Service.

## Physical Medicine and Rehabilitation Services

A structured therapeutic program of an intensity that requires a multidisciplinary coordinated team approach to upgrade the patient's ability to function as independently as possible; including skilled rehabilitative nursing care, physical therapy, occupational therapy, speech therapy and services of a Social Worker or Psychologist. The goal is to obtain practical improvement in a reasonable length of time in the appropriate Inpatient setting.

Physical medicine and rehabilitation involves several types of therapy, not just physical therapy, and a coordinated team approach. The variety and intensity of treatments required is the major differentiation from an admission primarily for physical therapy.

Non-Covered Services for physical medicine and rehabilitation include, but are not limited to:

- admission to a Hospital mainly for physical therapy;

- long-term rehabilitation in an Inpatient setting.

Day Rehabilitation Program services provided through a Day Hospital for physical medicine and rehabilitation are Covered Services. A Day Rehabilitation Program is for those patients who do not require Inpatient care but still require a rehabilitation therapy program four to eight hours a day, 2 or

more days a week at a Day Hospital. Day rehabilitation program services may consist of Physical Therapy, Occupational Therapy, Speech Therapy, nursing services, and neuro psychological services. A minimum of two Therapy Services must be provided for this program to be a Covered Service.

## Human Organ and Tissue Transplant (Bone Marrow/Stem Cell) Services

**See the Schedule of Benefits for any applicable Deductible, Coinsurance, Copayment, and Benefit Limitation information.**

**The human organ and tissue transplant (bone marrow/stem cell) services benefits or requirements described below do not apply to the following:**

- **Cornea and kidney transplants; and**

- **Any Covered Services, related to a Covered Transplant Procedure, received prior to or after the Transplant Benefit Period.**

**The above services are covered as Inpatient Services, Outpatient Services or Physician Home Visits and Office Services, depending where the service is performed, subject to applicable Member cost shares.**

### Covered Transplant Procedure

Any Medically Necessary human organ and stem cell/bone marrow transplants and transfusions as determined by Us, including necessary acquisition procedures, harvest and storage, and including Medically Necessary preparatory myeloablative therapy.

Covered Transplant Procedures include treatment of breast cancer by high-dose chemotherapy with autologous bone marrow transplantation or stem cell transplantation.

### Transplant Benefit Period

**Network Transplant Provider**: Starts one day prior to a Covered Transplant Procedure and continues for the applicable case rate/global time period. The number of days will vary depending on the type of transplant received and the Network Transplant Provider agreement. Contact the Case Manager for specific Network Transplant Provider information for services received at or coordinated by a Network Transplant Provider Facility.

**Non-Network Transplant Provider**: Starts one day prior to a Covered Transplant Procedure and continues to the date of discharge at a Non-Network Transplant Provider Facility.

### Prior Approval and Precertification

In order to maximize your benefits, We strongly encourage you to call Our transplant department to discuss benefit coverage when it is determined a transplant may be needed. We will assist you in maximizing your benefits by providing coverage information, including details regarding what is covered and whether any clinical coverage guidelines, medical policies, Network Transplant Provider requirements, or Exclusions are applicable. Contact the Customer Service telephone number on the back of your Identification Card **and ask for the transplant coordinator**. Even if We issue a prior approval for the Covered Transplant Procedure, We recommend that you or your Provider call Our

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Transplant Department for precertification prior to the transplant, whether this is performed in an Inpatient or Outpatient setting.

Please note that there are instances where your Provider requests approval for HLA testing, donor searches and/or a harvest and storage of stem cells prior to the final determination as to what transplant procedure will be requested. Under these circumstances, the HLA testing and donor search charges are covered as routine diagnostic testing. The harvest and storage request will be reviewed for Medical Necessity and may be approved. However, such an approval for HLA testing, donor search and/or a harvest and storage is NOT an approval for the subsequent requested transplant. A separate Medical Necessity determination will be made for the transplant procedure.

### Transportation and Lodging

The Plan will provide assistance with reasonable and necessary travel expenses as determined by Us when you obtain prior approval and are required to travel more than 75 miles from your residence to reach the facility where your Covered Transplant Procedure will be performed. Our assistance with travel expenses includes transportation to and from the facility and lodging for the patient and one companion. If the Member receiving treatment is a minor, then reasonable and necessary expenses for transportation and lodging may be allowed for two companions. The Member must submit itemized receipts for transportation and lodging expenses in a form satisfactory to Us when claims are filed. Contact Us for detailed information.

For lodging, and ground transportation benefits, We will provide a maximum benefit up to the current limits set forth in the Internal Revenue Code.

Non-Covered Services for transportation and lodging include, but are not limited to:

- Alcohol, tobacco, or any other non-food item,
- Child care,
- Mileage within the medical transplant facility city,
- Rental cars, buses, taxis, or shuttle service, except as specifically approved by Us,
- Frequent Flyer miles,
- Coupons, Vouchers, or Travel tickets,
- Prepayments or deposits,
- Services for a condition that is not directly related, or a direct result, of the transplant,
- Telephone calls,
- Laundry,
- Postage,
- Entertainment,
- Interim visits to a medical care facility while waiting for the actual transplant procedure,
- Travel expenses for donor companion/caregiver,
- Return visits for the donor for a treatment of a condition found during the evaluation.

**Certain Human Organ and Tissue Transplant Services may be limited. See the Schedule of Benefits.**

**Health Contract**

Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

## Prescription Drug Benefits

**See the Schedule of Benefits for any applicable Deductible, Coinsurance, Copayment, and Benefit Limitation information.**

### Pharmacy Benefits Manager

The pharmacy benefits available to you under this Contract are managed by the Pharmacy Benefits Manager (PBM) that contracts with Anthem. The PBM is a pharmacy benefits management company with which We contract to manage your pharmacy benefits. The PBM has a nationwide network of retail pharmacies, a Mail Service Pharmacy, and provides clinical management services

The management and other services the PBM provides include, among others, making recommendations to, and updating, the covered Prescription Drug list (also known as a Formulary), managing a network of retail pharmacies, and operating a Mail Service Pharmacy. The PBM, in consultation with Us, also provides services to promote and enforce the appropriate use of pharmacy benefits, such as review for possible excessive use; recognized and recommended dosage regimens; Drug interactions or Drug/pregnancy concerns.

You may request a copy of the covered Prescription Drug list by calling Us at the Customer Service telephone number on the back of your Identification Card. The covered Prescription Drug list is subject to periodic review and amendment. If the PBM deletes a drug for which you have a prescription from the Prescription Drug list, you will be notified electronically, or, at your request, in writing, at least 30 days prior to the deletion of the drug. Inclusion of a Drug or related item on the covered Prescription Drug list is not a guarantee of coverage.

Prescription Drugs, unless otherwise stated below, must be Medically Necessary and not Experimental/Investigative, in order to be Covered Services. For certain Prescription Drugs, the prescribing Physician may be asked to provide additional information before the PBM and/or the Plan can determine Medical Necessity. The Plan may establish quantity and/or age limits for specific Prescription Drugs. Covered Services will be limited based on Medical Necessity, quantity and/or age limits established by the Plan, or utilization guidelines.

Prior Authorization may be required for certain Prescription Drugs (or the prescribed quantity of a particular Drug). Prior Authorization helps promote appropriate utilization and enforcement of guidelines for Prescription Drug benefit coverage. At the time you fill a prescription, the Network pharmacist is informed of the Prior Authorization requirement through the Pharmacy's computer system, and the pharmacist is instructed to contact Us or the PBM. We, or the PBM, use pre-approved criteria, developed by the Pharmacy and Therapeutics Committee and reviewed and adopted by Us. We, or the PBM, communicate the results of the decision to the pharmacist. We, or the PBM, may contact your prescribing Physician if additional information is required to determine whether Prior Authorization should be granted.

If Prior Authorization is denied, you have the right to appeal through the appeals process outlined in the "Complaint and Appeals Procedures" section of this Contract.

For a list of the current Drugs requiring Prior Authorization, please contact Us at the Customer Service telephone number on the back of your ID Card. The covered Prescription Drug list is subject to periodic review and amendment. Inclusion of a Drug or related item on the covered Prescription Drug list is not a guarantee of coverage under your Contract. Refer to the Prescription Drug benefit sections in this Contract for information on coverage, limitations and exclusions. Please ask your Provider or Network pharmacist to check with Us or with the PBM to verify covered Prescription Drugs, any quantity and/or age limits, or applicable Brand or Generic Drugs recognized under the Plan.

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

**Therapeutic Substitution of Drugs** is a program approved by Us and managed by the PBM. This is a voluntary program designed to inform Members and Physicians about possible alternatives to certain prescribed Drugs. We, or the PBM, may contact you and your prescribing Physician to make you aware of substitution options. Therapeutic substitution may also be initiated at the time the prescription is dispensed. Only you and your Physician can determine whether the therapeutic substitute is appropriate for you. For questions or issues involving therapeutic Drug substitutes, contact Us by calling the Customer Service telephone number on the back of your ID Card. The therapeutic Drug substitutes list is subject to periodic review and amendment.

## Step Therapy

Step therapy protocol means that a Member may need to use one type of medication before another. The PBM monitors some Prescription Drugs to control utilization, to ensure that appropriate prescribing guidelines are followed, and to help Members access high quality yet cost effective Prescription Drugs. If a Physician decides that the monitored medication is needed, the Physician will need to submit a letter fax including the following details:

- Member name and ID number;
- Diagnosis;
- Drug name;
- Reason for appeal;
- Physician name, specialty, address and phone number.

## Specialty Pharmacy Network

Our Specialty Pharmacy Network is available to members who use Specialty Drugs.

"Specialty Drugs" are Prescription Legend Drugs which:

- Are only approved to treat limited patient populations, indications or conditions;
- Are normally high cost, injected, infused, oral or inhaled medication (including biological products) that require close monitoring by a Physician or clinically trained individual; or
- Have limited availability, special dispensing and delivery requirements, and/or require additional patient support – any or all of which make the Drug difficult to obtain through traditional pharmacies.

Network Specialty Pharmacies may fill both retail and mail service Specialty Drug Prescription Orders, subject to a 30-day supply for Retail and Mail Service, and subject to the applicable Copayment/Coinsurance shown in the Schedule of Benefits.

Network Specialty Pharmacies have dedicated patient care coordinators to help you manage your condition and offer toll-free 24-hour access to nurses and registered Pharmacists to answer questions regarding your medications.

You may obtain a list of the Network Specialty Pharmacies and covered Specialty Drugs by calling the Customer Service telephone number on the back of your ID card, or review the lists on Our website at www.anthem.com.

**Note**: In order to be covered, Specialty Drugs must be purchased from a Network Specialty Pharmacy.

**Health Contract**                                                              Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

## Covered Prescription Drug Benefits

- Prescription Legend Drugs.

- Injectable insulin and syringes used for administration of insulin.

- Injectables.

- Contraceptive Drugs, including injectable contraceptive Drugs and patches, are covered when obtained through an eligible Pharmacy. Certain contraceptives are covered under the "Preventive Care" benefit. Please see that section for further details.

- Certain Prescription Legend Drugs may be Covered Services if an over the counter equivalent exists. This list is subject to change on a semiannual basis. Please check our website at www.anthem.com for the most current listing of medications.

- Prescription Drugs to eliminate or reduce dependency on, or addiction to, tobacco and tobacco products.

## Non-Covered Prescription Drug Benefits (please also see the Exclusions section of this Contract for other non-Covered Services)

- Prescription Drugs dispensed by any Mail Service program other than the Mail Service used by Anthem, unless prohibited by law.

- Drugs, devices and products, or Prescription Legend Drugs with over the counter equivalents, unless noted as covered on our website at www.anthem.com and any Drugs, devices or products that are therapeutically comparable to an over the counter Drug, device, or product, unless noted as covered on the website at www.anthem.com.

- Off label use, except as otherwise prohibited by law or as approved by Us or the PBM.

- Drugs in quantities exceeding the quantity prescribed, or for any refill dispensed later than one year after the date of the original Prescription Order.

- Drugs not approved by the FDA.

- Charges for the administration of any Drug.

- Drugs consumed at the time and place where dispensed or where the Prescription Order is issued, including but not limited to samples provided by a Physician. This does not apply to Drugs used in conjunction with a Diagnostic Service, with Chemotherapy performed in the office or Drugs eligible for coverage under the Medical Supplies benefit; they are Covered Services.

- Any Drug that is primarily for weight loss.

- Drugs not requiring a prescription by federal law (including Drugs requiring a prescription by state law, but not by federal law), except for injectable insulin.

- Drugs in quantities that exceed the limits established by the Plan, or which exceed any age limits established by Us.

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

- Any New FDA Approved Drug Product or Technology (including but not limited to medications, medical supplies, or devices) available in the marketplace for dispensing by the appropriate source for the product or technology, including but not limited to Pharmacies, for the first six months after the product or technology received FDA New Drug Approval or other applicable FDA approval. The Plan may waive this exclusion in whole or in part for a specific New FDA Approved Drug Product or Technology.

- Drugs for treatment of sexual or erectile dysfunctions or inadequacies, regardless of origin or cause.

- Fertility Drugs.

- Oral immunizations and biologicals, although they are federal legend Drugs, are payable as medical supplies based on where the service is performed or the item is obtained. If such items are over the counter Drugs, devices or products, they are not Covered Services.

- Human Growth Hormone for children born small for gestational age. It is only a Covered Service in other situations when allowed by Us through Prior Authorization.

- Compound Drugs unless there is at least one ingredient that requires a prescription.

- Treatment of Onchomycosis (toenail fungus).

- Certain Prescription Legend Drugs are not Covered Services when any version or strength becomes available over the counter. **Please contact Us for additional information on these Drugs.**

- Certain Prescription Drugs may not be covered when clinically equivalent alternatives are available, unless otherwise required by law. "Clinically equivalent" means Drugs that, for the majority of Members, can be expected to produce similar therapeutic outcomes for a disease or condition. If you have questions regarding whether a particular drug is covered and which drugs fall into this category, please call the member services number on the back of your Identification Card, or visit our website at www.anthem.com.

### Deductible/Coinsurance/Copayment

Each Prescription Order may be subject to a Deductible and Coinsurance/Copayment. If the Prescription Order includes more than one covered Drug, a separate Coinsurance/Copayment will apply to each covered Drug. Your Prescription Drug Coinsurance/Copayment will be the lesser of your scheduled Copayment/Coinsurance amount or the Maximum Allowed Amount. Please see the Schedule of Benefits for any applicable Deductible and Coinsurance/Copayment. If you receive Covered Services from a Non-Network Pharmacy, a Deductible and Coinsurance/Copayment amount may also apply.

### Days Supply

The number of days supply of a Drug which you may receive is limited. The days supply limit applicable to Prescription Drug coverage is shown in the Schedule of Benefits. If you are going on vacation and you need more than the days supply allowed for under this Certificate, you should ask your Pharmacist to call the PBM and request an override for one additional refill. This will allow you to fill your next prescription early. If you require more than one extra refill, please call the Customer Service telephone number on the back of your Identification Card.

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

## Payment of Benefits

The amount of benefits paid is based upon whether you receive the Covered Services from a Network Pharmacy, including a Specialty Pharmacy, a Non-Network Pharmacy, or the Mail Service Program used by Anthem. Please see the Schedule of Benefits for the applicable amounts and for applicable limitations on number of days supply.

We retain the right at Our discretion to determine coverage for dosage formulations in terms of covered dosage administration methods (for example by mouth, injections, topical or inhaled) and may cover one form of administration and exclude other forms of administration.

The amounts for which you are responsible are shown in the Schedule of Benefits. No payment will be made by Us for any Covered Service unless the negotiated rate exceeds any applicable Deductible and/or Copayment/Coinsurance for which you are responsible.

Your Copayment(s), Coinsurance and/or Deductible amounts will not be reduced by any discounts, rebates or other funds received by the PBM and/or the Plan from Drug manufacturers or similar vendors. For Covered Services provided by a Network Pharmacy or Specialty Drug Network or through the Mail Service used by Anthem, you are responsible for all Deductibles and/or Copayment/Coinsurance amounts.

For Covered Services provided by a Non-Network Pharmacy, you will be responsible for the amount(s) shown in the Schedule of Benefits. This is based on the Maximum Allowed Amount.

## How to Obtain Prescription Drug Benefits

How you obtain your benefits depends upon whether you go to a Network or a Non-Network Pharmacy.

**Network Pharmacy** – Present your written Prescription Order from your Physician and your Identification Card to the pharmacist at a Network Pharmacy. The Pharmacy will file your claim for you. You will be charged at the point of purchase for applicable Deductible and/or Copayment/Coinsurance amounts. If you do not present your Identification Card, you will have to pay the full retail price of the prescription. If you do pay the full charge, ask your pharmacist for an itemized receipt and submit it to Us with a written request for refund.

**Specialty Network Pharmacy** - You or your Physician can order your Specialty Drugs directly from a Specialty Network Pharmacy. Simply call 1-800-870-6419. If you or your Physician orders your Specialty Drugs from a Specialty Network Pharmacy, you will be assigned a patient care coordinator who will work with you and your Physician to obtain Prior Authorization and to coordinate the shipping of your Specialty Drugs directly to you or your Physician's office. Your patient care coordinator will also contact you directly when it is time to refill your Specialty Drug Prescription.

**Non-Network Pharmacy** – You are responsible for payment of the entire amount charged by the Non-Network Pharmacy. You must submit a Prescription Drug claim form to Us for reimbursement consideration. These forms are available from Us. You must complete the top section of the form and ask the Non-Network Pharmacy to complete the bottom section. If for any reason the bottom section of this form cannot be completed by the pharmacist, you must attach an itemized receipt to the claim form and submit to Us. The itemized receipt must show:

- name and address of the Non-Network Pharmacy;
- patient's name;
- prescription number;
- date the prescription was filled;

**Health Contract**                                   Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

- name of the Drug;

- cost of the prescription;

- quantity of each covered Drug or refill dispensed.

You are responsible for the amount shown in the Schedule of Benefits. This is based on the Maximum Allowed Amount as determined by Us or the PBM's normal or average contracted rate with Network pharmacies on or near the date of service.

**The PBM's Mail Service** – Complete the Order and Patient Profile Form. You will need to complete the patient profile information only once. You may mail written prescriptions from your Physician, or have your Physician fax the prescription to the Mail Service. Your Physician may also phone in the prescription to the Mail Service Pharmacy. You will need to submit the applicable Deductible and/or Coinsurance and/or Copayment amounts to the Mail Service when you request a prescription or refill.

# 5  NON-COVERED SERVICES/EXCLUSIONS

The following section indicates items that are excluded from benefit consideration, and are not considered Covered Services. This information is provided as an aid to identify certain common items that may be misconstrued as Covered Services, but is in no way a limitation upon, or a complete listing of, such items considered not to be Covered Services.

We do not provide benefits for procedures, equipment, services, supplies or charges:

1. that We determine are not Medically Necessary or do not meet Our medical policy, clinical coverage guidelines, or benefit policy guidelines, except reasonable and Medically Necessary Drugs, devices, medical treatments, procedures or other technology included as part of a Phase II, III or IV clinical trial undertaken to treat cancer. The clinical trial, including Phase II, must be underwritten by a National Institute of Health Cooperative, the National Cancer Institute, or an equivalent entity. Covered care includes routine patient care costs incurred for Drugs and devices related to the clinical trial. Covered items do not include: the investigational item or service itself; items and services used only for data collection, not for clinical management of the patient; or items and services customarily provided by research sponsors at no charge.

2. received from an individual or entity that is not a Provider, as defined in this Contract, or recognized by Us.

3. that are Experimental/Investigative or related to such, whether incurred prior to, in connection with, or subsequent to the Experimental/Investigative service or supply, as determined by Us, except reasonable and Medically Necessary Drugs, devices, medical treatments, procedures or other technology included as part of a Phase II, III or IV clinical trial undertaken to treat cancer. The clinical trial, including Phase II, must be underwritten by a National Institute of Health Cooperative, the National Cancer Institute, or an equivalent entity. Covered care includes routine patient care costs incurred for Drugs and devices related to the clinical trial. Covered items do not include: the investigational item or service itself; items and services used only for data collection, not for clinical management of the patient; or items and services customarily provided by research sponsors at no charge. The fact that a service is the only available treatment for a condition will not make it eligible for coverage if we deem it to be Experimental/Investigational.

**Health Contract**

Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

4. for any condition, disease, defect, ailment, or injury arising out of and in the course of employment if benefits are available under any Worker's Compensation Act or other similar law. If Worker's Compensation Act benefits are not available to you, then this Exclusion does not apply. This exclusion applies if you receive the benefits in whole or in part. This exclusion also applies whether or not you claim the benefits or compensation. It also applies whether or not you recover from any third party.

5. to the extent that they are provided as benefits by any governmental unit, unless otherwise required by law or regulation.

6. for any illness or injury that occurs while serving in the armed forces, including as a result of any act of war, declared or undeclared. At the Subscriber's request, We will refund any Premiums paid from the date the Member enters the military.

7. for a condition resulting from direct participation in a riot, civil disobedience, nuclear explosion, or nuclear accident.

8. for court ordered testing or care, unless the service is Medically Necessary and authorized by Us.

9. for which you have no legal obligation to pay in the absence of this or like coverage.

10. for any Pre-Existing Condition for the time period specified in the Schedule of Benefits, except the waiting period will not apply to Members under the age of 19.

11. for the following:

    - Physician or Other Practitioners' Charges for consulting with Members by telephone, facsimile machine, electronic mail systems or other consultation or medical management service not involving direct (face-to-face) care with the Member;
    - surcharges for furnishing and/or receiving medical records and reports.
    - charges for doing research with Providers not directly responsible for Your care.
    - charges that are not documented in Provider records.
    - charges from an outside laboratory or shop for services in connection with an order involving devices (e.g., prosthetics, orthotics) which are manufactured by that laboratory or shop, but which are designed to be fitted and adjusted by the attending Physician.

12. received from a dental or medical department maintained by or on behalf of an employer, mutual benefit association, labor union, trust, academic institution, or similar person or group.

13. prescribed, ordered or referred by, or received from a member of your immediate family, including your spouse, child/stepchild, brother/stepbrother, sister/stepsister, parent/stepparent, in-law, or self.

14. for completion of claim forms or charges for medical records or reports, unless otherwise required by law.

15. for missed or canceled appointments.

16. for mileage, lodging and meals costs, and other Member travel related expenses, except as authorized by Us or specifically stated as a Covered Service.

17. in excess of Our Maximum Allowed Amounts.

18. incurred prior to your Effective Date.

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

19. incurred after the termination date of this coverage.

20. for reconstructive services, except as specifically stated in the "Covered Services" section of this Contract, or as required by law.

21. provided in connection with cosmetic services. Cosmetic services are primarily intended to preserve, change or improve your appearance or are furnished for psychiatric, psychological or social reasons. No benefits are available for surgery or treatments to change the texture or appearance of your skin or to change the size, shape or appearance of facial or body features (such as your nose, eyes, ears, cheeks, chin, chest or breasts). Complications directly related to cosmetic services, treatment or surgery, as determined by Us, are not covered. This exclusion applies even if the original cosmetic services treatment or surgery was performed while the Member was covered by another carrier/self-funded plan prior to coverage under this Contract. Directly related means that the treatment or surgery occurred as a direct result of the cosmetic services treatment or surgery and would not have taken place in the absence of the cosmetic services treatment or surgery. This exclusion does not apply to conditions including but not limited to: myocardial infarction; pulmonary embolism; thrombophlebitis; and exacerbation of co-morbid conditions. This exclusion also does not apply to plastic or reconstructive surgery to restore breast symmetry by reduction mammoplasty, mastopexy or breast augmentation as recommended by the oncologist or PCP for a Member incident to a covered mastectomy. Coverage will include reduction or uplift surgery on the unaffected breast to produce a symmetrical appearance.

22. for maintenance therapy, which is treatment given when no additional progress is apparent or expected to occur. Maintenance therapy includes treatment that preserves your present level of functioning and prevents loss of that functioning, but which does not result in any additional improvement.

23. for services which are solely performed to prevent regression of functions for an illness, injury or condition which is resolved or stable.

24. for the following:

   - Custodial, convalescent care or rest cures; domiciliary care provided in a residential institution, treatment center, halfway house, or school because a Member's own home arrangements are not available or are unsuitable, and consisting chiefly of room and board, even if therapy is included.

   - care provided or billed by a hotel, health resort, convalescent home, rest home, nursing home or other extended care facility home for the aged, infirmary, school infirmary, institution providing education in special environments, supervised living or halfway house, or any similar facility or institution.

   - care provided or billed by residential treatment centers or facilities, unless those centers are required to be covered by state law. This includes, but is not limited to, individualized and intensive treatment in a residential facility, including observation and assessment by a Provider weekly or more frequently, an individualized program of rehabilitation, therapy, education, and recreational or social activities.

   - services or care provided or billed by a school, Custodial Care center for the developmentally disabled, residential programs for drug and alcohol, or outward bound programs, even if psychotherapy is included.

   - wilderness camps

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

25. for routine foot care (including the cutting or removal of corns and calluses); nail trimming, cutting or debriding; hygienic and preventive maintenance foot care, including but not limited to:

- cleaning and soaking the feet.
- applying skin creams in order to maintain skin tone.
- other services that are performed when there is not a localized illness, injury or symptom involving the foot.

26. for surgical treatment of flat feet; subluxation of the foot; weak, strained, unstable feet; tarsalgia; metatarsalgia; hyperkeratoses.

27. for dental treatment, regardless of origin or cause, except as specified elsewhere in this Contract. "Dental treatment" includes but is not limited to: Preventive care, diagnosis, treatment of or related to the teeth, jawbones or gums, including but not limited to:

- extraction, restoration and replacement of teeth.
- medical or surgical treatments of dental conditions.
- services to improve dental clinical outcomes.

28. for treatment of the teeth, jawbone or gums that is required as a result of a medical condition except as expressly required by law or specifically stated as a Covered Service.

29. for Dental implants.

30. for Dental braces.

31. for Dental x rays, supplies & appliances and all associated expenses, including hospitalization and anesthesia, except as explained in the "Covered Services" section of this Contract. The only exceptions to this are for any of the following:

- transplant preparation.
- initiation of immunosuppressives.
- direct treatment of acute traumatic injury, cancer or cleft palate.

32. for treatment of congenitally missing, malpositioned, or super numerary teeth, even if part of a congenital anomaly.

33. for weight loss programs, whether or not they are pursued under medical or Physician supervision, unless specifically listed as covered in this Contract. This exclusion includes commercial weight loss programs (Weight Watchers, Jenny Craig, LA Weight Loss) and fasting programs.

34. for bariatric surgery, regardless of the purpose it is proposed or performed. This includes but is not limited to Roux-en-Y (RNY), Laparoscopic gastric bypass surgery or other gastric bypass surgery (surgical procedures that reduce stomach capacity and divert partially digested food from the duodenum to the jejunum, the section of the small intestine extending from the duodenum), or Gastroplasty, (surgical procedures that decrease the size of the stomach), or gastric banding procedures. Complications directly related to bariatric surgery that result in an Inpatient stay or an extended Inpatient stay for the bariatric surgery, as determined by Us, are not covered. This exclusion applies when the bariatric surgery was not a Covered Service under this plan or any previous one of Our Plans, and it applies if the surgery was performed while the Member was covered by a previous carrier/self-funded plan prior to coverage under this Contract. Directly

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

related means that the Inpatient stay or extended Inpatient stay occurred as a direct result of the bariatric procedure and would not have taken place in the absence of the bariatric procedure. This exclusion does not apply to conditions including but not limited to: myocardial infarction; excessive nausea/vomiting; pneumonia; and exacerbation of co-morbid medical conditions during the procedure or in the immediate post-operative time frame.

35. for marital counseling.

36. for prescription, fitting, or purchase of eyeglasses or contact lenses except as otherwise specifically stated as a Covered Service. This Exclusion does not apply for initial prosthetic lenses or sclera shells following intra-ocular surgery, or for soft contact lenses due to a medical condition.

37. for vision orthoptic training.

38. for hearing aids or examinations for prescribing or fitting them, except as specified in the "Covered Services" section of this Contract.

39. for services or supplies primarily for educational, vocational, or training purposes, except as otherwise specified herein.

40. for services to reverse voluntarily induced sterility.

41. for testing or treatment related to fertilization or infertility such as diagnostic tests performed to determine the reason for infertility and any service billed with an infertility related diagnosis.

42. for personal hygiene, environmental control, or convenience items including but not limited to:

   - air conditioners, humidifiers, air purifiers;
   - physical fitness equipment such as a treadmill or exercise cycles;
   - special exercise testing or equipment solely to evaluate exercise competency or assist in an exercise program;
   - charges from a health spa or similar facility;
   - personal comfort and convenience items during an Inpatient stay, including but not limited to daily television rental, telephone services, cots or visitor's meals;
   - charges for non-medical self-care except as otherwise stated;
   - purchase or rental of supplies for common household use, such as water purifiers;
   - hypoallergenic pillows, cervical neck pillows, special mattresses, or waterbeds;
   - infant helmets to treat positional plagiocephaly; safety helmets for Members with neuromuscular diseases; or sports helmets.

43. for health club memberships, exercise equipment, charges from a physical fitness instructor or personal trainer, or any other charges for activities, equipment, or facilities used for developing or maintaining physical fitness, even if ordered by a Physician. This exclusion also applies to health spas.

44. for telephone consultations or consultations via electronic mail or internet/web site, except as required by law, or authorized by Us.

45. for care received in an Emergency Room that is not Emergency Care, except as specified in this Contract. This includes, but is not limited to, suture removal in an Emergency Room.

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

46. for eye surgery to correct errors of refraction, such as near-sightedness, including without limitation LASIK, radial keratotomy or keratomileusis or excimer laser refractive keratectomy.

47. for self-help training and other forms of non-medical self care, except as specified in the "Covered Services" section of this Contract.

48. for examinations relating to research screenings.

49. for stand-by charges of a Physician.

50. for physical exams and immunizations required for enrollment in any insurance program, as a condition of employment, for licensing, or for other purposes.

51. related to artificial and/or mechanical hearts or ventricular and/or atrial assist devices related to a heart condition or for subsequent services and supplies for a heart condition as long as any of the above devices remain in place. This Exclusion includes services for implantation, removal and complications. This Exclusion does not apply to left ventricular assist devices when used as a bridge to a heart transplant.

52. for Private Duty Nursing Services.

53. for Manipulation Therapy services rendered in the home as part of Home Care Services.

54. for any New FDA Approved Drug Product or Technology (including but not limited to medications, medical supplies, or devices) available in the marketplace for dispensing by the appropriate source for the product or technology, including but not limited to Pharmacies, for the first six months after the product or technology received FDA New Drug Approval or other applicable FDA approval. The Plan may waive this exclusion in whole or in part for a specific New FDA Approved Drug Product or Technology.

55. for services and supplies related to sex transformation and/or the reversal thereof, or male or female sexual or erectile dysfunctions or inadequacies, regardless of origin or cause. This Exclusion includes sexual therapy and counseling. This exclusion also includes penile prostheses or implants and vascular or artificial reconstruction, Prescription Drugs, and all other procedures and equipment developed for or used in the treatment of impotency, and all related Diagnostic Testing.

56. for elective abortions and/or fetal reduction surgery. An elective (voluntary) abortion is defined in "Definitions."

57. for nutritional and dietary supplements, except as provided in the "Covered Services" section of this Contract or as required by law. This exclusion includes, but is not limited to, those nutritional formulas and dietary supplements that can be purchased over the counter, which by law do not require either the written prescription or dispensing by a licensed pharmacist.

58. for (services or supplies related to) alternative or complementary medicine. Services in this category include, but are not limited to, acupuncture, holistic medicine, homeopathy, hypnosis, aroma therapy, massage therapy, reiki therapy, herbal, vitamin or dietary products or therapies, naturopathy, thermograph, orthomolecular therapy, contact reflex analysis, bioenergial synchronization technique (BEST), iridology (study of the iris), auditory integration therapy (AIT), colonic irrigation, magnetic innervation therapy, electromagnetic therapy and neurofeedback.

59. for any services or supplies provided to a person not covered under the Contract in connection with a surrogate pregnancy (including the bearing of a child by another woman for an infertile couple).

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

60. for surgical treatment of gynecomastia.

61. for treatment of hyperhidrosis (excessive sweating).

62. for any service for which you are responsible under the terms of this Contract to pay a Copayment, Coinsurance or Deductible, and the Copayment, Coinsurance or Deductible is waived by a Non-Network Provider.

63. for Human Growth Hormone for children born small for gestational age. It is only a Covered Service in other situations when allowed by Us through Prior Authorization.

64. for services, supplies and equipment for the following:

  • gastric electrical stimulation.
  • hippotherapy.
  • intestinal rehabilitation therapy.
  • prolotherapy.
  • recreational therapy.
  • sensory integration therapy (SIT).

65. for extracorporeal shock wave treatment for plantar fasciitis and other musculoskeletal conditions.

66. for complications directly related to a service or treatment that is a non-Covered Service under this Contract because it was determined by Us to be Experimental/Investigational or not Medically Necessary. Directly related means that the service or treatment occurred as a direct result of the Experimental/Investigational or non-Medically Necessary service and would not have taken place in the absence of the Experimental/Investigational or non-Medically Necessary service.

67. for Drugs, devices, products, or supplies with over the counter equivalents, unless noted as covered on our website at www.anthem.com and any Drugs, devices, products, or supplies that are therapeutically comparable to an over the counter Drug, device, product, or supply, unless noted as covered on our website at www.anthem.com.

68. for sclerotherapy for the treatment of varicose veins of the lower extremities including ultrasonic guidance for needle and/or catheter placement and subsequent sequential ultrasound studies to assess the results of ongoing treatment of varicose veins of the lower extremities with sclerotherapy.

69. for treatment of telangiectatic dermal veins (spider veins) by any method.

70. for the treatment of temporomandibular or craniomandibular joint disorders.

71. (1) for which benefits are payable under Medicare Parts A, B and/or D, or would have been payable if a Member had applied for Parts A, B, and/or D, except, as specified elsewhere in this Contract or as otherwise prohibited by federal law, as addressed in the section titled "Medicare" in General Provisions. For the purposes of the calculation of benefits, if the Member has not enrolled in Medicare Part B, We will calculate benefits as if the Member had enrolled; (2) for services or supplies provided pursuant to a private contract between the Member and a Provider, for which reimbursement under the Medicare program is prohibited as specified in Section 1802 (42 U.S.C. 1395a) of Title XVII of the Social Security Act.

72. for maternity services, except complications of pregnancy are covered.

**Health Contract**

Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

## EXPERIMENTAL/INVESTIGATIVE SERVICES EXCLUSION

Any Drug, biologic, device, Diagnostic, product, equipment, procedure, treatment, service, or supply used in or directly related to the diagnosis, evaluation, or treatment of a disease, injury, illness, or other health condition which We determine to be Experimental/Investigative is not covered under the Plan.

We will deem any Drug, biologic, device, Diagnostic, product, equipment, procedure, treatment, service, or supply to be Experimental/Investigative if We determine that one or more of the following criteria apply when the service is rendered with respect to the use for which benefits are sought. The Drug, biologic, device, Diagnostic, product, equipment, procedure, treatment, service, or supply:

- cannot be legally marketed in the United States without the final approval of the Food and Drug Administration (FDA), or other licensing or regulatory agency, and such final approval has not been granted;
- has been determined by the FDA to be contraindicated for the specific use; or
- is provided as part of a clinical research protocol or clinical trial or is provided in any other manner that is intended to evaluate the safety, toxicity, or efficacy of the Drug, biologic, device, Diagnostic, product, equipment, procedure, treatment, service, or supply; or
- is subject to review and approval of an Institutional Review Board (IRB) or other body serving a similar function; or
- is provided pursuant to informed consent documents that describe the Drug, biologic, device, Diagnostic, product, equipment, procedure, treatment, service, or supply as Experimental/Investigative, or otherwise indicate that the safety, toxicity, or efficacy of the Drug, biologic, device, Diagnostic, product, equipment, procedure, treatment, service, or supply is under evaluation.

Any service not deemed Experimental/Investigative based on the criteria above may still be deemed Experimental/Investigative by Us. In determining whether a Service is Experimental/Investigative, We will consider the information described below and assess whether:

- the scientific evidence is conclusory concerning the effect of the service on health outcomes;
- the evidence demonstrates the service improves net health outcomes of the total population for whom the service might be proposed by producing beneficial effects that outweigh any harmful effects;
- the evidence demonstrates the service has been shown to be as beneficial for the total population for whom the service might be proposed as any established alternatives; and
- the evidence demonstrates the service has been shown to improve the net health outcomes of the total population for whom the service might be proposed under the usual conditions of medical practice outside clinical investigatory settings.

The information considered or evaluated by Us to determine whether a Drug, biologic, device, Diagnostic, product, equipment, procedure, treatment, service, or supply is Experimental/Investigative under the above criteria may include one or more items from the following list which is not all inclusive:

- published authoritative, peer-reviewed medical or scientific literature, or the absence thereof; or

**Health Contract**

Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

- evaluations of national medical associations, consensus panels, and other technology evaluation bodies; or

- documents issued by and/or filed with the FDA or other federal, state or local agency with the authority to approve, regulate, or investigate the use of the Drug, biologic, device, Diagnostic, product, equipment, procedure, treatment, service, or supply; or

- documents of an IRB or other similar body performing substantially the same function; or

- consent document(s) and/or the written protocol(s) used by the treating Physicians, other medical professionals, or facilities or by other treating Physicians, other medical professionals or facilities studying substantially the same Drug, biologic, device, Diagnostic, product, equipment, procedure, treatment, service, or supply; or

- medical records; or

- the opinions of consulting Providers and other experts in the field.

We will identify and weigh all information and determine all questions pertaining to whether a Drug, biologic, device, Diagnostic, product, equipment, procedure, treatment, service, or supply is Experimental/Investigative.

## 6  ELIGIBILITY AND ENROLLMENT

## Eligibility

### Subscriber

To be eligible to enroll as a Subscriber, you must:

- be under age 65;

- live in Our Missouri Service Area;

- not be covered by any other group or individual health plan; and

- be qualified under this Contract on the Effective Date, according to Our medical underwriting guidelines.

### Dependents

To be eligible to enroll as a Dependent, you must be listed on the application completed by the Subscriber, meet all Dependent eligibility criteria including Our medical underwriting guidelines and be:

- The Subscriber's spouse as recognized under the laws of the state where the Subscriber lives.

- The Subscriber's Domestic Partner - Domestic Partner or Domestic Partnership means a person of the same or opposite sex for whom all of the following are true: he or she is the Subscriber's sole Domestic Partner and has been for 12 months or more; he or she is mentally competent; neither the Subscriber nor the Domestic Partner is related in any way (including by adoption or blood) that would prohibit him or her from being married under state law; he or she is not married to or separated from anyone else; and he or she is financially interdependent with the Subscriber.

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

For purposes of this Contract, a Domestic Partner shall be treated the same as a Spouse, and a Domestic Partner's Child, adopted Child, or Child for whom a Domestic Partner has legal guardianship shall be treated the same as any other child.

A Domestic Partner's or a Domestic Partner's Child's Coverage ends on the date of dissolution of the Domestic Partnership.

To apply for Coverage as Domestic Partners, both the Subscriber and the eligible Domestic Partner are required to complete and sign the Enrollment Application, and must meet all criteria stated on the Enrollment Application. We reserve the right to make the ultimate decision in determining eligibility of the Domestic Partner.

- The Subscriber's or the Subscriber's spouse's children, including natural children, stepchildren, newborn and legally adopted children, including children who are covered under a "Qualified Medical Child Support Order" as defined by ERISA or any applicable state law.

- Children for whom the Subscriber or the Subscriber's spouse is a legal guardian or as otherwise required by law.

All enrolled eligible children will continue to be covered until the age limit listed in the Schedule of Benefits.

Eligibility will be continued past the age limit only for those already enrolled unmarried Dependents who cannot work to support themselves due to physical or mental handicap. The Dependent's disability must start before the end of the period they would become ineligible for coverage. The Plan must certify the Dependent's eligibility. The Plan must be informed of the Dependent's eligibility for continuation of coverage within 31 days after the Dependent would normally become ineligible. Subsequent proof of the child's disability and dependency must be provided upon Our request. Proof may be required at reasonable intervals during the first two years after the child reaches the Dependent age limit, and no more frequently than once each year thereafter. You must notify Us if the Dependent's marital status changes and they are no longer eligible for continued coverage.

The Plan may require the Subscriber to submit proof of continued eligibility for any enrolled child. Your failure to provide this information could result in termination of a child's coverage.

To obtain coverage for children, We may require that the Subscriber provide Us with a copy of any legal documents awarding guardianship of such child(ren) to the Subscriber. Temporary custody is not sufficient to establish eligibility under this Contract.

Any foster child who is eligible for benefits provided by any governmental program or law will not be eligible for coverage under this Contract unless required by the laws of this state.

## Enrollment

### Newborn and Adopted Child Coverage

Newborn children of the Subscriber or the Subscriber's spouse will be covered for an initial period of 31 days from the date of birth. Coverage for newborns will continue beyond the 31 days only if the Subscriber submits through the Plan, a request to add the child under the Subscriber's Contract. The request must be submitted within 31 days after the birth of the child or within 10 days after We provide the form, whichever is later. If the child is not added during this period, the child must satisfy Our medical underwriting guidelines.

A child will be considered adopted from the earlier of: (1) the moment of placement in your home; or (2) the date of an entry of an order granting custody of the child to you. The child will continue to be

**Health Contract**                                         Mercy SJ Exhibit 3

Case: 4:22-cv-01360-SEP   Doc. #:  1-6   Filed: 12/20/22   Page: 123 of 271 PageID #: 278

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

considered adopted unless the child is removed from your home prior to issuance of a legal decree of adoption.

Newborns and adopted children under the age of 19 are exempt from the Pre-Existing exclusion in this Contract, even if the newborn or adopted child is the Subscriber.

## Adding a Child due to Award of Legal Custody or Guardianship

If a Subscriber or the Subscriber's spouse is awarded legal custody or guardianship for a child, an application must be submitted within 31 days of the date legal custody or guardianship is awarded by the court. Coverage would start on the date the court granted legal custody or guardianship. If We do not receive an application within the 31-day period, the child will be subject to Our medical underwriting guidelines.

## Qualified Medical Child Support Order

If you are required by a qualified medical child support order or court order, as defined by ERISA and/or applicable state or federal law, to enroll your child under this Contract, We will permit your child to enroll without medical underwriting within 31 days of the issuance of the order and shall provide the benefits of this Contract in accordance with the applicable requirements of such order. If enrollment is requested following the 31-day period, the child will be subject to Our medical underwriting guidelines. A child's coverage under this provision will not extend beyond any Dependent Age Limit listed in the Schedule of Benefits. Any claims payable under this Contract will be paid, at Our discretion, to the child or the child's custodial parent or legal guardian, for any expenses paid by the child, custodial parent, or legal guardian. We will make information available to the child, custodial parent, or legal guardian on how to obtain benefits and submit claims to Us directly.

## Adding Other Dependents

You may apply to add other persons who meet Our definition of Dependent and who meet Our medical underwriting guidelines. Coverage will begin on the date a qualified Dependent first becomes eligible if You apply to add them and we receive the application within 31 days of that date. If you apply later, coverage will begin after acceptance and on the date determined by the Plan. Any Premium due must be paid for coverage to begin.

## Portability

Any Pre-Existing Condition waiting period will be reduced by the aggregate of the periods of prior creditable coverage applicable to you as of your Enrollment Date. Creditable coverage is prior coverage you had from: a group plan, Medicare, Medicaid, Indian Health Service, state risk pool, state children's health insurance program, public health plan, Peace Corps service, U.S. Government plans, foreign health plans or individual health plan. Prior coverage does not count as creditable if there was a break in coverage of 63 days or more prior to enrolling for coverage under this Plan. You have the opportunity to prove that you have prior creditable coverage, and We will assist you in obtaining that information if required.

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

## Effective Date of Coverage

For information on your specific Effective Date of Coverage under this Contract, you can contact Us by calling the number located on the back of your Identification (ID) Card.

## Statements and Forms

Subscribers (or applicants for membership) must complete and submit applications, medical review questionnaires or other forms or statements the Plan may reasonably request.

Applicants for membership understand that all rights to benefits under this Contract are subject to the condition that all such information is true, correct and complete. Any material misrepresentation by a Member may result in termination of coverage as provided in the "Changes in Coverage: Termination and Reinstatement" section. Any act, practice, or omission that constitutes fraud or an intentional misrepresentation of material fact by a Member may result in termination or rescission of coverage. We will not terminate this Contract on the basis of application misstatements after two years have passed since the Enrollment Date.

## Delivery of Documents

We will provide an Identification Card for each Member and a Contract for each Subscriber.

## 7   CHANGES IN COVERAGE: TERMINATION AND REINSTATEMENT

## Termination

Except as otherwise provided, your coverage may terminate in the following situations:

- The Subscriber fails to pay the Premium within the grace period. Coverage will terminate on the last day for which Premium was received.

- The Subscriber provides advance notice to terminate coverage. Termination will be effective on the last day of the billing period in which We received the notice of termination.

- If you engage in fraudulent conduct or furnish Us fraudulent or misleading material information relating to claims or application for coverage, then We may terminate your coverage immediately, retroactive to the date of fraud or material misrepresentation. Any act, practice, or omission that constitutes fraud or an intentional misrepresentation of material fact by a Member may result in termination or rescission of coverage. You are responsible to pay Us for the cost of previously received services based on the Maximum Allowed Amount for such services, less any Copayments/Coinsurance made or Premium paid for such services. On the date your coverage is terminated, We will also terminate your Dependent's coverage. We will not terminate your coverage on the basis of enrollment misstatements, other than fraudulent misstatements, more than two years after the Member's Effective Date of coverage.

- You no longer meet the Eligibility requirements.

   Your coverage ends upon the date on which you no longer reside in Our Missouri Service Area.

**Health Contract**                                    Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

- A Member no longer meets the Eligibility requirements.

  Coverage for any Member ends upon:

  - The date on which the Subscriber no longer resides in Our Missouri Service Area.

  Coverage for any spouse will terminate on the earlier of the following:

  - the date you are legally divorced from your spouse;
  - the date your coverage ends.

  Coverage for a Dependent child will terminate on the earliest of the following:

  - the end of the month of his or her 26th birthday, unless the child is Totally Disabled (see Eligibility section).
  - determination by Us that a child over the age limit is no longer Totally Disabled;
  - termination of your coverage.

  Coverage ends for a Member on the end of the month he or she no longer meets the eligibility requirements. You must furnish any information requested regarding your eligibility and the eligibility of your Dependents. You must immediately notify Us of any change in a Member's status. Failure to give timely notification of a loss of eligibility will not obligate Us to provide benefits for ineligible persons, even if We have accepted Premiums or paid benefits.

- If you permit the use of your or any other Member's Plan Identification Card by any other person; use another person's card; or use an invalid card to obtain services, your coverage will terminate immediately upon Our written notice to the Subscriber. Any Subscriber or Dependent involved in the misuse of a Plan Identification Card will be liable to and must reimburse Us for the Maximum Allowed Amount for services received through such misuse.

- If We cease to offer coverage in the individual market. Coverage may be discontinued only if We notify each Subscriber at least 180 days before discontinuation.

- If We discontinue a particular type of health insurance coverage in the individual market. Coverage may be discontinued only if We notify each Subscriber at least 90 days before the discontinuation and provide each Member the option to purchase any other individual product currently being marketed.

IMPORTANT: Upon Termination, We shall promptly return the unearned portion of any Premium paid. Termination of the Contract automatically terminates all your coverage as of the date of Termination, whether or not a specific condition was incurred prior to the Termination date. Covered Services are eligible for payment only if your Contract is in effect at the time such services are provided.

CANCELLATION: The insurer may cancel this policy at any time by written notice delivered to the insured, or mailed to his last address as shown by the records of the insurer, stating when, not less than five days thereafter, such cancellation shall be effective; and after the policy has been continued beyond its original term the insured may cancel this policy at any time by written notice delivered or mailed to the insurer, effective upon receipt or on such later date as may be specified in such notice. In the event of cancellation, the insurer will return promptly the unearned portion of any premium paid. If the insured cancels, the earned premium shall be computed by the use of the short-rate table last filed with the state official having supervision of insurance in the state where the insured resided when the policy was issued. If the insurer cancels, the earned premium shall be computed pro rata. Cancellation shall be without prejudice to any claim originating prior to the effective date of cancellation.

**Health Contract**                                    Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

## Removal of Members

A Subscriber may cancel the enrollment of any Member from the Plan. If this happens, no benefits will be provided for Covered Services provided after the Member's termination date.

## Reinstatement

If your Contract has been terminated for non-payment of Premium, We may decline to reinstate your coverage or We may reinstate your coverage by accepting the Premium due provided the request for Reinstatement is received within 60 days of the termination date. We have the right to require an application for Reinstatement and issue a conditional receipt for the Premium. Your Contract will be reinstated only upon approval of your application by medical underwriting. Lacking such approval and if you have not been notified in writing of Our disapproval of your application for Reinstatement within 45 days of the conditional receipt, your Contract will be reinstated on the 45th day following the date of conditional receipt.

The reinstated Contract shall cover services resulting from an accidental injury that is sustained after the date of Reinstatement and from an illness beginning more than 10 days after the date of Reinstatement. Premium accepted in connection with a Reinstatement will not be applied to a period more than 60 days prior to the date of Reinstatement.

## Certification of Prior Creditable Coverage

If your coverage is terminated, you and your covered Dependents will receive a certification showing when you were covered under the Plan. You may need the document to reduce your waiting period, under a new plan, for coverage of medical conditions that were present before your enrollment in that new plan. Certifications may be requested within 24 months of losing coverage. If you have any questions, contact the customer service telephone number listed on the back of your Identification Card.

## Material Misrepresentation

If, within two (2) years after the Effective Date of this Contract, We discover any act, practice or omission that constitutes fraud or an intentional misrepresentation of material fact that you or your covered Dependents did not disclose on your application, We may rescind this Contract as of the original Effective Date. Additionally, if within two (2) years after adding an additional Dependent (excluding newborn children of the Subscriber added within 31 days of birth), We discover any act, practice or omission that constitutes fraud or an intentional misrepresentation of material fact that you or your covered Dependent did not disclose on the application, We may rescind coverage for the additional Dependent as of his or her original Effective Date. Any act, practice, or omission that constitutes fraud or an intentional misrepresentation of material fact by a Member may result in termination or rescission of coverage. You are responsible to pay Us for the cost of previously received services based on the Maximum Allowed Amount for such services, less any Copayment/Coinsurance made or Premium paid for such services. After the two (2) years following your Effective Date, We may rescind or terminate your coverage on the basis of any act, practice or omission that constitutes fraud.

**Intentional Misrepresentation of Material Fact or Fraud:** When a Member has committed any act, practice or omission that constitutes fraud or an intentional misrepresentation of material fact in certain situations, the above actions on the application may result in termination or rescission of this

**Health Contract**

Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Contract. This Contract may also be terminated if you knowingly participate in or permit fraud or deception by any Provider, vendor or any other person associated with this Contract. Termination for any act, practice or omission that constitutes fraud or any intentional misrepresentation of material fact will be effective as of the Effective Date of coverage in the case of rescission. We will give you at least 30 days written notice prior to rescission of this Contract.

## 8   HOW TO OBTAIN COVERED SERVICES

Network Providers are the key to providing and coordinating your health care services. Benefits are provided when you obtain Covered Services from Providers; however, the broadest benefits are provided for services obtained from a Primary Care Physician (PCP), Specialty Care Physician (SCP), or other Network Provider. **Services you obtain from any Provider other than a PCP, SCP or another Network Provider are considered a Non-Network Service, except for Emergency Care, Urgent Care, ambulance services, or as an Authorized Service.** Contact a PCP, SCP, other Network Provider, or Us to be sure that Prior Authorization and/or precertification has been obtained.

If a Non-Network Provider meets Our enrollment criteria and is willing to meet the terms and conditions for participation, that Provider has the right to become a Network Provider for the product associated with this Contract.

## Network Services and Benefits

If your care is rendered by a PCP, SCP, or another Network Provider, benefits will be paid at the Network level and you will not be financially responsible for any Covered Services that We determine are not Medically Necessary. However, regardless of Medical Necessity, no benefits will be provided for care that is not a Covered Service even if performed by a PCP, SCP, or another Network Provider. All medical care must be under the direction of Physicians. We determine the Medical Necessity of the service.

We may inform you that it is not Medically Necessary for you to receive services or remain in a Hospital or other facility. This decision is made upon review of your condition and treatment. You may appeal this decision. See the "Complaint and Appeals Procedures" section of this Contract.

- **Network Providers** - include PCPs, SCPs, other professional Providers, Hospitals, and other facility Providers who contract with Us to perform services for you. PCPs include general practitioners, internists, family practitioners, pediatricians, obstetricians & gynecologists, geriatricians or other Network Providers as allowed by the Plan. The PCP is the Physician who may provide, coordinate, and arrange your health care services. SCPs are Network Physicians who provide specialty medical services not normally provided by a PCP.

For services rendered by Network Providers:

1. You will not be required to file any claims for services you obtain directly from Network Providers. Network Providers will seek compensation for Covered Services rendered from Us and not from you except for approved Deductibles, Coinsurance and/or Copayments. You may be billed by your Network Provider(s) for any non-Covered Services you receive or when you have not acted in accordance with this Contract.

2. Health Care Management is the responsibility of the Network Provider.

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

If there is no Network Provider who is qualified to perform the treatment you require, contact Us prior to receiving the service or treatment and We may approve a Non-Network Provider for that service as an Authorized Service.

## Non-Network Services

Services that are not obtained from a PCP, SCP or another Network Provider, or that are not an Authorized Service will be considered a Non-Network Service. The only exceptions are Emergency Care, Urgent Care, and ambulance services.

For services rendered by a Non-Network Provider, you are responsible for:

- The difference between the actual charge and the Maximum Allowed Amount, plus any Deductible and/or Coinsurance/Copayments;

- Services that are not Medically Necessary;

- Non-Covered Services;

- Filing claims; and

- Higher cost sharing amounts.

Note: Except as otherwise noted in this Contract, all services covered by a Network Provider are also covered by a Non-Network Provider.

## Relationship of Parties (Plan - Network Providers)

The relationship between the Plan and Network Providers is an independent contractor relationship. Network Providers are not agents or employees of the Plan, nor is the Plan, or any employee of the Plan, an employee or agent of Network Providers.

The Plan shall not be responsible for any claim or demand on account of damages arising out of, or in any manner connected with, any injuries suffered by a Member while receiving care from any Network Provider or in any Network Provider's facilities.

Your Network Provider's agreement for providing Covered Services may include financial incentives or risk sharing relationships related to provision of services or referrals to other Providers, including Network Providers, Non-Network Providers, and disease management programs. If you have questions regarding such incentives or risk sharing relationships, please contact your Provider or the Plan.

To be an informed consumer, it is important for you to know what services are covered under this Contract. At times, a Network Provider may recommend that you obtain services that are not covered under this Contract. If a Network Provider clearly informs you that We may not cover the services or continue to cover the services, and you agree with the Network Provider to continue the services solely at your expense, you will be held liable for the actual charges of all such non-Covered Services.

## Not Liable for Provider Acts or Omissions

The Plan is not responsible for the actual care you receive from any person. This Contract does not give anyone any claim, right, or cause of action against the Plan based on the actions of a Provider of health

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

care, services or supplies. We and our Providers are independent entities contracting with each other for the sole purpose of carrying out the provisions of this Contract. We will not be liable for any act or omission of any Provider or any agent or employee of a Provider.

Network Physicians maintain the Physician-patient relationship with Members and are solely responsible to Members for all medical services they provide.

## Identification Card

When you receive care, you must show your Identification Card. Only a Member who has paid the Premiums under this Contract has the right to services or benefits under this Contract. If anyone receives services or benefits to which he/she is not entitled to under the terms of this Contract, he/she is responsible for the actual cost of the services or benefits.

# 9  CLAIMS PAYMENT

When you receive care through a Network Provider, you are not required to file a claim. This means that the provisions below, regarding Claim Forms and Notice of Claim, do not apply unless the Provider did not file the claim.

## How Benefits Are Paid

### Maximum Allowed Amount

This section describes how We determine the amount of reimbursement for Covered Services. Reimbursement for services rendered by Network/participating and Non-Network Providers is based on the Maximum Allowed Amount for the Covered Service that you receive.

The Maximum Allowed Amount is the maximum amount of reimbursement Anthem will allow for services and supplies:

- that meet Our definition of Covered Services, to the extent such services and supplies are covered under your Plan and are not excluded;

- that are Medically Necessary; and

- that are provided in accordance with all applicable preauthorization, utilization management or other requirements set forth in your Contract.

You will be required to pay a portion of the Maximum Allowed Amount to the extent you have not met your Deductible or have a Copayment or Coinsurance. In addition, when you receive Covered Services from a Non-Network Provider, you may be responsible for paying any difference between the Maximum Allowed Amount and the Provider's actual charges. This amount can be significant.

When you receive Covered Services from a Provider, we will, to the extent applicable, apply claim processing rules to the claim submitted for those Covered Services. These rules evaluate the claim information and, among other things, determine the accuracy and appropriateness of the procedure and diagnosis codes included in the claim. Applying these rules may affect our determination of the Maximum Allowed Amount. Our application of these rules does not mean that the Covered Services you

**Health Contract**                                        Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

received were not Medically Necessary. It means we have determined that the claim was submitted inconsistent with procedure coding rules and/or reimbursement policies. For example, your Provider may have submitted the claim using several procedure codes when there is a single procedure code that includes all of the procedures that were performed. When this occurs, the Maximum Allowed Amount will be based on the single procedure code rather than a separate Maximum Allowed Amount for each billed code.

Likewise, when multiple procedures are performed on the same day by the same physician or other healthcare professional, we may reduce the Maximum Allowed Amounts for those secondary and subsequent procedures because reimbursement at 100% of the Maximum Allowed Amount for those procedures would represent duplicative payment for components of the primary procedure that may be considered incidental or inclusive.

## Provider Network Status

The Maximum Allowed Amount may vary depending upon whether the Provider is a Network Provider or a Non-Network or non-participating Provider.

A Network Provider or participating Provider is a Provider who is in the managed network for this specific plan or in a special Center of Excellence/or other closely managed specialty network, or who has a participation contract with Us. For Covered Services performed by a Network Provider or participating Provider, the Maximum Allowed Amount is the rate the Provider has agreed with Anthem to accept as reimbursement for the Covered Services. Because Network Providers and participating Providers have agreed to accept the Maximum Allowed Amount as payment in full for those Covered Services, they should not send you a bill or collect for amounts above the Maximum Allowed Amount. However, you may receive a bill or be asked to pay all or a portion of the Maximum Allowed Amount to the extent you have not met your Deductible or have a Copayment or Coinsurance. Please call Customer Service for help in finding a Network Provider or participating Provider, or visit www.anthem.com.

Providers who have not signed any contract with Us and are not in any of our networks are Non-Network Providers, subject to Blue Cross Blue Shield Association rules governing claims filed by certain ancillary providers.

For Covered Services you receive from a Non-Network Provider, the Maximum Allowed Amount will be one of the following as determined by Anthem:

1. An amount based on Our non-participating Provider fee schedule/rate, which we have established in our discretion, and which we reserve the right to modify from time to time, after considering one or more of the following: reimbursement amounts accepted by like/similar providers contracted with Anthem, reimbursement amounts paid by the Centers for Medicare and Medicaid Services for the same services or supplies, and other industry cost, reimbursement and utilization data; or

2. An amount based on the level and/or method of reimbursement used by the Centers for Medicare and Medicaid Services for the same services or supplies; or

3. An amount based on information provided by a third party vendor, which may reflect one or more of the following factors: (1) the complexity or severity of treatment; (2) level of skill and experience required for the treatment; or (3) comparable providers' fees and costs to deliver care; or

4. An amount negotiated by Us or a third party vendor which has been agreed to by the Provider. This may include rates for services coordinated through case management.; or

**Health Contract**                                    Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

5.  An amount equal to the total charges billed by the Provider, but only if such charges are less than the Maximum Allowed Amount calculated by using one of the methods described above.

Providers who are not contracted for this product, but contracted for other products with Us are also considered Non-Participating. The Maximum Allowed Amount for services from these Providers will be one of the five methods shown above unless the contract between Us and that Provider specifies a different amount.

Unlike Network Providers or participating Providers, Non-Network Providers may send you a bill and collect for the amount of the Provider's charge that exceeds Our Maximum Allowed Amount. You are responsible for paying the difference between the Maximum Allowed Amount and the amount the Provider charges. This amount can be significant. Choosing a Network Provider or participating Provider will likely result in lower out of pocket costs to you. Please call Customer Service for help in finding a Network Provider or participating Provider, or visit our website at www.anthem.com.

Customer Service is also available to assist you in determining the Maximum Allowed Amount for a particular service from a Non-Network Provider. In order for us to assist you, you will need to obtain from your Provider the specific procedure code(s) and diagnosis code(s) for the services the Provider will render. You will also need to know the Provider's charges to calculate your out of pocket responsibility. Although Customer Service can assist you with this pre-service information, the final Maximum Allowed Amount for your claim will be based on the actual claim submitted by the Provider.

## Member Cost Share

For certain Covered Services and depending on your plan design, you may be required to pay a part of the Maximum Allowed Amount as your cost share amount (for example, Deductible, Copayment, and/or Coinsurance).

Your cost share amount and Out-of-Pocket Limits may vary depending on whether you received services from a Network/participating or Non-Network Provider. Specifically, You may be required to pay higher cost sharing amounts or may have limits on your benefits when using Non-Network Providers. Please see the Schedule of Benefits in this Contract for your cost share responsibilities and limitations, or call Customer Service to learn how this plan's benefits or cost share amounts may vary by the type of Provider you use.

Anthem will not provide any reimbursement for non-covered services. You may be responsible for the total amount billed by your Provider for non covered services, regardless of whether such services are performed by a Network/participating or Non-Network/nonparticipating Provider. Both services specifically excluded by the terms of your Contract, and those received after benefits have been exhausted are non-covered services. Benefits may be exhausted by exceeding, for example, your benefit caps or day/visit limits.

In some instances, you may only be asked to pay the lower Network cost sharing amount when you use a Non-Network Provider. For example, if you go to a Network/Participating Hospital or Provider Facility and receive Covered Services from a Non-Network Provider such as a radiologist, anesthesiologist or pathologist who is employed by or contracted with a Network Hospital or facility, you will pay the Network cost share amounts for those Covered Services. However, you also may be liable for the difference between the Maximum Allowed Amount and the Non-Network Provider's charge.

## Authorized Services

In some circumstances, such as where there is no Network Provider or participating provider available for the Covered Service, we may authorize the Network cost share amounts (Deductible, Copayment,

**Health Contract**

Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

and/or Coinsurance) to apply to a claim for a Covered Service you receive from a Non-Network Provider. In such circumstance, you must contact Us in advance of obtaining the Covered Service. We also may authorize the Network cost share amounts to apply to a claim for Covered Services if you receive Emergency services from a Non-Network Provider and are not able to contact Us until after the Covered Service is rendered. If we authorize a Covered Service so that you are responsible for the Network cost share amounts, you may still be liable for the difference between the Maximum Allowed Amount and the Non-Network Provider's charge. Please contact Customer Service for Authorized Services information or to request authorization.

## Payment of Benefits

You authorize Us to make payments directly to Providers for Covered Services. Payments may also be made to, and notice regarding the receipt and/or adjudication of claims sent to, an Alternate Recipient (any child of a Subscriber who is recognized, under a Qualified Medical Child Support Order (QMCSO), as having a right to enrollment under the Subscriber's Contract), or that person's custodial parent or designated representative. Any payments made by Us will discharge Our obligation to pay for Covered Services. You cannot assign your right to receive payment to anyone else, except as required by a "Qualified Medical Child Support Order" as defined by ERISA or any applicable state law.

Once a Provider performs a Covered Service, We will not honor a request for Us to withhold payment of the claims submitted.

## Services Performed During Same Session

We may combine the reimbursement of Covered Services when more than one service is performed during the same session. Reimbursement is limited to Our Maximum Allowed Amount. **If services are performed by Non-Network Providers**, then you are responsible for any amounts charged in excess of Our Maximum Allowed Amount **with or without a referral or regardless if allowed as an Authorized Service**. Contact Us for more information.

## Assignment

Members cannot legally transfer the coverage. Benefits available under this Contract are not assignable by any Member without obtaining written permission from the Plan, unless in a way described in this Contract.

If Prescription Drugs are provided by a licensed pharmacist, We will recognize a valid assignment by You to the pharmacist of your right to receive payment for the Prescription Drugs subject to the following conditions:

The claim must provide all of the information specified above, and Our payments must not have been made to You prior to Our receipt of the assignment.

## Notice of Claim and Proof of Loss

Written notice of a claim must be submitted to Us within 20 days of when the Covered Services were provided, or as soon thereafter as is reasonably possible. All claims must be submitted to Us within 15 months of when the Covered Services were provided, or as soon thereafter as is reasonably possible.

**Health Contract**

Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

We will process the claim within 30 processing days of its receipt, unless information necessary to process the claim is not available. In that case, We will process the claim within an additional 10 processing days after receipt of the additional information.

Claims not processed by the 45th processing day of receipt require Us to pay the Provider or individual who filed the claim interest of 1% per month and a penalty in an amount equal to one percent of the claim per day until the claim is paid. The interest and penalty shall be calculated based upon the unpaid balance of the claim as of the 45th processing day,

All Benefits payable under this Contract will be paid no more than 30 days after receipt of due proof of loss. Failure to furnish such proof within the time required shall not invalidate nor reduce any claim if it was not reasonably possible to give proof within such time, provided such proof is furnished as soon as reasonably possible and in no event, except in the absence of legal capacity, later than one year from the time proof is otherwise required.

## Claim Forms

Claim forms will usually be available from most Providers. If forms are not available, either send a written request for claim forms to Us, or contact customer service and ask for a claim form to be sent to you. The form will be sent to you within 15 days. If you do not receive the claim form within that time, you will be deemed to have complied with the Notice of Claim requirements upon submitting, within the time fixed in the "Notice of Claim" section (above) for filing proofs of loss, written proof covering the occurrence, the character and the extent of the loss for which claim is made. The same information that would be given on the claim form must be included in the written notice of claim. This includes:

- Name of patient.

- Patient's relationship with the Subscriber.

- Identification number.

- Date, type and place of service.

- Your signature and the Provider's signature.

We will respond to a filed claim within 10 days of its receipt by:

- sending an acknowledgement of the date We received your claim; or

- sending notice of the status of the claim that includes a request for additional information.

These provisions do not apply if We pay the claim within 10 days after We receive it.

Claims submitted by a public (government operated) Hospital or clinic will be paid by Us directly, as long as You have not already received benefit under that claim. We will pay all claims within 30 days after We receive proof of loss. If You are dissatisfied with Our denial or amount of payment, You may request that We review the claim a second time, and you may submit any additional relevant information.

**Health Contract**

Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

CLAIMS PAYMENT                                                                              M-67

## Member's Cooperation

Each Member shall complete and submit to the Plan such authorizations, consents, releases, assignments and other documents as may be requested by the Plan in order to obtain or assure reimbursement under Medicare, Worker's Compensation or any other governmental program. Any Member who fails to cooperate (including a Member who fails to enroll under Part B of the Medicare program where Medicare is the responsible payer) will be responsible for any charge for services.

You agree (on behalf of yourself and as authorized representative of your enrolled Dependents) to furnish all information required by Us, Our affiliates, agents or designees, and that any Provider, insurance or reinsurance company, health services corporation, health maintenance organization, medical information bureau, Medicare fiscal agent, consumer reporting agency, employer or third party administrator, is authorized and directed to release any and all information relating to history, diagnosis, prognosis, treatment and Covered Services relating to any condition (including but not limited to alcohol/Substance Abuse and HIV) to Us, Our affiliates, agents or designees, who are also authorized to receive and release such information in connection with: investigating, evaluating and/or processing claims; utilization, credentialing, quality or medical management programs; managing the provision of services; insurance; and carrying out any other lawful purpose relating to coverage.

This authorization remains valid until expressly revoked by notifying Us, Our affiliates, agents or designees in writing of such revocation at any time (except to the extent any action has been taken based on this authorization and/or except as release of such information may be required or authorized by law). Refusal to consent to the release of such information to Us, Our affiliates, agents or designees will permit Us to deny claims for benefits.

## Overpayment of Claims

If We make any payment to a Provider, to You, or to any other organization that is wholly or partially incorrect under the terms of this Contract, We will seek reimbursement from You, the Provider or other organization to which payment was made. We will not request a refund or offset against a claim more than 12 months after paying the claim, except in cases of fraud or misrepresentation by the Provider. This will apply regardless of the reason for the overpayment. This provision will survive the termination of this Contract.

## Explanation of Benefits (EOB)

After you receive medical care, you will generally receive an explanation of benefits (EOB). The EOB is a summary of the coverage you receive. The EOB is not a bill but a statement from Us to help you understand the coverage you are receiving. The EOB shows:

- Total amounts charged for services/supplies received.
- The amount of the charges satisfied by your coverage.
- The amount for which you are responsible (if any).
- General information about your appeals rights and for ERISA plans, information regarding the right to bring action after the Appeals Process.

**Health Contract**                                                     Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

## The BlueCard Program

### Out-of-area services

Anthem has a variety of relationships with other Blue Cross and/or Blue Shield Licensees. These are referred to generally as "Inter-Plan Programs." When you obtain covered services outside of Anthem's service area, the claims may be processed through one of these Inter-Plan Programs. These programs include the BlueCard Program, described below. They may also include negotiated national account arrangements between Anthem and other Blue Cross and Blue Shield Licensees.

Typically, when you access medical care outside Anthem's service area, you will obtain it from Providers that have a contractual agreement (i.e., are "participating Providers") with the local Blue Cross and/or Blue Shield Licensee in that other area ("Host Blue"). But in some cases, you may obtain care from non-participating Providers. Anthem's payment practices in both cases are generally described below.

### BlueCard® Program

Under the BlueCard® Program, when you obtain covered services within the geographic area served by a Host Blue, Anthem will still fulfill its contractual obligations. But the Host Blue is responsible for: (a) contracting with its Providers; and (b) handling its interactions with those Providers.

When you obtain covered services outside Anthem's service area and the claim is processed through the BlueCard Program, the amount you pay is calculated based on the lower of:

- The billed Covered Charges for the covered services or Supplies; or

- The negotiated price that the Host Blue makes available to Anthem.

Often, this "negotiated price" will be a simple discount that reflects an actual price that the Host Blue pays to the Provider. Sometimes it is an estimated price that takes into account a special arrangement with that Provider or Provider group. Sometimes, such an arrangement may be an average price, based on a discount that results in expected average savings for services provided by similar types of Providers. Estimated and average pricing arrangements may also involve: types of settlements; incentive payments; and/or other credits or charges.

Estimated and average pricing arrangements also take into account certain adjustments to their basic rates. These may be made to correct for an over- or underestimation of changes of the past pricing for the types of transactions noted above. But, such adjustments will not affect the price on the claim that Anthem will use to determine the amount you pay.

Also, laws in a small number of states may require the Host Blue to add a surcharge to a claim calculation. If any state law mandates other liability calculation methods, including a surcharge, Anthem calculates a member's liability for any covered service according to applicable law.

## 10 HEALTH CARE MANAGEMENT

Health Care Management includes the processes of Precertification, Predetermination and Medical Review. Its purpose is to promote the delivery of cost-effective medical care to all Members by reviewing the use of appropriate procedures, setting (place of service), and resources and optimizing the health of the Members we serve. These processes are described in the following section.

**Health Contract**

Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Anthem may, from time to time, waive, enhance, modify or discontinue certain medical management processes (including utilization management, case management, and disease management) if in Anthem's discretion, such change is in furtherance of the provision of cost effective, value based and/or quality services. In addition, we may select certain qualifying Providers to participate in a program that exempts them from certain procedural or medical management processes that would otherwise apply. We may also exempt your claim from medical review if certain conditions apply. Just because Anthem exempts a process, Provider or claim from the standards which otherwise would apply, it does not mean that Anthem will do so in the future, or will do so in the future for any other Provider, claim or Insured. Anthem may stop or modify any such exemption with or without advance notice. You may determine whether a Provider is participating in certain programs by checking your on-line Provider Directory, on-line pre-certification list, or contacting customer service at the number on your identification card.

Your plan includes the processes of Precertification, Predetermination and Medical Review to determine when services should be covered by your plan. Their purpose is to promote the delivery of cost-effective medical care by reviewing the use of procedures and, where appropriate, the setting or place of service that they are performed. Your plan requires that Covered Services be Medically Necessary for benefits to be provided.

Prior Authorization: Network Providers are required to obtain Prior Authorization in order for you to receive benefits for certain services. Prior Authorization criteria will be based on multiple sources including medical policy, clinical guidelines, and pharmacy and therapeutics guidelines. Anthem may determine that a service that was initially prescribed or requested is not a Covered Service if you have not previously tried alternative treatments which are more cost effective.

If you have any questions regarding the information contained in this section, you may call the Precertification telephone number on the back of your Identification Card or visit www.anthem.com. For information on how to obtain Precertification, call the Precertification number on the back of your ID card, or visit www.anthem.com.

## Types of Requests:

**Precertification** – A required review of a service, treatment or admission for a benefit coverage determination which must be obtained prior to the service, treatment or admission start date. For emergency admissions, you, your authorized representative or Physician must notify us within 48 hours of the admission or as soon as possible within a reasonable period of time. For childbirth admissions, Precertification is not required unless there is a complication and/or the mother and baby are not discharged at the same time. To obtain a list of services that require Precertification, please call the customer service number on the back of your ID card, or visit www.anthem.com.

**Predetermination** – An optional, voluntary Prospective or Concurrent request for a benefit coverage determination for a service or treatment. We will review your Contract to determine if there is an exclusion for the service or treatment. If there is a related clinical coverage guideline, the benefit coverage review will include a review to determine whether the service meets the definition of Medical Necessity under this Contract or is Experimental/Investigative as that term is defined in this Contract.

**Medical Review** – A Retrospective review for a benefit coverage determination to determine the Medical Necessity or Experimental/Investigative nature of a service, treatment or admission that did not require Precertification and did not have a Predetermination review performed. Medical Reviews occur for a service, treatment or admission in which we have a related clinical coverage guideline and are typically initiated by Us.

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Most Network Providers know which services require Precertification and will obtain any required Precertification or request a Predetermination if they feel it is necessary. Your Primary Care Physician and other Network Providers have been provided detailed information regarding Health Care Management procedures and are responsible for assuring that the requirements of Health Care Management are met. Generally, the ordering Provider, facility or attending Physician will contact us to request a Precertification or Predetermination review ("requesting Provider"). We will work directly with the requesting Provider for the Precertification request. However, you may designate an authorized representative to act on your behalf for a specific request. The authorized representative can be anyone who is 18 years of age or older.

| Who is responsible for Precertification | |
|---|---|
| **Services provided by a Network Provider** | **Services provided by a BlueCard/Non-Network/Non-Participating Provider** |
| Provider | • Member is responsible for Precertification.<br>• Member is financially responsible for service and/or setting that are/is not covered under this Contract, based on an Adverse Determination of Medical Necessity or Experimental/Investigative |

We will utilize our clinical coverage guidelines, such as medical policy and other internally developed clinical guidelines, and preventative care clinical coverage guidelines, to assist in making our Medical Necessity decisions. These guidelines reflect the standards of practice and medical interventions identified as appropriate medical practice. We reserve the right to review and update these clinical coverage guidelines periodically. Your Contract takes precedence over these guidelines.

You are entitled to receive, upon request and free of charge, reasonable access to any documents relevant to your request. To request this information, contact the Precertification telephone number on the back of your Identification Card.

**\*NOTE: You may be financially responsible for the health care charges, in whole or in part, for your failure to obtain required Precertification of such health care charges**. For information on how to obtain Precertification, call the Precertification number on the back of your ID card, or visit www.anthem.com.

## Request Categories:

**Urgent** – a request for Precertification or Predetermination that in the opinion of the treating Provider or any Physician with knowledge of the Member's medical condition, could in the absence of such care or treatment, seriously jeopardize the life or health of the Member or the ability of the Member to regain maximum function or subject the member to severe pain that cannot be adequately managed without such care or treatment.

**Prospective** – a request for Precertification or Predetermination that is conducted prior to the service, treatment or admission.

**Concurrent** - a request for Precertification or Predetermination that is conducted during the course of treatment or admission.

**Retrospective** - a request for Precertification that is conducted after the service, treatment or admission has occurred. Medical Reviews are also retrospective. Retrospective review does not include a review that is limited to an evaluation of reimbursement levels, veracity of documentation, accuracy of coding or adjudication of payment.

**Health Contract**                                                        Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

## Decision and Notification Requirements

Timeframes and requirements listed are based on state and federal regulations. Where state regulations are stricter than federal regulations, we will abide by state regulations. If you receive services in a state other than the state where your Contract was issued, other state-specific Health Care Management requirements may apply. You may call the telephone number on the back of your membership card for additional information.

| Request Category | Timeframe Requirement For Decision | Timeframe Requirement for Notification |
|---|---|---|
| *Precertification Requests* | | |
| Prospective Urgent | 2 business days from the receipt of request *If the Member receives an emergency service that requires immediate post evaluation or post stabilization services, we will provide an authorization decision within sixty minutes of receiving the request; if the authorization decision is not made within thirty minutes, such services shall be deemed approved* | For approval determination, we will notify the Provider by telephone within 24 hours of the decision and notify the Member or member representative and Provider by written or electronic means within 2 business days of the decision |
| Prospective Non-Urgent | 2 business days from the receipt of the request | For Adverse Determination, we will notify the Provider by telephone within 24 hours of the decision and notify the Member or member representative and Provider by written or electronic means within 1 business days of the decision |

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

| Concurrent Urgent when request is received more than 24 hours before the expiration of the previous authorization | 24 hours from the receipt of the request | For approval determination, we will notify the Provider by telephone within 1 business day of the decision and notify the Member or member representative and Provider by written or electronic means within 1 business days of the telephonic notification. |
| Concurrent Urgent when request is received less than 24 hours before the expiration of the previous authorization or no previous authorization exists | 72 hours or 1 business day from the receipt of the request whichever is less | For Adverse Determination, we will notify the Provider by telephone within 24 hours of the decision and notify the Member or member representative and Provider by written or electronic means within 1 business day of the telephonic notification. |
| Concurrent Non-Urgent | 1 business day from the receipt of the request | The service will continue without Member liability until the Member has been notified of the determination |
| Retrospective | 10 business days from the receipt of the request | We will notify the Member by written means of the determination within 10 business days of the determination. |
| | | |

| *Predetermination Requests* | | |
|---|---|---|
| Prospective Urgent | 72 hours from the receipt of request | |
| Prospective Non-Urgent | 15 calendar days from the receipt of the request | |
| Concurrent Urgent when request is received more than 24 hours before the expiration of the previous authorization | 24 hours from the receipt of the request | |
| Concurrent Urgent when request is received less than 24 hours before the expiration of the previous authorization or no previous authorization exists | 72 hours from the receipt of the request | |
| Concurrent Non-Urgent | 15 calendar days from the receipt of the request | |

If additional information is needed to make our decision, we will notify the requesting Provider and send written notification to you or your authorized representative of the specific information necessary to complete the review. If we do not receive the specific information requested or if the information is

**Health Contract**                                                    Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

not complete by the timeframe identified in the written notification, a decision will be made based upon the information in our possession.

We will provide notification of our decision in accordance with state and federal regulations. Notification may be given by the following methods:

**Verbal:** oral notification given to the requesting provider via telephone or via electronic means if agreed to by the provider.

**Written:** mailed letter or electronic means including email and fax given to, at a minimum, the requesting provider and the member or authorized member representative

If We authorize medical services, We will not subsequently retract Our authorization after the services have been provided, or reduce payment for an item or service furnished in reliance on approval, unless:

(1)  Such authorization is based on a material misrepresentation or omission about the Member's health condition or the cause of the health condition; or

(2)  The Member's coverage terminates before the services are provided.

## Value-Added and Incentive Programs

We may offer health or fitness related programs to Our members, through which you may access discounted rates from certain vendors for products and services available to the general public. Products and services available under this program are not Covered Services under the Plan but are in addition to plan benefits. As such, program features are not guaranteed under your Contract and could be discontinued at any time. We do not endorse any vendor, product or service associated with this program. Program vendors are solely responsible for the products and services you receive. In addition, we may offer incentives to members who participate in programs that help to reduce administrative expenses or make retaining coverage more convenient. Such programs may include, but are not limited to, enrolling to automatically pay premiums electronically instead of receiving a bill each month.

## 11  COMPLAINT, GRIEVANCE AND APPEALS PROCEDURES

If you have a complaint, please call 1-800-392-1104. A Client Services representative will review your records and investigate your complaint.

If you are not satisfied with the review and Our response, You, your health care provider or your authorized representative acting upon your behalf, may file a Grievance. You also may file a Grievance without first requesting a review. A Grievance is a written complaint submitted by or on behalf of a Member regarding the a) availability, delivery or quality of health Care services, including a complaint regarding an Adverse Determination made pursuant to Utilization Review; b) claims payment, handling or reimbursement for health Care services; or c) matters pertaining to the contractual relationship between a Member and the Company. We will not charge you anything to file a Grievance.

Under Missouri law, an Adverse Determination is a denial, reduction or termination of benefits because the care does not meet Our requirements for Medical Necessity, appropriateness, health care setting, level of care or effectiveness.

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

## How To File An Expedited Grievance Review

If your complaint concerns a decision or action by Us that could significantly increase the risk to your life, health, or ability to regain maximum function, the Grievance may be made by phone, or fax instead of going through the mail. Please call 1-800-992-5498, or fax your request to 314-923-8542. This is an **expedited** Grievance. We will notify the person filing the Grievance within 24 hours of all information we need to evaluate the Grievance.

Then, We will make a decision within 24 hours after we receive the information and notify You orally of the determination within 72 hours after receipt of the expedited review request. We will send written confirmation to You within three working days.

## How To File a First Level Grievance for Review

A standard Grievance should be submitted to Us in writing and sent to the address listed below:

Anthem Blue Cross Blue Shield

Grievances and Appeals

PO Box 105568

Atlanta GA 30348-5568

If you send Us a written complaint, please include with your letter any records or other information you believe supports your Grievance. We will carefully consider your complaint. We will not charge you anything to file a Grievance, and filing a Grievance will not affect your benefits.

We will acknowledge in writing receipt of the Grievance within 10 working days, unless it is resolved within that period of time.

Then, We will conduct a complete investigation of the Grievance within 20 working days after receipt of it, unless the investigation cannot be completed within this time. If the investigation cannot be completed within 20 working days after receipt of the Grievance, You will be notified in writing on or before the 20th working day, and the investigation will be completed within 30 additional days. The notice will include specific reasons why additional time is needed for the investigation.

A person or committee who was not involved in the initial decision and does not report to, or is not subordinate to, the person involved in the initial decision, will review your complaint. If the decision You are asking Us to review was based on a medical judgment, the review will include consultation with a health care professional who has training and experience in the appropriate medical field and who was not involved in the initial decision. The person or committee who reviews your Grievance will not be bound by, or be expected to defer to, the initial decision.

Within five working days after the investigation is completed, the representative not involved in the circumstances giving rise to your Grievance or its investigation will decide upon the appropriate resolution and notify You in writing of Our decision and your right to file a Grievance for a second review. The notice will explain the resolution of the Grievance and the right to file a Grievance in terms that are clear and specific. You, or the person who filed the Grievance upon your behalf, will be notified of the resolution within 15 working days.

If We deny your Grievance, You may voluntarily request a second Grievance by writing to the address above. If you do file a voluntary second Grievance, We agree that any applicable statute of limitation will be temporarily suspended while the second Grievance is pending.

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

## How to File a Second Level Grievance for Review

If you remain dissatisfied with the response to the first level review, You may submit any additional information, including written comments, records or documents that you want Us to consider along with your letter of Grievance l, addressed to Us at the address below.

Anthem Blue Cross Blue Shield

Grievances and Appeals

PO Box 105568

Atlanta GA 30348-5568

The Grievance will be reviewed by the Grievance Advisory Panel within 20 working days after receipt, unless the investigation cannot be completed within this time. If the investigation cannot be completed within 20 working days after receipt of a Grievance, You, or Your representative acting upon Your behalf, will be notified in writing on or before the 20th working day, and the investigation will be completed within 30 days thereafter. The notice will state specific reasons why additional time is needed for the investigation. A panel of individuals who were not involved in either the initial decision or the first Grievance will review your second Grievance. If the decision you are asking Us to review is based on a medical judgment, the committee will include, or will consult with, two or more health care professionals of the same or a similar specialty that would typically manage the medical condition or treatment plan under review.

Within five working days after the investigation is completed, the Grievance Advisory Panel will decide upon the appropriate resolution of the Grievance, and We will notify You in writing, in terms that are clear and specific, of the panel's decision. We will also notify You of your right to file an appeal with the director of the Missouri Department of Insurance. The notice will contain the toll-free telephone number and address of the director. You, or the person you authorized to represent you in filing the Grievance, will be notified of the resolution of the Grievance within 15 working days after the investigation is completed. Your decision to file an appeal will not affect your rights to any other benefits under your coverage. Your relative, friend, lawyer or other representative may help you with your appeal.

At any time, You can request free copies of all records and other information We have relevant to your written complaint, including the name of any health care professional We consulted. To obtain copies, send a written request to the Grievance Unit address given above.

## Review of Your Complaint By the MDI

At any time, you may request help from, or file a Grievance with, the Missouri Department of Insurance (MDI). The number is 1-800-726-7390. The address is:

Missouri Department of Insurance

Consumer Complaints

P.O. Box 690

Jefferson City, MO 65102-0690

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

## Legal Action

You may not take legal action against Us to receive benefits:

- Earlier than 60 days after We receive the claim; or

- Later than three years after the date the claim is required to be furnished to Us.

## 12  GENERAL PROVISIONS

## Entire Contract

Note: The laws of the state of Missouri will apply unless otherwise stated herein.

This Contract, the application, and any Riders, Endorsements or attachments, if any, constitute the entire Contract between the Plan and the Subscriber and as of the Effective Date, supersede all other agreements between the parties. Any and all statements made to the Plan by the Subscriber and any and all statements made to the Subscriber by the Plan are representations and not warranties, and no such statement, unless it is contained in a written application for coverage under this Contract, shall be used in defense to a claim under this Contract. No change in this Contract shall be valid unless approved by one of Our executive officers and attached to this Contract. No agent has authority to change this Contract or to waive any of its provisions.

## Renewal Date

The renewal date for this Contract is the date that your annual renewal Premium change occurs for your Contract in 2013.

## Policy Year

The Policy Year for this Contract begins on your renewal date and continues for a one year period from that date. If your Contract's effective date is on or after January 1, 2013, the Policy Year for this Contract begins on your effective date and continues for a one year period from that date.

## Form or Content of Contract

No agent or employee of the Plan is authorized to change the form or content of this Contract. Changes can only be made through a written authorization, signed by an officer of the Plan.

## Premium

Your Contract will renew each month if you pay your Premium before the end of the Grace Period. The amount of Premium is printed on your premium notice; however, this amount is subject to change. We have the right to increase a Member's Premium at any time in the future. We will not increase Premium

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

for any reason without giving you at least 30 days written notice. We will then send you a new notice with the new Premium amount.

Additionally, your Premium may change on your Contract anniversary date based on your attained age.

If a Premium increase is necessary, We will bill you for the extra amount due. If this amount is not paid, this Contract will be canceled at the end of the Grace Period and you will receive a refund of any unearned Premium.

If a decrease in Premium is appropriate, We will adjust what is owed to Us and let you know the new amount of Premium due. We will refund any excess Premium to you.

If we have not charged the proper amount of Premium, We will let you know the new amount of Premium due from you. We will refund any amount that has been overpaid to Us. You must pay Us any amounts that should have been paid but were not.

If Premium has been paid for any period of time after the date you cancel this Contract, We will refund that Premium to you. The refund will be for that period of time after your coverage ends. Also, if a Member dies while this Contract is in force, We will refund the Premium paid for such Member for any period after the date of the Member's death to you or your estate.

If a Member's age or sex has been misstated, We will adjust the Premiums and/or benefits under this Contract. The benefits will be the amount the Premiums paid would have purchased at the correct age and/or sex.

## Grace Period

If you do not pay the required Premium by the premium due date, you have a grace period of 31 days in which to pay that Premium. During the 31-day grace period, the Contract shall continue in force. However, any claims incurred and submitted during the grace period will be pended until Premium is received. If Premium is not received within the grace period, these claims will be denied and this Contract will automatically terminate retroactively to the last date for which full premium payment was made. Upon termination of the Contract as provided in this paragraph, We shall only have liability to make payment for Covered Services through the last date for which full premium payment has been received. You may be able to reinstate this Contract after it ends as described in the Termination section.

## Disagreement with Recommended Treatment

Each Member enrolls in the Plan with the understanding that he/she, in consultation with his/her Providers, is responsible for determining the treatment appropriate for his/her care. You may, for personal reasons, refuse to accept procedures or treatment recommended by your Providers. Providers may regard such refusal to accept their recommendations as incompatible with continuance of the Physician-patient relationship and as obstructing the provision of proper medical care. In this event, the Provider shall have no further responsibility to provide care to you, and We shall have no obligation to have Network Providers available who will render the care.

If you refuse to follow a recommended treatment or procedure, and the Provider believes that no professionally acceptable alternative exists, you will be so advised. In such case, neither the Plan, nor any Provider shall have any further responsibility to provide care in the case of the Provider, and to arrange care in the case of the Plan for the condition under treatment or any complications thereof.

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

## Variable Deductible (Coordination of Benefits)

When a Member has other valid coverage, the applicable Deductible amount will be determined as follows. Other valid coverage means any group or individual hospital, surgical or medical insurance policy or medical practice or other prepayment plan or any other plan or program, whether insured or uninsured, or by reason of state or federal law, including automobile medical payment coverage.

The amount paid under other valid coverage for services received by a Member will be compared to the individual Deductible applicable to this Contract. If the amount paid by the other valid coverage is less than the individual Deductible under this Contract, We will calculate the Member's benefit as if there were no other valid coverage. If the amount paid by the other valid coverage is greater than the Deductible under this Contract, the amount paid by other valid coverage will replace and satisfy the individual Deductible under this Contract. We will then process the remaining amount of covered expenses, as specified by the other valid coverage, under the provisions of this Contract.

If more than one policy containing a variable deductible provision provides benefits for medical expenses incurred by a Member, the amount of benefits payable by each company will be determined as follows:

- After applying benefits payable under any plan(s) not containing variable deductibles, each variable deductible plan shall share remaining expenses on a pro rata basis; and

- each plan's pro rata share of expenses will be that portion of the total remaining expenses as each plan's benefits bears to the total benefits payable under all variable deductible plans.

## Medicare

Any benefits covered under both this Contract and Medicare will be paid pursuant to Medicare Secondary Payer legislation, regulations, and Centers for Medicare & Medicaid Services guidelines, subject to federal court decisions. Federal law controls whenever there is a conflict among state law, Contract provisions, and federal law.

## Physical Examination

When a claim is pending, We reserve the right to request a Member to be examined by an applicable Provider, at Our expense. This will be requested as often as reasonably required.

## Worker's Compensation

The benefits under this Contract are not designed to duplicate benefits that Members are eligible for under the Worker's Compensation Law. All money paid or owed by Worker's Compensation for services provided to a Member shall be paid back by, or on behalf of, the Member to the Plan if the Plan has made or makes payment for the services received. It is understood that coverage under this Contract does not replace or affect any Worker's Compensation coverage requirements.

## Other Government Programs

The benefits under this Contract shall not duplicate any benefits that Members are entitled to, or eligible for, under any other governmental program. This does not apply if any particular laws require the Plan

**Health Contract**                                              Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

to be the primary payer. If the Plan has duplicated such benefits, all money paid by such programs to Members for services they have or are receiving, shall be paid by or on behalf of the Member to the Plan.

## Subrogation

Subrogation will not be allowed in any plan as distinguished from the right of recovery.

## Important Note

The Subscriber hereby expressly acknowledges his or her understanding that this Contract constitutes a contract solely between the Subscriber and Healthy Alliance Life Insurance Company, dba Anthem Blue Cross and Blue Shield (Anthem), and that Anthem is an independent corporation licensed to use the Blue Cross and Blue Shield names and marks in its Missouri service area. The Blue Cross and Blue Shield marks are registered by the Blue Cross and Blue Shield Association with the U.S. Patent and Trademark Office in Washington, D.C. and in other countries. Further, Anthem is not contracting as the agent of the Blue Cross and Blue Shield Association or any other Blue Cross and/or Blue Shield plan or licensee. The Subscriber further acknowledges and agrees that it has not entered into this Contract based upon representations by any person other than Anthem, and that no person, entity, or organization other than Anthem shall be held accountable or liable to the Subscriber for any of Anthem's obligations to the Subscriber created under this Contract. This paragraph shall not create any additional obligations whatsoever on the part of Anthem other than those obligations created under other provisions of this agreement.

## Conformity with Law

Any provision of this Plan which is in conflict with the laws of the state of Missouri, or with federal law, is hereby automatically amended to conform with the minimum requirements of such laws.

## Clerical Error

A clerical error will never disturb or affect a Member's coverage, as long as the Member's coverage is valid under the rules of this Contract. This rule applies to any clerical error, regardless of whether it was the fault of the Subscriber or the Plan.

## Policies and Procedures

The Plan is able to introduce new policies, procedures, rules and interpretations, as long as they are reasonable. Such changes are introduced to make the Contract more orderly and efficient.

## Waiver

No agent or other person, except an authorized officer of the Plan, is able to disregard any conditions or restrictions contained in this Contract, to extend the amount of time for making a payment to the Plan, or to bind the Plan by making any promise or representation or by giving or receiving any information.

**Health Contract**                                                    Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

## Additional Benefits

The Plan may cover services and supplies not specifically covered by the Contract. This applies if the Plan determines such services and supplies are in lieu of more expensive services and supplies, which would otherwise be required for the care and treatment of a Member.

## Notice

Any notice given under this Contract shall be in writing. The notices shall be sent to: Anthem Blue Cross & Blue Shield, P.O. Box 36550, Louisville, KY 40233. If we are forwarding you a notice, it will be sent to your most recent address as it appears in the Plan's system records.

## 13   DEFINITIONS

If a word or phrase in this Contract has a special meaning, or is a title, it will start with a capital letter. If the word or phrase is not explained in the text where it appears, it will be defined in this section.

If you need additional clarification on any of these definitions, please contact the customer service number located on the back of your ID Card.

**Abortion** - Ending of a pregnancy before the birth of the infant. Miscarriage is a spontaneous abortion (occurs naturally and suddenly). A therapeutic abortion is one performed to save the life of the mother.

An elective (voluntary) abortion is one performed for reasons other than described above. Regardless of Medical Necessity, We do not pay Covered Services from a Provider for elective abortion accomplished by any means.

**Authorized Service** – A Covered Service that is prescribed by any Provider, other than a Network Provider, which has been authorized in advance by Us (except for Emergency Care which may be authorized after the service is rendered) to be paid at the Network level. The Member may be responsible for the difference between the Non-Network Provider's charge and the Maximum Allowed Amount, in addition to any applicable Network Copayment/ Coinsurance and Deductible.

**Behavioral Health Conditions** –

- **Recognized Mental Illness** – Those conditions classified as mental disorders in the American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders.

- **Substance Abuse** – The psychological or physiological dependence upon or abuse of drugs, including alcohol, characterized by drug tolerance or withdrawal and the impairment of social or occupational role functioning or both.

**Behavioral Health Treatments** -

- **Episode** – A distinct course of Substance Abuse treatment separated by at least 30 days without treatment.

- **Facility-Based Treatment Program** – A program certified by the Department of Mental Health or accredited by a nationally recognized organization, involving structured, intensive treatment for a Recognized Mental Illness or Substance Abuse. Such a program includes day or evening

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

treatment, Partial Hospitalization, intensive Outpatient programs and residential treatment programs.

- **Intensive Outpatient Treatment** – A structured array of treatment services, offered by practice groups or facilities to treat behavioral health conditions. Intensive outpatient programs generally provide three hours of treatment per day, and the program is generally available at least two to three days per week. Intensive Outpatient Programs may offer group, DBT, individual, and family services.

- **Medical Detoxification** – Hospital Inpatient or residential medical care to ameliorate acute medical conditions associated with Substance Abuse.

- **Partial Hospitalization** – An intensive structured setting providing three or more hours of treatment or programming per day or evening, in a program that is available five days a week. The intensity of services is similar to Inpatient settings. Skilled nursing care and daily psychiatric care (and Substance Abuse care if the patient is being treated in a partial hospital Substance Abuse program) are available, and treatment is provided by a multidisciplinary team of behavioral health professionals.

- **Social Setting Detoxification** – A program in a supportive non-Hospital setting designed to achieve detoxification without the use of drugs or other medical intervention, to establish a plan of treatment and to provide for medical referral when necessary.

**Benefit Period** – The length of time that We will pay benefits for Covered Services. The Benefit Period is listed in the Schedule of Benefits. If your coverage ends before this length of time, then the Benefit Period also ends.

**Benefit Period Maximum** – The maximum that We will pay for specific Covered Services during a Benefit Period.

**Brand Name Drug** – The first version of a particular medication to be developed or a medication that is sold under a pharmaceutical manufacturer's own registered trade name or trademark. The original manufacturer is granted a patent, which allows it to be the only company to make and sell the new Drug for a certain number of years.

**Coinsurance** - A specific percentage of the Maximum Allowed Amount for Covered Services indicated in the Schedule of Benefits that you must pay. Coinsurance normally applies after the Deductible, if applicable, that you are required to pay. See the Schedule of Benefits for any exceptions. Your Coinsurance will not be reduced by refunds, rebates or any other form of negotiated post-payment adjustments.

**Contract** – The contract between Us and the Subscriber. It includes this Contract, your Schedule of Benefits, your application, any supplemental application or change form, your Identification Card, and any endorsements or riders.

**Copayment** – A specific dollar amount of the Maximum Allowed Amount for Covered Services, that is indicated in the Schedule of Benefits, which you must pay. The Copayment does not apply to any Deductible or Coinsurance or Out-of-Pocket Limit. Your Copayment will be the lesser of the amount shown in the Schedule of Benefits or amount charged by the Provider.

**Note**: For covered care provided by a Chiropractor, in no event will the Copayment for a single service be more than 50% of the cost of that service.

**Covered Services** - Services, supplies or treatment as described in this Contract which are performed, prescribed, directed or authorized by a Provider. To be a Covered Service the service, supply or treatment must be:

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

- Medically Necessary or otherwise specifically included as a benefit under this Contract.

- Within the scope of the license of the Provider performing the service.

- Rendered while coverage under this Contract is in force.

- Not Experimental/Investigative or otherwise excluded or limited by this Contract, or by any amendment or rider thereto.

- Authorized in advance by Us if such Prior Authorization is required in this Contract.

A charge for a Covered Service is incurred on the date the service, supply or treatment was provided to you. The incurred date (for determining application of Deductible and other cost share amounts) for an Inpatient admission is the date of admission, except as otherwise specified in "Covered Services."

Covered Services do not include any services or supplies that are not documented in Provider records.

**Covered Transplant Procedure** – Any Medically Necessary human organ and bone marrow / stem cell transplant / transfusion as determined by Us including necessary acquisition procedures, harvest and storage, and including Medically Necessary preparatory myeloblative therapy.

**Custodial Service or Care** - Care primarily for the purpose of assisting you in the activities of daily living or in meeting personal rather than medical needs. Custodial Care is not specific treatment for an illness or injury. It is care which cannot be expected to substantially improve a medical condition and has minimal therapeutic value. Such care includes, but is not limited to:

- Assistance with walking, bathing, or dressing

- Transfer or positioning in bed

- Normally self-administered medicine

- Meal preparation

- Feeding by utensil, tube, or gastrostomy

- Oral hygiene

- Ordinary skin and nail care

- Catheter care

- Suctioning

- Using the toilet

- Enemas

- Preparation of special diets and supervision over medical equipment or exercises or over self-administration of oral medications not requiring constant attention of trained medical personnel.

Care can be Custodial regardless of whether it is recommended by a professional or performed in a facility, such as a Hospital or Skilled Nursing Facility, or at home.

**Deductible** – The dollar amount of Covered Services listed in the Schedule of Benefits for which you are responsible before We start to pay for Covered Services subject to the Deductible in each Benefit Period.

**Health Contract**                                                                   Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

**Dependent** – A member of the Subscriber's family who is covered under the Contract, as described in the "Eligibility and Enrollment" section.

**Domiciliary Care** – Care provided in a residential institution, treatment center, halfway house, or school because a Member's own home arrangements are not available or are unsuitable, and consisting chiefly of room and board, even if therapy is included.

**Effective Date** – The date that a Subscriber's coverage begins under this Contract. A Dependent's coverage also begins on the Subscriber's Effective Date, unless otherwise specified

**Emergency Medical Condition (Emergency)** –a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) so that a prudent layperson, who possesses an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to result in one of the following conditions:

- Placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy;

- Serious impairment to bodily functions; or

- Serious dysfunction of any bodily organ or part.

**Emergency services (Emergency Care)** - with respect to an Emergency Medical Condition:

1. A medical screening examination that is within the capability of the emergency department of a hospital, including ancillary services routinely available to the emergency department to evaluate such Emergency Medical Condition, and

2. Within the capabilities of the staff and facilities available at the hospital, such further medical examination and treatment to stabilize the patient.

The term **"stabilize"** means, with respect to an Emergency Medical Condition:

To provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility. With respect to a pregnant woman who is having contractions, the term "stabilize" also means to deliver (including the placenta), if there is inadequate time to effect a safe transfer to another hospital before delivery or transfer may pose a threat to the health or safety of the woman or the unborn child.

**Enrollment Date** – The date coverage begins for a Member.

**Experimental/Investigative** – A Drug, device or medical treatment or procedure that:

- has not been given approval for marketing by the United States Food and Drug Administration at the time it is furnished and such approval is required by law; or

- reliable evidence shows is the subject of ongoing phase I, II or III clinical trials or under study to determine its maximum tolerated dose, its toxicity, its safety, its standard means of treatment or diagnosis. Reliable evidence means only the published reports and articles and authoritative medical and scientific literature, written protocol or protocols by the treating facility or other facility studying substantially the same Drug, device or medical treatment or procedure; or the written informed consent used by the treating facility or other facilities studying substantially the same Drug, device or medical treatment or procedure.

**Health Contract**                                             Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

We may consult with professional peer review committees or other appropriate sources for recommendations.

**Family Coverage** – Coverage for the Subscriber and all eligible Dependents.

**Formulary** - The list of pharmaceutical products, developed in consultation with Physicians and pharmacists, approved for their quality and cost effectiveness.

**Generic Drugs** – Prescription Drugs that have been determined by the FDA to be equivalent to Brand Name Drugs, but are not made or sold under a registered trade name or trademark. Generic Drugs have the same active ingredients, meet the same FDA requirements for safety, purity, and potency and must be dispensed in the same dosage form (tablet, capsule, cream) as the Brand Name Drug.

**Grievance Advisory Panel** - A panel consisting of other enrollees; Our representatives who were not involved in the circumstances giving rise to the grievance or in any subsequent investigation or determination of the grievance; and, where the grievance involves an adverse determination, a majority of persons that are appropriate clinical peers in the same or similar specialty as would typically manage the case being reviewed who were not involved in the circumstances giving rise to the grievance or in any subsequent investigation or determination of the grievance.

**Identification Card / ID Card** – A card issued by the Plan, showing the Member's name, membership number, and occasionally coverage information. It is important to carry this card with you.

**Inpatient** – A Member who receives care as a registered bed patient in a Hospital or other Provider where a room and board charge is made. This does not apply to a Member who is placed under observation for fewer than 24 hours.

**Mail Service** – Our Prescription management program which offers you a convenient means of obtaining Maintenance Medications by mail if you take Prescription Drugs on a regular basis. Covered Prescription Drugs are ordered directly from the licensed Pharmacy Mail Service which has entered into a reimbursement agreement with Us, and sent directly to your home.

**Maintenance Medications** – Medications you take on a regular, recurring basis to treat or control a chronic illness such as heart disease, high blood pressure, epilepsy, or diabetes.

**Maximum Allowed Amount** – The maximum amount that We will pay for Covered Services you receive. For more information, see the "Claims Payment" section.

**Medically Necessary or Medical Necessity** – Services rendered for the diagnosis or treatment of a condition that are generally accepted as being necessary and appropriate according to the prevalent standards of medical care practice. The level and amount of services must not be greater than is necessary and appropriate according to said standards; for example, Inpatient services are not Medically Necessary if the services could have been appropriately provided as Outpatient services according to said standards. Services will not be considered Medically Necessary simply because they are rendered or prescribed by the Member's Physician or other Provider. We may consult with professional peer review committees or other appropriate sources for recommendations.

Medically Necessary services must be cost-effective compared to alternative interventions, including no intervention. Cost effective does not always mean lowest cost. It does mean that as to the diagnosis or treatment of the Member's illness, injury or disease, the service is: (1) not more costly than an alternative service or sequence of services that is medically appropriate, or (2) performed in the least costly setting that is medically appropriate.

**Medicare** – The programs of health care for the aged and disabled established by Title XVIII of the Social Security Act of 1965, as amended.

**Member** – A Subscriber or Dependent who has satisfied the eligibility conditions, applied for coverage, been approved by the Plan and for whom the required Premium payment has been made; Members are sometimes called "you" or "your" in this Contract.

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

**Network Provider** - A Provider who has entered into a contractual agreement or is otherwise engaged by Us, or with another organization which has an agreement with Us, to provide Covered Services and certain administration functions for the Network associated with this Contract.

**Network Specialty Pharmacy** – A Pharmacy that has entered into a contractual agreement or is otherwise engaged by Us to render Specialty Drug Services, or with another organization that has an agreement with Us, to provide Specialty Drug services and certain administrative functions to you for the Specialty Pharmacy Network.

**Network Transplant Provider** – A Provider that has been designated as a "center of excellence" by Us and/or a Provider selected to participate as a Network Transplant Provider by a designee. Such Provider has entered into a transplant provider agreement to render Covered Transplant Procedures and certain administrative functions to you for the transplant network. A Provider may be a Network Transplant Provider with respect to:

- certain Covered Transplant Procedures; or

- all Covered Transplant Procedures.

**New FDA Approved Drug Product or Technology** - The first release of the brand name product or technology upon the initial FDA New Drug Approval. Other applicable FDA approval for its biochemical composition and initial availability in the marketplace for the indicated treatment and use.

New FDA Approved Drug Product or Technology does not include:

- New formulations: a new dosage form or new formulation of an active ingredient already on the market;

- Already marketed Drug product but new manufacturer: a product that duplicates another firm's already marketed Drug product (same active ingredient, formulation, or combination);

- Already marketed Drug product, but new use: a new use for a Drug product already marketed by the same or a different firm; or

- Newly introduced generic medication: generic medications contain the same active ingredient as their counterpart brand-named medications.

**Non-Network Provider** - A Provider who has not entered into a contractual agreement with Us for the Network associated with this Contract. Providers who have not contracted or affiliated with Our designated Subcontractor(s) for the services they perform under this Contract are also considered Non-Network Providers.

**Non-Network Specialty Pharmacy** – Any Pharmacy that has not entered into a contractual agreement nor otherwise engaged by Us to render Specialty Drug Services, or with another organization that has an agreement with Us, to provide Specialty Drug services to you for the Specialty Pharmacy Network.

**Non-Network Transplant Provider** - Any Provider that has **NOT** been designated as a "center of excellence" by Us or has not been selected to participate as a Network Transplant Provider by a designee.

**Out-of-Pocket Limit** - A specified dollar amount of expense incurred by a Member and/or family for Covered Services in a Benefit Period as listed on the Schedule of Benefits. Such expense does not include charges in excess of the Maximum Allowed Amount or any non-covered services. Refer to the Schedule of Benefits for other services that may not be included in the Out-of-Pocket Limit. When the Out-of-Pocket Limit is reached for a Member and/or family, then no additional Deductibles and

**Health Contract**                                                    Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Coinsurance are required for that person and/or family unless otherwise specified in this Contract and/or the Schedule of Benefits.

**Outpatient** - A Member who receives services or supplies while not an Inpatient.

**Pharmacy and Therapeutics (P&T) Committee** – A committee of Physicians and pharmacists who review literature and studies which address the safety, efficacy, approved indications, adverse effects, contraindications, medical outcome, and pharmacoeconomics. The committee will develop, review and/or approve guidelines related to how and when certain Drugs and/or therapeutic categories will be approved for coverage.

**Plan (or We, Us, Our)** – Anthem Blue Cross and Blue Shield, which provides or administers benefits for the Covered Services described in this Contract.

**Pre-Existing Condition** – For Members age 19 and older, a condition which manifests itself in such a manner as would cause an ordinarily prudent person to seek medical advice, diagnosis, care or treatment within 12 months immediately preceding his or her Effective Date. Pre-Existing Condition also means a condition for which medical advice, diagnosis, care or treatment was recommended or received within 12 months immediately preceding his or her Effective Date. A pregnancy existing on the Effective Date is also a Pre-Existing Condition. We do not cover services you receive for Pre-Existing Conditions during the first 12 months after your Effective Date.

**Premium** – The charges that must be paid by the Subscriber to maintain coverage. This may be based on your age.

**Prescription Legend Drug, Prescription Drug, or Drug** – A medicinal substance that is produced to treat illness or injury and is dispensed to Outpatients. Under the Federal Food, Drug & Cosmetic Act, such substances must bear a message on its original packing label that states, "Caution: Federal law prohibits dispensing without a prescription." Compounded (combination) medications, which contain at least one such medicinal substance, are considered to be Prescription Legend Drugs. Insulin is considered a Prescription Legend Drug under this Contract.

**Prescription Order** – A legal request, written by a Provider, for a Prescription Drug or medication and any subsequent refills.

**Primary Care Physician ("PCP")** – A Network Provider who is a practitioner that specializes in family practice, general practice, internal medicine, pediatrics, obstetrics/gynecology, geriatrics, chiropractic medicine, or any other Network Provider as allowed by the Plan. A PCP supervises, coordinates and provides initial care and basic medical services to a Member and is responsible for ongoing patient care.

**Prior Authorization** – The process applied to certain services, supplies, treatment, and certain Drugs and/or therapeutic categories to define and/or limit the conditions under which they will be covered. Prescription Drugs and their criteria for coverage are defined by the Pharmacy and Therapeutics (P&T) Committee.

**Provider** – A duly licensed person or facility that provides services within the scope of an applicable license and is a person or facility that the Plan approves. This includes any Provider rendering services that are required by applicable state law to be covered when rendered by such Provider. Providers include, but are not limited to, the persons and facilities listed below. If you have a question about a Provider not shown below, please call the number on the back of your ID Card.

- **Alternative Care Facility** – A non-Hospital health care facility, or an attached facility designated as free standing by a Hospital that the Plan approves, which provides Outpatient Services primarily for but not limited to:

  1. Diagnostic Services such as Computerized Axial Tomography (CAT scan) or Magnetic Resonance Imaging (MRI)

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

2. Surgery

3. Therapy Services or rehabilitation.

- **Ambulatory Surgical Facility** - A facility, with an organized staff of Physicians, that:

  1. is licensed as such, where required;

  2. has permanent facilities and equipment for the primary purpose of performing surgical procedures on an Outpatient basis;

  3. provides treatment by or under the supervision of Physicians and nursing services whenever the patient is in the facility;

  4. does not provide Inpatient accommodations; and

  5. is not, other than incidentally, used as an office or clinic for the private practice of a Physician or other professional Provider.

- **Certified Advance Registered Nurse Practitioner**

- **Certified Nurse Midwife** – When services are supervised and billed for by an employer Physician.

- **Certified Registered Nurse Anesthetist** – When services are performed in collaboration with a Physician and billed by a certified facility or Hospital.

- **Certified Surgical Assistant**

- **Chiropractor**

- **Community Mental Health Center** – A legal entity certified by the Department of Mental Health or accredited by a nationally recognized organization, through which a comprehensive array of mental health services are provided to individuals.

- **Day Hospital** - A facility that provides day rehabilitation services on an Outpatient basis.

- **Dialysis Facility** - A facility that mainly provides dialysis treatment, maintenance or training to patients as an Outpatient or at your home. It is not a Hospital.

- **Home Health Care Agency** – A facility, licensed in the state in which it is located, which:

  1. provides skilled nursing and other services on a visiting basis in the Member's home; and

  2. is responsible for supervising the delivery of such services under a plan prescribed and approved in writing by the attending Physician.

- **Home Infusion Facility** - A facility which provides a combination of:

  1. Skilled nursing services

  2. Prescription Drugs

  3. Medical supplies and appliances

in the home as home infusion therapy for Total Parenteral Nutrition (TPN), Antibiotic therapy, Intravenous (IV) Chemotherapy, Enteral Nutrition Therapy, or IV pain management.

**Health Contract**      Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

- **Hospice** - A coordinated plan of home, Inpatient and Outpatient care that provides palliative and supportive medical and other health services to terminally ill patients. An interdisciplinary team provides a program of planned and continuous care, of which the medical components are under the direction of a Physician. Care is available 24 hours a day, seven days a week. The Hospice must meet the licensing requirements of the state or locality in which it operates.

- **Hospital** - A Provider constituted, licensed, and operated as set forth in the laws that apply to Hospitals, which:

  1. provides room and board and nursing care for its patients;
  2. has a staff with one or more Physicians available at all times;
  3. provides 24 hour nursing service by or under the supervision of graduate Registered Nurses on call or on duty;
  4. maintains on its premises all the facilities needed for the diagnosis, medical care, and treatment of an illness or injury; and
  5. is fully accredited by the Joint Commission on Accreditation of Health Care Organizations.

  The term Hospital does not include a Provider, or that part of a Provider, used mainly for:

  1. nursing care
  2. rest care
  3. extended care
  4. convalescent care
  5. care of the aged
  6. Custodial Care
  7. educational care
  8. treatment of mental illness
  9. treatment of alcohol or drug abuse

- **Laboratory (Clinical)**

- **Licensed Marital and Family Counselor**

- **Licensed Mental Health Professional** – A licensed Physician specializing in the treatment of Mental Illness and/or Substance Abuse, a licensed Psychologist, a licensed clinical Social Worker or a Licensed Professional Counselor.

- **Licensed Practical Nurse** – When services are supervised and billed for by an employer Physician.

- **Licensed Professional Counselors**

- **Occupational Therapist**

- **Pharmacy** - An establishment licensed to dispense Prescription Drugs and other medications through a duly licensed pharmacist upon a Physician's order. A Pharmacy may be a Network Provider or a Non-Network Provider.

- **Physical Therapist**

**Health Contract**    Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

- **Physician** - A legally licensed doctor of medicine, doctor of osteopathy (bones and muscles), dental surgeon (teeth), podiatrist (diseases of the foot) or surgical chiropodist (surgical foot specialist) or ophthalmologist (eye and sight specialist).

- **Psychologist** - A licensed clinical Psychologist. In states where there is no licensure law, the Psychologist must be certified by the appropriate professional body.

- **Registered Nurse First Assistant** – When services are supervised and billed for by an employer Physician.

- **Registered Nurse** – When services are supervised and billed for by an employer Physician.

- **Registered Nurse Practitioner**

- **Regulated Physician's Assistant** – When services are supervised and billed for by an employer Physician.

- **Rehabilitation Hospital** - A facility that is primarily engaged in providing rehabilitation services on an Inpatient or Outpatient basis. Rehabilitation care services consist of the combined use of medical, social, educational, and vocational services to enable patients disabled by disease or injury to achieve some reasonable level of functional ability. Services are provided by or under the supervision of an organized staff of Physicians. Continuous nursing services are provided under the supervision of a Registered Nurse.

- **Respiratory Therapist (Certified)**

- **Skilled Nursing Facility** - A Provider constituted, licensed, and operated as set forth in applicable state law, which:

  1. mainly provides Inpatient care and treatment for persons who are recovering from an illness or injury;
  2. provides care supervised by a Physician;
  3. provides 24 hour per day nursing care supervised by a full-time Registered Nurse;
  4. is not a place primarily for care of the aged, Custodial or domiciliary care, or treatment of alcohol or drug dependency; and
  5. is not a rest, educational, or custodial Provider or similar place.

- **Social Worker** - A licensed Clinical Social Worker. In states where there is no licensure law, the Social Worker must be certified by the appropriate professional body.

- **Speech Therapist**

- **Supplier of Durable Medical Equipment, Prosthetic Appliances and/or Orthotic Devices**

- **Urgent Care Center** - A licensed health care facility that is organizationally separate from a Hospital and whose primary purpose is the offering and provision of immediate, short-term medical care, without appointment, for Urgent Care.

**Service Area** – The geographical area, designated by Us, in which the program described in this Contract is marketed and sold.

**Single Coverage** – Coverage that is limited to the Subscriber only.

**Health Contract**                                    Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

**Specialty Care Physician (SCP)** - A Network Provider, other than a Primary Care Physician, who provides services within a designated specialty area of practice.

**Stabilize** - The provision of medical treatment to you in an Emergency as may be necessary to assure, within reasonable medical probability, that material deterioration of your condition is not likely to result from or during any of the following:

- your discharge from an emergency department or other care setting where Emergency Care is provided to you; or

- your transfer from an emergency department or other care setting to another facility; or

- your transfer from a Hospital emergency department or other Hospital care setting to the Hospital's Inpatient setting.

**Subcontractor** – We may subcontract particular services to organizations or entities that have specialized expertise in certain areas. This may include but is not limited to Prescription Drugs. Such subcontracted organizations or entities may make benefit determinations and/or perform administrative, claims paying, or customer service duties on Our behalf.

**Subscriber** - The individual in whose name this Contract has been issued and whose coverage is in effect and whose name appears on the Identification Card as the Subscriber.

**Therapy Services** – Services and supplies that are used to help a person recover from an illness or injury. Covered Therapy Services are limited to services listed in the "Covered Services" section.

**Total Disability (or Totally Disabled)** – A Subscriber or a Dependent who had been actively working is considered Totally Disabled if the Member is unable to perform the material and substantial duties of his or her occupation for a period of at least 12 months.

A retiree or a Dependent who had not been actively working is considered Totally Disabled if he or she is unable, because of an illness or injury, to perform the usual and ordinary activities of a person of like age. (In any of these situations, the disability may be either permanent or temporary.)

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

In most of Missouri, Anthem Blue Cross and Blue Shield is the trade name
RightCHOICE® Managed Care, Inc. (RIT), Healthy Alliance® Life Insurance Company
(HALIC) and HMO Missouri, Inc. RIT and certain affiliates administer non-HMO benefits
underwritten by HALIC and HMO benefits underwritten by HMO Missouri, Inc.
RIT and certain affiliates only provide administrative services for self-funded plans
and do not underwrite benefits. Independent licensees of the Blue Cross and Blue Shield Association.
The Blue Cross and Blue Shield names and symbols are registered marks of the Blue Cross and Blue Shield
Association.

**MO IND LUMENOS HSA**
**REV 01/10**

Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM



*Underwritten by Healthy Alliance Life Insurance Company*

# Notice of Privacy Practices

HIPAA Notice 9/23/13

Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM



## Information That's Important to You

Every year, we're required to send you specific information about your rights, your benefits and more. This can use up a lot of trees, so we've combined a couple of these required annual notices. Please take a few minutes to read about:

- State notice of privacy practices

- HIPAA notice of privacy practices

- Breast reconstruction surgery benefits

Want to save more trees? Go to anthem.com and sign up to receive these types of notices by e-mail.

## State notice of privacy practices

As mentioned in our Health Insurance Portability and Accountability Act (HIPAA) notice, we must follow state laws that are stricter than the federal HIPAA privacy law. This notice explains your rights and our legal duties under state law. This applies to life insurance benefits, in addition to health, dental and vision benefits that you may have.

### Your personal information

We may collect, use and share your nonpublic personal information (PI) as described in this notice. PI identifies a person and is often gathered in an insurance matter.

We may collect PI about you from other persons or entities, such as doctors, hospitals or other carriers. We may share PI with persons or entities outside of our company — without your OK in some cases. If we take part in an activity that would require us to give you a chance to opt out, we will contact you. We will tell you how you can let us know that you do not want us to use or share your PI for a given activity. You have the right to access and correct your PI. Because PI is defined as any information that can be used to make judgments about your health, finances, character, habits, hobbies, reputation, career and credit, we take reasonable safety measures to protect the PI we have about you. A more detailed state notice is available upon request. Please call the phone number printed on your ID card.

## HIPAA notice of privacy practices

This notice describes how health, vision and dental information about you may be used and disclosed, and how you can get access to this information with regard to your health benefits. Please review it carefully.

We keep the health and financial information of our current and former members private, as required by law, accreditation standards and our rules. This notice explains your rights. It also explains our legal duties and privacy practices. We are required by federal law to give you this notice.

**HIPAA Notice of Privacy Practices**    Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

## Your Protected Health Information

We may collect, use and share your Protected Health Information (PHI) for the following reasons and others as allowed or required by law, including the HIPAA Privacy rule:

**For payment:** We use and share PHI to manage your account or benefits; or to pay claims for health care you get through your plan. For example, we keep information about your premium and deductible payments. We may give information to a doctor's office to confirm your benefits.

**For health care operations:** We use and share PHI for our health care operations. For example, we may use PHI to review the quality of care and services you get. We may also use PHI to provide you with case management or care coordination services for conditions like asthma, diabetes or traumatic injury.

**For treatment activities:** We do not provide treatment. This is the role of a health care provider, such as your doctor or a hospital. But, we may share PHI with your health care provider so that the provider may treat you.

**To you:** We must give you access to your own PHI. We may also contact you to let you know about treatment options or other health-related benefits and services. When you or your dependents reach a certain age, we may tell you about other products or programs for which you may be eligible. This may include individual coverage. We may also send you reminders about routine medical checkups and tests.

**To others:** In most cases, if we use or disclose your PHI outside of treatment, payment, operations or research activities, we must get your OK in writing first. We must receive your written OK before we can use your PHI for certain marketing activities. We must get your written OK before we sell your PHI. If we have them, we must get your OK before we disclose your provider's psychotherapy notes. Other uses and disclosures of your PHI not mentioned in this notice may also require your written OK. You always have the right to revoke any written OK you provide. You may tell us in writing that it is OK for us to give your PHI to someone else for any reason. Also, if you are present and tell us it is OK, we may give your PHI to a family member, friend or other person. We would do this if it has to do with your current treatment or payment for your treatment. If you are not present, if it is an emergency, or you are not able to tell us it is OK, we may give your PHI to a family member, friend or other person if sharing your PHI is in your best interest.

**As allowed or required by law:** We may also share your PHI, as allowed by federal law, for many types of activities. PHI can be shared for health oversight activities. It can also be shared for judicial or administrative proceedings, with public health authorities, for law enforcement reasons, and with coroners, funeral directors or medical examiners (about decedents). PHI can also be shared with organ donation groups for certain reasons, for research, and to avoid a serious threat to health or safety. It can be shared for special government functions, for Workers' Compensation, to respond to requests from the U.S. Department of Health and Human Services, and to alert proper authorities if we reasonably believe that you may be a victim of abuse, neglect, domestic violence or other crimes. PHI can also be shared as required by law. If you are enrolled with us through an employer-sponsored group health plan, we may share PHI with your group health plan. We and/or your group health plan may share PHI with the sponsor of the plan. Plan sponsors that receive PHI are required by law to have controls in place to keep it from being used for reasons that are not proper. If your employer pays your premium or part of your premium, but does not pay your health insurance claims, your employer is not allowed to receive your PHI — unless your employer promises to protect your PHI and makes sure the PHI will be used for legal reasons only.

**Authorization:** We will get an OK from you in writing before we use or share your PHI for any other purpose not stated in this notice. You may take away this OK at any time, in writing. We will then stop using your PHI for that purpose. But, if we have already used or shared your PHI based on your OK, we cannot undo any actions we took before you told us to stop.

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

**Genetic information:** We cannot use or disclose PHI that is an individual's genetic information for underwriting.

## Your Rights

Under federal law, you have the right to:

- Send us a written request to see or get a copy of certain PHI, or ask that we correct your PHI that you believe is missing or incorrect. If someone else (such as your doctor) gave us the PHI, we will let you know so you can ask him or her to correct it.

- Send us a written request to ask us not to use your PHI for treatment, payment or health care operations activities. We are not required to agree to these requests.

- Give us a verbal or written request to ask us to send your PHI using other means that are reasonable. Also, let us know if you want us to send your PHI to an address other than your home if sending it to your home could place you in danger.

- Send us a written request to ask us for a list of certain disclosures of your PHI. Call Customer Service at the phone number printed on your identification (ID) card to use any of these rights. Customer Service representatives can give you the address to send the request. They can also give you any forms we have that may help you with this process.

- Right to a restriction for services you pay for out of your own pocket: If you pay in full for any medical services out of your own pocket, you have the right to ask for a restriction. The restriction would prevent the use or disclosure of that PHI for treatment, payment or operations reasons. If you or your provider submits a claim to Anthem, Anthem does not have to agree to a restriction (see Your Rights section above). If a law requires the disclosure, Anthem does not have to agree to your restriction.

## How we protect information

We are dedicated to protecting your PHI, and have set up a number of policies and practices to help make sure your PHI is kept secure.

We have to keep your PHI private. If we believe your PHI has been breached, we must let you know.

We keep your oral, written and electronic PHI safe using physical, electronic, and procedural means. These safeguards follow federal and state laws. Some of the ways we keep your PHI safe include securing offices that hold PHI, password-protecting computers, and locking storage areas and filing cabinets. We require our employees to protect PHI through written policies and procedures. These policies limit access to PHI to only those employees who need the data to do their job. Employees are also required to wear ID badges to help keep people who do not belong out of areas where sensitive data is kept. Also, where required by law, our affiliates and nonaffiliates must protect the privacy of data we share in the normal course of business. They are not allowed to give PHI to others without your written OK, except as allowed by law.

## Potential Impact of Other Applicable Laws

HIPAA (the federal privacy law) generally does not preempt, or override, other laws that give people greater privacy protections. As a result, if any state or federal privacy law requires us to provide you with more privacy protections, then we must also follow that law in addition to HIPAA.

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

## Complaints

If you think we have not protected your privacy, you can file a complaint with us. You may also file a complaint with the Office for Civil Rights in the U.S. Department of Health and Human Services. We will not take action against you for filing a complaint.

## Contact Information

Please call Customer Service at the phone number printed on your ID card. Representatives can help you apply your rights, file a complaint or talk with you about privacy issues.

## Copies and Changes

You have the right to get a new copy of this notice at any time. Even if you have agreed to get this notice by electronic means, you still have the right to a paper copy. We reserve the right to change this notice. A revised notice will apply to PHI we already have about you, as well as any PHI we may get in the future. We are required by law to follow the privacy notice that is in effect at this time. We may tell you about any changes to our notice in a number of ways. We may tell you about the changes in a member newsletter or post them on our website. We may also mail you a letter that tells you about any changes.

## Effective Date of this notice

The original effective date of this Notice was April 14, 2003. The most recent revision date is indicated in the footer of this Notice.

## Breast reconstruction surgery benefits

If you ever need a benefit-covered mastectomy, we hope it will give you some peace of mind to know that your Anthem benefits comply with the Women's Health and Cancer Rights Act of 1998, which provides for:

- Reconstruction of the breast(s) that underwent a covered mastectomy.

- Surgery and reconstruction of the other breast to restore a symmetrical appearance.

- Prostheses and coverage for physical complications related to all stages of a covered mastectomy, including lymphedema.

All applicable benefit provisions will apply, including existing deductibles, copayments and/or co-insurance. Contact your Plan administrator for more information.

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

HIPAA Notice of Privacy Practices

Anthem Blue Cross and Blue Shield is the trade name of: In Indiana: Anthem Insurance Companies, Inc. In Kentucky: Anthem Health Plans of Kentucky, Inc. In most of Missouri: RightCHOICE® Managed Care, Inc. (RIT), Healthy Alliance® Life Insurance Company (HALIC), and HMO Missouri, Inc. RIT and certain affiliates administer non-HMO benefits underwritten by HALIC and HMO benefits underwritten by HMO Missouri, Inc. RIT and certain affiliates only provide administrative services for self-funded plans and do not underwrite benefits. In Ohio: Community Insurance Company. In Wisconsin: Blue Cross and Blue Shield of Wisconsin ("BCBSWi") underwrites or administers the PPO and indemnity policies; Compcare Health Services Insurance Corporation ("Compcare") underwrites or administers the HMO policies; and Compcare and BCBSWi collectively underwrite or administer the POS policies. Independent licensees of the Blue Cross and Blue Shield Association. ® ANTHEM is a registered trademark. The Blue Cross and Blue Shield names and symbols are the registered marks of the Blue Cross and Blue Shield Association.

Mercy SJ Exhibit 3

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Mercy SJ Exhibit 3

Page: 167 of 271 PageID Filed: 12/20/22 #: 322 Doc. #: 1-6 Case: 4:22-CV-01360-SEP COMPLI_PROD-7747333-20131207-091824

Mercy SJ Exhibit 3

Si necesita ayuda en español para entender este documento, puede solicitarla sin costo adicional, llamando al número de servicio al cliente que aparece al dorso de su tarjeta de identificación o en el folleto de inscripción.

| | |
|---|---|
| Group Name: | Individual |
| Group Identification Number: | 00217838 |
| Subgroup Identification Number: | 0000 |

Mail to subscriber.

INDM-MB1 SBSB

Kimberly A Dames
712 Brookside Dr
Marthasville MO 63357

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

IN THE CIRCUIT COURT OF FRANKLIN COUNTY
STATE OF MISSOURI

| | | |
|---|---|---|
| KIM DAMES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 19AB-CC00264 |
| v. | ) | |
| | ) | Division VI |
| MERCY HOSPITALS | ) | |
| EAST COMMUNITIES, | ) | |
| | ) | |
| Defendant. | ) | |

### Affidavit of James Mazzola

James Mazzola, have been duly sworn upon his oath, deposes and states the following:

1.    I am over 18 years of age and am competent to testify regarding the matters in this affidavit.

2.    I have been employed by MHM Support Services, a subsidiary of Mercy Health, which is the ultimate parent company of Mercy Hospitals East Communities ("Mercy"), as Executive Director—Patient Receivables Management since 2014. As such, I am responsible for overseeing Mercy's activities related to the collection of insurance claims for treatment that Mercy hospitals provide to patients.

3.    The facts set forth in this affidavit are based upon my personal knowledge and my familiarity with the business records maintained by Mercy in the ordinary course of business concerning its billing and collection for treatment that Mercy provided to Kim Dames on October 25, 2015.

Mercy SJ Exhibit 4

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

4.      On October 25, 2015, Dames obtained medical treatment at Mercy Hospital Washington.

5.      At the time of Dames' treatment at Mercy, there was a provider agreement between Mercy and Anthem Blue Cross and Blue Shield (the "Anthem Provider Agreement"). A true and accurate copy of the Anthem Provider Agreement is attached to my affidavit and is attached as Exhibit 4 to the Statement of Uncontroverted Material Facts in Support of Defendant's Motion for Summary Judgment.

6.      The Anthem Provider Agreement is the agreement between Mercy and Anthem concerning Dames' treatment at Mercy.

7.      Mercy did not assert any hospital lien against any claim that Dames may have against any tortfeasor.

Mercy SJ Exhibit 4

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

This completes my affidavit.

Dated: May  27 , 2021.

_____
James Mazzola

STATE OF MISSOURI            )
                             ) SS.
COUNTY OF ST. LOUIS          )

On May  27 , 2021, before me appeared James Mazzola, to me personally known, who being by me duly sworn, did state that he is authorized to make this affidavit on behalf of Mercy Hospitals East Communities, and that the statements made herein are true to the best of his knowledge, information, and belief.

IN TESTIMONY WHEREOF, I hereunto set my hand and affix my official seal in the County and State aforesaid, the date and year written above.

_____
Notary Public

My Commission Expires:  10 - 26 - 2021

TRACEY TZIANOS
Notary Public, Notary Seal
State of Missouri
St. Louis County
Commission #91486016
My Commission Expires 10-26-2021

- 3 -

Mercy SJ Exhibit 4

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

# NETWORK AGREEMENT

## WITH

## (Mercy and Affiliates, LLC, on behalf of Mercy Hospitals East Communities d/b/a Mercy Hospital St. Louis, and d/b/a Mercy Hospital Washington, Mercy Health Services, LLC and Saint Anthony's Health Center, Alton, Illinois)

CONFIDENTIAL

Mercy SJ Exhibit 4
**Mercy 00592**

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

## NETWORK AGREEMENT

This Network Agreement (hereinafter "Agreement") is made and entered into by and between RightCHOICE Managed Care, Inc. (hereinafter "Company") and Mercy and Affiliates, LLC, on behalf of Mercy Hospitals East Communities d/b/a Mercy Hospital, St. Louis, and d/b/a Mercy Hospital Washington, Mercy Health Services, LLC and Saint Anthony's Health Center, Alton, Illinois on behalf of itself and the Participating Facilities and Participating Professionals set forth on the Providers Attachment (collectively "Provider" herein).    Neither HealthLink, Inc. nor HealthLink HMO, Inc. will be considered a party to this Agreement or an Affiliate as defined below.    In consideration of the mutual promises and covenants herein contained the sufficiency of which is acknowledged by the parties, the parties agree as follows:

## ARTICLE I
## DEFINITIONS

"Affiliate" means any entity owned or controlled, either directly or through a parent or subsidiary entity, by Company or any entity which is under common control with Company and that accesses the rates, terms or conditions of this Agreement. An Affiliates list, as of the Effective Date of this Agreement, is attached as Attachment A incorporated into and made a part of this Agreement. Company will make best efforts to have changes to the current listing of such Affiliates available through a commonly available website.

"Capitation" means the amount of pre-payment made by Company to a provider or management services organization on a per member per month basis for either specific services or the total cost of care.

"Case Rate" means the all inclusive Company Rate for an entire admission or one outpatient encounter.

"Chargemaster" or "Charges" means a Participating Facility's listing of Participating Facility charges for products, services and supplies.

"Claim" means either the uniform bill claim form or electronic claim form in an industry standard format acceptable to Plan, submitted by a Provider or payment by a Plan for Health Services rendered to a Covered Individual.

"CMS" means Centers for Medicare and Medicaid Services, an agency of the United States government for the administration of Medicare benefits.

"Coded Service Identifier(s)" means a listing of descriptive terms and identifying codes, updated from time to time by CMS) or other industry source for reporting Health Services on the UB-04, CMS 1500 or either forms successor. The codes include but are not limited to, American Medical Association Current Procedural Terminology (CPT-4), CMS Healthcare Common Procedure Coding System (HCPCS), International Classification of Diseases, 9th Revision, Clinical Modification (ICD-9-CM), National Drug Code (NDC) and Revenue Codes (RC), or their successors; provided, however that successors forms or codes shall not be applied until required by CMS for all healthcare providers.

"Company Rate" means the lesser of a Provider's Charges for Covered Services, or the total reimbursement amount that Provider  and Company have agreed upon for such Covered Services as set forth in the Plan Compensation Schedule ("PCS"). The Company Rate shall represent payment in full to Provider for Covered Services.

"Complete Claim" means, unless state law otherwise requires, an accurate Claim submitted pursuant to this Agreement, for which all information necessary to process such Claim and make a benefit determination is included.

"Cost Share" means, with respect to Covered Services, an amount which a Covered Individual is required to pay under the terms of the applicable Health Benefit Plan.  Such payment may be referred to as an allowance, coinsurance, copayment, deductible, or other Covered Individual payment responsibility, and may be a fixed amount or a percentage of applicable payment for Covered Services rendered to the Covered Individual. The Cost Share amount is determined by Plan in accordance with the Covered Individual's Health Benefit Plan and documented EOB to Provider.

Network Agreement  Ver. 8.1
© 2008 RightCHOICE Managed Care, Inc.
12/29/11

LIM

CONFIDENTIAL

Mercy SJ Exhibit 4
**Mercy 00593**

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

"Covered Individual" means any individual who is eligible, as determined by Plan, at the time services are rendered to receive Covered Services under a Health Benefit Plan. For all purposes related to this Agreement, including all schedules, attachments, exhibits, manual(s), notices and communications related to this Agreement, the term "Covered Individual" may be used interchangeably with the terms Insured, Covered Person, Member, Enrollee, Subscriber, Dependent Spouse/Domestic Partner, Child or Contract Holder, and the meaning of each is synonymous with any such other.

"Covered Services" means Medically Necessary Health Services, as determined by Plan and described in the applicable Health Benefit Plan, for which a Covered Individual is eligible for coverage. Covered Services do not include the preventable adverse events set forth herein, in the Plan Compensation Schedule or in the provider manual(s).

"DRG" means Diagnosis Related Group or its successor as set forth by CMS or other grouper as set forth in the PCS.

"Emergency Condition" means the sudden and, at the time, unexpected onset of a health condition that manifests itself by symptoms of sufficient severity that would lead a prudent lay person, possessing an average knowledge of medicine and health, to believe that immediate medical care is required, which may include, but shall not be limited to: (a) Placing the person's health in significant jeopardy; (b) Serious impairment to a bodily function; (c) Serious dysfunction of any bodily organ or part; (d) Inadequately controlled pain; or (e) With respect to a pregnant woman who is having contractions: (a) that there is inadequate time to effect a safe transfer to another hospital before delivery; or (b) that transfer to another hospital may pose a threat to the health or safety of the woman or unborn child.

"Emergency Services" means those Covered Services furnished or required to evaluate and treat an Emergency Condition, which may include, but shall not be limited to, Covered Services that are provided in a licensed hospital's emergency facility by an appropriate provider.

"Fee Schedule Rate" means the Company Rate payable to a Provider based on a specific Coded Service Identifier(s), as set forth in the applicable fee schedule(s).

"Health Benefit Plan" means the document(s) describing the partially or wholly insured, underwritten, and/or administered, marketed health care benefits, or services program between the Plan and an employer, governmental entity, or other entity or individual.

"Health Service" means those services or supplies that a health care provider is licensed, equipped and staffed to provide and which he/she/it customarily provides to or arranges for individuals.

"Inpatient Services" means Covered Services provided by a Participating Facility to a Covered Individual who is admitted and treated as a registered inpatient, is assigned a licensed bed within the Participating Facility, remains assigned to such bed and for whom a room and board charge is made.

"Maximum Payment" means the amount allowed for an inpatient admission or outpatient visit determined by the principal or primary procedure or type of service as determined by the Company for all services or resources dispensed for the Covered Individual's treatment and care, regardless of the Covered Individual's length of confinement or amount of services or supplies required.

"Medically Necessary" or "Medical Necessity" means a determination, through utilization management, audit or normal claims adjudication processes or under the terms of the applicable Health Benefit Plan, including and subject to the grievance and appeal processes available under such Health Benefit Plan, that Covered Services are: (a) appropriate and necessary for the symptoms, diagnosis or treatment of the medical condition, (b) provided for the diagnosis, care and treatment of the medical condition, (c) within standards of good medical practice within the medical community, (d) not primarily for the convenience of the Covered Individual, the attending physician or another health care provider, and (e) the type, supply or level of service or care which can safely be provided and that is not more than what is necessary or appropriate."

"Medicare Advantage" means a health care program administered by Company pursuant to a written agreement with CMS under which Company agrees to arrange for the provision of Covered Services to Medicare eligible members as more fully described in the Medicare Advantage Participation Attachment.

"Network" means a group of providers that support, through a direct or indirect contractual relationship, some or all of the product(s) and/or program(s) in which Covered Individuals are enrolled.

3

Network Agreement Ver. 8.1
© 2008 RightCHOICE Managed Care, Inc.
12/29/11

**CONFIDENTIAL**

Mercy SJ Exhibit 4
**Mercy 00594**

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

"Network/Participating Provider" means a provider designated by Plan to participate in one or more Networks.

"Observation" means the services furnished by a Network/Participating Provider on a Participating Facility's premises, , including use of a bed and periodic monitoring by nursing or other staff, which are Medically Necessary to evaluate an outpatient condition and determine the need for a possible admission to the Participating Facility as an inpatient. Total observation payable amount shall not exceed 24 hours.

"Other Payors" means persons or entities, utilizing the Networks/Plan Programs pursuant to an agreement with Company or an Affiliate, including without limitation, other Blue Cross and/or Blue Shield Plans that are not Affiliates, and employees or insurers providing Health Benefit Plans pursuant to insured, self-administered or self-insured programs."

"Other Reimbursement Rate" means the Company Rate as set forth in the PCS to be used when there is not a specifically negotiated rate for the particular service.

"Outpatient Services" means Covered Services other than Inpatient Services which are provided to a Covered Individual by a Provider.

"Participation Attachment" means the document(s) Company and Provider have mutually agreed to and attached to, and made a part of this Agreement which identifies the additional duties and/or obligations related to Network(s) and/or Plan Programs.

"Participating Facility" means a hospital or other health care facility duly licensed in the state where Health Services are rendered, and that is associated with Provider, either through an ownership or contractual relationship, and listed on the Provider Attachment.

"Participating Professional" means a physician or other professional, a partnership of such professionals, or a professional corporation, duly licensed to practice medicine in the state where he/she practices, and that is associated with Provider, either through employment or a contractual relationship, and listed on the Provider Attachment.

"Patient Day" means each approved calendar day of care that a Covered Individual receives in a Participating Facility, to the extent such day of care is a Covered Service under the terms of the Covered Individual's Health Benefit Plan, but excluding the day of discharge.

"Percentage Rate" means the Company Rate that is expressed as a percentage of Charges.

"Per Diem Rate" means the Company Rate that is expressed as the all inclusive fixed payment for each Patient Day of admission or one outpatient encounter.

"Per Hour Rate" means the Company Rate that is applicable when payment is derived based on an increment of time multiplied by the Company Rate in the applicable fee schedule.

"Per Procedure Rate" means the maximum allowed for all services rendered or resources dispensed in connection with a particular procedure performed on a given day unless services are carved out and paid in addition. For example, with respect to MRI procedures, "Per Procedure" means each CPT-4 or HCPCS code properly billed for the image or images taken, and covers all incidental supplies, pharmaceuticals, and ancillary charges which will not be reimbursed at a separate rate.

"Per Unit Rate" means the Company Rate that is applicable when payment is derived based on a unit of service multiplied by the Company Rate in the applicable fee schedule(s).

"Per Visit Rate" means the Company Rate that is expressed as the all inclusive fixed payment rate for the service type designated under Outpatient Services.

"Plan" means: Company; an Affiliate as designated by Company; and/or an Other Payor. For purposes of this Agreement, when the term "Plan" applies to an entity other than Company, "Plan" shall be construed to only mean such entity.

Network Agreement Ver. 8.1
© 2008 RightCHOICE Managed Care, Inc.
12/29/11

CONFIDENTIAL

Mercy SJ Exhibit 4
**Mercy 00595**

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

"Plan Compensation Schedule ("PCS")" means the document(s) attached to, or made a part of this Agreement which sets forth the Company Rate(s) and compensation related terms for the Network(s) in which Provider participate. "Plan Fee Schedule(s)" means the schedule of maximum amounts that Company will pay for Covered Services, less Cost Shares if applicable. The Plan Fee Schedule(s) applicable for the Network(s) in which Provider participates is further described in the PCS.

"Plan Program" means any program now or hereafter established, marketed, administered, sold, or sponsored by Plan, or Blue Cross Blue Shield Association ("BCBSA") (and includes the Health Benefit Plans that access, or are issued, or entered into in connection with such program). Plan Program shall include but is not limited to, a health maintenance organization(s), a preferred provider organization(s), a point of service product(s) or program(s), an exclusive provider organization(s), an indemnity product(s) or program(s), and a quality program(s). The term Plan Program shall not include any program excluded by Plan or BCBSA.

"Professional Charges" means the regular, uniform rate or price the Participating Professional determines and submits to Company as charges for Health Services provided to Covered Individuals. Such Professional Charges shall be no greater than the rate or price Provider submits to any person or other health care benefit payor for the same Health Services provided, regardless of whether Participating Professional agrees with such person or other payor to accept a different rate or price as payment in full for such services.

## ARTICLE II
## SERVICES/OBLIGATIONS

2.1 <u>Covered Individual Identification.</u>
Company shall ensure that Plan will issue Covered Individuals an identification card or other means of identification ("Identification Card"). Company will ensure that each Identification Card or other means of identification includes information necessary to contact Plan to determine Covered Individuals' participation, and the applicable Health Benefit Plan. Provider acknowledges and agrees that possession of such identification, in and of itself, does not qualify the holder thereof as Covered Individual, nor does the lack thereof mean that the person is not a Covered Individual. Company shall provide Provider with examples of identification cards, and other materials as reasonable to assist Provider in determining Covered Individual's eligibility. Company shall make best efforts to maintain and will require each Plan to make available electronic methods, such as via the internet or via an automated phone system, for timely verification of Covered Individual eligibility, summary of Health Benefit Plan coverage, Network identification and pre-certification requirements and Covered Services under Plan',

2.2 <u>Non-discrimination by Provider.</u> Provider shall provide Health Services to Covered Individuals in a manner similar to and within the same time availability in which Provider provides Health Services to any other individual. Provider will not differentiate, or discriminate against any Covered Individual as a result of his/her enrollment in a Plan, or because of race, color, creed, national origin, ancestry, religion, sex, marital status, age, disability, payment source, state of health, need for health services, status as a litigant, status as a Medicare or Medicaid beneficiary, sexual orientation, or any other basis prohibited by law. A Provider shall not be required to provide any type, or kind of Health Service to Covered Individuals that he/she/it does not customarily provide to others. Nothing set forth in this Section 2.4 shall be construed to prohibit Provider from lawfully refusing to provide Health Services to Covered Individuals provided the basis for such refusal is lawful and applied to other patients of Provider under comparable circumstances.

2.3 <u>Publication and Use of Provider Information.</u> For the term of this Agreement, Provider agrees that Company and Plans may use, publish, disclose, and display information, and disclaimers, as applicable, relating to Provider, including quality and/or cost information related to transparency initiatives. Company will make good faith efforts to share data with a Provider at least 30 days prior to initial disclosure or publication of any information related to a procedure or service for its transparency initiative(s) impacting such Provider, such as but not limited to, Anthem Care Comparison. Should Provider disagree with the accuracy of the data or information that Company intends to use, publish, display and disclose, Company agrees to work in good faith with Provider toward correcting any erroneous data or information.

2.4 <u>Use of Symbols and Marks.</u> Neither party to this Agreement shall publish, copy, reproduce, or use in any way the other party's symbols, service mark(s) or trademark(s) without the prior written consent of such other party. Notwithstanding the foregoing, the parties agree that each party may identify Provider as a

Network Agreement. Ver. 6.1
© 2008 RightCHOICE Managed Care, Inc.
12/29/11

CONFIDENTIAL

Mercy SJ Exhibit 4
Mercy 00596

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

participant in the Network(s) in which Provider participates.

2.5    Submission and Payment of Claims.  Unless otherwise instructed, or required by state, or federal law, each Provider shall submit Claims to Plan, using appropriate and current Coded Service Identifier(s), within ninety (90) days from: (i) the date the Health Services are rendered for outpatient services, or (ii) the date of discharge or transfer for an inpatient admission or Plan will refuse payment, or (iii) the date of payment by the primary payor if a Plan is not the primary payor. Provider shall not bill or seek payment from a Plan, a Covered Individual or any other person for Covered Services not billed within such ninety (90) day period, unless such Provider can establish, to the satisfaction of the Company, that extenuating circumstances existed which prevented timely submission (e.g., a Covered Individual fails to present correct and complete identification and coverage information at the time of service.)

2.5.1    Each Provider agrees to provide to Company, unless otherwise instructed, at no cost to Company, Plan or the Covered Individual one copy of all medical records and supporting information necessary for Plan to determine its payment liability.  Such information includes, without limitation, accurate and Complete Claims for Covered Services. For additional copies of medical records, Plan will pay the Provider at the rate set forth in Section 3.3. Once Company determines Plan has any payment liability, all Complete Claims will be paid in accordance with the terms and conditions of a Covered Individual's Health Benefit Plan and the PCS and this Agreement.

2.5.2    Provider agrees to submit Claims in a format consistent with the National Uniform Billing Data Element Specifications developed by the National Uniform Billing Committee on UB 04 form or its successor, or CMS Form 1500 or its successor, using Coded Service Identifiers.  Provider shall submit such Claims either (a) electronically, or (b) if electronic submission is not available, utilizing paper forms. If Plan is the secondary payor, the ninety (90) day period will not begin to run until Provider receives notification of primary payor's responsibility.

2.5.3    If Company or Plan asks for additional information so that Plan may process the Claim, the Provider must provide that information within sixty (60) days, or before the expiration of the ninety (90) day period referenced above, whichever is longer.

2.5.4    In no event shall a Provider bill, collect, or attempt to collect payment from the Covered Individual for Claims Plan receives after the applicable period(s) set forth above, regardless of whether Plan pays such Claims.

2.5.5    In all events, however, Provider shall only look for payment (except for applicable Cost Share or other obligations of Covered Individuals) from the Plan that provides the Health Benefit Plan for the Covered Individual for Covered Services rendered. Company shall use its best efforts to assure that Plan compensate Provider in accordance with the terms of this Agreement.

2.5.6.    Notwithstanding any contrary provision herein, Provider shall have the right to submit Claims to Plan on a "cycle bill" basis which include some, but not all Charges for a Covered Individual's inpatient stay at a Participating Facility.

2.6    Plan Payment Time Frames.  Company shall require Plans or their designees to use diligent efforts to adjudicate or arrange for adjudication, and where appropriate make payment for all Complete Claims for Covered Services submitted by Provider within forty-five (45) days, exclusive of Claims that have been suspended due to the need to determine Medical Necessity, or the extent of Plan's payment liability, if any, because of issues such as coordination of benefits or verification of coverage. Interest and penalties shall apply to Claims subject to and in accordance with state law.

2.7    Excess Accounts Receivable.  If at any time during the term of this Agreement Provider reasonably determines that the total reimbursement due from Plan for Claims pending in any category of Provider's accounts receivable increases by more than 10% for two (2) consecutive months, and such increase is not associated with any increase in Covered Individual utilization, Provider shall notify Company of the current accounts

6

CONFIDENTIAL

Mercy SJ Exhibit 4
**Mercy 00597**

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

receivable balance and request to meet with representatives of Company within thirty (30) days. Company and Provider shall work in good faith to identify a claims reconciliation process to be completed in ninety (90) days.

2.8     Payment in Full and Hold Harmless:

2.8.1     Except as expressly set forth herein, Provider agrees to accept as payment in full, in all circumstances, the applicable Company Rate whether such payment is in the form of a Cost Share, or a payment by Plan, or payment by another source If Plan is other than the primary payor, Provider is not precluded from accepting amounts in excess of the Company Rate from the primary payor. Provider shall bill, collect, and accept compensation for Cost Shares. Provider agrees to make reasonable efforts to verify Cost Shares prior to billing for such Cost Shares. In no event shall Plan be obligated to pay Provider or any person acting on behalf of Provider for services that are not Covered Services, or any amounts in excess of the Company Rate, less Cost Shares or payment by another source, as set forth above. Notwithstanding the foregoing, Provider agrees to accept the Company Rate as payment in full if the Covered Individual has not yet satisfied his/her deductible.

2.8.2     Provider agrees that in no event, including but not limited to, nonpayment by applicable Plan, insolvency of applicable Plan, or breach of this Agreement, shall a Provider, or any person acting on behalf of such Provider, bill, charge, collect a deposit from, seek compensation from, or have any other recourse against a Covered Individual, or a person acting on the Covered Individual's behalf, for Covered Services provided pursuant to this Agreement. This section does not prohibit Provider from collecting reimbursement for the following from the Covered Individual:

2.8.2.1.     Cost Shares, if applicable;

2.8.2.2.     Health Services that are not Covered Services. However, a Provider may seek payment for a Health Service that is not Medically Necessary or is experimental/investigational only if the Provider obtains a written waiver that meets the following criteria:
a) The waiver notifies the Covered Individual that the Health Service is likely to be deemed not Medically Necessary, or experimental/investigational;
b) The waiver notifies the Covered Individual of the Health Service being provided and the date(s) of service;
c) The waiver notifies the Covered Individual of the approximate cost of the Health Service; and
d) The waiver is signed by the Covered Individual prior to receipt of the Health Service;

2.8.2.3.     Any reduction in or denial of payment as a result of the Covered Individual's failure to comply with his/her utilization management program.

2.8.2.4.     Health Services which are not payable in the Covered Individual's Health Benefit Plan because the Provider does not participate in the applicable Plan Program. A Provider may seek payment from the Covered Individual for Health Services which are non-Covered Services because the services are not part of the applicable Plan Program, pursuant to subsection 2.7.1.

2.8.3     Except as provided in this section -2.7, this Agreement does not prohibit Provider from pursuing any available legal remedy, including, but not limited to, collecting from any insurance carrier providing coverage to a Covered Individual.

2.9     Adjustments for Incorrect Payments. Unless prohibited by law, Provider shall refund all duplicate or erroneous Claims payments regardless of the cause. In lieu of a refund, Plan may offset future Claim payments. The Company shall use diligent efforts to request, in writing, a refund from Provider prior to making any corrective adjustment for an overpayment. In the event Provider fails to pay such amount on or before the thirtieth (30th) day following the date on which the Company makes such request, the Company (or the applicable Plan) may recover the amount overpaid against current and future amounts due Provider. The Company will use diligent efforts to provide such notice and make such adjustment as soon as possible after obtaining knowledge of the incorrect or erroneous payment. Except as provided below, Provider and

7

Network Agreement Ver. 5.1
© 2008 RightCHOICE Managed Care, Inc.
12/29/11

CONFIDENTIAL

Mercy SJ Exhibit 4
**Mercy 00598**

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Company agree that any payment or payment determination made by or on behalf of a Plan that is a "health carrier" ("Health Carrier Plan") constitutes full and final satisfaction of any Claim for payment submitted by a Provider to or for that Health Carrier Plan. If a party fails to challenge, in writing, any payment or payment determination made by or on behalf of a Health Carrier Plan within twelve (12) months after such payment or payment determination is made, such payment and/or payment determination shall be deemed a full and final settlement of the Claim and shall constitute an accord and satisfaction between and among the Provider, Company and the Health Carrier Plan with respect to the Claim. Nothing in this section 2.8 prevents or precludes such a Plan (or anyone acting on its behalf) from pursuing recovery, recovering or making an adjustment for any overpayment (i) that a Plan is obligated by law to recover (through the imposition of a duty or otherwise), (ii) that a Plan is obligated by duty or contract to recover and for which the Plan is not prohibited by law from recovering, (iii) that is made due to any fraud or misrepresentation, or (iv) that is made with respect to a Covered Individual with a "Health Benefit Plan" that is not subject to Mo. Rev. Stat. §376.384.1(3) (or any successor thereto) for whatever reason (e.g., by inapplicability, exclusion, preemption). For purposes of this section 2.8, the terms "health carrier" and "Health Benefit Plan" have the meanings ascribed to such terms in Mo. Rev. Stat. §376.383 (or any successor thereto).

2.10 <u>Provider Subcontractors.</u>  Provider may fulfill some of its duties under this Agreement through subcontractors or delegates. Hereinafter, subcontractors and delegates are referred to as "subcontractors". Provider shall provide Company with thirty (30) days prior notice of any Health Services subcontractors with which Provider may contract to perform Provider's duties and obligations under this Agreement. Provider shall be solely responsible to pay subcontractor for any Health Services, and shall require such subcontractors to abide by the terms and conditions of this Agreement.

2.11 <u>Compliance with Provider Manual(s) and Policies, Programs and Procedures.</u>  Provider agrees to abide by and comply with, the provider manual(s) and other policies, programs and procedures established and implemented by Plan (collectively "Policies") to the extent that they are consistent with the terms and provisions of this Agreement, including but not limited to exhibits attached hereto. In the event the Policies conflict with the terms of this Agreement, including but not limited to the exhibits attached hereto, then the terms of this Agreement shall prevail. Company or its designee may modify the provider manual(s) and Policies by providing notice to Provider at least forty-five (45) days in advance of the effective date of material modifications thereto.

2.12 <u>In Network Referrals and Transfers.</u>  Each Provider shall, when medically appropriate, refer and transfer Covered Individuals to Network/Participating Providers. Unless such Provider has obtained a written acknowledgement (i.e. written waiver form) from the Covered Individual prior to the provision of the service, indicating that (1) the Covered Individual was advised that no coverage, or only out-of-network coverage would be available from Plan and (2) the covered Individual agreed to be financially responsible for additional costs related to such service. Additionally, each Provider represents that Provider does not give, provide, condone or receive any incentives or kickbacks, monetary or otherwise, in exchange for the referral of a Covered Individual, and if a Claim for payment is attributable to an instance in which Provider provided or received an incentive or kickback in exchange for the referral, such Claim shall not be payable and, if paid in error, shall be refunded to Company.

2.13 <u>Programs and Provider Panels.</u>  Provider acknowledges that Plan may have, develop, or contract to develop, various networks or programs that have a variety of provider panels, program components and other requirements, and that Plan may discontinue, or modify such networks or programs, upon 30 days notice to provider. In addition to those Networks designated on the signature page of the Agreement, Company may also identify Provider as a Network/Participating Provider in additional Networks as mutually agreed to by Company and Provider. The terms and conditions of Provider's participation as a Network/Participating Provider in such Networks shall be on the terms and conditions set forth in this Agreement unless otherwise agreed to, in writing, by Provider and Company.

2.13.1 Provider further acknowledges and understands that Company participates in the Federal Employees Health Benefit Program ("FEHBP") - the health insurance plan for federal employees. Provider further understands and acknowledges that the FEHBP is a federal government program and the requirements of the program are subject to change at the sole direction and discretion of the United States Office of Personnel Management. Provider agrees to abide by the rules, regulations and other requirements of the FEHBP as they exist and as they may be amended or changed from time to time. Provider further agrees that in the event of conflict between this

8

Network Agreement Ver. 8.1
© 2008 RightCHOICE Managed Care, Inc.
12/29/11

**CONFIDENTIAL**

Mercy SJ Exhibit 4
**Mercy 00599**

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Agreement and/or the provider manual, and the rules/regulations/other requirements of the FEHBP, the terms of the rules/regulations/other requirements of the FEHBP shall control.

2.14    Provider's Inability to Carry Out Duties.  A Provider shall promptly send written notice, in accordance with the Notice section of this Agreement, to Company of:

2.14.1    Any change in such Provider's business address;

2.14.2    Any final, nonappealable legal, governmental, or other action involving such Provider which could materially impair the ability of Provider to carry out his/her/its duties and obligations under this Agreement, except for temporary emergency diversion situations; or

2.14.3    Any change in accreditation, facility affiliation, licensure, certification or insurance coverage which could materially impair the ability of Provider to carry out its duties and obligations under this Agreement.

2.15    Facility Based Providers: Facility agrees to use best efforts to encourage its contracted Facility-based providers or those with exclusive privileges at Facility to obtain and maintain Network/Participating Provider status with Company. In addition, Facility agrees to assist in facilitating issues that may arise as a result of a member receiving services from a non-Network/Participating Professional who is a contracted Facility-based Provider. Facility-based providers may include, but are not limited to, anesthesiologists, radiologists, pathologists, hospitalists and emergency room physicians. 2.16 Provider Credentialing.  Where applicable, each Provider agrees that he/she/it meets Company's credentialing standards for Networks in which Provider participates.  A description of the credentialing program, including any applicable accreditation requirements, is set forth in the provider manual(s).

2.17    Provider Accreditation.    Each Provider agrees to meet any applicable accreditation requirements which Company may apply to participating facilities as set forth in the provider manual(s).

2.18    Appeals/Adjustment Requests.  If a Provider believes a Claim has been improperly adjudicated for a Covered Service, for which Provider timely submitted a Claim to Plan or its designee, such Provider must submit a request for an appeal or adjustment with Plan within one (1) year from the date of Plan's payment or explanation of payment unless otherwise set forth in the provider manual. The request must be submitted in accordance with Plan's payment appeal or adjustment process.  Requests for appeals or adjustments submitted after this date may be denied for payment, and Provider will not be permitted to bill Company, Plan, or the Covered Individual for those services for which payment was denied.

2.19    Blue Cross Blue Shield Out of Area Program.  Provider agrees to provide Covered Services to any person who is covered under another BCBSA out of area programs and to submit Claims for payment in accordance with current BCBSA Claims filing guidelines and in accordance with the terms of this Agreement and its contracted rates. Provider agrees to accept payment by Plan at the applicable Company Rate as payment in full, except Provider may bill, collect and accept compensation for Cost Shares. The provisions of this Agreement shall apply to charges for services under the out of area or reciprocal programs. For Covered Individuals who are enrolled under BCBSA out of area or reciprocal programs, Provider shall comply with the applicable Plan's utilization management policies.

2.20    Coordination of Benefits.  Except as otherwise required under state and federal law, Provider shall cooperate with Plan regarding coordination of benefits, and shall notify Plan promptly after receipt of information regarding any Covered Individual who may have a Claim involving coordination of benefits. Coordination of benefits is furthered described in the provider manual.

2.21    Preventable Adverse Events ("PAEs").  Notwithstanding any provision in this Agreement to the contrary, when any CMS-adopted Never Event or CMS-defined Hospital Acquired Condition (collectively referred to as a Preventable Adverse Event or "PAE), that was not present on admission, occurs with respect to forth in a Covered Individual, the Facility shall neither bill, nor seek to collect from, nor accept any payment from Plan or Covered Individual for the charges and/or days which are the result of the PAE.  The parties recognize that as of the Effective Date, Facility does not have the operational capacity to remove all Charges and/or days from Claims which are the result of PAEs prior to submission to Company.  Facility shall fully cooperate with Company in all audits and other initiatives designed to identify and/or eliminate reimbursement to Facility for Charges and/or days which are the result of PAEs.  Notwithstanding the foregoing, Facility shall not bill Company or a Covered Individual for Charges and/or days which are the

CONFIDENTIAL

Mercy SJ Exhibit 4

**Mercy 00600**

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

result of any of the following events: (i) surgery on the wrong body part, (ii) surgery on the wrong person, and (iii) incorrect surgical procedure.  If Facility does receive any payment from Plan or Covered Individual for such events, it shall refund such payment to the entity making the payment within ten (10) business days of becoming aware of such receipt.  Further, Facility shall cooperate with Company to the extent reasonable, in any Company initiative designed to help analyze or reduce such PAEs.

Participating Facility Claims must have the Present on Admission ("POA") indicator populated on all inpatient acute care Claims which are billed to Plan.

2.22    Supervision of Participating Professional Services.  Participating Professional agrees that all Health Services provided to Covered Individuals under this Agreement shall be provided by Participating Professional or by a qualified person under Participating Professional's direction.  Participating Professional agrees that any nurses or other health professionals employed by or providing services for Participating Professional shall be duly licensed or certified under applicable law.

2.23    Pass-Through Charges.  Participating Professional agrees not to pass through to Plan or the Covered Individual any charges which Participating Professional incurs as a result of providing supplies or making referrals to another provider or entity.  Examples include, but are not limited to, pass-through charges associated with laboratory services, pathology services, radiology services and durable medical equipment. Company's direct contract with the subcontractor shall prevail.

2.24    Quality Assurance Programs. When required by law applicable to Company, a Plan or a Health Benefit Plan, Provider shall provide, arrange for, or participate in the quality assurance programs mandated by Illinois law, unless the Illinois Department of Public Health certifies that such programs will be fully implemented without any participation or action from Provider.

2.25    Ethical and Religious Directives.  Company understands and acknowledges that Provider and any service or activity operated or sponsored by it is governed by the Ethical and Religious Directives for Catholic Health Care Services as approved by the National Conference of Catholic Bishops ("Directives"). Company further understands and agrees that throughout the term of this Agreement, the performance of Provider obligations hereunder will be governed by the Directives.  Notwithstanding anything to the contrary contained herein, Providers shall not be required, nor shall any provisions hereof be construed to require Provider to provide services or participate in activities that are inconsistent with the Directives or any other medical ethics or precepts of the Catholic Church.


# ARTICLE III
## CONFIDENTIALITY/RECORDS

3.1    Proprietary Information.   All information and material provided by either party in contemplation of or in connection with this Agreement remains proprietary to the disclosing party.   Neither party shall disclose any information proprietary to the other, or use such information or material except: (1) as otherwise set forth in this Agreement; (2) as may be required to perform obligations hereunder; (3) as required to deliver Health Services or administer a Health Benefit Plan; (4) to Plan or its designees, provided such designees agree to maintain confidentiality of such information; (5) upon the express written consent of the parties; or (6) as required by law or regulation, except that either party may disclose such information to its legal advisors, lenders and business advisors, provided that such legal advisors, lenders and business advisors agree to maintain confidentiality of such information.

3.2    Confidentiality of Personally Identifiable Information.   Both parties agree to abide by state and federal laws and regulations regarding confidentiality of the Covered Individual's personally identifiable information.

3.3    Plan Access to and Request for Provider Records.  Provider shall comply with all applicable state and federal record keeping requirements, and, as set forth in the provider manual(s), shall permit Plan or its designees to have, consistent with applicable law and upon seven (7) business days advance notice during  normal business hours,  on site access to and the right to examine, audit, copy, excerpt and transcribe any books, documents, papers, and records related to Covered Individual's medical and billing information within the possession of Provider and inspect Provider's operations, which involve transactions relating to Covered Individuals and as may be reasonably required by Plan in carrying out its responsibilities and programs including, but not limited to, assessing quality of care, Medical Necessity, appropriateness of care, accuracy of

Network Agreement  Ver. 6.1
© 2008 RightCHOICE Managed Care, Inc.
12/29/11

CONFIDENTIAL

Mercy SJ Exhibit 4
**Mercy 00601**

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

payment, and compliance with this Agreement. In lieu of on-site access, at Plan's request, Provider shall submit records once to Plan, the Covered Individual or their respective designees via photocopy or electronic transmittal, at no charge. Provider shall have the right to charge Company a reasonable fee for any additional copies of such information, consistent with applicable state and federal law. For all additional photocopies of records described herein, Plan shall reimburse Facility at a rate of $21.36 plus .50 cents per a page. Provider shall make such records available to the state and federal authorities involved in assessing quality of care or investigating Covered Individual grievances or complaints.

3.4   Transfer of Medical Records   Each Provider shall share a Covered Individual's medical records, maintained in accordance with any applicable laws, rules and regulations, and forward medical records and clinical information in a timely manner to other health care providers treating a Covered Individual, at no cost to Company, Plan, a Covered Individual, or other treating healthcare providers as necessary to facilitate such treatment and consistent with applicable federal and state law

3.5   Network Provider/Patient Discussions.   Notwithstanding any other provision in this Agreement and regardless of any benefit or coverage exclusions or limitations associated with a Health Benefit Plan, a Provider shall not be prohibited from discussing fully with a Covered Individual any issues related to the Covered Individual's health including recommended treatments, treatment alternatives, treatment risks and the consequences of any benefit coverage or payment decisions made by Plan or any other party.

## ARTICLE IV
## INSURANCE

4.1   Company Insurance.   Company shall maintain, at its sole expense, a self-insurance arrangement or insurance for professional liability and comprehensive general liability in amounts customarily maintained by similar organizations in the industry.   Company shall provide Provider with evidence of coverage upon Provider's request.

4.2   Provider Insurance.   Provider shall self-insure or maintain at its sole expense, a self-insurance arrangement or insurance for professional liability and comprehensive general liability, in amounts reasonably acceptable to the Company. Company acknowledges that Provider may opt to self-insure under the arrangement maintained by Mercy Health (f/k/a Sisters of Mercy Health System) or another appropriate self-insurance program.   Evidence of such insurance or self-insurance shall be provided to Company upon the effective date of this Agreement and thereafter upon request.   Provider shall use diligent efforts to advise the Company at least thirty (30) days prior to the termination of such insurance or reduction in the amount of such insurance, or any material changes in the self-insurance arrangement.

## ARTICLE V
## RELATIONSHIP OF THE PARTIES

5.1   Relationship of the Parties.   For purposes of this Agreement, Company and Provider are and will act at all times as independent contractors.   Nothing in this Agreement shall be construed, or be deemed to create, a relationship of employer or employee or principal and agent, or any relationship other than that of independent entities contracting with each other for the purposes of effectuating this Agreement.   In no way shall Company or Plan be construed to be providers of Health Services or responsible for the provision of such Health Services. Provider shall be solely responsible to Covered Individuals for treatment and medical care with respect to the provision of Health Services.

5.2   Blue Cross Blue Shield Association (BCBSA).   Provider, hereby expressly acknowledges its understanding that this Agreement constitutes a contract between Provider and Company, that Company is an independent corporation operating under a license from the Blue Cross and Blue Shield Association, an association of independent Blue Cross and/or Blue Shield Plans ("Association"), permitting Company to use the Blue Cross and/or Blue Shield Service Marks in the state (or portion of the state) where Company is located, and that Company is not contracting as the agent of the Association. Provider further acknowledges and agrees that it has not entered into this Agreement based upon representations by any person other than Company, and that no person, entity or organization other than Company shall be held accountable or liable to Provider for any of Company's obligations to Provider created under this Agreement.   Provider have no license to use the Blue Cross and/or Blue Shield names, symbols, or derivative marks (the "Brands") and nothing in the Agreement shall be deemed to grant a license to Provider to use the Brands.   Any references to the Brands made by Provider in their own materials are subject to review and approval by Company.   This section shall not create

11

Network Agreement Ver. 6.1
© 2008 RightCHOICE Managed Care, Inc.
12/29/11

CONFIDENTIAL

Mercy SJ Exhibit 4
**Mercy 00602**

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

any additional obligations whatsoever on the part of Plan other than those obligations created under other provisions of this Agreement.

## ARTICLE VI
## INDEMNIFICATION AND LIMITATION OF LIABILITY

6.1   Indemnification.

6.1.1   Indemnification by Provider. Provider shall defend, indemnify and hold harmless Company, its subsidiaries , parent and affiliates, and all of their respective directors, officers, employees, and representatives from and against all claims, liabilities, losses, damages, costs, reasonable attorneys' fees and expenses arising from or relating to, directly or indirectly, (a) any negligent or wrongful act or omission of Provider or its agents or employees in connection with this Agreement, (b) any breach or default of this Agreement by Provider or its agents or employees (c)any violation of any law, statute, ordinance, order, rule or regulation.

6.1.2   Indemnification by Company. Company shall defend, indemnify and hold harmless Provider, its subsidiaries , parent and affiliates, and all of their respective directors, officers, employees, and representatives from and against all claims, liabilities, losses, damages, costs, reasonable attorneys' fees and expenses arising from or relating to, directly or indirectly, (a) any negligent or wrongful act or omission of Company or its agents or employees in connection with this Agreement, (b) any breach or default of this Agreement by Company or its agents or employees (c)any violation of any law, statute, ordinance, order, rule or regulation.

6.1.3   Indemnification Procedures. The obligation to provide indemnification under this Agreement shall be contingent upon the party seeking indemnification (a) providing the indemnifying party with prompt written notice of any claim for which indemnification is sought, (b) allowing the indemnifying party to control the defense and settlement of such claim, provided however that the indemnifying party agrees not to enter into any settlement or compromise of any claim or action in a manner that admits fault or imposes any restrictions or obligations on an indemnified party without that indemnified party's prior written consent which will not be unreasonably withheld, and (c) cooperating fully with the indemnifying party in connection with such defense and settlement.

6.2   This provision intentionally left blank.

6.3   The provision intentionally left blank.

## ARTICLE VII
## DISPUTE RESOLUTION

7.1   Dispute Resolution. All disputes between Company and Provider arising out of or related in any manner to this Agreement shall be resolved using the dispute resolution procedures set forth below. Provider shall exhaust all applicable Company internal provider appeal/provider dispute resolution procedures prior to invoking the dispute resolution procedures. The exhaustion of any such internal provider appeal/dispute procedures shall be a condition precedent to Provider's right to pursue the dispute resolution procedures.

7.1.1   In order to invoke the dispute resolution procedures in this Agreement, a party first shall send to the other party a written demand letter that contains a detailed description of the dispute and all relevant underlying facts, a detailed description of the amount(s) in dispute and how they have been calculated. If the total amount in dispute as set forth in the demand letter is less than two million dollars ($2,000,000), exclusive of interest, costs, and attorneys' fees, within twenty (20) calendar days following the date on which the receiving party receives the demand letter, representatives of each parties' choosing shall meet to discuss the dispute in person or telephonically in an effort to resolve the dispute. If the total amount in dispute as set forth in the demand letter is two million dollars ($2,000,000) or more, exclusive of interest, costs, and attorneys' fees, within ninety (90) calendar dates following the date of the demand letter, the parties shall engage in non-binding mediation in an effort to resolve the dispute unless both parties agree

12

Network Agreement Ver. 8.1
© 2008 RightCHOICE Managed Care, Inc.
12/29/11

**CONFIDENTIAL**

Mercy SJ Exhibit 4
**Mercy 00603**

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

in writing to waive the mediation requirement. The parties shall mutually agree upon a mediator, and failing to do so, Judicial Arbitration and Mediation Services (JAMS) shall be authorized to appoint a mediator.

7.2.1    This provision intentionally left blank.

7.2.2    This provision intentionally left blank.

7.2.3    This provision intentionally left blank.

7.2.4    This provision intentionally left blank.

## ARTICLE VIII
## TERM AND TERMINATION

8.1    Initial Term of Agreement.  The initial term of this Agreement shall commence at 12:01 AM on the Effective Date and shall continue in effect for a term of one (1) year ("Initial Term"), automatically renewing for consecutive one (1) year terms unless either party gives the other party written notice of non-renewal of this Agreement not less than ninety (90) days prior to the renewal date, or either party terminates this Agreement as provided herein.

8.2    Termination Upon Notice.  At any time, either party may terminate this Agreement without cause with such termination to be effective on or after the expiration of the Initial Term, by giving at least one hundred twenty (120) days prior written notice of termination to the other party. A non-renewal shall not constitute a termination for purposes of this provision.

Any Participating Professional's participation as a Network/Participating Provider in a Network may be terminated by Company, Provider or Participating Professional Provider by giving the others written notice of such termination at least ninety (90) days prior to the effective date of such termination.

8.3    This provision intentionally left blank.

8.4    Breach of Agreement.  Except for circumstances giving rise to the Termination With Cause section, if either party fails to comply with or perform when due any material term or condition of this Agreement, the other party shall notify the breaching party of its breach in writing stating the specific nature of the material breach, and the breaching party shall have thirty (30) days to cure the breach.  If the breach is not cured to the reasonable satisfaction of the non-breaching party within said thirty (30) day period, the non-breaching party may terminate this Agreement by providing written notice of such termination to the other party.  The effective date of such termination shall be no sooner than sixty (60) days after such notice of termination.

8.5    Termination With Cause.

8.5.1    Company may, at its option, terminate this Agreement immediately or suspend a Provider's participation pending investigation, if:

8.5.1.1    Provider commits any act or conduct for which his/her/its license(s), permit(s), or any governmental or board authorization(s) or approval(s) necessary for business operations or to provide Health Services are lost or voluntarily surrendered in whole or in part; or

8.5.1.2    Provider commits a fraud or makes any material misstatements or omissions on any documents related to this Agreement which it submits to Company or to a third party; or

8.5.1.3    Provider files for bankruptcy, either party makes an assignment for the benefit of its creditors without the other party's written consent or if a receiver is appointed; or

8.5.1.4    Provider's insurance coverage as required by this Agreement lapses for any reason and such coverage is not reinstated within five (5) business days of receipt of such lapse; or

8.5.1.5    Provider fails to maintain Company's credentialing standards; or

8.5.1.6    Company reasonably believes based on Provider's conduct or inaction, or allegations of

13

Network Agreement Ver: 8.1
© 2008 RightCHOICE Managed Care, Inc.
12/29/11

CONFIDENTIAL

Mercy SJ Exhibit 4
**Mercy 00604**

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

such conduct or inaction that the well-being of patients may be jeopardized; or

8.5.2    Provider may, at its option, terminate this Agreement if:

8.5.2.1    Company commits any act or conduct for which its license(s), permit(s), or any governmental or board authorization(s) or approval(s) necessary for business operations are lost or voluntarily surrendered in whole or in part; or

8.5.2.2    Company commits a fraud or makes any material misstatements or omissions on any documents related to this Agreement which it submits to Provider or to a third party; or

8.5.2.3    Company files for bankruptcy, or if receiver is appointed; or

8.5.2.4    Company's insurance coverage as required by this Agreement lapses for any reason and such coverage is not reinstated within five (5) business days of receipt of such lapse.

8.5.3    In the event that a Provider is suspended as provided above, such Provider shall, as directed by Company during such suspension, either discontinue treating Covered Individuals, if medically appropriate, or discontinue providing a particular Health Service to Covered Individuals. Upon any suspension, the Provider shall promptly notify Covered Individuals that its status as a Network/Participating Provider has been suspended. Such suspension will continue pending Company's full investigation.

8.6    <u>Transactions Prior to Termination</u>. Termination shall have no effect on the rights and obligations of the parties arising out of any transaction occurring prior to the date of such termination.

8.7    <u>Continuance of Care-Termination</u>. Unless otherwise set forth in the Health Benefit Plan, or required by statute or regulation, Continuance of Care-Termination shall apply as follows:

8.7.1    <u>Participating Facilities</u>.    Participating Facility shall, upon termination of this Agreement provide and be compensated for inpatient Covered Services rendered to Covered Individuals receiving treatment at the time of termination, under the terms and conditions of this Agreement until the earlier of: (1) ninety (90) days after the effective date of such termination or (2) such time that the Covered Individual has completed the course of treatment and with respect to inpatient Covered Individuals, was discharged from Participating Facility. For purposes of this section, "discharge" shall mean the Covered Individual's physical release from Participating Facility. Covered Services that are part of the global charge for the Health Services which caused an admission for such Health Services shall continue to be rendered and subject to the global charge in accordance with the Agreement, even though the Covered Individual has been discharged from Participating Facility.

8.7.2    <u>Participating Professionals</u>.    Participating Professional shall, upon termination of this Agreement for reasons other than the grounds set forth in the "Termination With Cause" provision of this Agreement, continue to provide and be compensated for Covered Services rendered to Covered Individuals under the terms and conditions of this Agreement until the earlier of: (1) ninety (90) days after the effective date of such termination; (2) such time that the Covered Individual has completed the course of treatment; or (3) reasonable and medically appropriate arrangements have been made for a Network/Participating Provider to render Health Services to the Covered Individual.

8.7.3    In addition, Provider (Participating Facilities and Participating Professionals) agree to accept payment under the terms of this Agreement including but not limited to the hold harmless obligations set forth in section 2.7, for those Covered Individuals receiving treatment at the time of termination until the earlier of ninety (90) days after the effective date of such termination or until such treatment ends. Notwithstanding the foregoing, for Covered Individuals who: (i) have entered the second or third trimester of pregnancy at the time of such termination, or (ii) are defined as terminally ill under § 1861 (dd) (3) (A) of the Social Security Act at the time of such termination, this continuance of care section and all other provisions of this Agreement shall remain in effect for such pregnant Covered Individuals through the provision of postpartum care directly related to their delivery, and for such terminally ill Covered Individuals for the remainder of their life for care directly related to the treatment of the terminal illness.

Network Agreement Ver. 8.1
© 2006 RightCHOICE Managed Care, Inc.
12/29/11

CONFIDENTIAL

Mercy SJ Exhibit 4
**Mercy 00605**

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

8.8    <u>Patient List Upon Termination</u>.  When required by law applicable to Company, a Plan or a Health Benefit Plan, a Provider shall provide Company with a list of his, her or its patients and customers who are Covered Individuals and a list of Covered Individuals, including but not limited to Covered Individuals, who are seen on a regular basis within fifteen (15) business days of the date that such Provider either gives or receives notice of termination.  When required by law or deemed appropriate by the Plan, the Plan will give, within the time period required by law, if any, notice of such termination or nonrenewal to Covered Individuals seen on a regular basis by a Provider.

8.9    <u>Continuation of Care Upon Insolvency or Cessation of Operations</u>.  When required by law applicable to Company, a Plan or a Health Benefit Plan, Provider agree that in the event of Company's or a Plan's insolvency, each Provider shall continue to provide Covered Services to Covered Individuals in accordance with this Agreement, until the later of: (i) the expiration of the period through which the premium or membership due has been paid for coverage under the applicable Health Benefit Plan, (ii) the date on which the Covered Individual is discharged from an inpatient facility, or (iii) the expiration of such other period as may be required by laws and regulations applicable to Company, a Plan, the Health Benefit Plan or the Covered Individual, whichever is greater.  This provision will be construed in favor of a Covered Individual and supersedes any oral or written contrary agreement between a Provider and a Covered Individual or the representative of a Covered Individual if the contrary agreement is inconsistent with this provision and the provisions of this Agreement regarding the continuation of care after termination of this Agreement. This provision shall survive termination of this Agreement.

8.10    <u>Termination Procedures</u>.    When expressly required by applicable law:  (a) Company will include an explanation for the reasons for the proposed termination of a Participating Professional in any notice of termination given by Company, and (b) if timely requested by a Participating Professional, Company will provide such Participating Professional with an opportunity for review or hearing as required by law, not less than thirty (30) days from the date of notification and in accordance with Company's applicable procedures.

8.11    <u>Survival</u>.  In the event of termination of the Agreement, the following provisions shall survive:

8.11.1    Payment in Full and Hold Harmless (Section 2.7);

8.11.2    Adjustments for Incorrect Payments (Section 2.8);

8.11.3    Confidentiality/Records (Article III);

8.11.4    Indemnification (Article VI);

8.11.5    Dispute Resolution (Article VII);

8.11.6    Continuance of Care-Termination (Section 8.7); and

8.11.7    Continuation of Care Upon Insolvency or Cessation of Operations (Section 8.9).

## ARTICLE IX
## GENERAL PROVISIONS

9.1    <u>Amendment</u>.  Except as otherwise expressly provided in this Agreement, this Agreement or any article, section, Exhibit or schedule hereto may be amended at any time during the term of this Agreement only by mutual written agreement of duly authorized representatives of the parties. Company further may amend this Agreement or any article, section, Exhibit or schedule hereto by giving written notice of such amendment to Provider only to the extent such amendment is necessary in order to comply with state or federal laws or regulations, any change in such laws or regulations or any change in the interpretation of such laws or regulations.  Notice of such amendment shall be provided by Company to Provider at least thirty (30) days prior to the effective date of such amendment, unless a shorter notice is required for Company to comply with applicable law.  In the event Provider believes the required amendment may be implemented in a different manner which will still achieve compliance but will be less costly and intrusive with Facility's operations, Provider may notify Company, in writing, of such alternative implementation within the thirty (30) day period following receipt of Company's notice of such amendment.  For a thirty (30) day period following notice provided by Provider pursuant to this section, the parties shall negotiate in good faith to reach a mutually acceptable resolution to the amendment implemented by Company.  If the parties are unable to reach a mutually acceptable resolution, the issue shall be subject to the dispute resolution provisions set forth in Article VII.

Network Agreement Ver. 8.1
© 2008 RightCHOICE Managed Care, Inc.
12/29/11

**CONFIDENTIAL**

Mercy SJ Exhibit 4

**Mercy 00606**

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

9.1.1 Notwithstanding the foregoing, Company may amend its standard market fee schedules for participating professionals upon 90 days notice.

9.2 Assignment. This Agreement shall be binding upon and inure to the benefit of the respective legal successors and assignees of the parties. However, neither this Agreement, nor any rights or obligations hereunder may be assigned, either by operation of law or otherwise, transferred in whole or in part, without the prior written consent of the other party. Notwithstanding the foregoing and subject to the obligations set forth in section 9.3 herein, either party shall have the right to assign this Agreement upon written notice to the other party to any entity that controls, is controlled by or is under common control with the assigning party, so long as such assignee agrees to be bound by the terms and conditions set forth herein. For purposes of this Section 9.2, "control" means an entity which (a) acquires all or substantially all of the assets of the controlled entity, or (2) has the power (through ownership of securities, membership rights, reserved powers or otherwise) to appoint and remove more than 50% of the voting members of the Board of Directors (or comparable governing body) of the controlled entity.

9.3 Scope/Change in Status. Company and Network agree that this Agreement applies to Hospital Services rendered at the locations set forth in Exhibit A. Company and Network further agree to meet and discuss the possible changes to the Agreement should one of the following events occur: (1) Network or Network Hospital sells all or substantially all of its assets; (2) Network or Network Hospital transfers control of its management or operations to any third party; or (3) Network or Network Hospital acquires or controls any other medical hospital, facility or is in any manner otherwise acquired or controlled by any other party, whether by purchase, merger, consolidation, alliance, joint venture, partnership, association, material expansion. Network shall provide Company thirty (30) days prior written notice of change in operations, business or corporate form as described herein that may impact the services covered under the current Agreement.

Regarding the addition of new physician groups as they become part of the Mercy and Affiliates' physician network, Company agrees to make determinations on a case by case basis as to whether such new physician groups will be reimbursed pursuant to the Company Rates set forth herein. Company shall make such determinations within one-hundred twenty (120) days from both the date of receipt of written notice from Mercy and Affiliates of the addition of the new physician group.

9.4 Definitions. Unless otherwise specifically noted, the definitions set forth in this Agreement will have the same meaning when used in any attachment, the provider manual(s) and Policies.

9.5 Entire Agreement. This Agreement (including items incorporated herein by reference) constitutes the entire understanding between the parties and supersedes all prior oral or written agreements between them with respect to the matters provided for herein. If there are any inconsistencies between this Agreement and the provider manual, this Agreement will take precedence.

9.6 Force Majeure. Neither party shall be liable nor deemed to be in violation of this Agreement if such party is delayed or prevented from performing any of its obligations hereunder for any reason beyond its reasonable control, including without limitation, acts of God, civil or military authority, acts of any public enemy, floods, fires or strikes, statutory or other laws, regulations, rules, or orders of the federal, state, or local government or any agency thereof.

9.7 Compliance with Federal and State Laws. Company and Provider agree to comply with all requirements of the law relating to their obligations under this Agreement, and maintain in effect all permits, licenses and governmental and board authorizations and approvals as necessary for business operations. Provider and Company agrees that its agents and employees, to the extent applicable, shall be and remain licensed and certified (including Medicare certification in unqualified, unrestricted status) in accordance with all state and federal laws and regulations (including those applicable to utilization review and Claims payment) relating to the provision of Provider's services to Covered Individuals and the payment for such services, or Company's performance hereunder, as applicable. Provider and Company shall supply evidence of such licensure, compliance and certifications to the other party upon request. Each party further agrees to immediately notify the other party if he/she/it loses or voluntarily surrenders such licensure, accreditation, permits, authorizations or approvals, or, as to Provider and when applicable, no longer meets Company's

16

Network Agreement Ver. 8.1
© 2008 RightCHOICE Managed Care, Inc.
12/29/11

**CONFIDENTIAL**

Mercy SJ Exhibit 4
**Mercy 00607**

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

credentialing standards. From time to time legislative bodies, boards, departments or agencies may enact, issue or amend laws, rules, or regulations pertinent to this Agreement. Both parties agree to immediately abide by all said laws, rules, or regulations to the extent applicable, and to cooperate with the other to carry out any responsibilities placed upon the other by said laws, rules, or regulations, subject to other's right to terminate as set forth under this Agreement. In the event of a conflict between this section and any other provision in this Agreement, this section shall control.

9.7.1    In addition to the foregoing, Provider represents that at the time of entering into this Agreement, to the best of its knowledge, neither he/she/it nor any of his/her/its employees, contractors, subcontractors or agents are ineligible persons identified on the General Services Administrations' List of Parties Excluded from Federal Programs (available through the internet at http://www.epls.gov/ or its successor) and the HHS/OIG List of Excluded Individuals/Entities (available through the internet at http://www.oig.hhs.gov/fraud/exlusions.asp or its successor), or as otherwise designated by the Federal government. If a Provider or any employees, subcontractors or agents thereof becomes an ineligible person after entering into this Agreement or otherwise fails to disclose his/her/its ineligible person status, such Provider shall have an obligation to (1) upon becoming aware of such fact, promptly notify Company of such ineligible person status and (2) within ten (10) days of such notice, remove such individual from responsibility for, or involvement with, the Provider's business operations related to this Agreement.

9.7.2    In addition to the foregoing, Company warrants and represents that at the time of entering into this Agreement, neither Company, including Company's employees, contractors, subcontractors or agents are ineligible persons identified on the General Services Administrations' List of Parties Excluded from Federal Programs (available through the internet at http://www.epls.gov/ or its successor) and the HHS/OIG List of Excluded Individuals/Entities (available through the internet at http://www.oig.hhs.gov/fraud/exlusions.asp or its successor), or as otherwise designated by the Federal government. If Company, or any Company employees, subcontractors or agents thereof becomes an ineligible person after entering into this Agreement or otherwise fails to disclose its ineligible person status, Company shall have an obligation to: (i) immediately notify provider of such ineligible status and (ii) within ten (10) days of such notice, remove such individual from responsibility for, or involvement with, the Company's or an Affiliate's business operations related to this Agreement.

9.8    Governing Law and Venue.  This Agreement shall be governed by and construed in accordance with the laws of the State of Missouri, unless federal law otherwise preempts such state laws. Any legal action, or proceeding with respect to this Agreement, shall be held in St. Louis County, Missouri. However, coverage issues specific to a Health Benefit Plan or to the delivery of Health Services are governed by the state laws where the Health Benefit Plan is issued, unless federal law otherwise preempts such state laws.

9.9    Intent of the Parties.  It is the intent of the parties that this Agreement is to be effective only in regards to their rights and obligations with respect to each other; it is expressly not the intent of the parties to create any independent rights in any third party or to make any third party a third party beneficiary of this Agreement, except to the extent Company utilizes a designee, which in such event shall give rights only within the scope of such designation, and to the extent specified in the Payment in Full and Hold Harmless section of this Agreement.

9.10    Non-Exclusive Participation.  None of the provisions of this Agreement shall prevent Provider or Plan from participating in or contracting with any provider, preferred provider organization, health maintenance organization/health insuring corporation, or any other health delivery or insurance program.  Provider acknowledges that Plan does not warrant or guarantee that Provider will be utilized by any particular number of Covered Individuals.

9.11    Notice.  Any notice required to be given pursuant to the terms and provisions of this Agreement shall be in writing and shall be delivered by electronic mail, by facsimile, by hand, or sent postage prepaid by regular mail to the parties at the addresses set forth on the signature page, except that notice of material breach of contract or termination shall be in writing and either hand-delivered or sent postage prepaid by certified mail, return receipt requested, to the parties at the addresses set forth on the signature page. Such address may be changed from time to time by written notice to the other party. Notice shall be effective upon the marked date associated with the corresponding delivery method noted above. Notwithstanding the foregoing,

17

Network Agreement Ver. 8.1
© 2008 RightCHOICE Managed Care, Inc.
12/29/11

CONFIDENTIAL

Mercy SJ Exhibit 4
**Mercy 00608**

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Company may post updates to its provider manual(s) and Policies on its web site by providing notice in accordance with Section 2.10.

9.12    Severability.    In case any one or more of the provisions of this Agreement shall be rendered invalid, illegal, or unenforceable in any respect by any law or regulation or declared as such by any court of competent jurisdiction, the remaining provisions shall be construed liberally in order to effectuate the purposes hereof, and the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.  If one or more provisions of the Agreement are invalid, illegal or unenforceable and an amendment to the Agreement is necessary to maintain its integrity, the parties shall make commercially reasonable efforts to negotiate an amendment to this Agreement and any attachments or addenda to this Agreement which could reasonably be construed not to contravene such statute, regulation, or interpretation.  In addition, if such invalid, unenforceable or materially affected provision(s) may be severed from this Agreement and/or attachments or addenda to this Agreement without materially affecting the parties' intent when this Agreement was executed, then such provision(s) shall be severed rather than terminating the Agreement or any attachments or addenda to this Agreement.

9.13    Waiver.  Neither the waiver by either of the parties of a breach of any of the provisions of this Agreement, nor the failure of either of the parties, on one or more occasion, to enforce any of the provisions of this Agreement, shall thereafter be construed as a waiver of any subsequent breach of any of the provisions of this Agreement.

9.14    Review.  Provider hereby acknowledges that Provider was allowed at least thirty (30) days to review this Agreement prior to Provider's execution hereof.

Network Agreement  Ver. 6.1
© 2008 RightCHOICE Managed Care, Inc.
12/29/11

**CONFIDENTIAL**

Mercy SJ Exhibit 4
**Mercy 00609**

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Each party warrants that it has full power and authority to enter into this Agreement and the person signing this Agreement on behalf of either party warrants that he/she has been duly authorized and empowered to enter into this Agreement.

**THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION
WHICH MAY BE ENFORCED BY THE PARTIES**

THE EFFECTIVE DATE OF THIS AGREEMENT IS: _DECEMBER 15, 2011_

LEGAL NAME   Mercy and Affiliates, LLC, on behalf of Mercy Hospitals East Communities d/b/a Mercy Hospital St. Louis, and d/b/a Mercy Hospital Washington,  Mercy Health Services, LLC and Saint Anthony's Health Center, Alton, Illinois :

By: _____    Date: _12/29/11_
    Signature, Authorized Representative

Printed: _LUCILLE MCLAIN_    _REGIONAL VP, PAYOR RELATIONS &_
    Name    Title    _CONTRACTING_

Address: _645 MARYVILLE CENTRE DR._    _ST. LOUIS_  _MO_  _63141_
    Street    City    State    Zip

Tax Identification Number (TIN): _43-0653493_

**(Note: if any of following is not applicable, please leave blank)**

Facsimile Number:_____

Email Address:_____

Web Site:_____


**RightCHOICE Managed Care, Inc.**

By: _____    Date: _12-30-11_
    Signature, Authorized Representative of Company

Printed: _Ruth Meyer Hollenback_    _Vice President, Health Services_
    Name    Title

Address: _1831 Chestnut Street_    _St. Louis_  _MO_  _63103_
    Street    City    State    Zip

**(Note: if any of following is not applicable, please leave blank)**

Facsimile Number:_ (314) 923-4919_

Email Address: _providercontractadmin@bcbsmo.com_

Web Site:_____www.anthem.com_____

**As of the Effective Date of this Agreement, Provider will be designated as Network/Participating Provider in the following Networks and any substantially equivalent successor Networks:**

_X___ Blue Access
_X___ Blue Access Choice
_X___ Blue Preferred
_X___ Traditional

1

Network Agreement  Ver. 8.1
© 2008 RightCHOICE Managed Care, Inc.
12/29/11

**CONFIDENTIAL**

Mercy SJ Exhibit 4
**Mercy 00610**

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

\_X\_\_ MA PPO
\_X\_\_ MA HMO

2

Network Agreement  Ver. 8.1
© 2008 RightCHOICE Managed Care, Inc.
12/29/11

Mercy SJ Exhibit 4
**Mercy 00611**

**CONFIDENTIAL**

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

## PROVIDER ATTACHMENT

| Name | Street Address | Tax Identification Number | City | State | Zip |
|------|----------------|---------------------------|------|-------|-----|

SEE ATTACHED FACILITY LISTING

Network Agreement  Ver. 8.1
© 2008 RightCHOICE Managed Care, Inc.
12/29/11

3

**CONFIDENTIAL**

Mercy SJ Exhibit 4
**Mercy 00612**

## AFFIDAVIT OF KRISTINA JOLLEY

I, Kristina Jolley, of Medical Reimbursements of America, Inc., after first being duly sworn, state as follows:

1. Medical Reimbursements of America, Inc. (MRA), is a company that assists Mercy Hospitals East Communities (Mercy) in collecting payment for treatment that Mercy provides to patients such as Kim Dames who are involved in a motor vehicle accident.

2. In November 2015, MRA learned that Dames had coverage under an automobile insurance policy (the Acuity Policy) issued by Acuity A Mutual Insurance Company (Acuity).

3. In November 2015 and again in January 2016, MRA submitted a claim to Acuity on behalf of Mercy seeking payment for Dames' treatment under any available medical payments coverage in the Acuity Policy. See Exhibits A and B attached hereto.

4. Mercy's claim to Acuity disclosed that Dames had commercial health insurance.

5. Acuity did not ask MRA or Mercy any questions about Mercy's claim or Dames' commercial health insurance.

6. Acuity did not object to Mercy's claim for Dames' treatment.

7. In January 2016, Acuity determined that it owed $5,000 to Mercy and paid $5,000 to Mercy for Mercy's treatment of Dames.

_Kristina Jolley_
Kristina Jolley

STATE OF TENNESSEE
COUNTY OF WILLIAMSON

SWORN TO AND SUBSCRIBED before me on the 27th day of May, 2021.

_W. Garst_
Notary Public

Mercy SJ Exhibit 5

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Acuity Insurance Claim #: PB8878  / DOI: 10/25/2015



**BUSINESS OFFICE EXTENSION**
**6840 CAROTHERS PKWY, STE 150**
**FRANKLIN, TN 37067**

November 12, 2015

Acuity Insurance
c/o Katherine Theriot
PO Box 58
Sheboygan, WI  53082

### NOTICE OF ASSIGNMENT OF MEDICAL PAYMENTS COVERAGE

RE:     Provider:   Mercy Hospital Washington      D/Service   10/25/2015-10/25/2015
        Patient:    KIMBERLY A DAMES              Balance:    $12382.50
        Account(s) #:   22152980131
        Claim #:    PB8878

Please be advised Medical Reimbursements of America has been contracted by Mercy Hospital Washington to coordinate insurance benefits for accident-related patient care. Enclosed please find an itemized bill in the amount of $12382.50 which we wish to have paid out of any medical payments / PIP benefits available to the patient. In accordance with policy at Mercy Hospital Washington, the above-referenced patient assigned at admission and/or discharge payments for medical expenses to the extent of any outstanding charges that relate to the accident.

In keeping with the assignment of benefits executed by the patient, we trust that the check satisfying this account will be made payable to Mercy Hospital Washington.

Sincerely,

Amanda L. Muehlman
Phone: 615-468-7432
Fax: (615)963-3849

**EXHIBIT A**

LIN: 0007.1.EN                          Page 1                          REF:4233039 - 11122015

Mercy SJ Exhibit 5

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Acuity Insurance Claim #: PB8878 / DOI: 10/25/2015

Claim Number: 110215279357142

| 1 MERCY HOSPITAL WASHINGTON 901 E 5TH ST WASHINGTON MO 63090 8554207900 | 2 PO BOX 776084 CHICAGO IL 60677 | 3a PAT CNTL# 2215298013100 b MED REC.# E130112175 | 4 TYPE OF BILL 131 |
|---|---|---|---|
| | | 5. FED. TAX NO. 431066883 | 6 STATEMENT COVERS PERIOD FROM 102515 THROUGH 102515 | 7 |

| 8 PATIENT NAME a ▮▮▮▮▮▮ b DAMES KIMBERLY A | 9 PATIENT ADDRESS a 712 BROOKSIDE DRIVE b MARTHASVILLE c MO d 63357 e |
|---|---|

| 10 BIRTHDATE ▮▮▮▮▮ | 11 SEX F | 12 DATE | ADMISSION 13 HR 14 TYPE 1 15 SRC 1 | 16 DHR | 17 STAT 01 | CONDITION CODES 18 19 20 21 22 23 24 25 26 27 28 | 29 ACDT STATE | 30 |
|---|---|---|---|---|---|---|---|---|

| 31 OCCURRENCE CODE DATE | 32 OCCURRENCE CODE DATE | 33 OCCURRENCE CODE DATE | 34 OCCURRENCE CODE DATE | 35 CODE OCCURRENCE SPAN FROM THROUGH | 36 CODE OCCURRENCE SPAN FROM THROUGH | 37 |
|---|---|---|---|---|---|---|
| 01 102515 | 05 102515 | | | | | |

| 38 | 39 CODE VALUE CODES AMOUNT | 40 CODE VALUE CODES AMOUNT | 41 CODE VALUE CODES AMOUNT |
|---|---|---|---|
| | a | | |
| | b | | |
| | c | | |
| | d | | |

| | 42 REV.CD. | 43 DESCRIPTION | 44 HCPCS/RATE/HIPPS CODE | 45 SERV. DATE | 46 SERV. UNITS | 47 TOTAL CHARGES | 48 NON-COVERED CHARGES | 49 |
|---|---|---|---|---|---|---|---|---|
| 1 | 0270 | MED-SUR SUPPLIES | | 102515 | 1.000 | 5 00 | | 1 |
| 2 | 0272 | STERILE SUPPLY | | 102515 | 2.000 | 11 00 | | 2 |
| 3 | 0300 | LAB | 36415 | 102515 | 1.000 | 25 00 | | 3 |
| 4 | 0301 | CHEMISTRY TESTS | 80301 | 102515 | 1.000 | 372 00 | | 4 |
| 5 | 0301 | CHEMISTRY TESTS | 80053 | 102515 | 1.000 | 237 00 | | 5 |
| 6 | 0301 | CHEMISTRY TESTS | 80320 | 102515 | 1.000 | 166 00 | | 6 |
| 7 | 0305 | HEMATOLOGY TESTS | 85025 | 102515 | 1.000 | 128 00 | | 7 |
| 8 | 0306 | BACT & MICRO TESTS | 87086 | 102515 | 1.000 | 171 00 | | 8 |
| 9 | 0306 | BACT & MICRO TESTS | 87088 | 102515 | 1.000 | 91 00 | | 9 |
| 10 | 0307 | UROLOGY TESTS | 81001 | 102515 | 1.000 | 98 00 | | 10 |
| 11 | 0352 | CT SCAN/BODY | 74177 | 102515 | 1.000 | 4151 00 | | 11 |
| 12 | 0352 | CT SCAN/BODY | 71260 | 102515 | 1.000 | 2277 00 | | 12 |
| 13 | 0352 | CT SCAN/BODY | 72125 | 102515 | 1.000 | 2132 00 | | 13 |
| 14 | 0450 | EMERG ROOM | 9928425 | 102515 | 1.000 | 1034 00 | | 14 |
| 15 | 0636 | DRUG/DETAIL CODE | Q9967 | 102515 | 125.000 | 597 50 | | 15 |
| 16 | 0981 | PRO FEE/ER | 99285 | 102515 | 1.000 | 887 00 | | 16 |
| 17 | | | | | | | | 17 |
| 18 | | | | | | | | 18 |
| 19 | | | | | | | | 19 |
| 20 | | | | | | | | 20 |
| 21 | | | | | | | | 21 |
| 22 | | | | | | | | 22 |
| 23 | 0001 | PAGE 1 OF 1 | CREATION DATE 110215 | TOTALS | | 12382 50 | | 23 |

| 50 PAYER NAME | 51 HEALTH PLAN ID | 52 REL INFO | 53 ASG BEN | 54 PRIOR PAYMENTS | 55 EST. AMOUNT DUE | 56 NPI 1285664177 | |
|---|---|---|---|---|---|---|---|
| A MRA | 62177 | Y | Y | | | 57 | A |
| B BLUE ACCESS CHOICE | 999990027 | Y | Y | | | OTHER | B |
| C | | | | | | PRV ID | C |

| 58 INSURED'S NAME | 59 P.REL | 60 INSURED'S UNIQUE ID | 61 GROUP NAME | 62 INSURANCE GROUP NO. | |
|---|---|---|---|---|---|
| A DAMES, KIMBERLY A | 18 | 486804218 | MRA | | A |
| B DAMES, KIMBERLY A | 18 | YRQ334A65770 | | 00217838 | B |
| C | | | | | C |

| 63 TREATMENT AUTHORIZATION CODES | 64 DOCUMENT CONTROL NUMBER | 65 EMPLOYER NAME | |
|---|---|---|---|
| A | | | A |
| B | | | B |
| C | | | C |

| 66 DX | S301XXA1 | M791 | 1 | Z87891 | 1 | | | | | | 68 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | | | | | | | | | | |

| 69 ADMIT DX | 70 PATIENT REASON DX R109 M549 M542 | 71 PPS CODE | 72 ECI V892XXA1 Y92410 1 | 75 | 76 ATTENDING NPI 1821218678 QUAL |
|---|---|---|---|---|---|
| | | | | | LAST STAPP FIRST MELISSA |

| 74 PRINCIPAL PROCEDURE CODE DATE | a. OTHER PROCEDURE CODE DATE | b. OTHER PROCEDURE CODE DATE | 77 OPERATING NPI QUAL |
|---|---|---|---|
| | | | LAST FIRST |

| c. OTHER PROCEDURE CODE DATE | d. OTHER PROCEDURE CODE DATE | e. OTHER PROCEDURE CODE DATE | 78 OTHER NPI QUAL |
|---|---|---|---|
| | | | LAST FIRST |

| 80 REMARKS | 81CC a B3 282N00000X b c d | 79 OTHER NPI QUAL |
|---|---|---|
| | | LAST FIRST |

UB-04 CMS-1450

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Mercy SJ Exhibit 5

Acuity Insurance Claim #: PB8878 / DOI: 10/25/2015

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

# Fax

| To: | MRA | From: | |
|---|---|---|---|
| Fax: | (615)963-3849 | Pages: | 1 (Including cover) |
| Re: | Payment Status | Date: | |
| | Insurer: Acuity Insurance | | |
| | Patient: KIMBERLY A DAMES | | |
| | Claim#: PB8878 | | |
| | MRA#(s): 4233039 | | |

**Please check all that apply**

☐ Payment was made on __/__/____ with check #_____ in the amount of _____. The check (check draft) was made payable to _____ and cleared on _____. Address where check was sent: _____ _____

*Please include and Explanation of Benefits.*

☐ Med-Pay /PIP benifits have been exhausted and the payment was Issues to: _____

☐ Med-Pay /PIP benifits were not paid in full and the reason for partial payment is: _____ _____

☐ Payment has not been made but Is under review.

☐ The following documentation is required In order to process payement: _____ _____

☐ Payment will not be made because: _____ _____

☐ Med-Pay /PIP benefits are not available on auto policy.

_____          _____
Signature                            Date

Page 1 of 1

Mercy SJ Exhibit 5

Acuity Insurance Claim #: PB8878  / DOI: 10/25/2015

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Cover Sheet Comments:
Claim Number: PB8878

Confirmation:
A fax has been successfully sent to Katherine Theriot (Acuity Insurance) at 9202087438.
--------------------------------------------------------------
From: Amanda L. Muehlman
MRA Event: 4233039
--------------------------------------------------------------
Time: 11/12/2015 14:54:42
Sent to 9202087438 with remote ID ""
Result: (0/339;0/0) Successful Send
Page record: 1 - 4
Elapsed time: 00:02:27 on channel 13

Mercy SJ Exhibit 5



Acuity Insurance Claim #: PB8878  / DOI: 10/25/2015

**BUSINESS OFFICE EXTENSION**
6840 CAROTHERS PKWY, STE 150
FRANKLIN, TN 37067

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

January 5, 2016

Acuity Insurance
c/o Katherine Theriot
PO Box 58
Sheboygan, WI 53082

## NOTICE OF ASSIGNMENT OF MEDICAL PAYMENTS COVERAGE

| | | | | |
|---|---|---|---|---|
| RE: | Provider: | Mercy Hospital Washington | D/Service: | 10/25/2015 - 10/25/2015 |
| | Patient: | KIMBERLY A DAMES | Balance: | $12,382.50 |
| | Account(s) #: | 22152980131 | | |
| | Claim #: | PB8878 | | |

Enclosed please find an itemized bill in the amount of $12,382.50 which we wish to have paid out of any medical payments / PIP benefits available to the patient. In accordance with policy at Mercy Hospital Washington, the above-referenced patient assigned at admission and/or discharge payments for medical expenses to the extent of any outstanding charges that relate to the accident.

In keeping with the assignment of benefits executed by the patient, we trust that the check satisfying this account will be made payable to Mercy Hospital Washington.

Sincerely,

Claims Department
Phone:   (615) 777-6837
Fax:     (615) 963-3849

**EXHIBIT B**

Mercy SJ Exhibit 5

Acuity Insurance Claim #: PB8878  / DOI: 10/25/2015

Claim Number: 110215279357142

| 1 MERCY HOSPITAL WASHINGTON 901 E 5TH ST WASHINGTON      MO 63090 8554207900 | 2  PO BOX 776084 CHICAGO      IL 60677 | 3a PAT CNTL# 2215298013100 | | 4 TYPE OF BILL 131 |
|---|---|---|---|---|
| | | b MED. REC.# E130112175 | | |
| | | 5. FED. TAX NO. 431066883 | 6 STATEMENT COVERS PERIOD FROM 102515 THROUGH 102515 | 7 |

| 8 PATIENT NAME | 9 PATIENT ADDRESS | a 712 BROOKSIDE DRIVE |
|---|---|---|
| b DAMES KIMBERLY A | b MARTHASVILLE | c MO  d 63357  e |

| 10 BIRTHDATE | 11 SEX F | 12 DATE | ADMISSION 13 HR 14 TYPE 15 SRC 1 1 | 16 DHR | 17 STAT 01 | 18 | 19 | 20 | CONDITION CODES 21 22 23 24 25 26 27 28 | 29 ACDT STATE | 30 |
|---|---|---|---|---|---|---|---|---|---|---|---|

| 31 OCCURRENCE CODE DATE 01 102515 | 32 OCCURRENCE CODE DATE 05 102515 | 33 OCCURRENCE CODE DATE | 34 OCCURRENCE CODE DATE | 35 CODE | OCCURRENCE SPAN FROM THROUGH | 36 CODE | OCCURRENCE SPAN FROM THROUGH | 37 |
|---|---|---|---|---|---|---|---|---|

| 38 | 39 CODE | VALUE CODES AMOUNT | 40 CODE | VALUE CODES AMOUNT | 41 CODE | VALUE CODES AMOUNT |
|---|---|---|---|---|---|---|
| | a | | | | | |
| | b | | | | | |
| | c | | | | | |
| | d | | | | | |

| | 42 REV.CD. | 43 DESCRIPTION | 44 HCPCS/RATE/HIPPS CODE | 45 SERV. DATE | 46 SERV. UNITS | 47 TOTAL CHARGES | 48 NON-COVERED CHARGES | 49 | |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 0270 | MED-SUR SUPPLIES | | 102515 | 1.000 | 5 00 | | | 1 |
| 2 | 0272 | STERILE SUPPLY | | 102515 | 2.000 | 11 00 | | | 2 |
| 3 | 0300 | LAB | 36415 | 102515 | 1.000 | 25 00 | | | 3 |
| 4 | 0301 | CHEMISTRY TESTS | 80301 | 102515 | 1.000 | 372 00 | | | 4 |
| 5 | 0301 | CHEMISTRY TESTS | 80053 | 102515 | 1.000 | 237 00 | | | 5 |
| 6 | 0301 | CHEMISTRY TESTS | 80320 | 102515 | 1.000 | 166 00 | | | 6 |
| 7 | 0305 | HEMATOLOGY TESTS | 85025 | 102515 | 1.000 | 128 00 | | | 7 |
| 8 | 0306 | BACT & MICRO TESTS | 87086 | 102515 | 1.000 | 171 00 | | | 8 |
| 9 | 0306 | BACT & MICRO TESTS | 87088 | 102515 | 1.000 | 91 00 | | | 9 |
| 10 | 0307 | UROLOGY TESTS | 81001 | 102515 | 1.000 | 98 00 | | | 10 |
| 11 | 0352 | CT SCAN/BODY | 74177 | 102515 | 1.000 | 4151 00 | | | 11 |
| 12 | 0352 | CT SCAN/BODY | 71260 | 102515 | 1.000 | 2277 00 | | | 12 |
| 13 | 0352 | CT SCAN/BODY | 72125 | 102515 | 1.000 | 2132 00 | | | 13 |
| 14 | 0450 | EMERG ROOM | 9928425 | 102515 | 1.000 | 1034 00 | | | 14 |
| 15 | 0636 | DRUG/DETAIL CODE | Q9967 | 102515 | 125.000 | 597 50 | | | 15 |
| 16 | 0981 | PRO FEE/ER | 99285 | 102515 | 1.000 | 887 00 | | | 16 |
| 17 | | | | | | | | | 17 |
| 18 | | | | | | | | | 18 |
| 19 | | | | | | | | | 19 |
| 20 | | | | | | | | | 20 |
| 21 | | | | | | | | | 21 |
| 22 | | | | | | | | | 22 |
| 23 | 0001 | PAGE 1 OF 1 | CREATION DATE 110215 | TOTALS | | 12382 50 | | | 23 |

| 50 PAYER NAME | 51 HEALTH PLAN ID | 52 REL INFO | 53 ASG BEN | 54 PRIOR PAYMENTS | 55 EST. AMOUNT DUE | 56 NPI 1285664177 | |
|---|---|---|---|---|---|---|---|
| A MRA | 62177 | Y | Y | | | 57 | A |
| B BLUE ACCESS CHOICE | 999990027 | Y | Y | | | OTHER | B |
| C | | | | | | PRV ID | C |

| 58 INSURED'S NAME | 59 P.REL | 60 INSURED'S UNIQUE ID | 61 GROUP NAME | 62 INSURANCE GROUP NO. | |
|---|---|---|---|---|---|
| A DAMES, KIMBERLY A | 18 | 486804218 | MRA | | A |
| B DAMES, KIMBERLY A | 18 | YRQ334A65770 | | 00217838 | B |
| C | | | | | C |

| 63 TREATMENT AUTHORIZATION CODES | 64 DOCUMENT CONTROL NUMBER | 65 EMPLOYER NAME | |
|---|---|---|---|
| A | | | A |
| B | | | B |
| C | | | C |

| 66 DX S301XXA1 | M791 | 1 | Z87891 1 | | | | | 08 |
|---|---|---|---|---|---|---|---|---|
| 0 | | | | | | | | |

| 69 ADMIT DX | 70 PATIENT REASON DX R109 | M549 | M542 | 71 PPS CODE | 72 ECI V892XXA1 | Y92410 1 | 73 |
|---|---|---|---|---|---|---|---|

| 74 PRINCIPAL PROCEDURE CODE DATE | a. OTHER PROCEDURE CODE DATE | b. OTHER PROCEDURE CODE DATE | 75 | 76 ATTENDING NPI 1821218678 LAST STAPP | QUAL FIRST MELISSA |
|---|---|---|---|---|---|
| c. OTHER PROCEDURE CODE DATE | d. OTHER PROCEDURE CODE DATE | e. OTHER PROCEDURE CODE DATE | | 77 OPERATING NPI LAST | QUAL FIRST |
| 80 REMARKS | | 81CC a B3 282N00000X | | 78 OTHER NPI LAST | QUAL FIRST |
| | | b | | 79 OTHER NPI LAST | QUAL FIRST |
| | | c | | | |
| | | d | | | |

UB-04 CMS-1450

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Mercy SJ Exhibit 5

Acuity Insurance Claim #: PB8878  / DOI: 10/25/2015

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

# Fax

| To: | MRA | From: | |
|---|---|---|---|
| Fax: | (615) 963-3849 | Pages: | 1 (including cover) |
| Re: | Payment Status<br>Insurer:    Acuity Insurance<br>Patient:    KIMBERLY A DAMES<br>Claim #:    PB8878<br>MRA #(s):    4233039 | Date: | |

**Please check all that apply:**

☐ Payment was made on ____/____/____ with check # _____ in the amount of _____. The check (check draft) was made payable to _____ and cleared on _____. Address where check was sent: _____ _____.

*Please include an Explanation of Benefits.*

☐ Med-Pay / PIP benefits have been exhausted and the payment was issued to: _____.

☐ Med-Pay/PIP benefits were not paid in full and the reason for the partial payment is: _____ _____

☐ Payment has not been made but is under review.

☐ The following documentation is required in order to process payment: _____ _____

☐ Payment will not be made because: _____ _____

☐ Med-Pay / PIP benefits are not available on the auto policy.

_____          _____
Signature                                          Date

Page **1** of **1**

Mercy SJ Exhibit 5

Acuity Insurance Claim #: PB8878 / DOI: 10/25/2015

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Cover Sheet Comments:

Claim Number: PB8878

Confirmation:

A fax has been successfully sent to Katherine Theriot (Acuity Insurance) at 9202087438.

------------------------------------------------------------

From: Caitlin A. Reed

MRA Event: 4233039

------------------------------------------------------------

Time: 01/05/2016 11:18:34

Sent to 9202087438 with remote ID ""

Result: (0/339;0/0) Successful Send

Page record: 1 - 4

Elapsed time: 00:02:25 on channel 9

Mercy SJ Exhibit 5

Acuity PB8878

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

To:dameshvac@gmail.com
cc:
bcc:noclaimsimage
From:Kathryn Theriot/FLD/CLMS/HMC
Date:01-28-2016 12:46:57
Subject:Acuity PB8878

Ms. Dames,

Please find the attached per our discussion.

Kathy Theriot, AIC
Field Claims Representative
Acuity Mutual Insurance
PO Box 58
Sheboygan, WI 53082
Telephone: 636-265-3277
Fax: 920-208-7438
Attachment: DamesER.pdf

███████████████████████

Mercy SJ Ex. 6

Dames2 Kim 000001

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Claim Number: 110215279357142



| 42 REV. CD. | 43 DESCRIPTION | 44 HCPCS/RATE/HIPPS CODE | 45 SERV. DATE | 46 SERV. UNITS | 47 TOTAL CHARGES | 48 NON-COVERED CHARGES |
|---|---|---|---|---|---|---|
| 0270 | MED-SUR SUPPLIES | | 102515 | 1.000 | 5 00 | |
| 0272 | STERILE SUPPLY | | 102515 | 2.000 | 11 00 | |
| 0300 | LAB | 36415 | 102515 | 1.000 | 25 00 | |
| 0301 | CHEMISTRY TESTS | 80301 | 102515 | 1.000 | 372 00 | |
| 0301 | CHEMISTRY TESTS | 80053 | 102515 | 1.000 | 232 00 | |
| 0301 | CHEMISTRY TESTS | 80320 | 102515 | 1.000 | 166 00 | |
| 0305 | HEMATOLOGY TESTS | 85025 | 102515 | 1.000 | 128 00 | |
| 0306 | BACT & MICRO TESTS | 87086 | 102515 | 1.000 | 171 00 | |
| 0306 | BACT & MICRO TESTS | 87088 | 102515 | 1.000 | 91 00 | |
| 0307 | UROLOGY TESTS | 81001 | 102515 | 1.000 | 98 00 | |
| 0352 | CT SCAN/BODY | 74177 | 102515 | 1.000 | 4151 00 | |
| 0352 | CT SCAN/BODY | 71260 | 102515 | 1.000 | 2277 00 | |
| 0352 | CT SCAN/BODY | 72125 | 102515 | 1.000 | 2132 00 | |
| 0450 | EMERG ROOM | 9928425 | 102515 | 1.000 | 1034 00 | |
| 0636 | DRUG/DETAIL CODE | Q9967 | 102515 | 125.000 | 592 50 | |
| 0981 | PRO FEE/ER | 99285 | 102515 | 1.000 | 887 00 | |
| 0001 | PAGE 1 OF 1 | | CREATION DATE 110215 | TOTALS | 12382 50 | |

Mercy SJ Ex. 6

Dames, Kim 000002

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM



**State of Missouri**

Jason Kander, Secretary of State

Corporations Division
PO Box 778 / 600 W. Main St., Rm. 322
Jefferson City, MO 65102

| X00720046 |
| --- |
| Date Filed: 2/25/2016 |
| Expiration Date: 2/27/2021 |
| Jason Kander |
| Missouri Secretary of State |

# Registration of Fictitious Name

*(Submit with filing fee of $7.00)*
*(Must be typed or printed)*

This information is for the use of the public and gives no protection to the name being registered. There is no provision in this Chapter to keep another person or business entity from adopting and using the same name. The fictitious name registration expires 5 years from the filing date. (Chapter 417, RSMo)

**Please check one box:**

| ☐ | New Registration | ☒ | Renewal | X00720046 | ☐ | Amendment | | ☐ | Correction | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | *Charter number* | | | *Charter number* | | | *Charter number* |

**The undersigned is doing business under the following name and at the following address:**

Business name to be registered:   Anthem Blue Cross and Blue Shield

Business Address:   1831 Chestnut Street

*(PO Box may only be used in addition to a physical street address)*

City, State and Zip Code:   St. Louis, MO  63103

**Owner Information:**

If a business entity is an owner, indicate business name and percentage owned. If all parties are jointly and severally liable, percentage of ownership need not be listed. Please attach a separate page for more than three owners. The parties having an interest in the business, and the percentage they own are:

| Name of Owners, Individual or Business Entity | Charter # Required If Business Entity | Street and Number | City and State | Zip Code | If Listed, Percentage of Ownership Must Equal 100% |
|---|---|---|---|---|---|
| RIGHTCHOICE MANAGED CARE, INC. | F00513998 | 1831 Chestnut Street | St. Louis, MO | 63103 | |

**All owners must affirm by signing below**

In Affirmation thereof, the facts stated above are true and correct:

(The undersigned understands that false statements made in this filing are subject to the penalties of a false declaration under Section 575.060 RSMo)

| RIGHTCHOICE MANAGED CARE, INC. - Kathleen S Kiefer | RIGHTCHOICE MANAGED CARE, INC. - KATHLEEN S KIEFER | 02/25/2016 |
|---|---|---|
| *Owner's Signature or Authorized Signature of Business Entity* | *Printed Name* | *Date* |

| Name and address to return filed document: |
|---|
| Name:   Jami J Meister |
| Address:   Email: JAMI.MEISTER@WELLPOINT.COM |
| City, State, and Zip Code: |

Mercy SJ Exhibit 7

Corp. 56 (09/2010)

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM



**State of Missouri**

Jason Kander, Secretary of State

Corporations Division
PO Box 778 / 600 W. Main St., Rm. 322
Jefferson City, MO 65102

| X00721153 |
| --- |
| **Date Filed: 2/25/2016** |
| **Expiration Date: 3/2/2021** |
| **Jason Kander** |
| **Missouri Secretary of State** |

# Registration of Fictitious Name

*(Submit with filing fee of $7.00)*
*(Must be typed or printed)*

This information is for the use of the public and gives no protection to the name being registered. There is no provision in this Chapter to keep another person or business entity from adopting and using the same name. The fictitious name registration expires 5 years from the filing date. (Chapter 417, RSMo)

**Please check one box:**

☐ New Registration   ☒ Renewal   X00721153   ☐ Amendment _____   ☐ Correction _____
 _____ *Charter number*            *Charter number*                  *Charter number*

**The undersigned is doing business under the following name and at the following address:**

Business name to be registered:   Anthem Blue Cross and Blue Shield

Business Address:   1831 Chestnut Street
 *(PO Box may only be used in addition to a physical street address)*

City, State and Zip Code:   St. Louis, MO  63103

**Owner Information:**

If a business entity is an owner, indicate business name and percentage owned. If all parties are jointly and severally liable, percentage of ownership need not be listed. Please attach a separate page for more than three owners. The parties having an interest in the business, and the percentage they own are:

| Name of Owners, Individual or Business Entity | Charter # Required If Business Entity | Street and Number | City and State | Zip Code | If Listed, Percentage of Ownership Must Equal 100% |
| --- | --- | --- | --- | --- | --- |
| HEALTHY ALLIANCE LIFE INSURANCE COMPANY | I00388401A | 1831 Chestnut Street | St. Louis, MO | 63103 | |

**All owners must affirm by signing below**

In Affirmation thereof, the facts stated above are true and correct:

(The undersigned understands that false statements made in this filing are subject to the penalties of a false declaration under Section 575.060 RSMo)

| HEALTHY ALLIANCE LIFE INSURANCE COMPANY - Kathleen S Kiefer | HEALTHY ALLIANCE LIFE INSURANCE COMPANY - KATHLEEN S KIEFER | 02/25/2016 |
| --- | --- | --- |
| *Owner's Signature or Authorized Signature of Business Entity* | *Printed Name* | *Date* |

| Name and address to return filed document: |
| --- |
| Name:   Jami J Meister |
| Address:   Email: JAMI.MEISTER@WELLPOINT.COM |
| City, State, and Zip Code:  _____ |

Mercy SJ Exhibit 7

Corp. 56 (09/2010)

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

IN THE CIRCUIT COURT OF FRANKLIN COUNTY
STATE OF MISSOURI

| | | |
|---|---|---|
| KIM DAMES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 19AB-CC00264 |
| v. | ) | |
| | ) | Division VI |
| MERCY HOSPITALS | ) | |
| EAST COMMUNITIES, d/b/a | ) | |
| Mercy Hospital Washington, | ) | |
| | ) | |
| Defendant. | ) | |

PLAINTIFF'S RESPONSE TO
DEFENDANT'S FIRST SET OF INTERROGATORIES TO PLAINTIFF

COMES NOW Plaintiff Kim Dames, by and through her undersigned attorneys of record, and submits the following objections and answers to Defendant's First Set of Interrogatories to Plaintiff:

1.      Provide the information required by Rule 56.01(b)(4) for each person you expect to call as an expert witness at trial.

**ANSWER:** Plaintiff has not decided what, if any, experts to call. Plaintiff will supplement her response as appropriate.

2.      Provide the information required by Rule 56.01(b)(5) for each non-retained expert you expect to call at trial to provide expert witness opinion testimony.

**ANSWER:** Plaintiff has not decided what, if any, experts to call. Plaintiff will supplement her response as appropriate.

Def.'s Dep. Ex.
18

Mercy SJ Exhibit 8

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

3.      For each request in Defendant's First Request for Admissions to Plaintiff that you do not admit, state all facts and identify all documents supporting your denial of the request.

**ANSWER:** Plaintiff objects to this interrogatory as cumulative and unduly burdensome in that it calls for information Plaintiff provided by Plaintiff in her Response to Requests for Admission. Plaintiff further objects that this interrogatory calls for privileged information protected by the attorney client privilege and the work product doctrine.

Subject to those objections and without waiving the same, Plaintiff states the following:

At the time of the October 25, 2015 accident, Plaintiff had health insurance through Anthem BlueCross BlueShield. Dames, Kim 000064–000069. Plaintiff also had auto insurance through Acuity Mutual Insurance Company. Dames, Kim 000026–000064. Plaintiff received treatment at Mercy and consequently owed Mercy a bill for such services. Dames, Kim 000072–000076. Mercy honored a contractual discount for services with Anthem, and Plaintiff owed Mercy $576. Mercy demanded payment from Acuity Mutual Insurance Company and received $5,000, the full amount of Plaintiff's Medical Payments Coverage. Dames, Kim 000080–000082. However, Acuity was not the primary insurer for medical bills associated with the October 25, 2015 accident. Dames, Kim 000018–000019. After receiving the $5,000, Mercy readjusted Plaintiff's bill to undo the contractual adjustment with Anthem and retained the entire $5,000. When Acuity and Plaintiff's attorneys brought this to the attention of Mercy, Mercy refused to refund Acuity the remaining amount of Plaintiff's Medical Payments Coverage, $4,424. Dames, Kim 000018–000019.

2

Mercy SJ Exhibit 8

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

4.    Identify all insurance policies, insurance plans, and employee benefit plans that provided coverage for your treatment at Mercy Hospital Washington on October 25, 2015.

**ANSWER:** Plaintiff objects to this interrogatory as vague and confusing. Plaintiff's theory of the case is that even though Defendant took Plaintiff's Medical Payments Coverage from a policy that covered her medical treatment as a result of the October 25, 2015 crash, Defendant was not entitled to recover any money under that policy because Plaintiff's medical insurance provided full coverage for Plaintiff's hospital bill. Accordingly, whether there was proper coverage by Plaintiff's auto insurance policy is disputed.

Subject to that objection and without waiving the same, Plaintiff states the following:

At the time of the October 25, 2015 crash, Plaintiff had health insurance through Anthem BlueCross BlueShield. Plaintiff will provide information related to this policy in documents bates labeled Dames, Kim 000064–000069.

At the time of the October 25, 2015 crash, Plaintiff had auto insurance through Acuity Mutual Insurance which provided Medical Payments Coverage. Plaintiff will provide a copy of this policy in documents bates labeled Dames, Kim 000026–000064.

3

Mercy SJ Exhibit 8

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

5. With respect to each instance of medical treatment that you received for the injuries you incurred in the auto accident that occurred on October 25, 2015:

    a. State the provider, date(s) of service, and the nature of the medical treatment;

    b. State the provider's charges for the medical treatment;

    c. State the amount that you directly paid to the provider for the medical treatment and the date(s) of your payment(s);

    d. State the payor, date, and amount that you received from any person or insurer for the medical treatment.

**ANSWER:** Plaintiff objects to this interrogatory as unduly burdensome. Defendant was Plaintiff's primary care provider for her injuries incurred in the October 25, 2015 auto accident. Accordingly, Defendant has superior access to this information in its own records, whereas Plaintiff's records (and ability to access the same) are much more limited.

Subject to that objection and without waiving the same, Plaintiff states the following:

(a) Plaintiff received emergency medical treatment at Mercy Hospital Washington on October 25, 2015. Dames, Kim 000002, 000073–000074.

Plaintiff received medical treatment from WCRG on October 25, 2015. Dames, Kim 000024, 000097–000102.

Plaintiff received chiropractic treatment from Tim Collins, D.C., on March 21, 24, and April 1, 2016. Dames, Kim 000092–000096.

Plaintiff received massage therapy from All About Massage on November 20, 25, December 2, 14, 22, and 28, 2015; January 5, 12, 18, February 11, 18, March 4, April 1, 13, and 20, 2016. Dames, Kim 000083–000091.

(b) Plaintiff was charged for the following:

Medical/Surgical Supplies And Devices - General ($5.00);

Medical/Surgical Supplies And Devices – Sterile ($11.00);

Laboratory - General Classification ($25.00);

4

Mercy SJ Exhibit 8

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Laboratory – Chemistry ($775.00);

Laboratory – Hematology ($128.00);

Laboratory - Bacteriology And Microbiology ($262.00);

Laboratory -Urology ($98.00);

CT Scan - Body Scan ($8,560.00);

Emergency Room - General Classification ($1,034.00); and

Pharmacy - Drugs Requiring Detailed Coding ($597.50);

Professional Fees - Emergency Room ($887.00). Dames, Kim 00002, 000073–000074.

Plaintiff was charged a total of $1,095.00 by WCRG. Dames, Kim 000024, 000098.

Plaintiff was charged a total of $144.00 by Tim Collins, D.C. Dames, Kim 000095–000096.

(b)     Plaintiff paid directly $5,000 through Acuity's Medical Payments Coverage on or about January 12, 2016. Dames, Kim 000073–000074, 000082.

Plaintiff's counsel negotiated a 25% reduction with WCRG and paid $821.25 on or about December 7, 2017.  Dames, Kim 000103–000105.

Plaintiff paid Dr. Collins $144.00 on or about December 7, 2017. Dames, Kim 000108.

Plaintiff paid All About Massage $1,010 on or about December 7, 2017.  Dames, Kim 000109.

(d)     Plaintiff did not receive any payment for medical treatment.

5

Mercy SJ Exhibit 8

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

6.      Did you assert a claim against, or receive a settlement or payment from, the owner or the driver of the other vehicle involved in the auto accident in which you were injured on October 25, 2015, or the insurer of the owner or the driver? If so, state the name, address, and telephone number of the owner, the driver, and the insurer; describe the nature and resolution of your claim against the owner, the driver, and/or the insurer; and state the payor, the date, and the amount of the settlement or payment that you received from the owner, the driver, and/or the insurer.

**ANSWER:** Plaintiff did receive a settlement from the other driver in the October 25, 2015 accident. The Driver was Memorie Henning. Her address, telephone number are unknown to Plaintiff. The insurer was Cameron Insurance Companies. Plaintiff's claim against the Driver was resolved via an early resolution settlement obtained by her attorneys. This settlement consistent of a payment of Sixteen Thousand Seven Hundred Fifty Dollars ($16,750.00), which Plaintiff received with her husband, Mr. Jack Dames. A true and accurate copy of the release can be found at document bates labeled Dames, Kim 000070–000071.

7.      For each oral communication between you or your attorneys and Anthem related to your medical treatment at Mercy Hospital Washington on October 25, 2015, state the date, speaker (i.e., the person), recipient (i.e., the person), and content of the communication.

**ANSWER:** Plaintiff objects to this interrogatory as it plainly calls for communications protected by the attorney client privilege and work product doctrine. Further, Plaintiff objects to this interrogatory as cumulative and unduly burdensome. The communications called for would have been supplanted by electronic communications. Literal compliance with this interrogatory would require Plaintiff to piece together conversations for over five years ago for which there is no record.

Subject to and without waiving the same objections, Plaintiff states the following:

Plaintiff does not have any information responsive to this interrogatory.

6

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

8.    For each oral communication between you or your attorneys and Acuity related to your medical treatment at Mercy Hospital Washington on October 25, 2015, state the date, speaker (i.e., the person), recipient (i.e., the person), and content of the communication.

**ANSWER:** Plaintiff objects to this interrogatory as it plainly calls for communications protected by the attorney client privilege and work product doctrine. Further, Plaintiff objects to this interrogatory as cumulative and unduly burdensome. The communications called for would have been supplanted by electronic communications. Literal compliance with this interrogatory would require Plaintiff to piece together conversations for over five years ago for which there is no record.

Subject to and without waiving the same objections, Plaintiff states the following:

Plaintiff communicated with Katheryn Theriot, a Field Claims Representative at Acuity, on or about January 28, 2016, regarding Acuity's payment of Plaintiff's emergency room bills and Plaintiff's policies with Acuity. Dames, Kim 000001–000013.

Plaintiff's attorneys communicated with Kathryn Theriot, a Field Claims Representative at Acuity, on or about August 10, 2017, regarding finalizing settlement of Plaintiff's claims against the other driver; on or about February 7, 2017, regarding an offer of global settlement; on or about February 16, 2017, regarding authority to settle pursuant to the global settlement; on or about June 9, 2017, regarding a status update; on or about July 27, 2017, regarding a status update; on or about July 31, 2017, regarding receiving releases pursuant to the global settlement; and on or about May 11, 2018, regarding that Acuity was not the primary insurer for medical bills for the October 25, 2015 accident.  Dames, Kim 000014–000015, 000018–000019.

9.    For each oral communication between you or your attorneys and Cameron Mutual Insurance Company related to your medical treatment at Mercy Hospital Washington

7

Mercy SJ Exhibit 8

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

on October 25, 2015, state the date, speaker (i.e., the person), recipient (i.e., the person), and content of the communication.

**ANSWER:** Plaintiff objects to this interrogatory as plainly calling for communications subject to the attorney client privilege. Further, Plaintiff objects that this interrogatory is unduly burdensome and cumulative. Literal compliance with this interrogatory would require Plaintiff to piece together conversations from five years ago, and, further, many of these oral communications would have been encapsulated in later written communications.

Subject to and without waiving the same objection, Plaintiff states the following:

Plaintiff's attorneys communicated with Larry Baker, a Casualty Adjuster at Cameron Mutual Insurance Company, on or about February 20, 2017, regarding an offer of global settlement; on or about January 19, 2017, regarding a global settlement proposal; and on or about September 12, 2016, regarding Plaintiff's retention of her attorneys. Bates, Kim 000016–000017, 000020–000021.

Plaintiff's attorneys communicated with Lea Hamil, a Claims Supervisor at Cameron Mutual Insurance Company, on or about July 31, 2017, regarding global settlement and release of all claims. Dames, Kim 000022–000025.

10.    For each oral communication between you or your attorneys and any other insurer related to your medical treatment at Mercy Hospital Washington on October 25, 2015, state the date, speaker (i.e., the person), recipient (i.e., the person), and content of the communication.

**ANSWER:** Plaintiff objects to this interrogatory as it plainly calls for communications protected by the attorney client privilege and work product doctrine. Further, Plaintiff objects to this interrogatory as cumulative and unduly burdensome. The communications called for would have been supplanted by electronic communications. Literal compliance

8

Mercy SJ Exhibit 8

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

with this interrogatory would require Plaintiff to piece together conversations for over five years ago for which there is no record.

Subject to and without waiving the same objections, Plaintiff states the following:

Plaintiff does not have any information responsive to this interrogatory.

11.    For each oral communication between you or your attorneys and Mercy related to your medical treatment at Mercy Hospital Washington on October 25, 2015, state the date, speaker (i.e., the person), recipient (i.e., the person), and content of the communication.

**ANSWER:** Plaintiff objects to this interrogatory as unduly burdensome. To comply with this request, Plaintiff would have to recall every conversation related to her medical treatment in detail from over five years ago. Defendant, more so, is in a far superior position than Plaintiff to provide this information because Defendant has access to its own medical records, including to whom Plaintiff may have spoken to regarding her treatment. Last, it cannot be overstated that at the time of her treatment in question, Plaintiff was undergoing the after-effects of a severe car accident which necessitated significant emergency medical treatment. Additionally, Plaintiff objects to this interrogatory as it plainly calls for information protected by the attorney client privilege and the work product doctrine.

12.    For each oral communication between you or your attorneys and Medical Reimbursements of America, Inc., related to your medical treatment at Mercy Hospital Washington on October 25, 2015, state the date, speaker (i.e., the person), recipient (i.e., the person), and content of the communication.

**ANSWER:** Plaintiff objects to this interrogatory as unduly burdensome. To comply with this request to the letter, Plaintiff would have to recall every conversation following a severe car accident in detail from over five years ago. Additionally, Plaintiff objects to this

9

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

interrogatory as it plainly calls for information protected by the attorney client privilege and the work product doctrine.

Subject to that objection and without waiving the same, Plaintiff states the following:

Plaintiff does not have any information responsive to this interrogatory.


Respectfully submitted,

LEAR WERTS LLP

/s/ Todd C. Werts
Bradford B. Lear, Mo. Bar No. 53204
Todd C. Werts, Mo. Bar No. 53288
Anthony J. Meyer, Mo. Bar No. 71238
103 Ripley Street
Columbia, MO 65201
Telephone:  573-875-1991
Facsimile:  573-279-0024
Email:  lear@learwerts.com
Email:  werts@learwerts.com
Email:  meyer@learwerts.com

ROBINSON BRINKMANN & FULFORD LLC
Mark E. Brinkmann, Mo. Bar No. 49950
24 S. Church St.
Union, MO  63084
T: 636-583-7908
F: 636-583-7908
E: mark@attorneysrbf.com

ROBERTS, WOOTEN & ZIMMER, LLC
Charles R. Wooten, Mo. Bar No. 51250
10438 Business 21
Hillsboro, MO  63050
T: 636-797-2693
F: 636-789-4205
E: charleswooten@rwzlaw.com

COUNSEL FOR PLAINTIFF

10

Mercy SJ Exhibit 8

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

## CERTIFICATE OF SERVICE

The above was filed with the Court's Case.net system on this 26th day of February, 2021.

That system will serve copies on all those registered for service therein.

/s/ Todd C. Werts

11

Mercy SJ Exhibit 8

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

STATE OF MISSOURI      )
                       ) SS
COUNTY OF FRANKLIN     )

    KIM DAMES, being duly sworn upon her oath, states that she has read the foregoing answers to interrogatories and that the statements contained therein are true according to her best knowledge, information and belief.

_____
KIM DAMES

Subscribed and sworn to before me on this __25__ day of __Feb.__, 20 _21_.

My Commission Expires:

_____

_____
Notary Public, State of Missouri

```
LESLEY R WISSMANN
Notary Public – Notary Seal
State of Missouri, Franklin County
Commission # 13449920
My Commission Expires Dec. 04, 2021
```

Mercy SJ Exhibit 8

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Page 1

IN THE CIRCUIT COURT OF FRANKLIN COUNTY

STATE OF MISSOURI

KIM DAMES,                                          )

                                                    )

     Plaintiff,                                     )

                                                    ) Cause No.

vs.                                                 ) 19AB-CC00264

                                                    )

MERCY HOSPITALS EAST COMMUNITIES,    )

                                                    )

     Defendant.                                     )

VIDEO ZOOM DEPOSITION OF KIMBERLY DAMES

Taken on behalf of the Defendant

May 25, 2021

Sheryl A. Pautler, RPR,

MO-CCR 871, IL-CSR 084-004585

(The proceedings began at 10:08 a.m.)

Mercy SJ Ex. 9

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Page 2

QUESTIONS BY:                    PAGE NO.

Mr. Fink                    7

INDEX OF EXHIBITS

NO.                         PAGE MKD.

Exhibit 1   (Consent and agreement.)      30

Exhibit 2   (11/04/2015 letter.)          60

Exhibit 3   (Anthem policy.)          35

Exhibit 4   (E-mail and claim form.)      48

Exhibit 5   (E-mail and auto declarations.) 50

Exhibit 7   (May 14, 2018, letter.)       61

Exhibit 8   (January 19, 2017, letter.)   53

Exhibit 10  (Limited release of claims.)   59

Exhibit 12  (Patient lien request.)       39

Exhibit 16  (December 7, 2017, letter.)    73

Exhibit 17  (August 24, 2017, fax.)       36

Exhibit 18  (Interrogatories.)            65

(Whereupon the exhibits were attached to the original and copies.)

Page 4

APPEARANCES

For the Plaintiff via Zoom:
Mr. Todd C. Werts
Lear Werts, LLP
2003 West Broadway, Suite 107
Columbia, Missouri 65201
573-875-1991
Werts@learwerts.com

For the Plaintiff via Zoom:
Mr. Mark E. Brinkmann
Becker Robinson Brinkmann & Fulford
24 South Church Street
Union, Missouri 63084
636-583-7908
Mark@attorneysrbf.com

For the Plaintiff via Zoom:
Mr. Charles R. Wooten
Roberts Wooten Zimmer
10438 Business 21
Hillsboro, Missouri 63050
636-797-2693
Charleswooten@rwzlaw.com

For the Defendant via Zoom:
Mr. Jeffrey R. Fink
Thompson Coburn, LLP
505 North 7th Street, 35th Floor
St. Louis, Missouri 63101
314-552-6000
Jfink@thompsoncoburn.com

The Court Reporter:
Ms. Sheryl Pautler
Veritext Legal Solutions
701 Market Street, Suite 310
St. Louis, Missouri 63101
314-241-6750

Page 3

IN THE CIRCUIT COURT OF FRANKLIN COUNTY
STATE OF MISSOURI

KIM DAMES,              )
                        )
   Plaintiff,           )
                        ) Cause No.
vs.                     ) 19AB-CC00264
                        )
MERCY HOSPITALS EAST COMMUNITIES,   )
                        )
   Defendant.           )

VIDEO ZOOM DEPOSITION OF WITNESS, KIMBERLY DAMES, produced, sworn, and examined on the 25th day of May, 2021, between the hours of ten o'clock in the forenoon and one o'clock in the afternoon of that day, via Veritext Zoom, before SHERYL A. PAUTLER, RPR, Certified Shorthand Reporter within and for the State of Illinois and Certified Court Reporter within and for the State of Missouri, in a certain cause now pending before the Circuit Court of the County of Franklin in the State of Missouri, wherein KIM DAMES is the Plaintiff, and MERCY HOSPITALS EAST COMMUNITIES is the Defendant.

Page 5

APPEARANCES

The Videographer:
Mr. Tim Perry
Veritext Legal Solutions
701 Market Street, Suite 310
St. Louis, Missouri 63101
314-241-6750

2 (Pages 2 - 5)

Mercy SJ Ex. 9

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Page 6

IT IS HEREBY STIPULATED AND AGREED, by and between counsel for Plaintiff and counsel for Defendant, that the deposition of KIMBERLY DAMES may be taken in shorthand by Sheryl A. Pautler, shorthand reporter, and afterwards transcribed into typewriting; and the signature of the witness is expressly reserved.

* * * * *

KIMBERLY DAMES, of lawful age, being produced, sworn and examined on behalf of the Defendant, deposes and says:

THE VIDEOGRAPHER: Good morning. We are going on the record at 10:08 a.m. on May 25, 2021. This is Media Unit 1 of the video-recorded deposition of Kim Dames taken by counsel for Defendant, Mercy Hospitals East Communities, in the matter of Kim Dames versus Mercy Hospitals East Communities filed in the Circuit Court of Franklin County, State of Missouri, Case No. 19AB-CC00264.

My name is Tim Perry, certified legal video specialist. Our court reporter is Sheryl Pautler.

Counsel, will you identify yourselves for the record, please.

Page 7

(Simultaneous speakers.)

MR. FINK: Go ahead, Todd.

MR. WERTS: Todd Werts on behalf of the plaintiffs. With me are Mark Brinkmann and Charlie Wooten.

MR. FINK: And this is Jeff Fink for the defendant.

THE VIDEOGRAPHER: Thank you, Counsel. Sheryl, please swear in the witness.

(Whereupon the witness responded "I do" to the oath administered by the court reporter.)

[EXAMINATION]

QUESTIONS BY MR. FINK:

Q. Could you state your full name, please.

A. Kimberly Ann Dames.

Q. Ms. Dames, why are you suing Mercy?

A. I'm -- my complaint is, and I'm suing, to retrieve the money that they took from my med pay.

Q. Any other reasons that you're suing Mercy?

A. I feel like what they -- what they did was underhanded, broke my trust. I had confidence that they would do what was in my best interests, not only medically, but also that they wouldn't be going behind my back underhandedly.

Page 8

Q. And what did Mercy do that was underhanded in your view?

A. When I came into the hospital for treatment, I gave them my medical card. And with that, I felt that I was coming in just like other medical -- how I got there is of no value. I contracted with my healthcare coverage, which was Anthem Blue Cross. And they in turn contracted with Mercy as to what those payments -- what they would be entitled to charge me.

From there, they charged me and reversed the charges and went after my med pay, which is a completely different -- they weren't entitled to that. So it would have been no different than had they treated and charged me for tests or treatments that was of no value, just padding their pockets.

Q. So is it your belief that Mercy breached its contract with your health insurance provider?

A. And myself.

Q. And what contract did Mercy breach with you?

A. When I went in for care, I gave them my healthcare coverage. They were in network. My primary doctor is connected to this facility. And

Page 9

I've never had to be concerned with submitting any bills. They have always taken care of that. I didn't have any reason to believe otherwise. And I know I chose a certain healthcare coverage that would give me good coverage. That they had -- Anthem is known -- well known, I guess, to -- to have large policies that -- however that all works, that they do have agreements with the providers for certain costs. And so I feel like I'm entitled to that provision.

Q. And I take it you're the one who chose the health insurance policy that covered you?

A. Ultimately, yes.

Q. So is it your view that Mercy should give up reimbursement that it is otherwise entitled to just so you can have your med pay coverage?

A. No.

MR. WERTS: Object to the form. Go ahead.

A. It is my view that Mercy should honor the contract they had with the insurance provider that I gave them.

Q. (By Mr. Fink) Have you seen the contract between Mercy and Anthem?

A. No, not physically.

3 (Pages 6 - 9)

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Page 10

Q.   Are you aware that the contract between Mercy and Anthem specifically allowed Mercy to bill and collect from your med pay coverage?

MR. WERTS:  I'm going to object to the extent it calls for a legal conclusion.

Go ahead.

A.   I would have no way of knowing that, other than I paid and go into contract for a year with Anthem Blue Cross.  So I look to them to cover my best interests.  My carrier, the in-network provider that I'm asked to rely on, I know has a contract.  I don't know the details of that contract.  But nevertheless, I know that they have a certain dollar amount that they work with on -- with Anthem.  And I feel that I'm entitled to that provision.

I pay my premiums.  I'm in contract with them year after year.  And I don't feel like that should be pulled under -- out from under the rug, because I came there to that facility to get treatment because I was in a car accident.  If I had fallen down the stairs and went in for the same treatment, I would have gotten the benefit of those lower costs.

Q.  (By Mr. Fink)  And did you know that your health insurance policy with Anthem says that it's

Page 11

secondary coverage when you have other coverage such as medical payments coverage?

MR. WERTS:  I'm going to object that it assumes facts not in evidence, calls for a legal conclusion.

Go ahead.

THE WITNESS:  Can you ask me that question again?

MR. FINK:  Sheryl, can you repeat the question for Ms. Dames, please?

THE COURT REPORTER:  Question:  And did you know that your health insurance policy with Anthem says that it's secondary coverage when you have other coverage such as medical payments coverage?

A.  I don't know that there's any way I would have known that.

Q. (By Mr. Fink)  Would that surprise you if that's true?

MR. WERTS:  Same objection.

A.  If it's true, I think it's very underhanded and unfair.

Q. (By Mr. Fink)  That would be unfair practice by Anthem, right?  They're the ones who sold you that insurance policy?

Page 12

A.   As I said, had I gone in for the same treatment on an accident that I had in my own home with no one else involved, I would have had the benefits.  And I feel that I'm entitled to those benefits.  That's what I pay my insurance for.

Q.  But if Anthem made its health insurance policy secondary to your medical payments coverage, do you think that was an underhanded act by Anthem?

A.  Well, I certainly was not made aware of it.  It wasn't a choice for me.  So, yes, I believe that's underhanded.

Q.  And that's an underhanded practiced by Anthem in your view?

A.  I disagree with that.

Q.  Why do you disagree with that?

A.  When I walked in the door and handed them my medical card, they took it willingly.  They never gave me any indication that that was going to be a problem or that I would somehow be billed differently or at a higher rate, because there was a car accident involved in this.

They took my medical insurance.  And I assumed just like any other time I had been at that facility, they would submit the paperwork and that was the end of it.

Page 13

Q.   So would you agree with me that your health insurance with Anthem is only going to pay as specified in your health insurance policy, correct?

A.   I assume so.

Q.   And if your health insurance policy says that it is secondary coverage to your medical payments coverage, wouldn't that lead you to conclude that your health insurance wasn't going to pay for your treatment?

A.   Absolutely not.  I had no way of knowing it was secondary.  As I said, I've been to that facility many times.  My primary doctor is in that facility.  I've never had any reason otherwise to believe that when I handed my medical card, that my insurance would be charged the appropriate amount.

Q.   And when you bought your health insurance policy with Anthem, I assume you received a copy of your policy, correct?

A.   I would imagine that's correct.  Do I read it?

Q.   Well, that was going to be my next question.  Did you ever read your health insurance policy with Anthem?

A.   Not page for page, word for word, no.

Q.   If you had read your policy and learned

4 (Pages 10 - 13)

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Page 14

that your health insurance with Anthem was secondary coverage if you had medical payments coverage, would you have done anything differently?

MR. WERTS:  Object to the form.  Calls for speculation.  Go ahead.

A.  If I had had the legal understanding of secondary insurance and how that applied if I had med pay, perhaps I might not have taken -- paid for the additional charge of med pay.

Q.  (By Mr. Fink)  And just to clarify, other than collecting on your medical payment coverage, do you think Mercy did anything else wrong to you?

A.  Having, as of yesterday, seen an itemized bill, I would say that they -- I was very shocked to find that they had run a drug and alcohol test on me, and to the tune of 900-plus dollars charged to me.  I was a passenger in the car.  There would have been no reason to have that test run.

Q.  Anything else that you think Mercy did wrong?

A.  Not that I can think about at this time.

Q.  Okay.  Ms. Dames, where do you reside?

A.  712 Brookside Drive, Marthasville, Missouri.  The zip code is 62357.

Q.  Is that in Franklin County?

Page 15

A.  It is Warren County.

Q.  How long have you lived there?

A.  Approximately 20 years.

Q.  In your lawsuit, you say, quote: Plaintiff, Kim Dames, is an adult resident of Franklin County, Missouri.

Is that a false statement?

A.  Marthasville is in Warren County.  So, yes, that would be an incorrect statement.  Typographical error.  I don't know.

Q.  You think that's a typographical error?

A.  I don't know.  I didn't type it up.

Q.  Did you review the -- did you review your lawsuit before it was filed on your behalf?

A.  Yes.  And actually I reviewed it again and apparently overlooked that.

Q.  Tell me about your family.  Are you married?

A.  I am.

Q.  And what's your husband's name?

A.  Jack.  Do you want his full name?

Q.  No.  First and last is enough.

A.  Jack Dames.

Q.  How long have you been married to Mr. Dames?

Page 16

A.  13 years.

Q.  Do you have any children?

A.  I do have children.  Not with my husband.

Q.  And is one of your children Anna Owens?

A.  Yes, that's correct.

Q.  And was she in the car with you during the accident?

A.  She was.

Q.  How old is Anna now?

A.  22.

Q.  Where does she live?

A.  Geneva, Switzerland.

Q.  Halfway across the world, huh?

A.  That's right.

Q.  I've got a cousin who did the same thing.  She was -- grew up in Springfield, Missouri and now lives over in Switzerland for a couple decades now.

A.  Really?

Q.  I guess it's lovely over there.  I never saw it.

A.  That's what I hear.

Q.  That's what I hear, too.

And are you employed?

A.  Retired.

Q.  When were you last employed?

Page 17

A.  We had a heating and cooling business.  And we sold that business in October of 2018.  And I went on to work for that buyer for an additional six months.  So February, March of 2019.

Q.  In October 2015, were you employed with that HVAC business?

A.  Yes, I was.

Q.  And what was the name of that business?

A.  Dames Heating and Cooling.

Q.  And what was your job?

A.  Office work, bookkeeping.

Q.  And on this lawsuit you filed, are you aware we asked you to produce certain documents?

A.  Yes.

Q.  And have you produced all the documents that you have that we've asked for?

A.  I've produced all the documents that I have.  I'm -- if there were other things that you asked for, I might not have been aware.  I gave my attorney everything I had.

Q.  And can you explain just generally what you did to look for items that I asked for?

A.  In the -- in the original car accident lawsuit, I had already provided him with all the documents I had.  At that time, it was fresh and

5 (Pages 14 - 17)

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Page 18

new. I was easily able to get my hands on everything that I had available to me.

Q. Did you do anything in addition to respond to my request for items from you?

A. I looked for, I think, one item that was requested, was that if I had made any payments personally to any of the med -- any of the medical bills. And I did do research on my HSA account. If I had written anything medical, it would have been through that. And I couldn't find anything.

Q. So did you pay anything personally out of pocket for any treatment you received for your injuries from the accident on October 25, 2015?

A. The only out-of-pocket expenses I had would have been that my medical -- medical providers were paid out of the settlement. So that would have been out of pocket. And the other out-of-pocket costs would have been the fact I wasn't able to use the med pay to my benefit.

Q. And you mentioned that you had a settlement. What was the settlement about?

A. The settlement was in regards to the car accident, repair of the car, and any outstanding medical bills that my health insurance didn't cover.

Q. Well, did you have medical bills from your

Page 19

accident that your health insurance didn't cover?

A. I did.

Q. And why didn't your health insurance cover those expenses?

A. I went to a chiropractor and a massage therapist, neither of which are covered under my medical insurance.

Q. Were claims submitted to Anthem for your treatment with the chiropractor?

A. They don't cover chiropractic insurance. There was no reason for me to give them my insurance.

Q. So did you choose not to give your health insurance information to the chiropractor?

A. He doesn't accept health insurance.

Q. Who is the chiropractor?

A. Tim Collins.

Q. And the massage therapy, who was that with?

A. Shelly James.

Q. Is that a company called All About Massage?

A. That's correct.

Q. And did you present All About Massage with your health insurance card and information?

Page 20

A. I don't recall.

Q. Were any claims submitted to your health insurance with Anthem for your massage therapy?

A. No.

Q. And why not?

A. I'm not certain she takes insurance either.

Q. Well, do you understand that your Acuity medical payments coverage would have paid for your massage therapy?

A. Are you referring to the med pay?

Q. Yes.

A. You know, quite honestly, I didn't -- similar to the medical insurance, there's things in your policy that are not very clear to me. That's why I hire experts to advise me as to what to get. I would certainly hope that my insurance company would have made it clear to me -- my car insurance company would have made it clear that I had that option available to me.

Q. Did you ever talk to anybody at Acuity as to whether your med pay coverage would have covered your massage therapy?

A. I did talk to someone at Acuity. I don't recall the name, and I was basically told that

Page 21

because the other driver had taken 100 percent responsibility, that I needed to deal with their insurance company.

Q. So they told you to go try and collect for your medical expenses from the other insurance company of the driver?

A. Correct.

Q. Did you ever receive any money from Acuity in connection with the auto accident?

A. I did not.

Q. And I noticed in the documents you produced, that it looks like out of your settlement with the driver's insurance company, you also paid the radiologist who read your CT scans at Mercy Hospital. Have you seen that?

A. Do you want me to look at something specific? Do you have a -- have something I need to look at?

Q. No. I just wondered, do you recall that?

A. I knew -- yes, I was aware that there was another bill from an additional doctor. I couldn't tell you with regards to what it was at this point.

Q. Do you know why your health insurance didn't cover that bill from that radiology provider?

A. I have no idea. I went to the hospital.

6 (Pages 18 - 21)

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Page 22

And as I said, I assumed that they pass through all the medical things through my healthcare coverage. I didn't know that there would be another doctor that would charge me additionally. I never saw anyone. And I -- I didn't understand where the billing was coming from.

Q. Well, I take it you saw a doctor when you were at Mercy Hospital Washington, didn't you?

A. In the emergency room, yes.

Q. We're going back to -- we kind of went on a tangent here. I was asking you about what you did to find items that I asked for to have you produce. Did you check your e-mail for anything that was relevant to the case?

A. I did check my e-mail. And I could not find anything else relevant.

Q. Did you -- did you have -- well, sitting here today, do you have a copy of any e-mail communications you had with anybody at Acuity?

A. I believe there -- I was shown something yesterday from Sherry -- I don't remember her name. I can try to find that document again -- that appeared that she e-mailed me. Although I never did receive those e-mails.

Q. I guess what I'm trying to get at is when

Page 23

we asked you to produce documents months ago, did you go back and look in your e-mail to see if you had anything in there that I was asking for?

A. I looked in my e-mails in regards to Mercy, Anthem, just trying to find something. As far as I was aware, I had already given everything that I had to my attorney.

Q. No, I understand. I think when you said you had already given stuff to your attorney, that was several years ago, right? When you were pursuing the driver's insurance company for the accident, that's when you provided stuff?

A. Yes.

Q. And I guess my question is, when I sent you a request for production earlier this year, did you go back and look through your e-mail again to make sure that anything you had that I asked for, you were turning over to your attorneys?

A. I know I looked at things. I don't know. I don't have any specific memory of what I was looking for. My attorney did ask me to -- if I could come up with any of those things, but I was not able to.

Q. Let's talk about the accident. Can you just describe generally what happened in the

Page 24

accident?

A. We were coming down 100. And I apologize, I'm not good at directions. So we were heading into Washington from 44. We got to the Independence and Raditrough (phonetic) Road. We were on the far right-hand side. It's a dual lane. And as we were moving straight, a driver made a left-hand turn in front of us and broadsided us.

Q. And you were a passenger in the car?

A. I was.

Q. And was your daughter Anna the driver?

A. My husband was the driver.

Q. Your husband was the driver. Anna was also a passenger in the vehicle?

A. Yes, she was.

Q. Did your husband suffer any injuries in the accident?

A. No.

Q. What vehicle were you in during the accident?

A. 2013 Nissan Altima.

Q. And who was the owner of that vehicle?

A. Myself.

Q. And were you injured in the accident?

A. I was.

Page 25

Q. And did you seek treatment for your injuries?

A. I did.

Q. And where did you seek treatment?

A. We drove to -- we drove ourselves to -- I can't remember the name of it. It's over in the Patients First building. It's not the emergency room, but critical care. We went in there. And at that point, I was only concerned with my daughter because she was very evidently hurt, and didn't realize that I was hurt that badly. We went in. We got our blood pressure, whatever. And they told me it was beyond their scope, that I needed to go to the emergency room. So that's what I did.

Q. And why did you choose to seek treatment from Mercy?

A. That is where they suggested I go.

Q. Who did?

A. The nurse practitioner from the little urgent care thing that I went into.

Q. Why did you choose to go to the urgent care first?

A. Because I know that my health insurance covers -- they have a better rate than an emergency room visit.

7 (Pages 22 - 25)

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Page 26

Q. Had you ever been to that urgent care facility before?

A. I had not.

Q. Before you went to that urgent care facility, did you know whether or not it was a network provider for Anthem?

A. Yes. It's in the same building as my primary care physician.

Q. So you assumed that the urgent care clinic was a network provider for Anthem?

A. Correct.

Q. I guess what I'm getting at is did you look up anywhere or call anybody before you got treatment to find out whether or not they were a network provider for Anthem?

A. I did not make any phone calls, no. My -- it was a pretty traumatic event. My daughter was in a lot of pain. And I was in pain. And it just wasn't the top of my list. I knew that they were a provider because they're in the same building, just as I knew Mercy was a provider. But this facility is a less expensive option.

And when I went -- so I went there first. I thought the wait would be shorter. I just thought it was a better option for us. And they

Page 27

told me that they weren't equipped for this kind of an injury, that I needed to go to the emergency room.

Q. And that was at Mercy Hospital Washington?

A. Yes.

Q. Is it fair to say that right after the accident, the most pressing concern to you was to get medical treatment for you and your daughter?

A. Yes.

Q. And were you trying to get to the closest available medical facility to get treatment for you and your daughter?

A. Well, I was -- I'm not sure how to answer that question. I -- the accident happened in Washington. Washington is where my medical provider is. And there's a hospital there. I went to the little urgent care, because I thought it would be less expensive on my insurance.

Q. Who is your medical provider?

A. Anthem Blue Cross.

Q. Oh, that's your -- you mean your health insurance, Anthem. Medical provider, I thought you meant your doctor. You're talking about your health insurance?

A. Well, my doctor is in that facility as

Page 28

well. And it is Dr. -- I'll have to come up with that one. I apologize. I go once a year.

Q. That's okay.

A. Hoffman, I believe.

Q. At the time of the accident, right after that, did you consider going to any other facility other than the urgent care facility you went to?

A. I'm not sure I understand that question.

Q. Well, in your thought process right after the accident, were you thinking I need to choose which healthcare facility to go to?

A. I -- I went to the urgent care because I -- I thought it would be less expensive according to my medical insurance, and that it was a less of -- I hoped that it would be less of a wait. And then they directed me to the emergency room at Mercy Hospital.

Q. Well, when you decided to go to the urgent care facility, did you think maybe I ought to go directly to the emergency room at Mercy?

A. At that time, I didn't know how badly we were hurt. But, you know, neither of us was bleeding. My daughter was evidently hurt. I didn't know to what extent. But I thought they were equipped for that kind of stuff.

Page 29

I didn't -- I opted not to take the ambulance, because I didn't think that it was to the extent that we needed an ambulance. My husband -- we actually called friends, because our car was undrivable. It had to be towed. And in that time that we were waiting for the car to be picked up, an ambulance did get there. And he looked my daughter over and asked if we wanted to take the ambulance. And I didn't see any need for it.

We had people there that could give us a ride. It wasn't that far. And again, I didn't see the reason to charge my health insurance and at my added expense, because I knew I would have copays and deductibles that I hadn't met. And I chose not to ride in the ambulance for that reason.

I chose to go to the ambulatory -- the first place, the care facility for the same reason. When they told me that they were not equipped to handle it and they sent me to the emergency room, I followed those directions and that's where I went.

Q. So what happened to the -- the Nissan Altima that was in the accident? Was that totaled?

A. It was not totaled and they did repair it.

Q. How much did it cost to repair the car?

8 (Pages 26 - 29)

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Page 30

A.  I -- I can't tell you off the top of my head.

Q.  Any rough estimate?

A.  Rough estimate, I'm thinking it was in the neighborhood of 13,000.  And that's really just a wild guess.

Q.  And where was the car repaired?

A.  It was repaired in Warrenton, Missouri at -- I -- I can't come up with the name of the place right now, but I can find out for you.

Q.  Okay.  So while you're at Mercy, did you sign a document consenting to your treatment?

A.  Not that I can remember.

Q.  Can you pull out Exhibit 1 that I've marked, please?

(Whereupon Exhibit 1 was introduced for identification.)

A.  Okay.

Q.  (By Mr. Fink)  And on Page 2 of Exhibit 1, is that your signature?

A.  Yes, it is.

Q.  And do you recall signing Exhibit 1?

A.  I do not.

Q.  Did you ask anybody at Mercy any questions about anything in Exhibit 1?

Page 31

A.  I don't remember ever seeing the document.  I don't recall signing it.

Q.  When you sought treatment at Mercy, do you recall any of your conversations with anybody at Mercy during your treatment?

A.  No, I really don't.  Other than they told me they were going to be running certain tests on me.  That I needed to have a scan.  Because, again, at that time, I really didn't think I was hurt.  I knew I was hurting, but I wasn't bleeding anywhere.

So they could -- I guess by the way I was holding myself and having difficulty walking, that they felt it would be in my best interest to get checked out.  And they told me that I could be bleeding internally.  And that was the reason they felt they should run these tests.

Q.  Okay.  Other than the tests that they thought you should get while you were at the emergency room, do you recall anything else that anyone at Mercy told you while you were at the hospital?

A.  No.

Q.  Do you recall any questions that you asked of anyone at Mercy while you were there?

A.  No.

Page 32

Q.  Okay.  And since your treatment at Mercy Hospital Washington on October 25, 2015, have you spoken to anybody at Mercy about that treatment?

A.  As far as the emergency room goes?

Q.  About any aspect of your treatment, have you talked to anybody at Mercy about that treatment?

A.  I got a -- the only conversation that I can recall is I went to the billing department, because I did receive an invoice from the first facility I went to, the urgent care.  And so I went to the billing department, which was in the Mercy building, and was very upset because they were charging me as if they had done something, when in reality I spent more time walking in and walking out.

And even though I didn't feel like I was going to be held responsible for those charges, I didn't feel that it was fair.  So I went to the billing office to explain my viewpoint.  And as far as I know, it was deducted, because they did absolutely nothing.

Q.  When you say it was deducted, do you mean they took back the bill for the urgent care visit?

A.  As far as I know.  I -- I never saw the bill again.  It was never brought up as an issue.

Page 33

Q.  Did you ever pay that bill from the urgent care?

A.  I did not.

Q.  Other than your conversation with Mercy about the bill you received from your short visit to the urgent care, do you recall any other conversations you've had with Mercy about any aspect concerning your treatment in the ER on October 25, 2015?

A.  I don't recall talking to anyone in the ER about anything.

Q.  Okay.  Let's talk about after your treatment.  This discussion is really just about the treatment, any billing you've received for the treatment.  Have you ever spoken to anybody at Mercy considering its billing or insurance collections or anything at all concerning your emergency room treatment on October 25, 2015?

A.  Some months later, I suddenly started getting collection letters.  And I did call Mercy then.  I don't remember who I spoke to.  I explained to -- gave her the information for the other driver's insurance information.

Q.  And you say you received collection letters?

9 (Pages 30 - 33)

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Page 34

A. I did.

Q. And were those for you personally?

A. I don't remember.

Q. Do you still have a copy of those letters?

A. I don't remember.

Q. And did you ever talk to anybody at Mercy to complain that it had collected on your medical payments coverage?

A. I was unaware of it until recently my -- when we were going through settling, my attorney questioned it. And as a result, discovered that Mercy had charged my med pay.

Q. So you never had any discussions with anybody at Acuity in 2016 where they told you that Mercy was collecting from your medical payments coverage?

A. I did not.

Q. Never received any e-mails from anybody at Acuity telling you that?

A. I did not receive them, no.

Q. At the time of the accident on October 25, 2015, you had health insurance with Anthem, correct?

A. I did.

Q. And sitting here today, do you have a copy of your health insurance policy from 2015?

Page 35

A. Yes, I believe it was printed off and sitting here, yes.

Q. Just to be clear, I went and got it from Anthem. Did you have a copy before I went and got it from Anthem?

A. Not -- not to my knowledge.

Q. Well, did you ever have a copy of your health insurance policy with Anthem?

A. I'm certain when I originally signed up with them, they must have sent me something. I had the Anthem policy for a number of years.

Q. Okay. Do you know what happened to it, your copy?

A. I probably pitched it.

Q. Okay. If you could, I'd like you to look at Exhibit 3, please.

(Whereupon Exhibit 3 was introduced for identification.)

A. Okay.

Q. (By Mr. Fink) And just on Exhibit 3, Anthem says that this was your health insurance policy in 2015. Do you have any reason to dispute that Exhibit 3 was your health insurance policy in 2015?

A. If that's what they say it is, then I

Page 36

would have to go along with that.

Q. And since you received this copy of the Anthem policy to prepare for your deposition today, have you reviewed it?

A. I have not.

Q. If we could look at Exhibit 17, please, Ms. Dames. Let me know when you're able to find that.

A. Okay.

(Whereupon Exhibit 17 was introduced for identification.)

THE WITNESS: Is that Page 17?

MR. FINK: Well, it says Exhibit 17. In the bottom left-hand corner, it should say DEF'S EX. And then underneath that, No. 17.

THE WITNESS: Okay.

MR. WERTS: One second, Jeff. She was turning to Page 17 in the Anthem policy.

MR. FINK: I'm sorry. Yeah. We're done with that.

THE WITNESS: Okay. Okay.

Q. (By Mr. Fink) And in Exhibit 17, this appears to be a fax that you sent to Mark Brinkmann on August 24, 2017; is that correct?

A. It is.

Page 37

Q. And it appears you faxed -- just to be clear, Mr. Brinkmann, he was your attorney in handling the claim against the driver of the other car?

A. Correct.

Q. And it looks like you sent to him a copy of your health insurance card with Anthem; is that correct?

A. It is.

Q. And then on Pages 3 and 4 of the document, Exhibit 17, it looks like you also printed out some claim details from Anthem; is that correct?

A. It appears to be, yes.

Q. And do you know why you did that?

A. I assume that I was trying to provide my attorney with all the medical expenses that had occurred.

Q. And I note that on the Page 4 of the document, the fax, it's labeled at the bottom with your name, it says Dames, Kim. Then it's got 000142. Do you see that page?

A. Yes, I do.

Q. And is that your handwriting?

A. Yes, it is.

Q. And it indicates on here that you paid out

10 (Pages 34 - 37)

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Page 38

of pocket for your massage therapy at All About Massage; is that correct?

A. That is what it says, yes.

Q. And is that what actually happened?

A. Based on this, I would say my memory is faulted. I thought she held it. But I may have paid her some out of pocket according to this.

Q. And then as to your treatment with Dr. Tim Collins, it says: Should have been on insurance claims, but then you said might have been -- might have paid out of pocket.

Do you see that?

A. I do.

Q. Do you know why you wrote that?

A. According to what I wrote, it's exactly what it says. It should -- it might have been, should have been on insurance claim, meaning the case that we had against the other driver. But I might have paid some of that out of pocket as well. That's how I read it.

Q. Okay. So when you say should have been on insurance claims, you're meaning on your claim against the other driver's insurance?

A. Correct.

Q. Not your own insurance with Anthem?

Page 39

A. I don't recall it that way.

Q. If we could, could you turn to Exhibit 12, please.

A. Okay.

(Whereupon Exhibit 12 was introduced for identification.)

Q. (By Mr. Fink) And Exhibit 12 appears to be a patient lien request. Do you see that?

A. I see it.

Q. And that was with your chiropractor, Dr. Tim Collins?

A. Correct.

Q. Is that your signature at the bottom of the page?

A. Yes, it is.

Q. And did you date this form?

A. It appears 10/25/15.

Q. Now, the date by the signature at the bottom of Exhibit 12 --

A. Oh.

Q. -- it says 3-22-16. Do you see that?

A. It does.

Q. Is that your handwriting?

A. It is.

Q. Did you fill out any of the other

Page 40

handwritten information in this document?

A. All of the information on the document is in my handwriting.

Q. Why did you fill out and sign Exhibit 12?

A. I -- that was many years ago. I could venture a guess, I don't think I'm supposed to. But apparently, this was to my chiropractor. As you can see, the insurance carrier is Cameron Insurance. And the agent, Larry Baker, was the underwriter or claims adjustor that I was in touch with. And that I provided him with that information.

Q. Did you ever provide your health insurance information with Anthem to Dr. Collins?

A. Not that I recall.

Q. Did you ever ask Dr. Collins to bill your Anthem health insurance for his chiropractic care of you?

A. Not that I recall.

Q. Do you know why not?

A. In my mind, I believed that at this point, the other car insurance company, the Cameron Insurance, had already taken full responsibility and that they would be covering anything that my medical insurance didn't cover. My medical insurance does not cover chiropractic.

Page 41

Q. How do you know that?

A. I asked them.

Q. You asked Anthem -- I'm sorry. I didn't mean to interrupt you. Go ahead.

A. I know that as the same as I know I don't have dental and vision.

Q. So did you just assume that you didn't have health insurance coverage for chiropractic care?

A. Yes. I didn't believe --

Q. Did you --

A. I don't recall ever calling them. My understanding was that I didn't --

Q. I'm sorry. Yeah. That was my follow-up question is, did you ever call anybody at Anthem to ask whether your health insurance provided coverage for chiropractic care?

A. Not that I recall.

Q. In your insurance claim against the driver, that was with Cameron Insurance; is that right?

A. That was their insurance.

Q. And with Cameron Insurance, did you ever submit as part of your claim to Cameron the bill for your treatment at Mercy Hospital Washington?

11 (Pages 38 - 41)

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Page 42

A.   I -- I don't recall having done that.  My view is that Mercy had -- Mercy is my regular provider.  I gave them my health insurance.

Q.   Yeah.  But did you ask Cameron to pay you any amount based on your medical care that you received at Mercy Hospital Washington?

A.   I'm not sure I understand the question.  So legally did my attorney ask them to cover those?  I really don't know how that works.  I leave that to him.

Q.   Well, do you deny that as part of your claim to Cameron, you submitted the full billed charges of Mercy for your care at Mercy Hospital Washington?

A.   So the question is, do I deny that I submitted any paperwork for Mercy to Cameron?

Q.   Correct.

A.   I don't deny that.  I could have.  I was sending all my medical, anything that came in related to the accident, to the Cameron underwriter, claims adjustor on a regular basis.

Q.   And who is that adjustor at Cameron?

A.   Larry Baker.

Q.   So you sent all your medical bills to Mr. Baker?

Page 43

A.   I did.

Q.   And did you send any medical bill from Mercy to Mr. Baker?

A.   I -- I don't know that specifically.

Q.   At the time of the accident on October 25, 2015, you had an automobile insurance policy with Acuity, correct?

A.   Yes.

Q.   And your automobile insurance policy with Acuity included medical payments coverage, correct?

A.   Yes.

Q.   And to your understanding, what does medical payment coverage provide for, what does it cover?

A.   Honestly, I would have assumed if the accident were my fault, they would pay whomever I may have injured medical.

Q.   Do you have any understanding as to whether medical payment coverage would be paid for treatment you received?

A.   I really didn't give it -- give it that thought.  In my head, my medical insurance covers any medical issues that I may have.  My automobile insurance covers my vehicle and any drivers that I may have injured if the accident was my fault.

Page 44

Q.   Right.  At the time of the accident on October 25, 2015, did you even know what medical payments coverage was?

A.   Not necessarily.

Q.   Had you ever heard of it?

A.   I -- I can't -- I can't specifically say I contacted a broker who set me up as to what he felt would be best for me and I relied on that information.  And so whatever was in the policy, I just figured it was the best option according to my broker.

Q.   And after your accident on October 25, 2015, do you recall any conversations you had with anybody at Acuity?

A.   I do recall one conversation.  Obviously -- well, I initially let them know that we had been involved in a car accident.  And within a matter of days, Cameron Insurance Agency made it clear that their client was a hundred percent at fault, and they would be taking care of everything else.

I assumed they would provide me with a rental car and so on until my car was repaired.  And I, from that point, started sending him the bills that was not covered under my medical

Page 45

insurance.

Q.   Well, what bills were not covered under your medical insurance?

A.   My chiropractor, my massage therapist.  I don't know if it was the one that you had mentioned that read some tests.  My daughter was also having things -- things going on, medical things happening.  And so whatever material -- whatever I was receiving, which my daughter was also at the Mercy clinic, and they had my medical insurance.

I had not met my deductible.  And of course I do have copays.  So I would just send him whatever I got in the mail.  Assuming that my health insurance covered whatever I was allotted according to that policy, that I would be provided with medical coverage.  I was aware that I needed to pay my deductible.

And I was also confident that since I was not at fault in the accident, that the other driver's insurance should be covering those expenses.

Q.   Well, did you believe that the other driver or his or her insurance should have paid Mercy for your treatment?

A.   I didn't.  I have medical coverage with

12 (Pages 42 - 45)

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Page 46

Mercy.

Q. So you mentioned the one conversation with Acuity to let them know you had been in an accident. I assume that occurred shortly after the accident happened?

A. Right. And then I -- I did have another conversation with them sometime later because I had started receiving collection letters. And I felt like my insurance company should be working with the other insurance company, and they should work this out.

That I shouldn't be penalized for having to come up with these documents and stop my day. I had a teenage daughter. I ran a business. I didn't have time to work with this. And I felt like the people with the expertise should be guiding me in this. And I didn't feel like I was getting any guidance.

Q. Who were you looking for for their expertise and guidance?

A. Both the insurance companies actually. Cameron, the adjustor. Larry Baker was very, very nice. And, in fact, he was the one that told me I needed to hire an attorney. The -- my insurance agent at Acuity, basically the gist of what I got

Page 47

out of them was the other driver's at fault. You need to deal with their insurance company.

Q. Did you ever have any discussion with anybody at Acuity about your medical payments coverage?

A. I did not.

Q. Did you ever have any discussion or communication with your insurance agent about your medical payments coverage?

A. My insurance agent. Can you clarify that?

Q. Well, as I understand, you had an insurance agent through whom you purchased your policy with Acuity?

A. Yes.

Q. And who is that?

A. K. Flynn Insurance.

THE COURT REPORTER: Can you repeat that, please?

THE WITNESS: K. Flynn Insurance. They're based out of Troy, Missouri.

Q. (By Mr. Fink) And is the last name spelled F-L-Y-N-N?

A. Correct.

Q. And the first name is Kay, K-A-Y?

A. No. It's just the initial K.

Page 48

Q. And did you talk to anybody at K. Flynn about your medical payments coverage?

A. I did not.

Q. If you'd look at Exhibit No. 4, please. Let me know when you're able to pull that up and look at it.

A. Okay.

(Whereupon Exhibit 4 was introduced for identification.)

Q. (By Mr. Fink) Exhibit 4, the first page of that appears to be an e-mail from Kathyrn Theriot of Acuity to an e-mail address dameshv ac@gmail.com. Do you see that?

A. I do.

Q. Is that the e-mail address -- or is that your e-mail address?

A. My e-mail address is dameshvac. It does not have a space between the V and the A.

Q. Is that the e-mail address you were using in January 2016?

A. It was.

Q. Do you still use that e-mail address today?

A. I do.

Q. And do you recall receiving this e-mail

Page 49

from Ms. Theriot on January 28, 2016?

A. I do not.

Q. Can you notice in the body of the e-mail message, Ms. Theriot writes to you, quote: Ms. Dames, please find the attached per our discussion.

Do you see that?

A. I see that.

Q. Do you recall anything about that discussion that she's mentioning?

A. I do not recall anything about that discussion. And I never received the e-mail.

Q. I'm sorry. You never received the e-mail?

A. I didn't.

Q. So the second page of Exhibit 4 was an attachment to her e-mail. Do you see that?

A. I do.

Q. And this appears to be a claim form submitted to Acuity for your treatment at Mercy Hospital Washington. Do you see that?

A. I see that.

Q. And I take it you're saying -- your testimony is that you never saw this before?

A. I -- I don't recall having ever seen it before, no.

13 (Pages 46 - 49)

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Page 50

Q. So Acuity never told you that Mercy had submitted a claim to Acuity for your treatment at Mercy?

A. I don't remember any conversation like that.

Q. As of January 28, 2016, had you hired an attorney to represent you?

A. I had not.

Q. When did you hire an attorney to represent you?

A. I -- I would have to look to be specific. But I know it was towards the end of the year, in the fall. October -- September, October.

Q. Of 2016?

A. Yes.

Q. If we could turn next to Exhibit 5.

A. Okay.

(Whereupon Exhibit 5 was introduced for identification.)

Q. (By Mr. Fink) And the first page of Exhibit 5 appears to be another e-mail from Kathryn Theriot at Acuity to you at dameshv ac@gmail.com. Do you see that?

A. I do see that.

Q. Do you deny --

Page 51

A. It doesn't --

Q. Go ahead. I'm sorry. I didn't mean to interrupt.

A. I guess I do deny receiving that e-mail. I -- I'm looking at it. The only thing I can see wrong with it is that space. I don't know if that would be enough to prevent me. I did, since seeing this yesterday, do a search on my e-mail. Although I have old e-mails, it doesn't show any of this.

Q. Okay. This e-mail and the last one we looked at were produced by you. Do you know how you have a copy of this if you didn't receive the e-mail?

A. I don't know. It's in my attorney's thing that says for this deposition, it was put together. I don't know where it came from.

MR. WERTS: Can we go off the record for just a moment?

MR. FINK: Sure. Absolutely. Let me try to talk -- oh, yeah, we can go off the record. Are we off? We'll take a break. Let's go off the record. We'll take a break either way.

THE VIDEOGRAPHER: Off the record at 11:14.

(Whereupon there was a short

Page 52

break.)

THE VIDEOGRAPHER: We are back on the record. This is Media Unit No. 2. The time is 11:26 Central Time.

Q. (By Mr. Fink) Okay. Ms. Dames, did you ever pursue a claim for underinsured motorist coverage under your Acuity policy?

A. I -- I believe when my attorney recognized what was going on, he contacted Acuity.

Q. And did you ever receive any payment from Acuity under the underinsured motorist coverage of your Acuity policy?

A. No.

Q. Do you know why not?

A. No.

Q. The settlement payments that you received from Cameron for you and your daughter Anna, did you feel that they had completely compensated you and Anna and your husband for all the damage that occurred from the accident?

A. Until I found out that Mercy had actually taken moneys that I should have been entitled to.

Q. But aside from that, do you feel that Cameron fully reimbursed you, your husband and daughter Anna for all the injuries and damage caused

Page 53

by the accident?

A. I believe they had a ceiling on damages. And I think that that's kind of where it ended.

Q. So how much did you receive out of the settlement with Cameron all together, you and your daughter and your husband?

A. My husband received nothing. I received approximately 10,000. Are you asking for what I actually received or what was awarded as a full...

Q. No. Your net amount. I know your attorney gets a portion of it. I understand that.

A. So I believe mine was about 10,000. I think my daughter's was a little higher than that. I don't know specifically. It might have been 12.

Q. So approximately about $22,000 net to you and Anna from the settlement with Cameron?

A. Approximately.

Q. If we could look at Exhibit 8, please.

A. Okay.

(Whereupon Exhibit 8 was introduced for identification.)

Q. (By Mr. Fink) Do you see this is a letter dated January 19, 2017, from Cameron to your attorney and others?

A. Yes.

14 (Pages 50 - 53)

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Page 54

Q.   And William Robinson, was he your attorney?

A.   No.  Mark Brinkmann was the attorney.

Q.   Do you know if Mr. Robinson worked with Mr. Brinkmann?

A.   As I'm reading this, yes, it appears that way.

Q.   Had you ever met Mr. Robinson before?

A.   I think I might have met him once.  I -- I did talk with a different attorney initially.  But just the one time.

Q.   And do you see in this letter, Exhibit 8, that there was a settlement proposed by Cameron?

A.   Yes.

Q.   And if you look at the top of the second page, the first sentence, the letter says, quote: We believe an equitable settlement offer for all parties within the available limits would be to utilize the incurred medical expenses as a basis for apportionment.

Do you see that?

A.   I do.

Q.   And then there's a chart underneath that where you're the first listed name.  Do you see that?

Page 55

A.   Yes.

Q.   And next to you under expenses, it says $14,351.50.  Do you see that?

A.   I do.

Q.   And then for the proposed settlement for you for your portion, it says $16,750.  Do you see that?

A.   Yes, I do.

Q.   The expenses of $14,351.50, do you know what that included?

A.   I don't.

Q.   Isn't it true that amount included Mercy's billed charges to you of $12,382.50?

MR. WERTS:  Object to the form, foundation.

Go ahead.

A.   I guess.  I would -- I assume so.

Q.   (By Mr. Fink)  Well, other than the $12,282.50 of billed charges from Mercy, did you have any other charges anywhere near that amount?

A.   No.

Q.   All the other charges were relatively a lot smaller, correct?

A.   Yes.

Q.   Do you know why you're asking Cameron to

Page 56

pay for your medical treatment at Mercy?

A.   I had an attorney at that point.  I don't know.

Q.   You'd defer to his judgment?

A.   Correct.

Q.   Fair enough.  How much do you think Mercy should have been paid for your treatment?

A.   I feel like Mercy should have honored the contract it had with my provide -- my health insurance provider.  And I understand the bill went down to $500 instead of $1,200.  And that's what I feel like they were entitled to.

Q.   So if Mercy was entitled to only $500, why were you asking Cameron to pay you based on charges of $12,382?

MR. WERTS:  Object to the form, calls for a legal conclusion, assumes facts not in evidence.

Go ahead.

A.   I don't know.

Q.   (By Mr. Fink)  Do you think that was fair of you to ask Cameron to pay you based on Mercy's full billed charges when you're claiming that Mercy should only get $500 for your treatment?

MR. WERTS:  Same objection.

Page 57

A.   What I'm claiming is Mercy has agreed with Anthem, they came to a conclusion of a price.  And I think that I'm entitled to that.  That is why I pay for health insurance.

Q.   (By Mr. Fink)  Okay.  You think you're entitled to a price of $500 for your treatment at Mercy, correct?

A.   I'm sorry?

Q.   You believe that you are entitled to a price of $500 or so for your treatment at Mercy?

A.   I believe that Mercy should have honored the contract it had.  And they agreed between the two of them on the $500 price.

Q.   How do you know that that's the agreement between Mercy and Anthem?

A.   When my attorney was doing the research, he came up with the -- that amount, and was trying to make sense of it, because we didn't know what had happened.  Why they had entered it one way, backed it out another way.  So he dug until he figured out what was going on.

Q.   Are you aware that under Mercy's agreement with Anthem, Mercy is actually entitled to $5,000 for your treatment?

MR. WERTS:  Object to the form of the

15 (Pages 54 - 57)

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Page 58

question, facts not in evidence, legal conclusion.

Go ahead.

A. I'm unaware of that.

Q. (By Mr. Fink) You've never heard that before. No one's ever told you that?

MR. WERTS: Same.

A. (The witness shakes head.)

Q. (By Mr. Fink) I'm sorry. You have to say yes or no for the court reporter.

A. Oh, I'm sorry. No. I've never -- I was unaware of that.

Q. Do you have any reason to dispute that Mercy is entitled under its contract with Anthem to $5,000 for your treatment?

MR. WERTS: Same objection.

A. I think as a -- as the person that purchases insurance, that I should have confidence in the agreement that they made on what their healthcare participants should have to pay. I -- it -- it seems inconsistent that those charges for the same work would vary to such great degrees.

Q. (By Mr. Fink) If we could look at Exhibit 10, please.

A. Okay.

Page 59

(Whereupon Exhibit 10 was introduced for identification.)

Q. (By Mr. Fink) And Exhibit 10, does that contain your signature at the bottom of the first page?

A. Yes, it does.

Q. And is this a limited release of your claims against Cameron Insurance?

A. Yes.

Q. And this indicates that you were paid $16,750 by Cameron?

A. Yes.

Q. And I take it your daughter Anna also had a release for her claim too with Cameron?

A. Yes.

Q. Do you know how much she got paid by Cameron, in gross; not net, gross amount?

A. Right. No, I don't.

Q. And so as to the damage to the vehicle, did you pay for that out of pocket?

A. I don't recall.

Q. Did you ever pursue a lawsuit against anybody over the accident?

A. The lawsuit against the driver's insurance, which was Cameron.

Page 60

Q. Yeah. But was an actual lawsuit filed or was the settlement handled without needing to file a lawsuit, if you know?

A. I think -- I think it was handled. I'm -- I'm pretty sure it was handled. I never went to court, if that makes it one way or the other.

Q. Can you look at Exhibit 2, please?

A. Okay.

(Whereupon Exhibit 2 was introduced for identification.)

Q. (By Mr. Fink) Do you recall receiving Exhibit 2?

A. It's addressed to me.

Q. Do you recall receiving it?

A. Not -- not offhand, no.

Q. In Exhibit 2, there's a reference to a company called Medical Reimbursements of America. Do you see that?

A. Yes.

Q. Do you recall any communications you ever had with Medical Reimbursements of America?

A. No, not that I recall.

Q. Did they ever call you and ask you for your insurance information?

A. I -- I just don't remember.

Page 61

Q. If we could turn to Exhibit 7, please.

A. Okay.

(Whereupon Exhibit 7 was marked for identification.)

Q. (By Mr. Fink) Excuse me. You see Exhibit 7 consists of a letter dated May 14, 2018, from your attorney, Mark Brinkmann, to Susan Hannasch?

A. Yes.

Q. That's the first page of the exhibit. Then you see the second page is a letter dated May 11, 2018 from Kathryn Theriot of Acuity to Susan Hannasch at Mercy. Do you see that?

A. I do.

Q. Have you ever seen these letters before today?

A. I don't remember seeing them, no.

Q. If we could look in the first letter in Exhibit 7, the May 14 letter.

A. Okay.

Q. Do you see in the first paragraph, the second to last sentence, Mr. Brinkmann writes, quote: Please issue the appropriate refunds to Acuity.

Do you see that?

16 (Pages 58 - 61)

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Page 62

A.  Yes.

Q.  Do you know what the appropriate refund to Acuity was?

A.  I'm not sure who this lady is that the letter's addressed to.  I assume that it had something to do with my med pay.

Q.  I'll represent to you, Ms. Hannasch was an in-house attorney at Mercy at the time.

A.  Okay.

Q.  Do you understand what the, quote, appropriate refunds to Acuity were?

A.  I believe it was 4,424.

Q.  Dollars?

A.  Yes.

Q.  And why was that the appropriate refund?

A.  Because that's what Mercy was paid out of my med pay.

Q.  Was $5,000 -- weren't they paid $5,000?

A.  I don't know.

Q.  So in any event you wanted the refund to go from Mercy to Acuity, correct?

A.  Yes.

Q.  Why did you want the refund to go to Acuity instead of you?

A.  I have -- during this, getting ready in

Page 63

the deposition, the attorney said it should go back to the proper channels it came from.

Q.  The money should go back to Acuity?

A.  I believe he felt that it would be better to go back to Acuity for a paper trail.  And then Acuity would then need to send it to me.

Q.  And assuming that happened, how much do you believe Acuity should pay to you?

MR. WERTS:  Object to the form, legal conclusion.

Go ahead.

A.  I don't know if I have restraints on how to use that.  I don't believe I do.  So I would -- I would expect the whole amount.

Q.  (By Mr. Fink)  The full $5,000?

A.  4,424 is my understanding.

Q.  Because you believe $576 should be retained by Mercy?

A.  I -- I believe that that was what their original charge were in agreement to -- with my health insurance coverage.

Q.  Outside of your medical bills with Mercy, did you have $4,424 in medical bills?

A.  No.  Mercy was the biggest bill.

Q.  Why should you get $4,424 if your medical

Page 64

bills outside of Mercy were less than that?

MR. WERTS:  Object to the form of the question, legal conclusion, application of legal principles.

Go ahead.

A.  Because I chose an insurance coverage that included that extra coverage.  And I feel like I'm entitled to that rather than a third party.

Q.  (By Mr. Fink)  So you feel you're entitled to the medical payment coverage based on getting treated at Mercy, right?

MR. WERTS:  Same objection.  Form.

Go ahead.

A.  I feel like I purchased health coverage to cover my medical bills.  And I purchased vehicle coverage with the med pay to cover anything that might effect me or someone that I caused injury to.  And having been in that position, and with the -- doing what I could on this, if -- if I had not purchased that additional coverage, Mercy would have accepted the Anthem offer of -- or agreement that they made with Anthem of the $517.

Q.  (By Mr. Fink)  It was actually $576.  Do you agree?

A.  Yes.

Page 65

Q.  And but for your med pay coverage, that $576, you would have been responsible to pay that out of your own pocket as your deductible under your health insurance, correct?

A.  Yes.

Q.  And you never paid the $576 to Mercy out of your own pocket, did you?

A.  I don't believe I did.  I -- I don't believe I did, no.  I think my health insurance coverage paid it.

Q.  Do you think Anthem made any payments to Mercy?

A.  I really don't know.

Q.  If you can turn to Exhibit 18, please.

A.  Okay.

(Whereupon Exhibit 18 was introduced for identification.)

Q.  (By Mr. Fink)  And Exhibit 18, is that a copy of your response to defendant's first set of interrogatories?

A.  Yes.

Q.  And just to be clear, interrogatories are written questions that I asked you to answer.  Do you understand that?

A.  I do.

17 (Pages 62 - 65)

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Page 66

Q. And on the very last page of Exhibit 18 --

A. Do I have the wrong pages? Okay. This goes up to Page 11. Am I looking at the wrong thing?

Q. Well, on the very back, isn't there a page with your signature on it?

A. Yes.

Q. That's part of Exhibit 18. I was going to ask you, is that your signature on the last page of --

A. It is, yes.

Q. And before signing Exhibit 18, did you read over the answers to make sure they were true and accurate to the best of your knowledge?

A. To the best of my knowledge, yes. I'm sure I read it, yes.

Q. And if we could, I want to look at your answer to Interrogatory No. 3, which shows up on Page 2 of Exhibit 18.

A. Okay.

Q. Go ahead. Do you want to take a minute to read it first?

A. Yes, please.

Q. Yeah. Please do and let me know when you're done reading. Take your time. We have

Page 67

plenty of time.

A. Okay.

Q. Great. Have you had a chance to look over your answer to Interrogatory No. 3?

A. Yes.

Q. I want to ask you, a statement towards the bottom of your answer on Page 2, it says, quote: However, Acuity was not the primary insurer for medical bills associated with the October 25, 2015, accident.

Do you see that?

A. I do. I'm going to read through that just another moment. Okay?

Q. Please do.

A. Okay.

Q. What is the basis for your assertion that Acuity was not the primary insurer for medical bills associated with the October 25, 2015, accident?

MR. WERTS: Just object to the form. It calls for a legal conclusion.

Go ahead and answer.

A. When I went into the emergency room, my understanding, they asked for my medical insurance card and I provided that. I knew I was in network. I knew that -- it never occurred to me that they

Page 68

wouldn't charge my health insurance.

Q. (By Mr. Fink) I understand that. But in your interrogatory answer, you say, quote: Acuity was not the primary insurer for medical bills associated with the October 25, 2015, accident.

My question to you is: What is the basis for that assertion by you?

MR. WERTS: Same objection and asked and answered.

You can go ahead.

A. I would say that my -- my auto insurance shouldn't have been involved at all. I had zero responsibility in the accident. So I don't think that my vehicle insurance should have been involved in any of this.

Q. (By Mr. Fink) Okay. Any other basis for your assertion that Acuity was not the primary insurer for your medical bills with Mercy?

MR. WERTS: Same objection. Go ahead.

A. Same answer. I -- as far as I'm concerned, when I have medical expenses, it goes on to my medical insurance.

Q. (By Mr. Fink) Is that your personal opinion?

A. That's what I've always believed from

Page 69

experience.

Q. Have you reviewed your insurance policies to determine who was the primary insurer for your medical bills with Mercy?

A. I have not.

Q. And then the last sentence at the bottom of Page 2 of Exhibit 18, your answer to Interrogatory No. 3 says, quote: When Acuity and plaintiff's attorneys brought this to the attention of Mercy, Mercy refused to refund Acuity the remaining amount of plaintiff's medical payment coverage, $4,424.

Do you see that?

A. I do.

Q. So is it your position that Mercy owes $4,424 to Acuity?

MR. WERTS: Object to the form, legal conclusion.

Go ahead.

A. My opinion, that my insurance shouldn't have been involved in this, because the accident -- the responsibility on the accident was never involved with it.

Q. (By Mr. Fink) How much do you believe Mercy owes to you?

18 (Pages 66 - 69)

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Page 70

A. I believe that Mercy owes $4,424 back to Acuity. So I can make a claim and use the money how I see fit, because I was the -- it was my policy. And if anybody could make a claim on it, it should be me.

Q. Well, isn't it true that in the consent agreement, that you assigned your rights to Mercy, your rights under your Acuity policy?

MR. WERTS: Object to the form, legal conclusion.

Go ahead.

A. Are you referring to the paper that I supposedly signed in the emergency room?

Q. (By Mr. Fink) Well, not supposedly, ma'am. You did sign that document, right?

A. Right. I did sign that document. You are correct. That is my signature. I don't recall signing it. It certainly wasn't anywhere in my mind. I was concerned about my daughter and myself.

Q. You were more concerned about getting treatment than reviewing the agreement that you signed when you got treatment at Mercy, correct?

A. Yes. My concern was our health.

Q. Back on Exhibit 18, I want to ask you about your answer to Interrogatory No. 5, which

Page 71

starts on Page 4.

A. And you said Page 4. And you want Paragraph 5?

Q. No. It's at the top of Page 4, this is my Question No. 5 to you. I'm going to ask you about your answer to Question No. 5. If you want to read over it first. Your answer goes for two pages. If you want to read over it first, that might be helpful.

A. Okay.

Q. Then let me know when you're ready.

A. All right. Thank you.

Q. Sure.

A. Okay.

Q. Great. You've had a chance to look over your answer to Interrogatory 5?

A. Yes, I did.

Q. Does everything seem accurate in what you said there?

A. As far as I know.

Q. Sure. Let's look at your answer to Subpart A, which starts in the middle of the Page 4. And here I was just asking basically who were the providers, the date of service and the nature of the medical treatment you got for your injuries from the

Page 72

auto accident. Do you see that?

A. Yes.

Q. And it looks like you basically listed four providers. You have Mercy Hospital Washington. Do you see that?

A. Yes.

Q. And then you have WCRG. Do you see that?

A. I do.

Q. Is that West County Radiological Group?

A. I don't really know.

Q. Fair enough. And then the third item is your chiropractic treatment, Dr. Collins?

A. Correct.

Q. And then lastly, you have the massage therapy from All About Massage, correct?

A. Yes.

Q. And then if we look at your answer to Subpart B, as in boy, and it carries over on to Page 5, it looks like you start off giving me all the charges broken down at Mercy Hospital Washington. That's what it looks like. So we'll skip that.

But it looks like your charges at West County Radiological Group are $1,095; is that correct?

Page 73

A. Yes. That's what it says.

Q. And is that true?

A. I don't know.

Q. And then under that, it says you were charged $144 by Tim Collins. Do you see that?

A. I do.

Q. Is that true?

A. I assume so.

Q. And then in your answer to Subpart B, you didn't put down what the charges were for All About Massage. Do you have any idea what those charges were?

A. I do not.

Q. Well, if you could look at Exhibit 16, please. Pull that up.

A. Exhibit 16?

Q. Yeah. 16.

A. Okay.

(Whereupon Exhibit 16 was introduced for identification.)

Q. (By Mr. Fink) And Exhibit 16, that appears to be a letter from your attorney, Mark Brinkmann, to All About Massage dated December 7, 2017. Do you see that?

A. I do.

19 (Pages 70 - 73)

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Page 74

Q. And in his letter, Mr. Brinkmann, he enclosed a check for $1,010 to All About Massage. Do you see that?

A. Yes, I do.

Q. And if we look at the letter, there's an invoice attached to the letter?

A. Yes.

Q. And do you see at the end of the invoice, it appears the total charges for All About Massage was $1,010?

A. Yes, it is.

Q. I'm sorry?

A. Yes. I agree with that.

Q. So it's fair to say All About Massage got paid in full all of its charges?

A. Yes.

Q. Do you think that was fair?

A. Yes.

Q. Why?

A. Because her charges aren't fluctuating. That was the agreed on price.

Q. And where did your attorney get the funds to pay All About Massage?

A. That would have been after the settlement.

Q. Is it fair to say that All About Massage

Page 75

was in effect paid by Cameron Insurance?

A. No. I believe that Cameron Insurance paid me. And out of that check, I paid All About Massage.

Q. If we go back to Exhibit 18, the interrogatory answers, we were on Interrogatory No. 5.

A. Okay.

Q. And then there's -- the next, it says -- on Page 5, there's another Subpart B, which I think is a typo. I think it's supposed to be Subpart C.

A. I see.

Q. Do you see that? Skipping the one about Mercy, because we've already talked about that. It says here: Plaintiff's counsel negotiated a 25 percent reduction with WCRG and paid $821.25 on or about December 7, 2017.

Do you see that?

A. I do.

Q. Is that a true statement?

A. It's what the paper says. That would have been my attorney. I didn't do that.

Q. And then it says in your answer, quote: Plaintiff paid Dr. Collins $144 on or about December 7, 2017.

Page 76

Do you see that?

A. I do.

Q. So Dr. Collins got his charges paid in full too?

A. Yes, he did.

Q. And at the bottom of Page 5 in Exhibit 18, your answer to Interrogatory No. 5, do you see Subpart D?

A. D as in dog?

Q. Yeah. D as in dog. Do you see that?

A. Yes.

Q. And it says, quote: Plaintiff did not receive any payment for medical treatment.

Do you see that?

A. I do.

Q. Is that a true statement?

A. I'm not sure how to answer that question. I don't know the -- at what point this letter was written. Was it prior to -- up until that point? I don't know how to answer that.

Q. Well, the question asked you to state the payor date and amount that you received from any person or insurer for your medical treatment. And Subpart D, you answer, quote: Plaintiff did not receive any payment for medical treatment.

Page 77

Do you see that?

A. I do.

Q. Is that a true statement?

A. I would need to confer with my attorney on that. I don't understand it.

Q. Well, isn't it true that Cameron paid you amounts for your medical treatment?

A. Cameron paid me for the damages incurred in an accident, yes.

Q. And those damages included the cost of your medical treatment?

A. I don't -- I don't know what they base it on.

Q. Where did the money come from to pay West County Radiological Group, Dr. Collins and All About Massage?

A. Through the settlement that Cameron paid to me.

Q. You'd agree with me Cameron did pay for some of your medical treatment then?

A. I believe I paid for the medical treatment from the settlement that I made with Cameron.

Q. You got reimbursed by Cameron, right, for the cost of that medical treatment?

A. I -- I don't know. I -- I defer to my

20 (Pages 74 - 77)

Mercy SJ Ex. 9

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Page 78

attorneys for that. Technically once I got that settlement, did I have to pay the medical bills? I guess -- I guess I didn't have to pay the medical bills with it. The money was mine to do with as I'd like.

Q. Do you have any outstanding medical bills from your treatment from the auto accident that you haven't paid?

A. I do not.

Q. And the settlement proceeds paid for on behalf of your daughter Anna, the net proceeds, who actually got the money; was it you and your husband or your daughter Anna?

A. My daughter.

Q. So it went into her bank account?

A. It did.

Q. Did she pay off her medical expenses with those proceeds?

A. Her medical expenses were paid through my medical insurance.

Q. All of them were?

A. To my knowledge.

Q. Well, why is it, then, that if all of Anna's bills were paid for by health insurance, but not all of yours were?

Page 79

MR. WERTS: Objection, lacks foundation. Go ahead.

A. I don't know.

Q. (By Mr. Fink) And are you aware that you have been asked to serve as a representative of a class action?

A. Yes.

Q. And do you know what a class action is?

A. Yes.

Q. Can you explain for us what a class action is?

A. My understanding is that it is a group of people that had a similar -- similarly impacted by the same defendant.

Q. And you're willing to serve as a class representative in this case?

A. Yes.

MR. FINK: That's all the questions I have. I thank you for your time this morning, Ms. Dames.

THE WITNESS: Thank you.

MR. WERTS: I don't have any questions. We will read and sign.

MR. FINK: Very good.

THE VIDEOGRAPHER: And we are off the

Page 80

record at 12:08.

(Whereupon signature was reserved.)

(Off the record at 12:08 p.m.)

Page 81

CERTIFICATE OF REPORTER

I, Sheryl A. Pautler, RPR, Certified Court Reporter (MO), Certified Shorthand Reporter (IL), do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; the testimony of said witness was taken by me to the best of my ability and thereafter reduced to typewriting under my direction; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

_____
     Certified Court Reporter (MO)
     Certified Shorthand Reporter (IL)

21 (Pages 78 - 81)

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Page 82

COURT MEMO

Dames, Kim

        Plaintiffs,
                        Cause No.
    vs.              19ABCC00264
Mercy Hospitals East Communities Et Al
    Defendant.
        CERTIFICATE OF OFFICER AND
        STATEMENT OF DEPOSITION CHARGES
    (Rule 57.03 (g) (2) (a) & Sec., 492.590 RsMO 1985.)
        DEPOSITION OF Kimberly A. Dames
                ON
            5/25/2021
Name and address of person or firm having custody of the original transcript:  Jeffrey R. Fink

TAXED IN FAVOR OF:  Jeffrey R. Fink
        TOTAL................ $_____

    TAXED IN FAVOR OF:  Other Attorneys
        TOTAL................ $_____*
Upon delivery of transcript, the above charges had not yet been paid.  It is required that all charges will be paid in the normal course of business.
IN WITNESS WHEREOF, I have hereunto set my hand and seal on this    day of        ,   .

        _____
                Notary Public

* A completed signed Certificate of Officer and Statement of Deposition Charges pursuant to Rule 57.03(g)(2)(a) shall be provided upon request.

Page 83

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

June 9, 2021

To: MR. WERTS

Case Name: Dames, Kim v. Mercy Hospitals East Communities Et Al

Veritext Reference Number: 4577938

Witness:  Kimberly A. Dames        Deposition Date:  5/25/2021

Dear Sir/Madam:

Enclosed please find a deposition transcript.  Please have the witness review the transcript and note any changes or corrections on the included errata sheet, indicating the page, line number, change, and the reason for the change.  Have the witness' signature notarized and forward the completed page(s) back to us at the Production address shown above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,
Production Department

NO NOTARY REQUIRED IN CA

Page 84

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 4577938
CASE NAME: Dames, Kim v. Mercy Hospitals East Communities Et Al
DATE OF DEPOSITION: 5/25/2021
WITNESS' NAME: Kimberly A. Dames
    In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.
    I have made no changes to the testimony as transcribed by the court reporter.

_____   _____
Date                Kimberly A. Dames
    Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

    They have read the transcript;
    They signed the foregoing Sworn Statement; and
    Their execution of this Statement is of their free act and deed.

    I have affixed my name and official seal

this _____ day of_____, 20____.

        _____
        Notary Public
        _____
        Commission Expiration Date

Page 85

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 4577938
CASE NAME: Dames, Kim v. Mercy Hospitals East Communities Et Al
DATE OF DEPOSITION: 5/25/2021
WITNESS' NAME: Kimberly A. Dames
    In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.
    I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).
    I request that these changes be entered as part of the record of my testimony.

    I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.

_____   _____
Date                Kimberly A. Dames

    Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:
    They have read the transcript;
    They have listed all of their corrections in the appended Errata Sheet;
    They signed the foregoing Sworn Statement; and
    Their execution of this Statement is of their free act and deed.
    I have affixed my name and official seal
this _____ day of_____, 20____.

        _____
        Notary Public

        _____
        Commission Expiration Date

22 (Pages 82 - 85)

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

IN THE CIRCUIT COURT OF FRANKLIN COUNTY
STATE OF MISSOURI

| | | |
|---|---|---|
| KIM DAMES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 19AB-CC00264 |
| v. | ) | |
| | ) | Division VI |
| MERCY HOSPITALS | ) | |
| EAST COMMUNITIES, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Defendant Mercy Hospitals East Communities ("Mercy") is entitled to summary judgment as to the claims of Plaintiff Kim Dames ("Dames") in her petition because:

1.    The four written contracts at issue in this case (the "Contracts") and Missouri insurance law govern the parties' rights and obligations as to the medical treatment that Dames received from Mercy;

2.    Mercy acted in accordance with the Contracts and Missouri insurance law; and

3.     Mercy was correctly reimbursed for Dames' treatment under the Contracts and Missouri insurance law.

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

**The Contracts**

The four written Contracts that apply to Dames' treatment are:

A.  Dames' automobile insurance policy with Acuity, A Mutual Insurance Company ("Acuity"). Mercy SJ Ex. 2. This policy (the "Acuity Policy") contains medical payments coverage that is the primary coverage for Dames' treatment.

B.  Dames' individual health insurance policy with Anthem Blue Cross and Blue Shield ("Anthem"). Mercy SJ Ex. 3. This policy (the "Anthem Policy") is the secondary coverage for Dames' treatment because of the Anthem Policy's variable deductible/coordination of benefits provision and Dames' Acuity medical payments coverage.

C.  Dames' written agreement with Mercy to obtain treatment (the "Consent and Agreement"). Mercy SJ Ex. 1. Under Section 3 of the Consent and Agreement, Dames assigned to Mercy all of her "rights under all insurance and benefit plan documents," including her rights under her Acuity medical payments insurance coverage.

D.  Mercy's provider agreement with Anthem (the "Anthem Provider Agreement"). Mercy SJ Ex. 4. Under Section 2.8 of the Anthem Provider Agreement, Mercy was entitled to bill and collect from Acuity the amount due under the Acuity Policy for Dames' treatment ($5,000) without regard to any negotiated rates between Mercy and Anthem because Acuity is the primary payor for Dames' treatment.

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

**The Applicable Missouri Insurance Law**

The applicable Missouri insurance law consists of:

i.    20 CSR 500-2.100(2)(C). Under this Missouri insurance regulation, Dames' Acuity medical payments coverage is primary coverage.

ii.    20 CSR 400-2.060(7). Under this Missouri insurance regulation, Dames' Anthem Policy lawfully contains the variable deductible/coordination of benefits provision that rendered the Anthem Policy secondary coverage for Dames' treatment because of her Acuity medical payments coverage.

iii.    RSMo § 376.427. This Missouri insurance statute enforces Dames' assignment to Mercy of her benefits under her Acuity medical payments coverage.

**Summary**

Dames was involved in an auto accident. She chose to obtain medical treatment at Mercy Hospital Washington, a hospital operated by Mercy.

Dames was covered for her treatment under: (1) the medical payments coverage of her Acuity automobile insurance policy; and (2) her Anthem health insurance policy. Under the plain terms of the two insurance policies and Missouri insurance regulations (20 CSR 500-2.100(2)(C) and 20 CSR 400-2.060(7)), the Acuity Policy is the primary coverage and Acuity is the primary payor for Dames' treatment, and the Anthem Policy is the secondary coverage and Anthem is the secondary payor for her treatment. Thus, Acuity was required to pay first for Dames' treatment, and it did so. *See, e.g., Planet Ins.*

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

*Co. v. Ertz*, 920 S.W.2d 591, 593 (Mo. App. W.D. 1996) ("Primary insurance first pays toward the loss.").

As part of her written agreement with Mercy to obtain treatment (the Consent and Agreement), Dames assigned to Mercy all of her "rights under all insurance and benefit plan documents" and authorized "direct payment to" Mercy "of all insurance and plan benefit payments for services provided." Mercy SJ Ex. 1, § 3. Dames' assignment of benefits included her rights under the medical payments coverage of her Acuity Policy, as expressly allowed under RSMo § 376.427. Her assignment of benefits passed all of her title and interest in the Acuity medical payments coverage to Mercy and divested her of all right of control over the coverage. *Marvin v. State Farm Mut. Auto. Ins. Co.*, 894 S.W.2d 712, 713 (Mo. App. W.D. 1995) (enforcing assignment of patient's medical payments coverage); *Saint Luke's Hosp. of Kansas City v. Benefit Mgmt. Consultants, Inc.*, No. WD 83388, 2021 WL 1375846, at *7 (Mo. App. W.D. Apr. 13, 2021). "When [Dames] assigned to [Mercy] her rights to [Acuity's] insurance payments, [Mercy] gained all of [Dames'] rights as beneficiary of the [Acuity] insurance policy's proceeds. [Dames] no longer had title or an interest to the insurance proceeds; [Mercy] became the insured for the purposes of receiving the medical benefits." *Marvin*, 894 S.W.2d at 713.

As Dames authorized in her assignment of *all* insurance benefits to Mercy, and as expressly allowed under Section 376.427.2, Mercy submitted a claim to Acuity for Dames' medical treatment. As required under the Acuity Policy (the primary coverage for Dames' treatment) and Section 376.427.2, Acuity promptly paid $5,000 (the coverage limit) to Mercy without question.

- 4 -

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Because Acuity is the primary payor for Dames' treatment, Mercy was expressly allowed under Section 2.8 of its provider agreement with Anthem (the Anthem Provider Agreement) to bill Acuity and accept Acuity's $5,000 payment for Dames' treatment. The Anthem Provider Agreement includes a negotiated rate (called the "Company Rate") as between Mercy and Anthem for treatment provided by Mercy to individuals covered by Anthem.[1] But the Anthem Provider Agreement expressly states that Mercy could pursue and collect more than the Anthem negotiated rate from any other insurance carrier that provided primary coverage to Dames (i.e., Acuity):

- Section 2.8.1 provides: "If Plan [Anthem] is other than the primary payor, Provider [Mercy] is not precluded from accepting amounts in excess of the Company Rate from the primary payor [Acuity]."

- Section 2.8.3 provides: "Except as provided in this section [2.8], this Agreement does not prohibit Provider [Mercy] from pursuing any available legal remedy, including, but not limited to, collecting from any insurance carrier [Acuity] providing coverage to a Covered Individual [Dames]."

- Section 9.9 provides: " Coordination of Benefits. Except as otherwise required under state and federal law, Provider [Mercy] shall cooperate with Plan [Anthem] regarding coordination of benefits…."

Mercy SJ Ex. 4. Because Acuity is the primary payor, Mercy was entitled under the Anthem Provider Agreement to bill Acuity and collect from Acuity the amount owed

---

[1] The "Company Rate" between Mercy and Anthem for Dames' treatment was $576.

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

unde the Acuity Policy ($5,000) without regard to any negotiated rate between Mercy and Anthem.[2]

Acuity's $5,000 payment was the entire reimbursement that Mercy received and was entitled to receive for Dames' treatment under the applicable Contracts. As a result of Acuity's payment, nothing was owed for Dames' treatment by Anthem (the secondary payor) or Dames, and Dames has paid nothing to Mercy out of her own pocket for her treatment. In sum, her insurance fully covered the cost of her treatment at Mercy.

Nevertheless, Dames has sued Mercy for billing and collecting from Acuity for her treatment. She claims that Mercy violated the Missouri Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. § 407.010 *et seq.* (Count I), was unjustly enriched (Count II), and is liable to her for money had and received (Count III) because Mercy billed and collected $5,000 from Acuity for her treatment (thereby exhausting her medical payments coverage) instead of billing and collecting only $576 from Anthem and Dames.[3] Each of her claims is based on her baseless allegations that Mercy was required under the Anthem Provider Agreement to accept a negotiated rate of $576 as payment in full for her

---

[2] Acuity has no provider agreement with Mercy and did not, and could not, invoke the Anthem negotiated rate because Acuity is not a party to the Anthem Provider Agreement and the Anthem negotiated rate only applies to Anthem.

[3] In Count IV of her petition, Dames asserts a purported claim for "declaratory judgment and injunctive relief." In her opposition to Mercy's motion to dismiss, Dames stipulated that Count IV is not a separate and independent claim, but asserts "alternative remedies under her substantive claims" in Counts I-III. Pl.'s Opp. to Mot. to Dismiss, p. 2, n.1 (filed Aug. 7, 2020).

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

treatment and could not collect more than $576 for her treatment from Acuity or anyone else:

- Petition ¶ 4: "[D]efendant is contractually required to submit said bills to health insurance, accept payment from health insurance in satisfaction of the bill, not seek payments from any additional sources, and hold the patient harmless from any amounts owed other than co-pays or deductibles."

- Petition ¶ 9: "Defendant is required to honor a contractual discount with their patients' health insurance and accept discounted payment from health insurance in full satisfaction of the patients' debts."

- Petition ¶ 10: "Defendant is precluded by its contracts with private health insurance from seeking payment for covered services from other sources, including from the patient directly, [or seeking] medical benefits from the patients' automobile insurer…."

These allegations, which underlie each of Dames' claims, are simply untrue in light of the unambiguous provisions of the actual Anthem Provider Agreement. Under the express terms of the Anthem Provider Agreement, Mercy was authorized to bill and collect $5,000 from Acuity for Dames' treatment. Accordingly, each of Dames' claims fails as a matter of law, and Mercy is entitled to summary judgment.

This case is essentially identical to *Hoops v. Med. Reimbursements of Am., Inc.*, No. 4:16-CV-01543-AGF, 2018 WL 1138464, at *11-14 (E.D. Mo. Mar. 2, 2018). In that case, the court granted summary judgment to Mercy on nearly identical claims brought

- 7 -

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

by another Mercy patient who signed the same Consent and Agreement at issue here. The court held that under the same Anthem Provider Agreement at issue here, Mercy was allowed to bill and collect $5,000 from the patient's automobile medical payments insurer (State Farm) for the patient's treatment, even though the negotiated rate under the Anthem Provider Agreement was only $1,045, because State Farm was the primary payor and the patient's health insurer (an Anthem affiliate) was the secondary payor. *Id.* As in *Hoops*, the Court should enter summary judgment in favor of Mercy as to each of Dames' claims.

## **STATEMENT OF FACTS**

The undisputed facts are set forth in Mercy's Statement of Uncontroverted Material Facts, which is attached to Mercy's Motion for Summary Judgment.

## **STANDARD FOR SUMMARY JUDGMENT**

In *ITT Commercial Finance Corp. v. Mid-America Marine Supply Corp.*, 854 S.W.2d 371, 381 (Mo. banc 1993), the Supreme Court of Missouri stated the standard for a defending party (such as Mercy) to obtain summary judgment as to a plaintiff's claims:

> Where a "defending party" will not bear the burden of persuasion at trial, that party need not controvert *each* element of the non-movant's claim in order to establish a right to summary judgment. Rather, a "defending party" may establish a right to judgment by showing (1) facts that negate *any one* of the claimant's elements facts, (2) that the non-movant, after an adequate period of discovery, has not been able to produce, and will not be able to produce, evidence sufficient to allow the trier of fact to find the existence of *any one* of the claimant's elements, or (3) that there is no genuine dispute as to the existence of *each* of the facts necessary to support the movant's properly-pleaded affirmative defense.  Regardless of which of these three means is employed by the "defending party," each establishes a right to judgment as a matter of law. Where the facts underlying this right to judgment are beyond dispute, summary judgment is proper.

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

*Id.*

## ARGUMENT

**I.    The Court should enter summary judgment in Mercy's favor because the Contracts and Missouri insurance law govern the parties' rights and obligations, Mercy acted in accordance with the Contracts and Missouri insurance law, and Mercy was correctly reimbursed for Dames' treatment under the Contracts and Missouri insurance law.**

In each of her claims, Dames complains that Mercy billed and collected $5,000 from Acuity for her treatment instead of billing and collecting only $576 from Anthem and Dames. Dames' claims fail as a matter of law because:

1.    the Contracts and Missouri insurance law govern the parties' rights and obligations;

2.    Mercy acted in accordance with the Contracts and Missouri insurance law; and

3.    Mercy was correctly reimbursed for Dames' treatment under the Contracts and Missouri insurance law.

The Court, therefore, should enter summary judgment in favor of Mercy as each count of Dames' petition. *Hoops v. Med. Reimbursements of Am., Inc.*, No. 4:16-CV-01543-AGF, 2018 WL 1138464, at *11-14 (E.D. Mo. Mar. 2, 2018) (granting summary judgment to Mercy in nearly identical case involving same Consent and Agreement, same Anthem Provider Agreement, medical payments coverage issued by State Farm that was primary coverage, and health insurance coverage issued by an Anthem affiliate that was secondary coverage).

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

**A.    Acuity is the primary payor and was required to pay first for Dames' treatment.**

Under the plain terms of Dames' Acuity Policy and her Anthem Policy and Missouri insurance regulations (20 CSR 500-2.100(2)(C) and 20 CSR 400-2.060(7)), the Acuity Policy is the primary coverage and Acuity is the primary payor for Dames' treatment, and the Anthem Policy is the secondary coverage and Anthem is the secondary payor for Dames' treatment. Thus, Mercy was correctly reimbursed for Dames' medical treatment when it received Acuity's $5,000 payment because Acuity, as the primary payor, was required to pay first for Dames' treatment.

**1.    The Acuity medical payments coverage is the primary coverage.**

The Acuity Policy expressly provided that its medical payments coverage is the primary coverage for Dames' treatment. Dames owned the vehicle that was involved in the auto accident. Mercy SJ Ex. 9, Plaintiff's Dep. 24:19-23. The Acuity Policy states: "For any covered *auto* you own, this Coverage Form provides primary insurance." Mercy SJ Ex. 2, Acuity Policy at page bates-labeled Dames, Kim 000039 (emphasis in original).[4]

Under Missouri insurance law, "[m]edical payments coverage shall not be excess over any accident and sickness insurance other than that provided under an automobile insurance policy unless the excess provisions are clearly disclosed to the insured and

---

[4] The "Coverage Form" is the "Business Auto Coverage Form" in the Acuity Policy. The Auto Medical Payments Coverage" is an endorsement to the "Business Auto Coverage Form." Mercy SJ Ex. 2, Acuity Policy at pages bates-labeled Dames, Kim 000060-61.

- 10 -

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

properly reflected in the rating of the coverage." 20 CSR 500-2.100(2)(C). The Acuity Policy contains no provision stating that its medical payments coverage is excess over any other insurance coverage that Dames has. Thus, the Acuity Policy is the primary coverage for Dames' treatment.

"Primary insurance first pays toward the loss." *Planet Ins. Co. v. Ertz*, 920 S.W.2d 591, 593 (Mo. Ct. App. 1996); *see also Brambl v. GEICO Gen. Ins. Co.*, No. 10-CV-474-TCK-PJC, 2011 WL 5326076, at *3 (N.D. Okla. Nov. 4, 2011) ("Primary insurance is … the first policy line to pay …" and "must be paid without regard to any other insurance available."). Because the Acuity Policy is the primary insurance, Acuity was required to pay first for Dames treatment, just as it did, without regard to the Anthem Policy.

### 2.    The Anthem Policy is the secondary coverage.

The Anthem Policy expressly provides that its coverage is secondary to Dames' Acuity medical payments coverage. At the beginning, the Anthem Policy advises: "Benefits under the Plan, including the Deductible, may vary depending on other medical expense insurance you may have." Mercy SJ Ex. 3, Anthem Policy, fourth page. The Anthem Policy contains the following provision:

> **Variable Deductible (Coordination of Benefits)**
>
> When a Member has other valid coverage, the applicable Deductible amount will be determined as follows. Other valid coverage means any group or individual hospital, surgical or medical insurance policy or medical practice or other prepayment plan or any other plan or program, whether insured or uninsured, or by reason of state or federal law, including automobile medical payment coverage.
>
> The amount paid under other valid coverage for services received by a Member will be compared to the individual Deductible applicable to this

- 11 -

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Contract. If the amount paid by the other valid coverage is less than the individual Deductible under this Contract, We will calculate the Member's benefit as if there were no other valid coverage. If the amount paid by the other valid coverage is greater than the Deductible under this Contract, the amount paid by other valid coverage will replace and satisfy the individual Deductible under this Contract. We will then process the remaining amount of covered expenses, as specified by the other valid coverage, under the provisions of this Contract….

Mercy SJ Ex. 3, Anthem Policy, p. M-78.

Missouri courts generally uphold "coordination of benefits" clauses, which "require[e] that benefits be reduced by payments from other sources." *Kyte v. Fireman's Fund Am. Ins. Companies*, 549 S.W.2d 366, 368 (Mo. App. 1977). Here, Missouri insurance regulations expressly allow the Anthem Policy's variable deductible/coordination of benefits (COB) provision, including its application to Dames' Acuity medical payments coverage. 20 CSR 400-2.060(7) ("Other valid coverage" for purposes of variable deductible provision "may also include automobile medical payment coverage provided that this inclusion is clearly disclosed in the policy.").

The Anthem Policy is secondary (excess) coverage to Dames' Acuity medical payments coverage because the Anthem Policy's variable deductible/COB provision states that benefits under the Anthem Policy are determined only after Dames' benefits under the Acuity Policy (the primary insurance) are determined first. *See Oates v. Equitable Assur. Soc. of the U.S.*, 717 F. Supp. 449, 450 (S.D. Miss. 1988) (Variable deductible "provision essentially rendered the policy one for excess coverage beyond payments made by other carriers on the same claim since it provided for a variable deductible of (1) $750, the basic deductible, or (2) the amount of benefits provided for

- 12 -

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

covered charges under other medical expense coverage, whichever is greater."); *Planet Ins.*, 920 S.W.2d at 593 ("Primary insurance first pays toward the loss. Excess insurance then pays after the limit of the primary insurance is exhausted.").

The Anthem Policy normally has a basic deductible of $3,000. Mercy SJ Ex. 3, Anthem Policy, p. M-8. However, because Dames had medical payments coverage ("other valid coverage" for purposes of the Anthem Policy's variable deductible/COB provision), her deductible under the Anthem Policy was subject to change depending on the amount paid first by Acuity: "When a Member has other valid coverage, the applicable Deductible amount will be determined as follows…. The amount paid under other valid coverage for services received by a Member will be compared to the individual Deductible applicable to this Contract." Mercy SJ Ex. 3, Anthem Policy, p. M-78.

Acuity paid $5,000 for Dames' treatment. Because this $5,000 amount paid by Acuity is greater than the $3,000 basic deductible under the Anthem Policy, Dames' deductible under the Anthem Policy became $5,000 and was satisfied by Acuity's $5,000 payment: "If the amount paid by the other valid coverage is greater than the Deductible under this Contract, the amount paid by other valid coverage will replace and satisfy the individual Deductible under this Contract." Mercy SJ Ex. 3, Anthem Policy, p. M-78.[5] As

---

[5] In turn, Dames was entitled to have Anthem "process the remaining amount of covered expenses, as specified by the other valid coverage, under the provisions of this Contract [the Anthem Policy]." Mercy SJ Ex. 3, Anthem Policy, p. M-78. The remaining amount of covered expenses for Dames' treatment at Mercy was $7,382.50 (Mercy's billed charges of $12,382.50 less Acuity's payment of $5,000.00). Because Acuity's $5,000

- 13 -

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

a result of this interaction between the Acuity Policy and the Anthem Policy's variable deductible/COB provision, Dames wound up owing nothing out of her own pocket for her treatment at Mercy. In sum, her insurance fully covered the cost of her treatment at Mercy.

**B.     Mercy was entitled to the $5,000 benefits due under Dames' Acuity medical payments insurance coverage because in the Consent and Agreement, Dames assigned the benefits to Mercy and authorized Mercy to bill Acuity for her treatment.**

Mercy was entitled to the $5,000 benefits due under Dames' Acuity medical payments coverage because in the Consent and Agreement, Dames assigned the benefits to Mercy and authorized Mercy to bill Acuity for her treatment. *Marvin v. State Farm Mut. Auto. Ins. Co.*, 894 S.W.2d 712, 713 (Mo. App. W.D. 1995) (enforcing assignment of patient's medical payments coverage; "State Farm had an obligation to pay the insured or a person authorized by law to receive such payment. Midtown Clinic qualified under either option. Because of the assignment, it became an entity authorized by law to receive payment. Also, because of the assignment, it gained the rights of the insured. State Farm was required by its policy and by the assignment to pay Midtown Clinic."); *Saint Luke's Hosp. of Kansas City v. Benefit Mgmt. Consultants, Inc.*, No. WD 83388, 2021 WL 1375846, at *7 (Mo. App. W.D. Apr. 13, 2021) ("Here, when Doe assigned to St. Luke's 'all of [his] interest and right to the insurance benefits otherwise payable to [him] for this

---

payment to Mercy was greater than the $576 negotiated rate between Mercy and Anthem under the Anthem Provider Agreement, nothing more was due from Anthem or Dames for her treatment. Mercy SJ Ex. 4, Anthem Provider Agreement, § 2.8.1.

- 14 -

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

hospitalization ... arising out of any ... self-insured health plan ... in [his] name or on [his] behalf,' St. Luke's became the insured for the purposes of receiving the insurance benefits and gained the right to sue Carthage for those benefits when they were denied."); *Am. Nursing Res., Inc. v. Forrest T. Jones & Co.*, 812 S.W.2d 790, 795 (Mo. App. W.D. 1991) ("The effect of the assignment by Ms. Ryan to American Nursing was to divest all rights to the benefits accrued to her favor under the N.Y. Life policy for the cost of the treatment by that health care provider, and to invest those same rights in American Nursing.").

> An assignment passes all the assignor's title or interest in the subject matter to the assignee and divests the assignor of all right of control over the subject matter.
>
> When Bass assigned to Midtown Clinic her rights to State Farm's insurance payments, Midtown Clinic gained all of Bass' rights as beneficiary of the insurance policy's proceeds. Bass no longer had title or an interest to the insurance proceeds; Midtown Clinic became the insured for the purposes of receiving the medical benefits.

*Marvin*, 894 S.W.2d at 713 (citations omitted).

In Section 3 of the Consent and Agreement (her written agreement with Mercy to obtain treatment), Dames assigned all of her insurance benefits to Mercy and authorized Mercy to receive direct payment of all her insurance benefits: "I assign to Mercy, my physician or other non-Mercy healthcare professional involved in my (or the patient's) care my (or the patient's) rights under *all insurance and benefit plan documents*, and authorize direct payment to each healthcare provider of *all insurance and plan benefits payments* for services provided to me (or the patient) by these providers." Mercy SJ Ex. 1, § 3 (emphasis added). The phrase "all insurance" in the first sentence of Section 3 is

- 15 -

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

unambiguous and plainly includes Dames' medical payments insurance under her Acuity Policy.

The medical payments coverage in Dames' Acuity Policy is a type of "health insurance" as the coverage only applies to health care treatment such as Dames received from Mercy (a health care provider). Missouri courts have observed that "[m]edical payment coverage in an automobile insurance policy is simply a form of health insurance." *Hendrickson v. Cumpton*, 654 S.W.2d 332, 334 (Mo. App. W.D. 1983). And Missouri insurance regulations recognize that medical payments coverage in an automobile insurance policy is a form of health (accident and sickness) insurance: "Medical payments coverage shall not be excess over *any accident and sickness insurance other than **that** provided under an automobile insurance policy* unless the excess provisions are clearly disclosed to the insured and properly reflected in the rating of the coverage." 20 CSR 500-2.100(2)(C) (emphasis added).

Section 376.427, RSMo, expressly allowed Mercy to obtain an assignment of Dames' benefits under the medical payments coverage of her Acuity Policy. Section 376.427.2 states: "Upon receipt of an assignment of benefits made by the insured to a provider, the insurer shall issue the instrument of payment for a claim for payment for health care services in the name of the provider. All claims shall be paid within thirty days of the receipt by the insurer of all documents reasonably needed to determine the claim." Section 376.427.1(4) defines "insured" as "any person entitled to benefits under a contract of accident and sickness insurance, or *medical-payment insurance issued as a*

- 16 -

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

*supplement to liability insurance* but not including any other coverages contained in a liability or a workers' compensation policy, issued by an insurer." (emphasis).

Consistent with Section 376.427, in *Marvin*, the court enforced an assignment of a patient's medical payments coverage to the patient's health care and held that State Farm was required to pay the medical provider instead of the patient because the patient assigned all of her rights to her auto policy medical benefits to her medical provider. Likewise, under Section 376.427.2 and *Marvin*, Acuity was required to pay Mercy the $5,000 benefits due under Dames' Acuity medical payments coverage because Dames assigned all of her rights under her Acuity medical payments coverage to Mercy.

While Dames protests that "the proceeds from [her] medical payments coverage were her property" and "Mercy deprived Ms. Dames of her property." Pl.'s Opp. to Mot. to Dismiss, pp. 3, 8, she is simply mistaken. Under Missouri law, her assignment of benefits passed all of her title and interest in the Acuity medical payments coverage to Mercy and divested her of all right of control over the coverage. *Marvin*, 894 S.W.2d at 713; *Saint Luke's Hosp.*, 2021 WL 1375846, at *7. "When [Dames] assigned to [Mercy] her rights to [Acuity's] insurance payments, [Mercy] gained all of [Dames'] rights as beneficiary of the [Acuity] insurance policy's proceeds. [Dames] no longer had title or an interest to the insurance proceeds; [Mercy] became the insured for the purposes of receiving the medical benefits." *Marvin*, 894 S.W.2d at 713.[6]

---

[6] Even absent Dames' assignment of benefits to Mercy, the outcome in this case would have been the same because Acuity is the primary payor and was required to pay first for Dames' treatment, regardless of who submitted a claim to it. If Acuity had paid Dames

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

**C.**    **The Anthem Provider Agreement expressly allowed Mercy to bill Acuity and collect from Acuity more than the Anthem negotiated rate.**

Dames' claims are based on the faulty premise that Mercy's provider agreement with Anthem somehow required Mercy to bill only Anthem for Dames' treatment and to accept the Anthem negotiated rate ($576) as payment in full. Just the opposite, Section 2.8 of the Anthem Provider Agreement expressly allowed Mercy to bill Acuity and collect from Acuity more than the Anthem negotiated rate.

Section 2.8.1 provides in pertinent part:

> *Except as expressly set forth herein*, Provider [Mercy] agrees to accept as payment in full, in all circumstances, the applicable Company Rate [the Anthem negotiated rate] whether such payment is in the form of a Cost Share, or a payment by Plan [Anthem], or payment by another source. ***If Plan [Anthem] is other than the primary payor, Provider [Mercy] is not precluded from accepting amounts in excess of the Company Rate [the Anthem negotiated rate] from the primary payor [Acuity].***

Mercy SJ Ex. 4 (emphasis added). As discussed above, Acuity is the primary payor for Dames' treatment under the Acuity Policy and the Anthem Policy and Missouri insurance regulations. Consequently, Section 2.8.1 of the Anthem Provider Agreement provides that Mercy was permitted to accept more than the Anthem negotiated rate from Acuity. *Hoops v. Med. Reimbursements of Am., Inc.*, No. 4:16-CV-01543-AGF, 2018 WL 1138464, at *11-14 (E.D. Mo. Mar. 2, 2018) (same Anthem Provider Agreement

---

instead of Mercy, Dames would have been required to turn over Acuity's entire payment to Mercy because the Acuity medical payments coverage is the primary coverage and Section 2.8.1 of the Provider Agreement states that Mercy is entitled to whatever is due under the Acuity Policy without regard to the Anthem negotiated rate.

- 18 -

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

"permitted Mercy to bill State Farm first and for the full amount" because State Farm, which issued medical payments coverage to the patient, was the primary payor).

Acuity did not, and could not, invoke the Anthem negotiated rate because Acuity is not a party to the Anthem Provider Agreement and the Anthem negotiated rate applies only to Anthem. *See Prickett v. Lucy Lee Hosp., Inc.*, 986 S.W.2d 947, 948 (Mo. App. S.D. 1999) ("[O]ne not a party to a contract cannot enforce the contractual terms upon one of the parties to the contract."); *Laboy v. Grange Indemn. Ins. Co.*, 41 N.E.3d 1224, 1229 (Ohio 2015) (auto insurer had no right to invoke health insurer's discounted rate); *Hayberg v. Robinson Mem. Hosp. Found.*, 995 N.E.2d 888, 893 (Ohio Ct. App. 2013) (hospital was not required to afford to patient's auto insurer the discount that hospital would have afforded to patient's health insurer). That is why Section 2.8.1 of the Anthem Provider Agreement states that Mercy could accept "amounts in excess of the Company Rate [the Anthem negotiated rate] from the primary payor [Acuity]."

Moreover, Section 2.8.3 of the Anthem Provider Agreement further confirms Mercy's right to bill and collect from Acuity: "Except as provided in this section [2.8], this Agreement does not prohibit Provider [Mercy] from pursuing any available legal remedy, including, but not limited to, collecting from any insurance carrier [Acuity] providing coverage to a Covered Individual [Dames]." Mercy SJ Ex. 4. Acuity is an "insurance carrier providing coverage to" Dames (a "Covered Individual"). Nothing in Section 2.8 precluded Mercy from billing and collecting from Acuity. To the contrary, the second sentence of Section 2.8.1 confirmed that Mercy could do so.

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

Finally, Mercy acted in accordance with Section 9.9 of the Anthem Provider Agreement, which provides: "Coordination of Benefits. Except as otherwise required under state and federal law, Provider shall cooperate with Plan regarding coordination of benefits…." Mercy SJ Ex. 4. As discussed above, under the Anthem Policy's variable deductible/coordination of benefits provision,  Dames' Acuity medical payments coverage is the primary coverage for her treatment and her Anthem Policy is the secondary coverage for her treatment. Accordingly, by billing and collecting from Acuity, Mercy cooperated with Anthem regarding the coordination of Dames' benefits under her insurance policies, as contemplated under the Anthem Provider Agreement.

**II.     Mercy is entitled to summary judgment as to Dames' MMPA claim (Count I) because Mercy did not commit any unfair practice, breach any duty of good faith and fair dealing, or otherwise violate the MMPA in that the Contracts and Missouri insurance law govern the parties' rights and obligations, Mercy acted in accordance with the Contracts and Missouri insurance law, and Mercy was correctly reimbursed for Dames' treatment under the Contracts and Missouri insurance law.**

In Count I, Dames purports to state a claim for violation of the MMPA. She asserts that "[t]he above described billing practices and related misconduct of Defendant Mercy violated the Missouri Merchandising Practices Act by, among other things, constituting an unfair practice and breach of the duty of good faith and fair dealing under the Act." Pet. ¶ 66. As a matter of law, Mercy did not commit any unfair practice, breach any duty of good faith and fair dealing, or otherwise violate the MMPA because:

- 20 -

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

1.      the Contracts and Missouri insurance law govern the parties' rights and obligations;

2.      Mercy acted in accordance with the Contracts and Missouri insurance law; and

3.      Mercy was correctly reimbursed for Dames' treatment under the Contracts and Missouri insurance law.

A defendant does not commit an unfair practice or otherwise violate the MMPA and is entitled to summary judgment when, as here, it has acted in compliance with:

A.      the written agreements applicable to the parties' transaction; and

B.      the Missouri statutes and regulations that govern the parties' relationship.

*Chochorowski v. Home Depot U.S.A.*, 404 S.W.3d 220 (Mo. banc 2013) (affirming summary judgment on MMPA claim because damage waiver fee in tool rental agreement was not an unfair practice); *Grace v. St. Louis Cty.*, 348 S.W.3d 120, 127 (Mo. App. E.D. 2011) (affirming dismissal of MMPA claim, based on allegation that waste haulers improperly collected and unjustly retained fees for recycling services, because waste haulers did not commit an unlawful practice in that St. Louis County Waste Management Code allowed waste haulers to charge a reasonable fee for recycling service as part of waste hauling); *Bauer v. Sw. Bell Tel. Co.*, 958 S.W.2d 568 (Mo. App. E.D. 1997) (charges for telephone services, which were made in accordance with filed tariffs sanctioned by the government, could not violate MMPA); *Wheatley v. JPMorgan Chase Bank, N.A.*, 860 F.3d 629, 631 (8th Cir. 2017) (8th Cir. 2017) (MMPA claims failed as matter of law because defendants had contractual right to foreclose on plaintiff's house);

- 21 -

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

*Victorian v. Wells Fargo Home Mortg.*, No. 4:15-CV-00667-AGF, 2017 WL 2535673, at *10 (E.D. Mo. June 12, 2017) (same); *Wivell v. Wells Fargo Bank, N.A.*, No. 6:12-CV-3457-DGK, 2015 WL 7259836, at *6 (W.D. Mo. Nov. 17, 2015).

The MMPA is construed in harmony with "the basic tenets of contract law," *Chochorowski*, 404 S.W.3d at 228, and does not allow "a claim for an activity that constituted performance of a valid contract," *Padberg v. DISH Network LLC*, No. 11-04035-CV-C-NKL, 2012 WL 2120765, at *6 (W.D. Mo. June 11, 2012). Moreover, as the Missouri Supreme Court has repeatedly held, "[t]here can be no breach of the implied promise or covenant of good faith and fair dealing where the contract expressly permits the actions being challenged, and the defendant acts in accordance with the express terms of the contract." *Arbors at Sugar Creek Homeowners Ass'n v. Jefferson Bank & Tr. Co.*, 464 S.W.3d 177, 185 (Mo. banc 2015) (quotation omitted); *Bishop & Assocs., LLC v. Ameren Corp.*, 520 S.W.3d 463, 471 (Mo. banc 2017) (quotation omitted). "Every contract contains an implied duty of good faith and fair dealing but there can be no breach when the contract expressly permits the actions being challenged, and the defendant acts under the express terms of the contract." *Park Ridge Assocs. v. U.M.B. Bank*, 613 S.W.3d 456, 464 (Mo. App. E.D. 2020).

As discussed in Section I, Mercy was correctly reimbursed for Dames' treatment in accordance with the express terms of the Contracts and Missouri insurance law. The Consent and Agreement and Section 376.427 expressly permitted Mercy to bill and collect from Acuity for Dames' treatment. Mercy was properly reimbursed by Acuity for Dames' treatment because the Acuity Policy is the primary coverage under the express

- 22 -

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

terms of the Acuity Policy, the Anthem Policy, and Missouri insurance regulations. And the Anthem Provider Agreement expressly permitted Mercy to bill Acuity for Dames' treatment and collect from Acuity the amount due under the Acuity Policy ($5,000) instead of the Anthem negotiated rate ($576) because Acuity is the primary payor for Dames' treatment. Thus, as a matter of law, Mercy did not commit any unfair practice, did not breach the duty of good faith and fair dealing, and did not otherwise violate the MMPA. The Court, therefore, should enter summary judgment in Mercy's favor as to Dames' MMPA claim (Count I).

**III.    Mercy is entitled to summary judgment as to Dames' unjust enrichment claim (Count II) because Mercy has not been unjustly enriched in that the Contracts and Missouri insurance law govern the parties' rights and obligations and Mercy was correctly reimbursed for Dames' medical treatment in accordance with the Contracts and Missouri insurance law.**

In Count II, Dames purports to assert a claim for unjust enrichment. She asserts:

- "Defendant has engaged in a pattern of subverting the financial interests and contractual agreements of Plaintiff and the class members for its own pecuniary gain."

- "Defendant has been unjustly enriched in that it received and retained the benefits of proceeds to which it was not entitled to and which were received in violation of Missouri law."

- "Said benefits were conferred on Defendant by Plaintiff and the class members, and unlawfully obtained to the detriment of Plaintiff and the class members."

- 23 -

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

- "Defendant's retention of these funds is unjust because payment for the services provided should have come from Plaintiff's and the class members' health insurance, and the reasonable value for Defendant's services determined by the contracts between Defendant and health insurance."

- "Allowing Defendant to retain the aforementioned benefits violates fundamental principles of justice, equity, and good conscience."

Pet. ¶¶ 68-72.

Dames' unjust enrichment claim fails as a matter of law because the Contracts and Missouri insurance law govern the parties' rights and obligations and Mercy properly collected the amounts due and owing for Dames' treatment in accordance with the Contracts and Missouri insurance law. "[T]here can be no unjust enrichment if the parties receive what they intended to obtain. If the plaintiff has entered into an express contract for the very subject matter for which he seeks recovery, unjust enrichment does not apply, for the plaintiff's rights are limited to the express terms of the contract." *Howard v. Turnbull*, 316 S.W.3d 431, 436 (Mo. App. W.D. 2010) (citations omitted). "[I]t is a well-settled principle of law that implied contract claims [such as unjust enrichment] arise only where there is no express contract. Accordingly, a plaintiff cannot recover under an equitable theory when [they have] entered into an express contract for the very subject matter for which [they seek] to recover." *Park Ridge*, 613 S.W.3d at 465 (quotation omitted). "[Dames'] arguments ignore the fact the contract[s] explicitly permitted [Mercy's] conduct. [Dames is] not entitled to an equitable remedy simply because

- 24 -

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

[Mercy] took actions under the contract[s] that [Dames] did not like." *Id.* Thus, Mercy is entitled to summary judgment as to Count II.

**IV.    Mercy is entitled to summary judgment as to Dames' claim for money had and received (Count III) because Mercy has not been unjustly enriched in that the Contracts and Missouri insurance law govern the parties' rights and obligations and Mercy was correctly reimbursed for Dames' medical treatment in accordance with the Contracts and Missouri insurance law.**

In Count III, Dames purports to assert a claim for money had and received. She asserts:

- "Defendant has engaged in a pattern of subverting the financial interests and contractual agreements of Plaintiff and the class members for its own pecuniary gain."

- "Defendant received and obtained possession of the named Plaintiff's and the class members' money."

- "Defendant appreciated a benefit from receiving and obtaining possession of the named Plaintiff's and the class members' money."

- "Defendant's acceptance and retention of these funds is unjust."

- "Defendant received money from the Plaintiff and the class members under circumstances that in equity and good conscience call for the Defendant pay it to Plaintiff and the class members."

- "Defendant's retention of these funds is unjust because payment for the services provided should have come from the class members' health

- 25 -

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

insurance, and the reasonable value for Defendant's services determined by the contracts between Defendant and health insurance."

- "Allowing Defendant to retain the aforementioned benefits violates fundamental principles of justice, equity, and good conscience."

Pet. ¶¶ 74-80.

Dames' claim for money had and received (Count III) is nearly a verbatim rehash of her claim for unjust enrichment (Count II). Indeed, "an action for unjust enrichment is very similar to one for money had and received" in that "[c]laims for money had and received and unjust enrichment are both founded upon equitable principles whereby the law implies a contract to prevent unjust enrichment." *Lowe v. Hill*, 430 S.W.3d 346, 349 & n.2 (Mo. App. W.D. 2014); *see also Fulton Nat. Bank v. Callaway Mem'l Hosp.*, 465 S.W.2d 549, 553 (Mo. 1971) (claim for money had and received "is one for unjust enrichment").

Like her unjust enrichment claim, Dames' claim for money had and received fails as a matter of law because the Contracts and Missouri insurance law govern the parties' rights and obligations and Mercy properly collected the amounts due and owing for Dames' treatment in accordance with the Contracts and Missouri insurance law. Under the Contracts and Missouri insurance law, payment for Dames' treatment was supposed to come from Dames' Acuity medical payments coverage, just as occurred.

As with claims for unjust enrichment, a plaintiff cannot recover under a claim for money had and received when, as here, there are express contracts governing the parties' rights and obligations: "It is a well-settled principle of law that implied contract claims

- 26 -

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

arise only where there is no express contract. Accordingly, a plaintiff cannot recover under an equitable theory when she has entered into an express contract for the very subject matter for which she seeks to recover." *Lowe*, 430 S.W.3d at 349 (citations omitted); *see also Charter Commc'ns Operating, LLC v. SATMAP Inc.*, 569 S.W.3d 493, 511 (Mo. App. E.D. 2018) (same); *A & L Underground, Inc. v. Leigh Const., Inc.*, 162 S.W.3d 509, 511 (Mo. App. W.D. 2005) (money had and received does not apply when parties have express contract). Moreover, a claim for money had and received cannot be based on actions specifically allowed by statute or regulation. *See Grace v. St. Louis Cty.*, 348 S.W.3d 120, 127 (Mo. App. E.D. 2011) (affirming dismissal of claim for money had and received, based on allegation that waste haulers improperly collected and unjustly retained fees for recycling services, because St. Louis County Waste Management Code allowed waste haulers to charge a reasonable fee for recycling service as part of waste hauling). Thus, Mercy is entitled to summary judgment as to Count III.

**IV.    Mercy is entitled to summary judgment as to Dames' claim for declaratory judgment and injunctive relief because her substantive claims (Counts I-III) fail as a matter of law.**

In Count IV of her petition, Dames asserts a purported claim for declaratory judgment and injunctive relief. In her opposition to Mercy's motion to dismiss, Dames acknowledged that her "counts for declaratory judgment and injunctive relief are not contract claims, rather they are alternative remedies under her substantive claims" in Counts I-III. Pl.'s Opp. to Mot. to Dismiss, p 2., n.1 (filed Aug. 7, 2020). Indeed, "an injunction is a remedy and not a cause of action; therefore, it must be based on some

- 27 -

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

recognized and pleaded legal theory." *Goerlitz v. City of Maryville*, 333 S.W.3d 450, 455 (Mo. banc 2011).

As discussed above, Dames' substantive claims (Counts I-III) fail as matter of law, and Mercy is entitled to summary judgment on them. In turn, Dames' claim for declaratory judgment and injunctive relief likewise fails, and Mercy is entitled to summary judgment as to Count IV.

## CONCLUSION

The Court should enter summary judgment in favor of Mercy and against Dames as to all claims in Dames' petition.

Respectfully submitted,

THOMPSON COBURN LLP

By /s/ Jeffrey R. Fink
   Jeffrey R. Fink, #44963
   Thompson Coburn LLP
   One US Bank Plaza
   St. Louis, Missouri 63101-1611
   Telephone: 314.552.6000
   Facsimile: 314.552.7000
   jfink@thompsoncoburn.com

   Attorneys for Defendant
   Mercy Hospitals East Communities

- 28 -

Electronically Filed - Franklin County - June 15, 2021 - 03:00 PM

## Certificate of Service

The undersigned hereby certifies that on June 15, 2021, a true and correct copy of the foregoing was served on all counsel of record via the Missouri Court's electronic filing system.

/s/ Jeffrey R. Fink

Electronically Filed - Franklin County - June 18, 2021 - 10:04 AM

IN THE CIRCUIT COURT OF FRANKLIN COUNTY
STATE OF MISSOURI

KIM DAMES,                                     )
                                              )
              Plaintiff,                       )
                                              )        Case No. 19AB-CC00264
v.                                            )
                                              )        Division VI
MERCY HOSPITALS                               )
EAST COMMUNITIES,                             )
                                              )
              Defendant.                       )

## NOTICE OF HEARING

PLEASE TAKE NOTICE that Defendant Mercy Hospitals East Communities

("Mercy") will call up for hearing its MOTION FOR SUMMARY JUDGMENT before

the Honorable David L. Hoven, Circuit Court of Franklin County, on **Tuesday,**

**September 14, 2021 at 9:00 a.m.**  PLEASE NOTE that the hearing date and time were

approved through Judge Hoven's clerk prior to the filing of this Notice.

Respectfully submitted,

THOMPSON COBURN LLP

By /s/ Jeffrey R. Fink
   Jeffrey R. Fink, #44963
   Thompson Coburn LLP
   One US Bank Plaza
   St. Louis, Missouri 63101-1611
   Telephone: 314.552.6000
   Facsimile: 314.552.7000
   jfink@thompsoncoburn.com

   Attorneys for Defendant
   Mercy Hospitals East Communities

Electronically Filed - Franklin County - June 18, 2021 - 10:04 AM

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 18, 2021, a true and correct copy of the foregoing was served on all counsel of record via the Missouri Court's electronic filing system.

/s/ Jeffrey R. Fink

Electronically Filed - Franklin County - July 16, 2021 - 04:03 PM

IN THE CIRCUIT COURT OF FRANKLIN COUNTY
STATE OF MISSOURI

KIM DAMES,                           )
                                     )
        Plaintiff,                   )
                                     )        Case No. 19AB-CC00264
v.                                   )
                                     )        Division VI
MERCY HOSPITALS                      )
EAST COMMUNITIES,                    )
                                     )
        Defendant.                   )

## MEMORANDUM TO THE COURT

COMES NOW the undersigned counsel and advises the Court that pursuant to an agreement between both parties, Plaintiff has been given a one-week extension of time to respond to Defendants Motion for Summary Judgment.

> *Respectfully submitted,*
> ROBINSON BRINKMANN
> & FULFORD LLC
>
> By:    /s/ Mark E. Brinkmann, MOBAR#49950
>        24 S. Church Street ▪ Union, MO 63084
>        Tel/Fax: (636) 583-7908
>        mark@attorneysrbf.com
>        **Co-Counsel for Plaintiff Kim Dames**

## CERTIFICATE OF SERVICE

On the 16th day of July, 2021, the foregoing was served via the Court's Electronic Filing System pursuant to Mo. Supreme Court Rule 103 to: Jeffrey Fink, Esq., Attorney for Defendant The undersigned certifies he signed the original of electronic filings; and the original signed filing will be maintained for a period of not less than the maximum allowable time to complete the appellate process.

                                     /s/ Mark E. Brinkmann

IN THE CIRCUIT COURT OF FRANKLIN COUNTY
STATE OF MISSOURI

KIM DAMES,                                )
                                          )
            Plaintiff,                     )
                                          )        Case No. 19AB-CC00264
v.                                        )
                                          )        Division VI
MERCY HOSPITALS                           )
EAST COMMUNITIES,                         )
                                          )
            Defendant.                     )

## MEMORANDUM TO THE COURT

COMES NOW the undersigned counsel and advises the Court that pursuant to an agreement between both parties, Plaintiff has been given a one-week extension of time to respond to Defendants Motion for Summary Judgment.

*Noted.*
*RCH*
*7/20/2021*

Respectfully submitted,
ROBINSON BRINKMANN
& FULFORD LLC

By:    /s/ Mark E. Brinkmann, MOBAR#49950
       24 S. Church Street ▪ Union, MO 63084
       Tel/Fax: (636) 583-7908
       mark@attorneysrbf.com
       **Co-Counsel for Plaintiff Kim Dames**

## CERTIFICATE OF SERVICE

On the 16th day of July, 2021, the foregoing was served via the Court's Electronic Filing System pursuant to Mo. Supreme Court Rule 103 to: Jeffrey Fink, Esq., Attorney for Defendant The undersigned certifies he signed the original of electronic filings; and the original signed filing will be maintained for a period of not less than the maximum allowable time to complete the appellate process.

                                        /s/ Mark E. Brinkmann